Notice has been delivered by First class mail
to all counsel (or parties) at their last known address
of record in this action on this date

Date:  Apr 13 2021, 9:21 am

FILED
CLERK, U.S. DISTRICT COURT

4/13/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ rf _____ DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUUL LABS, INC.,<br>Plaintiff,<br><br>v.<br><br>ANDY CHOU, et al.,<br>Defendants. | CV 21-3056 DSF (PDx)<br><br>Order GRANTING Plaintiff's<br>*Ex Parte* Application for Asset<br>Freeze Order, Expedited<br>Discovery, Order Authorizing<br>Alternative Service of Process,<br>Order to Show Cause Re:<br>Preliminary Injunction (Dkt. 5) |

Plaintiff JUUL Labs, Inc. (JLI) seeks an asset freeze order, expedited discovery, an order authorizing alternative service of process, and an order to show cause why a preliminary injunction should not issue against Defendants Andy Chou (aka Lizhi Zhou), Yiwu Cute Jewelry Co., Ltd., Yiwu Xite Jewelry Co., Ltd., CJ Fulfillment Corp., CJ Trade Corp., and Yiwu Promotional Trade Co., Ltd's (aka Yiwu Promotion Trade Co., Ltd.).  Dkt. 5.  Because JLI moved *ex parte*, requesting that no notice be provided and because the Court grants the request, Defendants have not submitted opposition.  The Court deems this matter appropriate for determination without oral argument.  See Fed. R. Civ. P. 78; Local Rule 7-15.  For the reasons set forth below, JLI's application is GRANTED.

# I. BACKGROUND

## A.    JLI and the JUUL Products

JLI is a global leader in offering an alternative to traditional combustible cigarettes.  JLI designs, manufactures, and distributes JUUL-branded electronic nicotine delivery systems (ENDS) and related

products.  <u>See</u> dkts. 10, 11 (Decl. No. 1) ¶¶ 7-8.  The JUUL Device is a rechargeable inhalation apparatus designed to be exclusively used with JLI's prefilled pods (JUULpods).  <u>Id.</u> ¶ 14.  JUULpods are individual disposable cartridges filled with JLI's proprietary nicotine e-liquid formulations and contain a heating chamber.  <u>Id.</u>  JUULpods are designed to be inserted directly into the JUUL Device.  <u>Id.</u>  The USB Charging Dock is an individual charging dock designed specifically for the JUUL Device and related accessories.  <u>Id.</u>

According to JLI, all JUUL Products are designed to meet industry standards for safety, quality, reliability, and performance.  <u>Id.</u> ¶ 15.  JLI practices stringent quality controls to guarantee consistent quality, safety, and performance for each of its products.  <u>Id.</u> ¶ 16.  JLI conducts quality control tests on JUUL products in their totality and on component parts.  <u>Id.</u>  JLI also conducts regular visits to and audits of its suppliers' factories to ensure strict product standards.  <u>Id.</u> ¶ 17.  In the United States, JLI sells its products online and through its authorized network of distribution partners.  <u>Id.</u> ¶ 18.  JLI ensures its distribution partners meet its standards and will only pre-approve authorized vendors if they do so.  <u>Id.</u>

JLI owns the following well-known and registered trademarks for use in connection with 1) e-cigarettes, 2) e-cigarette refill liquids and cartridges, and 3) nicotine-based liquid and cartridges, and that appear on genuine JUUL Products:

- "JUUL" (U.S. Trademark Reg. No. 4,818,664);

- JUUL (U.S. Trademark Reg. Nos. 4,898,257);

- JUUL (U.S. Trademark Reg. No. 5,770,541);

- "JUUL LABS" (U.S. Trademark Reg. No. 5,776,153);

- "JUULPODS" (U.S. Trademark Reg. Nos. 5,918,490);

Dkts. 12, 13 (Decl. No. 2) ¶¶ 9, 11, Ex. B.  JLI also owns the following well-known and registered trademarks for use in connection with 1)

carrying cases, and 2) adapters and battery chargers for e-cigarettes, and that appear on genuine JUUL Products:

- JUUL (U.S. Trademark Reg. No. 6,064,902); and

- JUUL (U.S. Trademark Reg. Nos. 6,211,614).

Id.

All of these marks together are referred to as the "JUUL Marks." JLI has used the JUUL Marks continuously in commerce, including in connection with its sale of the JUUL Device, JUULpods, and USB Charging Dock.  Id. ¶ 10.  JLI prominently displays the JUUL Marks in all of its promotional materials; the JUUL Marks are also prominently displayed on all product packaging.  Id. ¶ 12.  As a result of JLI's significant investment in marketing efforts featuring the JUUL Marks and JLI's marketplace success of the JUUL brand, the JUUL Marks are widely recognized and have become well known to the public.  Id.  JLI asserts that due to its longtime use of and investment in the JUUL Marks and the quality of JLI's products, the JUUL brand has built up a tremendous amount of consumer goodwill.  Id. ¶ 13.  The JUUL Marks symbolize the business goodwill of JLI and are invaluable assets to JLI.  Id.

## B.  Discovery and Testing of Counterfeit JUUL Products

The success of the JUUL brand has attracted criminal counterfeiters who illegally profit by selling fake JUUL Products.  To combat this, JLI investigates suspicious listings of purported JUUL Products for sale online.  Dkts. 12, 13 (Decl. No. 2) ¶¶ 5, 7.  JLI found Defendants advertising and offering for sale "JUUL Starter Kits" online, which included the following purported JUUL products: (a) JUUL Device; (b) USB Charging Dock; and (c) four JUULpods in Cool Mint, Virginia Tobacco, Crème Brulee, and Mango flavors.  Id. ¶ 8.  Notably, in the U.S., JLI has not sold JUUL Starter Kits that include four JUULpods since November 2018, raising a red flag that these products were likely counterfeit.  Id.

JLI arranged for an investigator to buy the suspect JUUL Products from Defendants, and the products or photographs of them were then sent to JLI for analysis.  See id. ¶¶ 7, 9, 11, 13, 15-16; dkts. 14, 15 (Decl. No. 3) ¶¶ 5, 7, 25, 34, 40; dkts. 16, 17 (Decl. No. 4) ¶¶ 4-12. JLI's Evidence Specialist, who is responsible for inspecting and authenticating suspect JUUL Products to determine whether they are counterfeit, evaluated the products and determined that each was, in fact, inauthentic.  Decl. No. 2 ¶¶ 3, 5, 17-18.

First, on October 7, 2019, JLI's investigator ordered three silver and two pink JUUL Starter Kits and five USB Charging Docks, which were delivered to the investigator on November 7, 2019, who forwarded them to JLI in January 2020.  Id. ¶ 13; Decl. No. 3 ¶¶ 14, 17-18, 25. Each of the JUUL Starter Kits contained a JUUL Device, a USB Charging Dock, and JUULpods in Cool Mint, Virginia Tobacco, Crème Brulee, and Mango flavors. Decl. No. 3 ¶ 22.  The exterior and interior packaging of each suspect product, as well as the JUUL Devices themselves, each bore one or more of the JUUL Marks, as shown below:





Decl. No. 3 ¶¶ 19-20, 22; Decl. No. 2 ¶ 13.  The packaging of each of the separate USB Charging Docks also bore one of the JUUL Marks as shown below:



Decl. No. 3 ¶ 21.

None of the suspect JUUL Devices had a serial number engraved on the back of the device below the JUUL logo.  All authentic JUUL Devices have an engraved unique serial number.  The foil packaging for

the suspect JUULpods did not have a lot code printed on it, which is inconsistent with authentic JUULpods. Id. ¶¶ 23-24; Decl. No. 2 ¶ 14. The packaging for the suspect JUUL Devices had an incorrect Universal Product Code (UPC). Decl. No. 2 ¶ 14. The exterior cardboard packaging for the suspect JUULpods showed lot code G0525A, but that lot code corresponded to a package of JUULpods that had been made by an authorized manufacturer and sold through an authorized retailer in 2018. Id. The font and spacing on the cardboard box packaging for the suspect JUUL Starter Kits, JUUL Device, and JUULpods differed from authentic JUUL products. Id. The foil packaging for the suspect JUULpods had a shiny metallic appearance, but authentic JUULpods have a matte appearance. Id. None of these suspect products were authentic JUUL products. Id.

On April 8, 2020, JLI's investigator ordered two silver, six pink, and five slate JUUL Starter Kits, which were delivered to the investigator on April 23, 2020; he forwarded them to JLI in June–July 2020. Decl. No. 3 ¶¶ 27-28, 34; Decl. No. 2 ¶ 15. The exterior and interior packaging of each suspect product, as well as the JUUL Devices themselves, each bore one or more of the JUUL Marks, as shown below:





















Decl. No. 3 ¶¶ 29-31; Decl. No. 2 ¶ 15.

None of the suspect JUUL Devices had a serial number engraved on the back of the device below the JUUL logo.  All authentic JUUL Devices have an engraved unique serial number.  The foil packaging for the suspect JUULpods did not have a lot code printed on it, which is inconsistent with authentic JUULpods.  Decl. No. 3 ¶¶ 32-33; Decl. No. 2 ¶ 15.  The packaging for the suspect silver and pink JUUL Devices had an incorrect UPC.  Decl. No. 2 ¶ 15.  The exterior cardboard packaging for the suspect JUULpods again showed lot code G0525A. Id.  The font and spacing on the cardboard box packaging for the suspect JUUL Starter Kits, JUUL Device, and JUULpods differed from authentic JUUL products.  Id.  The foil packaging for the suspect JUULpods had a shiny metallic appearance; authentic JUULpods have a matte appearance.  Id.  None of these suspect products were authentic JUUL products.  Id.

On March 16, 2020, JLI's investigator ordered another 100 JUUL Starter Kits to be shipped to Defendants' warehouse in New Jersey, but this shipment was delayed because of Defendants' concerns about ensuring their products got through U.S. Customs and because of COVID-related issues.  Decl. No. 3 ¶¶ 36-37.  On July 30, 2020, JLI received confirmation that the shipment had arrived.  Id. ¶ 38.  JLI arranged for another investigator, along with personnel from the U.S. Department of Homeland Security (DHS), to pick up the suspect JUUL Starter Kits from the warehouse, which they did on August 20, 2020. Decl. No. 4 ¶¶ 4-10.  DHS kept most of these products; JLI's investigator kept two samples, and then sent high resolution photos of one of the samples to JLI for analysis.  Id. ¶¶ 13-14; Decl. No. 2 ¶ 16.

The suspect JUUL Devices both had the same serial number engraved on the back, H4X6P2UF; authentic JUUL Devices have unique serial numbers, and JLI also found that the serial number did not match the lot code on the packaging.  Decl. No. 2 ¶ 16.  JLI has found this particular serial number on more than 100 counterfeit JUUL Devices uncovered through other investigations, id., suggesting that Defendants are part of a larger counterfeiting ring.  Font and spacing

on the cardboard box packaging for the suspect JUUL Starter Kits, JUUL Device, and JUULpods differed from authentic JUUL products. Id. The foil packaging for the suspect JUULpods had a shiny metallic appearance; authentic JUULpods have a matte appearance. Id. None of these suspect products were authentic JUUL products. Id.

To summarize, after ordering and receiving three shipments of suspect JUUL Products from Defendants, JLI confirmed that the products were clearly inauthentic in light of the differences between them and authentic JUUL Products, including:

a. The JUUL Device has either no engraved serial number or multiple JUUL Devices have the same engraved serial number;

b. The lot code on some of the suspect JUUL Device packaging does not match the serial number on the suspect JUUL Devices contained therein;

c. Some of the suspect JUUL Devices have an incorrect UPC;

d. Some of the foil packaging for the JUULpods has no lot code;

e. The foil packaging for the suspect JUULpods has a shiny metallic appearance, but authentic JUULpods have a matte appearance; and

f. The font and spacing on the packaging for the suspect JUUL Starter Kits, JUUL Device, and JUULpods differ from authentic JUUL products.

Id. ¶¶ 17-18.

Although Defendants appear to have stopped advertising and selling the purported JUUL Starter Kits, they are still advertising and offering for sale the JUUL USB Charging Docks at the following URLs:

1. https://cjdropshipping.com/product-detail.html?id=78196280-D6E8-451F-8504-B95CA1C8C8C9&from=all&fromType=&productType=0

2. https://cjdropshipping.com/product-detail.html?id=E5767978-2624-4B6A-B13A-482DD42C7527&from=all&fromType=&productType=0

3. https://cjdropshipping.com/product-detail.html?id=FC7BA5A2-2768-41C0-ADA1-D9AE943BC93C&from=all&fromType=&productType=0

Dkt. 7 (Wilkins Decl.) ¶ 3, Ex. A.

## C.   Counterfeit JUUL Products Are Potentially Dangerous

Defendants' purported JUUL Products are confusingly similar to JLI's genuine products. Defendants' products are marketed and sold using, and bear counterfeit imitations of, the JUUL Marks, and are clearly designed to create the impression that they are authentic JUUL Products.  These counterfeit JUUL Products are not manufactured by JLI or any party associated with, or authorized, licensed, or approved by JLI.  Decl. No. 2 ¶¶ 3, 7-18; Decl. No. 1 ¶ 19.  Defendants deceive customers by delivering inferior counterfeit products instead of genuine JUUL Products.  Decl. No. 1 ¶ 20-23.

The counterfeit JUUL Products sold by Defendants are potentially dangerous to users and those around them.  Beyond being inauthentic, the functionality, performance, and safety of these products is unknown.  Id. ¶ 20.  JLI has no control over the design, manufacturing, and packaging of Defendants' products and has no way of testing the safety of these products.  Id.  Defendants' products are not subjected to JLI's quality-control standards and testing.  Id.  These products may be manufactured with unknown foreign substances and materials that users and those around them are then inhaling and are otherwise exposed to.  Id.

Defendants' conduct harms JLI's customers who are deceived and receive counterfeit products that are at risk of being lower quality, less reliable, and less safe than the genuine JUUL products they expect.  Id. ¶ 21.  Defendants' conduct also harms JLI because consumers and the public are likely to associate any negative or unsafe qualities of these

11

inauthentic products with JLI and the JUUL Marks.  Id. ¶ 22.  This damages the JUUL brand and reputation JLI has worked to build, and also deprives JLI of legitimate sales and revenue.  Id.  As a result, JLI suffers substantial and irreparable harm to its brand, image, likeness, business, and goodwill with the public.  Id.  JLI has encountered examples of counterfeit JUUL products that posed potential risks to consumers and clear risks to JLI's and the JUUL brand's reputation and goodwill.  See id. ¶ 23.

## II. LEGAL STANDARD

### A.     Ex Parte Relief

A temporary restraining order (TRO) may be issued without notice to the adverse party if (1) "specific facts in an affidavit or a verified complaint" show that immediate and irreparable injury will occur before the adverse party can be heard and (2) the movant's attorney certifies in writing what efforts were made to give notice and the reasons why notice should not be required.  Fed. R. Civ. P. 65(b).

The Ninth Circuit recognizes that issuance of an *ex parte* TRO is warranted where notice to the defendant would render further prosecution fruitless.  "In the trademark arena, such cases include situations where an alleged infringer is likely to dispose of the infringing goods before the hearing."  Reno Air Racing Ass'n., Inc. v. McCord, 452 F.3d 1126, 1131 (9th Cir. 2006).  An applicant can justify excusal of the notice requirement on this ground by showing "that the adverse party has a history of disposing of evidence or violating court orders or that persons similar to the adverse party have such a history."  Id. (quoting First Tech. Safety Sys., Inc. v. Depinet, 11 F.3d 641, 651 (6th Cir. 1993)); Cisco Sys., Inc. v. Shenzhen Usource Tech. Co., No. 5:20-CV-04773-EJD, 2020 WL 5199434, at *6 (N.D. Cal. Aug. 17, 2020) (plaintiffs relieved of giving notice to defendants where defendants were willfully advertising and selling counterfeit products online and were likely and able to dispose of evidence and dissipate assets given advance notice).

## B.      TRO/Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  The standard for granting a TRO is essentially the same as for granting a preliminary injunction.  See City of Tenakee Springs v. Block, 778 F.2d 1402, 1407 (9th Cir. 1985).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter, 555 U.S. at 20.  Although the moving party must make a showing on each factor, the Ninth Circuit employs a "version of the sliding scale approach" where "a stronger showing of one element may offset a weaker showing of another."  All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).

Injunctive relief is specifically authorized in trademark infringement cases.  15 U.S.C. 1116(a).

## III. DISCUSSION

## A.      *Ex Parte* Relief

JLI requests the TRO be issued *ex parte*, claiming notice to the Defendants would render further prosecution fruitless.  See dkt. 6 at 23-25.  Specifically, JLI claims Defendants are likely to dispose of the infringing goods before the hearing.  See id.

The Court finds Gucci Am., Inc. v. Los Altos Boots, Inc., No. CV 14-06680 BRO (AJWx), 2014 WL 12561613 (C.D. Cal. Aug. 27, 2014), instructive.  There, the court excused the plaintiff from providing notice before issuing a TRO because: (1) the defendant could easily conceal the counterfeit goods and related records given their nature and location outside the U.S.; and (2) similarly situated defendants in trademark infringement cases have a history of ignoring court orders to preserve and instead destroying evidence after *ex parte* TROs and seizure orders

were denied.  Id. at *3-4 (citing First Tech. Safety Sys., Inc., 11 F.3d at 650 and Matter of Vuitton et Fils S.A., 606 F.2d 1, 5 (2d Cir. 1979)).

Here, JLI has presented substantial evidence that Defendants willfully advertised and sold counterfeit JUUL Products, are continuing to advertise and sell counterfeit USB Charging Docks exclusively online, and are able and likely to dispose of evidence if given advance notice of the present application.  JLI has shown that similarly situated defendants in similar online counterfeiting cases have a history of ignoring court orders to preserve and instead destroying evidence when notice is given.  See Decl. No. 1 ¶ 24.  In addition, JLI has had difficulty in the past recovering damages from counterfeiters like Defendants, that are overseas and advertise and sell their products primarily online, when they receive prior notice.  Id.¶ 25.[1]  For good cause shown, JLI is relieved from giving notice to Defendants.

**B.    Injunctive Relief**

**1.    Likelihood of Success**

JLI asserts federal claims for trademark infringement, counterfeiting, and false designation of origin and advertising under the federal Lanham Act, as well as claims for unfair competition and false advertising under California state law.  For the reasons explained below, JLI has demonstrated a likelihood of success with respect to all its claims.

a.    Federal Claims

A plaintiff claiming trademark infringement under the Lanham Act must show that it "owns a valid mark, and thus a protectable interest" and that the defendant's "use of the mark is likely to cause confusion, or to cause mistake, or to deceive."  Lahoti v. VeriCheck,

---

[1] The Court notes this evidence is more substantial than the "thin and barebones" supporting evidence in Reno Air Racing Ass'n., Inc., 452 F.3d at 1132.

Inc., 586 F.3d 1190, 1196 (9th Cir. 2009) (internal quotation marks omitted); see also 15 U.S.C. § 1114(1).

JLI has established that it owns federal trademark registrations for the JUUL Marks. Decl. No. 1 ¶¶ 9, 11, Ex. B. JLI has also shown that Defendants are using those marks in connection with selling counterfeit JUUL products in the U.S. See, e.g., Decl. No. 3 ¶¶ 19-22; Decl. No. 2 ¶ 13.

"To determine whether a likelihood of consumer confusion exists," courts in the Ninth Circuit rely "on the eight-factor Sleekcraft test, which reviews: (1) the strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines." JL Beverage Co., LLC v. Jim Beam Brands Co., 828 F.3d 1098, 1106 (9th Cir. 2016) (citing AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979), abrogated in part on other grounds by Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792, 810 (9th Cir. 2003)). "The factors are non-exhaustive and applied flexibly; the Sleekcraft factors are not intended to be a rote checklist." Id. (internal quotation marks and citation omitted).

Proving false designation of origin based on the same or similar trade names or symbols requires the same showing of a likelihood of confusion. Accuride Int'l, Inc. v. Accuride Corp., 871 F.2d 1531, 1534-35 (9th Cir. 1989) ("[T]he same broad standards of protection apply to trademarks and trade names. . . . [L]ikelihood of confusion is unquestionably the key to a finding of infringement in either case."); see also 15 U.S.C. § 1125(a)(1); Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1047 n. 8 (9th Cir. 1999) (noting that while Lanham Act § 32 of the (15 U.S.C. § 1114) protects registered marks, § 43(a) (15 U.S.C. § 1125(a)) also protects against infringement of unregistered marks and trade dress and against a wider range of practices such as false advertising, but "the analysis under the two provisions is oftentimes identical").

The <u>Sleekcraft</u> test is appropriate to determine likelihood of confusion regarding a claim for false designation of origin.  <u>Accuride Int'l, Inc.</u>, 871 F.2d at 1536.  But courts in this district and around the Ninth Circuit hold that in cases involving counterfeiting, "it is unnecessary to perform the step-by-step [eight-factor] examination . . . because counterfeit marks are inherently confusing."  <u>E.g.</u>, <u>Phillip Morris USA Inc. v. Shalabi</u>, 352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2004); <u>Microsoft Corp. v. Buy More, Inc.</u>, 136 F. Supp. 3d 1148, 1157 (C.D. Cal. 2015), <u>aff'd</u>, 703 F. App'x 476 (9th Cir. 2017) (quoting <u>Phillip Morris</u>, 352 F. Supp. 2d at 1073); <u>Daimler AG v. A-Z Wheels LLC</u>, 334 F. Supp. 3d 1087, 1096 (S.D. Cal. 2018) (citing <u>Phillip Morris</u>, 352 F. Supp. 2d 1067 at 1073); <u>Ubiquiti Networks, Inc. v. Kozumi USA Corp.</u>, No. C 12-2582 CW, 2012 WL 2343670, at *14 (N.D. Cal. June 20, 2012).

A counterfeit mark is: "(1) a non-genuine mark identical to the registered, genuine mark of another, where (2) the genuine mark was registered for use on the same goods to which the infringer applied the mark."  <u>Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.</u>, 658 F.3d 936, 946 (9th Cir. 2011) (citing <u>State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.</u>, 425 F.3d 708, 721 (9th Cir. 2005)).  As JLI has shown that this is a clear case of counterfeiting, including the use of identical marks in connection with, supposedly, the same goods, there is a likelihood of confusion as a matter of law.

In any event, JLI meets the <u>Sleekcraft</u> likelihood of confusion standard.  JLI has used its trade name and the JUUL Marks for more than five years in connection with the JUUL Products, and such products have been successful in the marketplace such that the JUUL Marks are widely recognized and well known, so the marks are strong (<u>Sleekcraft</u> factor 1).  Decl. No. 1 ¶¶ 10, 12.  Defendants sell the same kinds of products as JLI – nicotine delivery devices and cartridges and USB chargers for use with such devices (factor 2) – and are using identical marks and trade names in their advertising and on the packaging for such products and on the products themselves (factor 3).  And the use of identical marks and trade names to sell counterfeit products shows Defendants intend to confuse the public (factor 7).

JLI has shown that it is likely to succeed on the merits of its federal trademark infringement, false designation of origin, and unfair competition claims.

        b.    <u>State Law Claims</u>

JLI has also demonstrated a probability of success with respect to its state law claims for unfair competition and false advertising. The Ninth Circuit "has consistently held" that these claims "are 'substantially congruent' to claims made under the Lanham Act." <u>Cleary v. News Corp.</u>, 30 F.3d 1255, 1262-63 (9th Cir. 1994). "An action for unfair competition under Cal. Bus. & Prof. Code §§ 17200 <u>et seq.</u> is substantially congruent to a trademark infringement claim under the Lanham Act. Under both, the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks." <u>Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.</u>, 944 F.2d 1446, 1457 (9th Cir. 1991) (internal quotation marks and citations omitted).

Similarly, where plaintiffs establish that they are likely to succeed on the merits of federal Lanham Act claims, they also demonstrate a likelihood of success on parallel false advertising claims under California law because "the 'likelihood of success' analysis is the same" for both these statutory schemes. <u>Mercury Ins. Servs., Inc. v. Mercury Collision Center, Inc.</u>, No. CV 10-00144 CBM (AJWx), 2010 WL 11597513, at *3 (C.D. Cal. Mar. 31, 2010); <u>accord</u> <u>United Tactical Sys., LLC v. Real Action Paintball, Inc.</u>, No. 14-CV-04050-MEJ, 2014 WL 6788310, at *16-17 (N.D. Cal. Dec. 2, 2014) (finding showing of likelihood of success under Lanham Act sufficient to meet burden for unfair competition under Section 17200 and false advertising under Section 17500).

As JLI has shown it is likely to succeed on the merits of its federal claims, JLI has also shown it is likely to succeed on its parallel claims for unfair competition and false advertising under California law.

### 2. Irreparable Harm

To demonstrate the likelihood of irreparable harm, Plaintiff must show that "remedies available at law, such as monetary damages, are inadequate to compensate for the injury." Herb Reed Enters., LLC v. Fl. Ent. Mgmt., Inc., 736 F.3d 1239, 1249 (9th Cir. 2013). The Ninth Circuit has recognized that "intangible injuries," including loss of goodwill, can constitute irreparable harm. Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991). "That trademark infringement causes irreparable injury and necessitates immediate injunctive relief is universally recognized in the courts of this circuit." Steinway & Sons, 1981 WL 40530, at *7-8. A plaintiff need not prove loss of business from trademark infringement, rather, "'[t]he fact that [the] plaintiff has had the symbol of its reputation placed in the hands of another is irreparable injury.'" Id. at *8 (quoting Citibank, N.A v. City Bank of San Francisco, No. C 79 1922, 1980 WL 30239, at *7 (N.D. Cal. Mar. 23, 1980)).

Even without the presumption of irreparable harm, "'[e]vidence of a loss of control over business reputation and damage to goodwill' may be sufficient to show irreparable harm." Gucci, 2014 WL 12561613, at *7 (finding irreparable harm and issuing TRO where plaintiff's mark was well-known and it had spent substantial amount on advertising and promotion, thus, defendant's sales would harm goodwill and reputation) (quoting Herb Reed Enters., LLC, 736 F.3d at 1250); see also SATA GmbH & Co. Kg v. Wenzhou New Century Int'l, Ltd., No. CV 15-08157-BRO (EX), 2015 WL 6680807, at *8 (C.D. Cal. Oct. 19, 2015) (finding counterfeit products would cause irrepealable harm to plaintiff's goodwill and reputation).

JLI has spent years investing in and building the goodwill in its brand, which has become widely recognized and well known. See Decl. No. 1 ¶¶ 10, 12-13. Defendants' sales of counterfeit JUUL Products mislead customers and threaten irreparable harm to JLI's goodwill and reputation that cannot be adequately redressed with money. This is particularly so because Defendants' products were not subject to the

same rigorous quality control measures and safety testing as genuine JUUL Products.  See id. ¶¶ 15-23.

### 3.   Balance of Equities

"Courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  Winter, 555 U.S. at 24.  "[C]ourts will not shy away from issuing" preliminary injunctive relief "'where to do so would be to aid a second comer who has sought to trade upon the efforts and good will of the first comer.'"  Moroccanoil, Inc. v. Moroccan Gold, LLC, No. CV 08-05356-RGK (PLAx), 2008 WL 11411416, at *7 (C.D. Cal. Dec. 23, 2008) (quoting Helene Curtis Indus., Inc. v. Church & Dwight Co., 560 F.2d 1325, 1333 (7th Cir. 1977)).  Here, the balance of equities tips strongly in favor of the issuance of injunctive relief.

A TRO or preliminary injunction will impose no legally cognizable hardship on Defendants.  "[W]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration."  Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc., 924 F. Supp. 1559, 1574 (S.D. Cal. 1996) aff'd, 109 F.3d 1394 (9th Cir. 1997) (quoting Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 612 (1st Cir. 1988)).

Defendants have no right to sell counterfeit JUUL Products or use the JUUL Marks.  Any hardship from being barred from doing so should be disregarded.  At the same time, every sale of a counterfeit JUUL Product by Defendants is likely a lost sale for JLI that detracts from the value of its trademarks and goodwill and risks serious and irreparable harm to its reputation (not to mention the public) by being a potentially dangerous product.  Accordingly, the balance of equities strongly supports issuing a preliminary injunction in this case.

### 4.   Public Interest

Public policy favors granting an injunction when there is a likelihood of consumer confusion.  See Playboy Enters., Inc. v. Baccarat

Clothing Co., 692 F.2d 1272, 1275 (9th Cir. 1982) ("In addition to the harm caused the trademark owner, the consuming public is equally injured by an inadequate judicial response to trademark infringement.").

In this case, public policy favors injunctive relief even more than the usual counterfeiting case because JLI has offered substantial evidence that Defendants' conduct potentially poses a threat to health and safety.  The functionality, performance, and safety of these products is unknown.  Decl. No. 1 ¶ 20.  JLI has no control over the design, manufacturing, and packaging of Defendants' products.  Id. Defendants' products are not subjected to JLI's quality-control standards and testing.  Id.  These products may be manufactured with unknown foreign substances and materials that users and those around them are then inhaling and are otherwise exposed to.  Id.

Other courts have recognized that these kinds of dangers enhance the need for judicial intervention.  See Lorillard Tobacco Co. v. S & M Cent. Serv. Corp., No. 03 C 4986, 2004 WL 2534378, at *6 (N.D. Ill. Nov. 8, 2004) (finding counterfeit tobacco products are not "subject to any type of safety review or quality control process."); Philip Morris USA Inc. v. C.H. Rhodes, Inc., No. 08 CV 0069 ARR CLP, 2010 WL 1196124, at *5 (E.D.N.Y. Mar. 26, 2010) ("there is always a danger that [tobacco products] produced and distributed illegally could be more harmful to the health of the public" than tobacco products that are "produced under the auspices of the law" because "[t]here is no way of ensuring the quality of counterfeit [products], which could be made from anything"), report and recommendation adopted, No. 08-CV-0069 ARR CLP, 2010 WL 1633455 (E.D.N.Y. Apr. 21, 2010).

Even without the manifest threat to public health posed by the Defendants' counterfeit products, public policy still strongly favors granting interim relief.  In evaluating the public interest in enjoining suspected counterfeiters, courts should be mindful that despite the false view that "intellectual property disputes" concern fights between "two faceless entities," public policy strongly supports shutting down counterfeiters to protect end-consumers.  Neighborhood Assistance

Corp. v. First One Lending Corp., No. SACV 12-0463 DOC (MLGx), 2013 WL 12113414, at *5 (C.D. Cal. Feb. 11, 2013).  This is so because "the policy justification for trademark law is to protect *human beings*," and "the purpose of the Lanham Act is 'to protect the public' from false and deceptive practices that create confusion in the marketplace."  Id. (emphasis in original) (quoting U-Haul Int'l, Inc. v. Jartran, Inc., 681 F.2d 1159, 1162 (9th Cir. 1982)).

The Ninth Circuit has explained that "the consuming public is equally injured by an inadequate judicial response to trademark infringement," so "it is essential that the trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement."  Playboy Enters., Inc., 692 F.2d at 1275.  The Ninth Circuit has further found that a preliminary injunction barring probable trademark infringement "serve[s] the public interest by avoiding customer confusion-an important consideration in trademark cases."  Creative Labs, Inc. v. Cyrix Corp., 141 F.3d 1174 (9th Cir. 1998).

The above facts clearly demonstrate that the public interest favors injunctive relief.  JLI's request for an order to show cause why a preliminary injunction should not issue is GRANTED.

## C.    Asset Freeze

JLI seeks an order freezing Defendants' assets to preserve the possibility of equitable relief, including an accounting and return of Defendants' ill-gotten gains from counterfeiting.

When a plaintiff seeks equitable remedies under the Lanham Act, including recovery of a defendant's profits under 15 U.S.C. § 1117, a district court has "inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief." Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc., 970 F.2d 552, 559 (9th Cir. 1992).  This includes "the power to issue a preliminary injunction in order to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies."  Id. (quoting Republic of the Philippines v. Marcos, 862 F.2d 1355, 1364 (9th Cir.

21

1988) (en banc)).  The Ninth Circuit explained that "it is essential that the trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement," and affirmed the district court's granting of TROs and preliminary injunctions to freeze the defendants' assets, in addition to preventing various counterfeiting-related activities.  Id. at 560 (quoting Playboy Enters., 692 F.2d at 1275).

JLI has already met the standards for granting preliminary injunctive relief as to Defendants' counterfeiting activities. In addition, "[a] party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted."  Johnson v. Couturier, 572 F.3d 1067, 1085 (9th Cir. 2009).  Given the deceitful and secretive nature of counterfeiting, courts in the Ninth Circuit regularly find that dissipation of assets is likely and grant asset freezes in cases involving willful counterfeiting, particularly overseas where defendants can hide assets from a potential judgment.

In Chanel, Inc. v. Sunus Online Group, LLC, No. EDCV 13-2194 JGB (DTBx), 2014 WL 12558780, at *1 (C.D. Cal. Jan. 15, 2014), the defendants sold counterfeit handbags and wallets online.  The court found "based on Defendants' blatant violations of trademark laws there is likelihood that Defendants would transfer or hide the illegally obtained assets in order to avoid a judgment in this action," and thus, granted a preliminary injunction freezing their assets.  Id. at *3 (noting that while this "may harm [the defendants], when weighing this harm against the counterfeiting activities that have harmed Chanel, the balance of equities tips in Chanel's favor.").

Other district courts agree that asset freezes are warranted to preserve assets in counterfeiting cases, particularly where the defendants operate overseas or online.  See, e.g., Cisco Sys., Inc., 2020 WL 5199434, at *11 (issuing TRO and then preliminary injunction freezing assets of Chinese defendants who were selling counterfeit transceivers online); Reebok Int'l Ltd. v. Marnatech Enterprises, Inc., 737 F. Supp. 1521, 1527 (S.D. Cal. 1989) ("[d]ue to the international

aspect of the defendants' business, the Court is concerned that unless the assets are frozen, defendants may hide their allegedly ill-gotten funds."), aff'd, 970 F.2d at 563 (9th Cir. 1992); Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d 982, 987-88 (11th Cir. 1995) (affirming preliminary injunction freezing assets of U.S.-based defendants who arranged for making counterfeit jeans in China); Juul Labs, Inc. v. Unincorporated Associations Identified in Schedule a, No. 1:18-CV-1063, 2018 WL 4473586, at *1 (E.D. Va. Sept. 18, 2018) (granting TRO freezing each of the defendants' PayPal accounts to prohibit transfer of assets where Chinese defendants were selling counterfeit JUULpods online).

JLI seeks recovery of Defendants' profits from their wrongful use of the JUUL Marks in connection with sales of certain JUUL Products, among other relief, so the Court is authorized to freeze Defendants' assets.  See Dkt. 1 (Compl.) at Prayer for Relief ¶¶ J-K.  The present action involves blatant unauthorized use of the JUUL Marks by Defendants, including in their advertising for JUUL Products and on the JUUL Products themselves, and Defendants are based in China and offer their products exclusively online.

JUUL has met its burden of showing that Defendants can and likely will dissipate their assets during the pendency of this case if given the opportunity to do so.  This is especially true because of the difficulty in enforcing U.S. judgments in China.  See e.g., Enforcement of Judgments, U.S. Department of State, https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/Enforcement-of-Judges.html (noting no treaty or convention provides for reciprocal recognition and enforcement of judgments); Yee v. NIVS Intellimedia Tech. Group, Inc., No. CV 11-8472 JGB (AJWx), 2013 WL 1276024, at *5 (C.D. Cal. Mar. 25, 2013) (stating that the Chinese company whose executives are Chinese residents "bore no real risk of sanctions" given the difficulty of enforcing a U.S. judgment against a Chinese national); Redwen v. Sino Clean Energy, Inc., No. CV 11-3936 PA (SSx), 2013 WL 12303367, at *5-6 (C.D. Cal. Jul. 9, 2013) (finding that the plaintiff "would face

significant obstacles in enforcing any judgment against the defendants' assets in China").

JLI's request for an Order freezing Defendants' assets is GRANTED.

## D.   Expedited Discovery

JLI seeks two types of expedited discovery.  First, JLI seeks leave to obtain all documents from each Defendant, including but not limited to data from Defendants' inventory system, showing the names, addresses, and other contact information of all individuals and entities that each Defendant bought JUUL Products from and/or sold them to, along with quantities and prices of all such purchases and sales. Second, JLI seeks leave to obtain from any third party providing services to Defendants, e.g., financial institutions (including, but not limited to, PayPal and Visa), and Common Carriers, documents concerning: 1) contact information of each Defendant and all entities and individuals associated or acting in concert therewith; 2) each Defendant's account information and related transactional data, including but not limited to, account balances, account numbers, product category identifications, and associated accounts; and 3) each Defendant's operations, payment methods, and transportation and shipping history concerning purported JUUL Products.

The Court has discretion to expedite discovery, particularly in cases where plaintiffs seek temporary or preliminary injunctive relief. See Fed. R. Civ. P. 26(d) (allowing for expedited discovery "by court order"); Advisory Comm. Note on 1993 Amendment (stating "[d]iscovery can begin earlier" which "will be appropriate in some cases, such as those involving requests for a preliminary injunction"). Expedited discovery can be granted for good cause "where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party," Zosma Ventures, Inc. v. Nazari, No. CV-12-01404 RSWL (FFMX), 2012 WL 12887392, at *6 (C.D. Cal. Mar. 14, 2012), and "good cause is frequently found in cases

involving claims of infringement and unfair competition," <u>Semitool, Inc.</u>
<u>v. Tokyo Electron Am., Inc.</u>, 208 F.R.D. 273, 276 (N.D. Cal. 2002).

Courts in the Ninth Circuit have found good cause for expedited
discovery to enable plaintiffs in counterfeiting cases to identify:
1) accounts used for and transactions associated with infringing sales;
2) original sources of and pending shipments of counterfeit products;
and 3) other parties involved in counterfeiting activities. <u>See</u> <u>Spy Optic</u>
<u>Inc. v. Individuals, Partnerships & Unincorporated Associations</u>
<u>Identified on Schedule A</u>, No. CV 17-7649 DSF (KSX), 2017 WL
10592133, at *2 (C.D. Cal. Nov. 27, 2017) (ordering eBay and PayPal to
identify all funds transmitted to defendants' accounts and to provide
plaintiffs with data and accounting of all funds, accounts, and
transactions); <u>SATA GmbH & Co. Kg</u>, 2015 WL 6680807, at *11
(granting expedited discovery to ascertain sources of the counterfeit
products and learn of pending shipments of such products); <u>Sas v.</u>
<u>Sawabeh Info. Servs. Co.</u>, No. CV 11-04147 GAF (MANx), 2011 WL
13130013, at *6-7 (C.D. Cal. May 17, 2011) (granting expedited
discovery to get evidence for preliminary injunction, identify others
involved in counterfeiting, and preserve evidence).

There is good cause for such expedited discovery to aid the
Court's consideration of a preliminary injunction, and to ensure that
JLI can identify the full scope of infringing activities and immediately
halt the manufacture and distribution of counterfeit products and
resulting irreparable harm while this case is pending. JLI also needs
to be able to identify potential sources for equitable relief. The
requested discovery is narrowly focused and the documents should be
easily identifiable. The need for early discovery outweighs any
prejudice to Defendants from having to produce these discoverable
documents sooner rather than on the normal timeframe for discovery.

JLI's motion for expedited discovery is GRANTED.

## E.   Security

"The district court is afforded wide discretion in setting the
amount of the bond, [] and the bond amount may be zero if there is no

evidence the party will suffer damages from the injunction." Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills, 321 F.3d 878, 882 (9th Cir. 2003) (internal citations omitted); see also Beyond Blond Prods., LLC v. Heldman, 479 F. Supp. 3d 874, 890 (C.D. Cal. 2020) (no bond required where there was no evidence that infringing defendants would suffer damages by issuance of the injunction).

Because of the clear evidence of Defendants' counterfeiting, infringement, and unfair competition, the Court finds it appropriate to issue the requested *ex parte* relief and preliminary injunction without requiring JLI to provide security.

## F.   Alternative Service of Process

JLI requests an order authorizing it to serve the following Defendants by email because of the urgency involved in this matter, and the extreme difficulty and delays in effecting service in China through the Hague Convention, as well as the additional obstacles posed by the COVID-19 emergency: (1) Andy Chou (aka Lizhi Zhou); (2) Yiwu Cute Jewelry Co., Ltd.; (3) Yiwu Xite Jewelry Co., Ltd.; and (4) Yiwu Promotional Trade Co., Ltd. (aka Yiwu Promotion Trade Co., Ltd.).

Courts are permitted to authorize service of process on defendants located in foreign countries "by other means not prohibited by international agreement." Fed. R. Civ. P. 4(f)(3). The only requirements under Rule 4(f)(3) are that service be directed by the court and not prohibited by international agreement. Rio Properties, Inc. v. Rio Int'l Interlink, 284 F.3d 1007, 1015 (9th Cir. 2002). "[C]ourt-directed service under Rule 4(f)(3) is as favored as service available under Rules [4(f)(1–2)]" and does not require first attempting other means. Id. To provide due process in this context, courts evaluate whether a service method is "'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" Id. at 1016 (quoting Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950)). In Rio, the Ninth Circuit agreed that service by email

was appropriate, particularly where the defendant conducted its business by email.  Id. at 1017-18.

Service by email on defendants in China is not barred by any international agreement.  Toyo Tire & Rubber Co. v. CIA Wheel Grp., No. 15-0246-DOC (DFMX), 2016 WL 1251008, at *3 (C.D. Cal. Mar. 25, 2016).  Courts in this district and this circuit have authorized email service and found that it is reasonably calculated to provide notice to foreign defendants, including defendants based in China, where receipt is confirmed, the email addresses were previously used to communicate with the plaintiffs, or the defendants operate online and use email for their businesses.  Id. (affirming email service on defendants in China was sufficient where no bounce back email was received, confirming receipt); Carson v. Griffin, No. 13-CV-0520 KAW, 2013 WL 2403601, at *1-2 (N.D. Cal. May 31, 2013) (authorizing service by email where the plaintiff previously corresponded with the defendants via email); Cisco Sys., Inc., 2020 WL 5199434, at *14-15 (authorizing email service on Chinese defendants, which operated online and relied on email communications for their businesses).

Additionally, the Hague Convention expressly does not apply "where the address of the person to be served with the document is not known."  Convention Done at the Hague Nov. 15, 1965;, T.I.A.S. No. 6638 (Feb. 10, 1969); Toyo Tire, 2016 WL 1251008, at *3 (authorizing service of process by email where Chinese defendants' addresses were unknown); see also Rosen v. Imagevenue.com, No. CV 13-01742 (MANX), 2014 WL 12601326, at *3 (C.D. Cal. Aug. 11, 2014) (service of process by email on foreign defendant authorized where "Plaintiff's private investigator was unable to pinpoint Defendants' location").

The above-listed Defendants are based in China and operate Internet-based businesses trafficking in counterfeit JUUL Products; they provide email addresses for communication; and they ultimately negotiated and consummated transactions for the infringing products obtained by JLI's investigator via email.  See Decl. No. 3 ¶¶ 5, 7-11, 41.  Similarly, service by email is appropriate on Chou because his physical address is unknown.  See Wilkins Decl. ¶ 6.  Although China has

signed the Hague Convention on Service, district courts have recognized that China often obstructs and substantially delays service under that process for many months.  See Micron Tech., Inc. v. United Microelectronics Corp., No. 17-CV-06932-MMC, 2018 WL 6069646, at *1-2 (N.D. Cal. Nov. 20, 2018) (collecting cases authorizing alternative service for foreign defendants under the Hague Convention); Nike, Inc. v. Wu, 349 F. Supp. 3d 310, 338 (S.D.N.Y.), aff'd, 349 F. Supp. 3d 346 (S.D.N.Y. 2018); see also Jacob Shindler, Suing a Chinese entity in the United States?  Expect a two year wait to serve process, IAM (May 18, 2018), https://www.iam-media.com/frandseps/suing-chinese-entity-in-the-united-states-expect-two-year-wait-serve-process (reporting it can take 1-2 years to effect service in China through Hague Convention process).

The Court therefore GRANTS JLI's request for leave to effect service of the Summons and Complaint in this action, as well as this Order, via email to the following defendants at the respective email address(es) they used to communicate with or that were listed on the invoices sent to JLI's investigator: (1) Andy Chou (aka Lizhi Zhou); (2) Yiwu Cute Jewelry Co., Ltd.; (3) Yiwu Xite Jewelry Co., Ltd.; and (4) Yiwu Promotional Trade Co., Ltd. (aka Yiwu Promotion Trade Co., Ltd.).

## IV. CONCLUSION

For the reasons set forth above, the Court GRANTS JLI's Application for a TRO.  The Court therefore orders the following.

### A.    Freezing Defendants' Assets

Immediately on receipt of this Order, Defendants Andy Chou (aka Lizhi Zhou), Yiwu Cute Jewelry Co., Ltd., Yuwi Xite Jewelry Co., Ltd., CJ Fulfillment Corp., CJ Trade Corp., and Yiwu Promotional Trade Co., Ltd (aka Yiwu Promotion Trade Co., Ltd.) (collectively, Defendants), and their principals, agents, officers, directors, members, servants, employees, successors, assigns, and all other persons in concert and participation with them (collectively, the Restrained Parties), shall be restrained from secreting any assets, and from

transferring or conveying any assets held by, for, or on account of any of the Restrained Parties, and a full accounting of the restrained assets shall be provided to counsel for JLI within three business days of receipt of this Order.

Immediately on receipt of this Order, all assets and funds held by, for, or on account of any of the Restrained Parties, or in an account owned or controlled by any of the Restrained Parties, or in an account as to which any of the Restrained Parties has signature authority, shall be frozen and restrained, and a full accounting of the restrained assets shall be provided to counsel for JLI within three business days of receipt of this Order.

Immediately on receipt of this Order, any bank, brokerage house, financial institution, credit card association, merchant account provider, escrow service, savings and loan association, payment provider, payment processing service provider, money transmission service, third-party processor, or other financial institution (including, but not limited to, MasterCard, VISA, American Express, Discover, PayPal, Inc., Alipay, Wish.com, Amazon Pay, WeChat Pay, and any correspondent, issuing, or member bank or account) (collectively, Payment Services) holding any assets by, for, or on account of, or any balance, payable, or receivable owed to or held on account of, any of the Restrained Parties, or in an account as to which any of the Restrained Parties has signature authority, shall locate all accounts and funds, whether located inside or outside the United States, connected to any Restrained Parties and be restrained from releasing such funds until further order of this Court, and within three business days of receipt of this Order shall provide to counsel for JLI a full accounting of the restrained assets.

## B.  Sequestration and Inspection of JUUL-Marked Products and Products Advertised Using the JUUL Marks

Immediately on receipt of this Order the Restrained Parties shall sequester and deliver to counsel for JLI all JUUL-marked products or products advertised using the JUUL Marks in their inventory,

possession, custody, or control to be examined and held by JUUL until further order of this Court.

**C.    Order to Show Cause Re: Preliminary Injunction and Expedited Discovery**

Defendants are ordered to show cause at a remote hearing before this Court on April 27, 2021 at 10:00 a.m. Pacific Daylight Time,[2] why a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure should not be issued enjoining the Restrained Parties pending the final hearing and determination of this action from:

1. Purchasing, selling, distributing, marketing, manufacturing, or otherwise using any of the JUUL Marks (as defined in this Order) on any counterfeit or authentic product, or any marks confusingly similar thereto in connection with any JUUL products or other products.  The "JUUL Marks" are:

   - The "JUUL" wordmark (U.S. Trademark Reg. No. 4,818,664);

   - JUUL (U.S. Trademark Reg. Nos. 4,898,257);

   - JUUL LABS (U.S. Trademark Reg. No. 5,770,541);

   - "JUUL LABS" (U.S. Trademark Reg. No. 5,776,153);

   - "JUULPODS" (U.S. Trademark Reg. Nos. 5,918,490);

   - JUUL (U.S. Trademark Reg. No. 6,064,902); and

   - JUUL (U.S. Trademark Reg. Nos. 6,211,614).

---

[2] Instructions concerning how to participate in the hearing via Zoom are available on the Central District website and will be posted on the Court's calendar.

2. Using any logo, trade name, or trademark confusingly similar to any of the JUUL Marks which may be calculated to falsely represent or which has the effect of falsely representing that the services or products of any or all of the Defendants or of others are sponsored by, authorized by, or in any way associated with JUUL;

3. Infringing any of the JUUL Marks;

4. Otherwise unfairly competing with JUUL in the manufacture, sale, offering for sale, distribution, advertisement, or any other use of JUUL products;

5. Falsely representing any or all of Defendants as being connected with JUUL or sponsored by or associated with JUUL or engaging in any act that is likely to cause the trade, retailers, or members of the purchasing public to believe that any or all of Defendants are associated with JUUL;

6. Using any reproduction, counterfeit, copy, or colorable imitation of any of the JUUL Marks in connection with the publicity, promotion, sale, or advertising of counterfeit JUUL products;

7. Affixing, applying, annexing, or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to falsely describe or represent such goods as being JUUL products and from offering such goods in commerce;

8. Diluting any of the JUUL Marks;

9. Removing from their premises, or discarding, destroying, transferring, or disposing in any manner any information, computer files, electronic files, business records (including but not limited to e-mail communications), or other documents relating to Defendants' assets and operations or relating in any way to the purchase, sale, manufacture, offer for sale, distribution, negotiation, importation, advertisement,

promotion, or receipt of any products purporting to be JUUL; and

10.    Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (i) above.

11.    Defendants must disable, suspend, cancel, or otherwise cease all use of any and all URL listings from the cjdropshipping.com website or any other associated website that advertises or lists for sale or distribution any and all products that use the JUUL Marks or are otherwise advertised as JUUL products or "JUUL compatible" products.

It is further ordered that the Summons and Complaint, Plaintiffs' applications and all supporting papers, and this Order be served on Defendants or their attorneys of record no later than April 16, 2021 at 6:00 p.m. Pacific Daylight Time.  Defendants' failure to attend the scheduled show cause hearing shall result in the immediate issuance and confirmation of the preliminary injunction, and failure of Defendants to file their opposition or response to this Order and serve it electronically on Plaintiff's attorneys of record by April 22, 2021 at 1:00 p.m. Pacific Daylight Time, shall result in the automatic issuance of a preliminary injunction, which shall be deemed to take effect immediately and shall extend during the pendency of this action.  The Restrained Parties shall be deemed to have actual notice of the issuance and terms of such preliminary injunction, and any act by any of the Restrained Parties in violation of any of its terms may be considered and prosecuted as contempt of this Court.

**D.    Expedited Discovery**

**1.    Defendants**

Within three business days of receipt of this Order, the Restrained Parties shall produce to JLI's counsel a summary document showing the dates, quantities, names, addresses, and other contact information, including any and all associated email addresses, of all

suppliers and customers for the preceding 24 months from whom they have purchased or to whom they have sold any products using the JUUL Marks.

### 2.    Third Parties

Within three business days of receipt of this Order, any Payment Service or other financial institution, Common Carrier, or any other non-party that has information about the Restrained Parties shall produce to JLI's counsel expedited discovery, for the preceding 24 months, including copies of all documents and records in such person's or entity's possession, custody, or control relating or referring to:

1.  the names, addresses, and other contact information, including any and all associated email addresses, of any of the Restrained Parties;

2.  the nature of any of the Defendants' operations, methods of payment, and transportation concerning the advertisement, offer for sale, or sale of JUUL-marked products or products advertised using the JUUL Marks;

3.  any financial accounts owned or controlled by any of the Restrained Parties, including such accounts residing with or under the control of any Payment Service (as defined above);

4.  the names and electronic and physical addresses of every owner and employee of each of the Restrained Parties; and

5.  any other documents concerning or relating to any of the Restrained Parties.

### E.    Alternative Service of Process

Service of the Summons and Complaint and of this Order, together with copies of the papers in support thereof, shall be made on the following Defendants by delivering true copies thereof by email to 2632519261@qq.com, 3326632399@qq.com, and yky940519@sina.com, and such service shall be deemed sufficient: (1) Andy Chou (aka Lizhi Zhou); (2) Yiwu Cute Jewelry Co., Ltd.; (3) Defendant Yiwu Xite

Jewelry Co., Ltd.; and (4) Yiwu Promotional Trade Co., Ltd. (aka Yiwu Promotion Trade Co., Ltd.).

IT IS SO ORDERED.

Date: April 13, 2021

Dale S. Fischer
United States District Judge

*Docketed and served by email on April 13, 2021 at 9:30 a.m.*