1 | Alejandro S. Angulo (State Bar No. 217823)
aangulo@rutan.com
2 | Bradley A. Chapin (State Bar No. 232885)
bchapin@rutan.com
3 | Kathryn D.Z. Domin (State Bar No. 274771)
kdomin@rutan.com
4 | RUTAN & TUCKER, LLP
18575 Jamboree Road, 9th Floor
5 | Irvine, CA 92612
Telephone:  714-641-5100
6 | Facsimile:   714-546-9035

7 | Alexander Chen (State Bar No 245798)
William R. Walz (State Bar No 136995)
8 | Katja M. Grosch (State Bar No 266935)
Theodore S. Lee (State Bar No 281475)
9 | INHOUSE CO. LAW FIRM
7700 Irvine Center Drive, Suite 800
10 | Irvine, CA 92618
Telephone:  949-250-1555
11 | Facsimile:   714-882-7770

12 | Attorneys for Defendants and Counter-Claimants,
Andy Chou (aka Lizhi Zhou); Yiwu Cute Jewelry
13 | Co., Ltd.; Yiwu Xite Jewelry Co., LTD.; CJ
Fulfillment Corp.; CJ Trade Corp.; and Yiwu
14 | Promotional Trade Co., LTD (aka Yiwu Promotion
Trade Co., LTD.)

15 |

UNITED STATES DISTRICT COURT

16 |

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

17 |

18 | JUUL LABS, INC., a Delaware
corporation,
19 |
Plaintiff,
20 |
vs.
21 |
22 | ANDY CHOU (aka LIZHI ZHOU), an
individual; YIWU CUTE JEWELRY
CO., LTD., a Chinese limited company;
23 | YIWU XITE JEWELRY CO., LTD., a
Chinese limited company; CJ
24 | FULFILLMENT CORP., a California
corporation; CJ TRADE CORP., an
25 | Arizona corporation; and YIWU
PROMOTIONAL TRADE CO., LTD.
26 | (aka YIWU PROMOTION TRADE CO.,
LTD.), a Chinese limited company,
27 |
28 | Defendants.

Case No.: 2:21-cv-03056-DSF-PD

**DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

Hearing:     May 26, 2021
Time:        10:10 a.m. PDT

**Honorable Dale S. Fischer**

Rutan & Tucker, LLP
attorneys at law

2163/099999-0084
16501777.3 a05/17/21

-1-

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION

1
2
3
4

ANDY CHOU (aka LIZHI ZHOU), an individual, YIWU CUTE JEWELRY CO., LTD., a Chinese limited company; CJ FULFILLMENT CORP., a California corporation; and CJ TRADE CORP., an Arizona corporation,

5
6
7
8

Counter-Claimants,

vs.

HU QIAN, an individual,

Counter-Defendant.

_____

9   / / /
10   / / /
11   / / /
12   / / /
13   / / /
14   / / /
15   / / /
16   / / /
17   / / /
18   / / /
19   / / /
20   / / /
21   / / /
22   / / /
23   / / /
24   / / /
25   / / /
26   / / /
27   / / /
28   / / /

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ..................................................................................... 1

II.     PROCEDURAL HISTORY ...................................................................... 3

III.    RELEVANT FACTUAL BACKGROUND ............................................. 4

    A.     Overview of CJ Drop-Shipping And The Defendant Entities ......................................................................................... 4

    B.     The CJ Drop-Shipping Business ................................................. 6

    C.     CJ's Efforts To Prevent Listing And Sale Of Infringing And Counterfeit Products And The Suspect Juul Transactions .................................................................................. 7

    D.     The Alleged Counterfeit Juul Products ...................................... 8

IV.     LEGAL ARGUMENT .............................................................................. 10

    A.     The Court Should Deny the Requested Preliminary Injunctive Relief .......................................................................... 10

        1.     Juul Is Not Likely To Succeed On The Merits ................ 11

        2.     Juul Is Not Likely To Suffer Irreparable Harm .............. 12

        3.     The Balance Of Equities Does Not Tip In Juul's Favor ................................................................................. 13

        4.     An Injunction Is Not In The Public Interest ................... 13

        5.     Injunctive Relief Should Not Alternatively Be Granted Under The "Sliding Scale"/"Serious Questions" Test ................................................................ 13

    B.     The Court Should Deny Juul's Request To Continue To Freeze Any Of The Defendants' Assets .................................... 14

V.      JUUL SHOULD BE REQUIRED TO POST A BOND IF A PRELIMINARY INJUNCTION IS GRANTED ...................................... 16

VI.     CONCLUSION ......................................................................................... 18

Rutan & Tucker, LLP
attorneys at law

2163/099999-0084
16501777.3 a05/17/21

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1

## <u>TABLE OF AUTHORITIES</u>

2
<u>Page(s)</u>

3
**FEDERAL CASES**

4
*Alliance for the Wild Rockies v. Cottrell,*
5
   632 F.3d 1127 ............................................................................... 13, 14

6
*Apple, Inc. v. Samsung Electronics Co., Ltd.,*
7
   2012 WL 2401680 (June 26, 2012) ...................................................... 17

8
*CFTC v. Noble Metals Int'l,*
9
   67 F.3d 766 (9th Cir. 1995) ................................................................ 16

10
*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills,*
   321 F.3d 878 (9th Cir. 2003) .............................................................. 17

11

12
*Consumer Financial Protection Bureau v. Morgan Drexen Inc.,*
   2015 WL 12745793 (C.D. Cal. Apr. 30, 2015) .................................... 14

13

14
*Earth Island Inst. v. Carlton,*
   626 F.3d 462 (9th Cir. 2010) ........................................................ 11, 13

15
*Garcia v. Google, Inc.,*
16
   786 F.3d 733 (9th Cir. 2015) ........................................................ 11, 12

17
*Hoxworth v. Blinder, Robinson & Co.,*
18
   903 F.2d 186 (3rd Cir. 1990) .............................................................. 15

19
*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,*
20
   51 F.3d 982 (11th Cir. 1995) .............................................................. 15

21
*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.,*
   658 F.3d 936 (9th Cir. 2011) .............................................................. 12
22

23
*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.,*
   16 F.3d 1032 (9th Cir. 1994) .............................................................. 16

24

25
*Perfect 10, Inc. v. Google, Inc.,*
   653 F.3d 976 (9th Cir. 2011) .............................................................. 12

26
*Redwen v. Sino Clean Energy, Inc.,*
27
   No. CV 11-3936 PA, 2013 WL 12303367 (C.D. Cal. Jul. 9, 2013) .................... 16

28

Rutan & Tucker, LLP
attorneys at law

2163/099999-0084
16501777.3 a05/17/21

-ii-

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION

**Page(s)**

**FEDERAL CASES (CONT.)**

*Reebok Int'l Ltd. v. Marnatech Enterprises, Inc.*,
    737 F. Supp. 1521 (S.D. Cal. 1990) ....................................................... 15

*Save Our Sonoran, Inc. v. Flowers*,
    408 F.3d 1113 (9th Cir. 2005) .............................................................. 17

*SEC v. Gonzalez de Castilla*,
    170 F.Supp.2d 427 (S.D.N.Y. 2001) ..................................................... 15

*SEC v. Grossman*,
    No. 87 Civ. 1031 2003 U.S. Dist. LEXIS 317 (S.D.N.Y. 2003) ......................... 16

*SEC v. Int'l Loan Network, Inc.*,
    770 F. Supp. 678 (D.D.C. 1991)........................................................... 16

*SEC v. Lauer*,
    445 F. Supp. 2d 1362 (S.D. Fla. 2006)................................................... 15

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) .............................................................. 11, 12, 13, 14

*Yee v. NIVS Intellimedia Tech. Group, Inc.*,
    No. CV 11-8472 JGB, 2013 WL 1276024 (C.D. Cal. Mar. 25, 2013) ......... 15, 16

**RULES**

Federal Rules of Civil Procedure
    rule 65(c).......................................................................................... 16

Rutan & Tucker, LLP
attorneys at law

2163/099999-0084
16501777.3 a05/17/21

-iii-

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION

I.      **INTRODUCTION**

Defendants Andy Chou, Yiwu Cute Jewelry Co., Ltd. ("Yiwu Cute"), CJ Trade Corporation ("CJ Trade") and CJ Fulfillment Corporation ("CJ Fulfillment") (collectively "Defendants")[1] hereby oppose Plaintiff JUUL Labs, Inc.'s ("Juul") request for a preliminary injunction following the issuance of this Court's April 13, 2021 Order (the "TRO") granting Juul's unnoticed *ex parte* application to freeze Defendants' (all of them) assets, for expedited discovery, alternative service of process and OSC re the issuance of a preliminary injunction.  Based on the unopposed (because no notice was provided) and grossly incomplete and misleading record, the Court granted Juul's entire application.  This is therefore the first opportunity Defendants have had to address the allegations and set the record straight.

For starters, Defendant Yiwu Cute owns and operates a website based in China called CJDROPSHIPPING.com.  It is an online marketplace that connects over 400 third-party sellers to over 400,000 customers worldwide.  Yiwu Cute employees over 800 people in China, and has two fulfillment centers in the United States (New Jersey and California) operated by Defendants CJ Trade and CJ Fulfillment, respectively, both of which have US-based employees, lease property in the US, pay taxes in the US and remain in good standing.  Defendant Chou owns the two US fulfillment centers and is a part owner of Yiwu Cute.  Collectively, the operation is commonly referred to as CJ Drop-Shipping or "CJ."  CJ is a widely respected operation and is entirely above-board.  In fact, as explained in the extensive declarations filed in support of this Opposition, CJ has a robust IP Enforcement Unit that is 100% focused on ensuring that none of the third-party vendors that sell products through its website list or sell counterfeit or other products that infringe on third party intellectual property rights.

---

[1]   Plaintiff sues two additional defendants by the names of Yiwu Xite Jewelry Co., Ltd. and Yiwu Promotion Trade Co., Ltd., but these named entities are unfamiliar to the other named Defendants and may be improperly identified.

1   So, despite the conclusory rhetoric and innuendo in Juul's un-noticed filing

2   with this Court, CJ is not the hub of counterfeiting and criminal activity that Juul

3   suggested in its moving papers.  Nor does the simple fact that they are based in

4   China justify the wholly inappropriate statements in Juul's filing suggesting that

5   Defendants are a pack of sketchy foreign criminals that, if provided any due process,

6   would simply hide all the evidence and abscond with their ill-gotten gains, far away

7   from the reaches of this Court's jurisdiction.  What is more, because Juul appears to

8   have utterly failed to complete a reasonable investigation before filing this case, it

9   was unable to inform the Court that none of the Defendants actually sold the alleged

10  counterfeit products to Juul's investigator (the website operates similar Amazon),

11  that multiple named Defendants had no relationship or connection whatsoever to the

12  alleged purchases, that the *only* Juul products ever bought and sold over the CJ

13  platform were the four orders that were placed by Juul's private investigator

14  (totaling $2,058.04 in purchases), or that Juul sought and received an order from this

15  Court effectively shutting down CJ's entire US operations (estimated at $80 million

16  annually in sales) as a result of these isolated sales that CJ was not even aware of

17  until *after* Juul had executed on the Court's Order and frozen over $1.4 million in

18  operating funds.  To be clear, Juul asked and received an order from this Court

19  freezing millions of dollars in assets, effectively shutting down CJ's operations over

20  $2,058.04 of alleged counterfeit Juul products sold by a third party.

21  And Juul did this without bothering to reach out to CJ to ask them to take

22  down the listings or to investigate the listings as counterfeit.  This despite the fact

23  that CJ had an entire IP Enforcement Unit ready and waiting to address concerns

24  just like this that it fields from intellectual property owners around the world.  In

25  fact, CJ's enforcement team routinely rejects or removes over 200 listings a day

26  from its platform based on their conclusion that the listings violate third party

27  intellectual property rights.

28  In any event, CJ immediately complied with the TRO, including the

Rutan & Tucker, LLP
attorneys at law

2163/099999-0084
16501777.3 a05/17/21

-2-

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION

1  emergency discovery granted by the Court.  Indeed, although no other "Juul"

2  branded products were ever sold again over CJ's website, Defendants took

3  immediate action to take down the questioned listings and put measures in place to

4  ensure that no other Juul branded products are ever listed on its platform.

5       In short, the TRO should be dissolved in its entirety.  Juul has not and cannot

6  demonstrate a likelihood of prevailing on the merits.  Nor can Juul remotely

7  demonstrate that it would suffer irreparable harm if the TRO is dissolved and no

8  preliminary injunction is issued.  In the end, even if Juul could somehow overcome

9  these burdens (it cannot), the drastic relief it sought and received (freezing millions

10 in assets) is grossly out of line with the amounts at issue in this case.  Moreover, the

11 TRO is overbroad as to who it applies to because the only entities that were even

12 tangentially involved in the transaction were Yiwu Cute (who operates the CJ

13 website) and CJ Trade, who operates the New Jersey warehouse (the location where

14 Juul's investigator insisted one of his orders be shipped for him to pick up on

15 location).

16 **II.   PROCEDURAL HISTORY**

17       On April 8, 2021, Juul filed its Complaint against Defendants, along with the

18 Motion and related papers.  Dkt. 1, 5-6.  None of the Defendants were served with

19 the Complaint, the Motion, or any related papers; nor were they otherwise notified

20 of the filings.  *Id.*

21       On April 13, 2021, the Court granted the Motion and entered the TRO which,

22 in pertinent part, directed that all of Defendants' assets be frozen.  Dkt. 31.  The

23 TRO further required that Defendants oppose the issuance of a preliminary

24 injunction, which otherwise would, if ordered, go into effect automatically upon the

25 expiration of the TRO.  *Id.*

26       When Defendants were finally served with the Complaint, the Motion and the

27 TRO on April 22, 2021, they immediately engaged legal counsel and took action to

28 comply with the TRO.  Declaration of Andy Chou ("Chou Dec.") ¶¶ 31, 37.  The

Rutan & Tucker, LLP
attorneys at law

2163/099999-0084
16501777.3 a05/17/21

-3-

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION

1 TRO had essentially caused a (literal) overnight implosion of Defendants' business
2 in the U.S.  *Id.* at ¶ 37

3    On or about May 13, 2021, Defendants timely answered the Complaint and
4 filed a Counter-Claim against Hu Qian, the third party truly responsible for the
5 counterfeiting and infringement alleged against Defendants in Plaintiff's Complaint.
6 Dkt. No. 41.

7 **III.    RELEVANT FACTUAL BACKGROUND**

8    **A.    Overview of CJ Drop-Shipping And The Defendant Entities**

9    Defendant Andy Chou is the owner and Chief Executive Officer of
10 CJDROPSHIPPING ("CJ").  Chou Dec., ¶ 2.  Mr. Chou founded the company in
11 2014 and has since built it up to an internationally recognized and well-respected
12 operation with the help of his hundreds of dedicated employees.  *Id.*  As explained
13 below, CJ is comprised of several entities that serve various roles for the business.
14 *Id.*  At its core, CJ is an online marketplace that connects third-party vendors with
15 businesses throughout the world to fill product needs for the ultimate customer.  *Id.*
16 Much like an Amazon or Alibaba, CJ (albeit on a much smaller scale) provides the
17 apparatus for third-party vendors, suppliers, wholesalers, and resellers to connect
18 online with businesses seeking a one-stop shop to secure goods for sale to their
19 customers.  *Id.* at ¶ 2, Ex. 1.  In 2020, CJ grossed over $160 million (US),
20 maintaining an average of over 500,000 products for sale at any given time through
21 over 400 vendors (and CJ sourced products) for at least 400,000 customers
22 worldwide.  *Id.* at ¶ 3.  CJ currently employs over 800 people in China and
23 internationally, including eight employees at two fulfillment centers in the United
24 States.  *Id.*

25    Defendant Yiwu Cute Jewelry Co., Ltd. is a company based in China and
26 functions as the operating entity for all of CJ, employing the vast majority of CJ's
27 employees and is responsible for operation of the CJ website (i.e., the website
28 through which the alleged infringing sale of Juul products occurred).  Chou Dec.,

Rutan & Tucker, LLP
attorneys at law

2163/099999-0084
16501777.3 a05/17/21

-4-
DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION

¶ 4.  However, as explained in further detail below, the "Juul" products at issue were not sold by any of the Defendants, but instead, were sales made by a third-party vendor (Hu Qian) who is now a named counter-defendant in this action.  *Id.*

Defendant CJ Trade Corporation ("CJ Trade") is an established Arizona corporation that has been in business since 2017.  Chou Dec., ¶ 6.  CJ Trade operates one of two fulfillment centers in the United States for CJ.  *Id.*  Specifically, CJ Trade leases property in New Jersey where CJ maintains its East Coast fulfillment operations.  *Id.* at ¶ 6, Exs. 3, 4.  While not all products sold on the CJ website ship through the fulfillment center, sellers have the option for product shipments to be received and stored until such time that the purchasing business customer arranges to pick up the goods or shipping arrangements are made to deliver the product to the purchasing customer.  *Id.* at ¶ 6.  CJ Trade has 6 employees, and remains in good standing.  *Id.*  The Court's Order freezing Defendants' assets resulted in CJ Trade's bank account being frozen, preventing it from continuing to financially support its entire East Coast fulfillment center for all products.  *Id.*

Defendant CJ Fulfillment Corporation ("CJ Fulfillment") is an established California corporation that has been in business since 2018.  Chou Dec., ¶ 7.  CJ Fulfillment leases property in Chino, California where CJ maintains its West Coast fulfillment operations.  *Id.* at ¶ 7, Exs. 6, 7.  As with CJ Trade, not all products sold on the CJ website ship through the fulfillment center, but sellers have the option for product shipments to be received and stored until such time that the purchasing business customer arranges to pick up the goods or shipping arrangements are made to deliver the product to the purchasing customer.  *Id.* at ¶ 7.  CJ Fulfillment has 2 employees, and remains in good standing.  *Id.*  Despite that CJ Fulfillment had no involvement whatsoever with any of the alleged infringing Juul sales, the Court's Order freezing Defendants' assets resulted in CJ Fulfillment's bank account being frozen, preventing it from continuing to financially support its entire West Coast

Rutan & Tucker, LLP
attorneys at law

2163/099999-0084
16501777.3 a05/17/21

-5-

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION

1  fulfillment center for all products sold through CJ's website.  *Id.*

2          Currently, CJ employs over 800 people.  Chou Dec., ¶ 16.  It is truly a

3  thriving company with a dedicated staff and a focus on productive, legally

4  compliant operations.  *Id.* at ¶ 16, Ex. 7.

5          **B.**      **The CJ Drop-Shipping Business**

6          CJ entered the drop-shipping industry in 2014, and launched its ecommerce

7  platform in 2018.  Chou Dec., ¶ 10.  Since then, CJ has grown to be recognized as

8  one of the most professionally operated drop-shipping supply chain companies in

9  China. [*Id.*] CJ focuses on the drop-shipping piece of the supply chain, e.g., product

10 sourcing, warehousing, order processing, and shipping, thus allowing retailers to

11 focus on sales and marketing.  *Id.* at ¶ 12.  CJ offers to help each drop-shipper from

12 order to successful delivery.  *Id.*

13         CJ now leases and operates warehouses in China, the U.S., Germany,

14 Thailand, and Indonesia.  Decl. Chou, ¶ 13.  CJ also cooperates with warehouses in

15 Britain, Australia, and France.  *Id.*  CJ is able to source any legal products its

16 customers seek.  *Id.*  Part of the reason for CJ's success is its excellent customer

17 service in a niche market.  *Id.* at ¶ 14.  Indeed, a big reason for CJ's success is due to

18 its hybrid form between the web-based marketplaces Amazon and Alibaba.  *Id.*

19 While Amazon provides a platform for third-party Chinese sellers to sell to

20 customers with logistic support in the US, Alibaba provides a platform for third-

21 party Chinese sellers to sell to US retailers but without local US logistics.  *Id.*

22         CJ merges the two concepts and provides a platform for third-party Chinese

23 sellers to sell to US retailers with logistic support in the US.  Chou Dec., ¶ 14.  As

24 such, a typical US retailer would operate an e-commerce site using Shopify on the

25 front end to process transactions and CJ on the back end to provide inventory and

26 fulfilment.  *Id.*

27         The reason CJ now has two fulfillment centers in the US and 8 employees

28 between the two locations is due to the immense demand for CJ's services in the

Rutan & Tucker, LLP
attorneys at law

2163/099999-0084
16501777.3 a05/17/21

-6-
DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION

United States.  Chou Dec., ¶ 15.  In fact, roughly 50% of CJ's $160 million (US) revenue in 2020 came from customers in the United States.  *Id.*; Wu Dec., ¶¶ 8, 10.

Presently, CJ supplies more than 400,000 retailers worldwide and ships on average 3,000 packages a day to customers within the US, and over 10,000 daily from China to the US.  Chou Dec., ¶ 17, Ex. 8.  In order to provide the broadest selection of available products, CJ collaborates with over 400 third-party suppliers, wholesalers, or resellers (collectively "Third-Party Sellers") in China who sell products on a regular basis to retailers via the CJ ecommerce platform.  *Id.* at ¶ 18.  In addition to providing its platform, storage, and shipping services at the retailers' request, CJ also offers sourcing programs through which CJ will try to match the demand to a third-party reseller to fulfill a retailer's request.  *Id.*

Because CJ collaborates with over 400 third-party sellers and over 400,000 customers, there are hundreds of thousands of different products available on CJ's marketplace.  Chou Dec., ¶ 19.  Naturally, given the number of available products, CJ is not able to train and request its own team to adequately provide products support.  *Id.*

## C.   CJ's Efforts To Prevent Listing And Sale Of Infringing And Counterfeit Products And The Suspect Juul Transactions

To protect the intellectual property of others and to combat counterfeiting, CJ has an anti-counterfeiting and intellectual property rights policy posted on its website and contained within the terms and conditions of its agreement with its users.  Chou Dec., ¶ 20, Ex. 9.

In addition, CJ maintains an IP Enforcement Unit that actively monitors the listing requests on the CJ platform via manual review as well using Artificial Intelligence software for better accuracy and efficiency to combat counterfeiting and trademark infringement.  *Id.* at ¶ 21.  This team's sole purpose is to ensure compliance with intellectual property laws and avoid the listing or sale of unauthorized or counterfeit products.  *Id.*; Huiyun Dec., ¶ 3.  Indeed, on average,

1  CJ's IP Enforcement Unit removes approximately two hundred (200) listing
2  requests per day which they identify as potentially counterfeit or infringing of a
3  third-party's IP rights.  Chou Dec., ¶ 21.  The team filters both buy-side requests and
4  sell-side listings and works with new sellers to educate them about CJ's IP
5  infringement policies.  *See* Huiyun Dec., ¶¶ 4-6.

6         In fact, Plaintiff's own "consultant," Max Hewlett, who apparently purchased
7  the offending "Juul" products through the CJ website, has experience with CJ's IP
8  enforcement team's efforts.  Chou Dec., ¶ 22.  Mr. Hewlett previously posed as a
9  retailer in 2019 in connection was a separate sting operation and was denied
10 sourcing for Samsung-logo products.  *Id.* at ¶ 22, Ex. 10.

11        Notably, Samsung is a widely recognized brand in China.  Chou Dec., ¶ 23.
12 But CJ's IP Enforcement program relies heavily on brand recognition.  *Id.*  If a
13 brand is not widely recognized in China and is not recognized by a CJ team
14 member, it is hard to police for potential infringement because a CJ team member
15 would not know whether it is a domestic brand in China or from elsewhere in the
16 world.  *Id.*  It is therefore understandable that listings like the "Juul" products would
17 not be flagged.  *Id.*  Had Juul reached out to CJ at any time and made it aware of the
18 Juul brand and the suspect listings, CJ would have immediately investigated it and
19 removed the offending listings.  *Id.*  Unfortunately, that did not happen and it was
20 not until this lawsuit was served on Defendants that they first realized the issue.  *Id.*
21 Defendants took immediate action.  *Id.*

22        **D.    The Alleged Counterfeit Juul Products**

23        Regarding the subject Juul-branded products, in late 2019, Juul's operative,
24 Mr. Hewlett interacted with a person named Celia, who is an agent of and works for
25 third-party seller and counter-defendant, Hu Qian.  Chou Dec., ¶ 24.  Celia is not an
26 employee of CJ.  *Id.*  In communications with Celia, Mr. Hewlett inquired about
27 procuring the suspected counterfeit Juul products listed on the CJ platform.  *Id.* at
28 ¶ 24, Ex. 11.  CJ's platform allows third-party sellers and customers to directly

Rutan & Tucker, LLP
attorneys at law

2163/099999-0084
16501777.3 a05/17/21

-8-

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION

1  interact because it is these third-party sellers who are most knowledgeable about
2  their own products and thus best able to assist the customers. *Id.* at ¶ 11. As such, it
3  was Hu Qian's agent, Celia, who assisted Mr. Hewlett in purchasing the allegedly
4  counterfeit JUUL products from Hu Qian. *Id.* To be clear, Hu Qian makes its own
5  listings and fulfills the order; CJ's only involvement is to collect the funds and
6  manage logistics. *Id.* at ¶ 25, Ex. 12.

7  It is also important to note that all third-party sellers who wish to utilize CJ's
8  platform, must first receive training from CJ's team, including CJ's IP Enforcement
9  Team. Chou Dec., ¶ 27. During this training, these third-party sellers and their
10  agents are informed of CJ's IP Policy and warned against attempting to list or sell
11  counterfeit goods or products that in any way infringe on the intellectual property
12  rights of others. *Id.* The strict policy of CJ is not to permit the listing or sale of any
13  items that infringe the intellectual property right of others. *Id.* When items are
14  determined to pose a risk of IP infringement or counterfeiting, they are flagged for
15  closer inspection, and then if deemed as potentially infringing or counterfeit, the
16  third-party retailers are denied access to the CJ Platform. *Id.*

17  Notably, in the same interaction surrounding the complained-of Juul incident,
18  Hewlett also attempted to purchase products bearing the Apple logo and *Celia*
19  *repeatedly rejected his request*s. Chou Dec., ¶ 28. Thus, Celia and Mr. Hewlett
20  knew and understood CJ's IP enforcement policy. *Id.* at ¶ 28, Ex. 10.

21  Unfortunately, as it happens, CJ's IP Enforcement team did not know that
22  Juul was a US brand for electronic cigarettes. Chou Dec., ¶ 29. It must be noted that
23  there are hundreds of thousands of trademarks that are registered in 120-plus
24  countries and at any given time, some marks are abandoned, others are transferred,
25  some are registered, others are never registered, some are only well known in certain
26  countries, others are well known only in a certain part of a country. These
27  enforcement issues are not unique to CJ, as much larger and more robust companies
28  like Amazon and Alibaba continue to address these issues on a daily basis. *Id.* As

Rutan & Tucker, LLP
attorneys at law

-9-

2163/099999-0084
16501777.3 a05/17/21

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION

such, unlike with the well-known Apple or Samsung brand, CJ's IP Enforcement team never identified the Juul-branded products as being suspect, and thus were not alerted to intercede in the transaction whereby Mr. Hewlett was able to consummate his sting purchase on behalf of JUUL from Hu Qian.  *Id.*; *see* Huiyun Dec., ¶ 12.  But it is critical to note that these are the only Juul branded sales that have ever taken place over the CJ platform.  Chou Dec., ¶ 29.  Indeed, none of the products remain listed on CJ's website and the brand has been flagged so that no Juul branded product (or known knock-off) will ever been listed for sale on the CJ website.  *Id.* at ¶ 5.  In all, the sum total of Juul products ever sold through the CJ platform adds up to $2,058.04.  *Id.* at ¶ 5, Ex. 2.

Contrary to the allegations made by Juul in this case, CJ at no point intentionally evaded U.S. Customs or participated in brand counterfeiting.  Chou Dec., ¶ 30.  To the contrary, CJ has a dedicated staff whose sole focus is to assure that no counterfeit goods are sold over the CJ platform.  *Id.*

At no time before filing this lawsuit did CJ ever receive any notice of infringement or complaint from Juul.  Chou Dec., ¶ 31.  The first time Defendants were made aware of the alleged infringing activity was on April 22, 2021, when they were first served by email with the documents filed in this action.  *Id.*  Had CJ received any notice of infringement or complaint from Juul prior to the filing any lawsuits in US or China, CJ, consistent with its past practice and policy, would have immediately taken the listings down.  *Id.*  Indeed that was exactly what CJ did when it learned about this action and Juul's efforts to protect its intellectual property rights.  *Id.*

## IV.  <u>LEGAL ARGUMENT</u>

### A.  <u>The Court Should Deny the Requested Preliminary Injunctive Relief</u>

A plaintiff seeking a preliminary injunction must establish (1) "that he is likely to succeed on the merits"; (2) that he is likely to suffer irreparable harm in the

absence of preliminary relief"; (3) "that the balance of equities tips in his favor"; and (4) "that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). This is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22; *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). Here, Juul's request for a preliminary injunction is not factually or legally supported and should be denied. Indeed, and as set forth below, Juul cannot establish any of the four *Winter* elements.

### 1.   Juul Is Not Likely To Succeed On The Merits

To obtain the requested preliminary injunction, Juul must first prove that it is "likely" to prevail on the merits. *Winter*, 555 U.S. at 20. This first element "is the most important," and if Juul fails to prove it is likely to be successful, the Court "need not consider the remaining" *Winter* elements. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (quoting *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013).

Here, Juul will not succeed on the merits because it did not even bring the correct claims against Defendants. Indeed, Juul brought claims for Federal Trademark Infringement And Counterfeiting; Federal Unfair Competition; California False Advertising; And California Unfair Competition. All of these claims are based on the allegation that Defendants manufacture, advertise, or sell the infringing products. *Id.* at ¶ 7. This is incorrect. As set forth in great detail above, Defendants solely operate an ecommerce marketplace where third party vendors sell their goods and had no involvement in the manufacturing, advertising, or selling of the infringing products.

Further, and even if Juul had brought the right claim(s) against Defendants (i.e., contributory trademark infringement), Juul would still not be able to prove likelihood of success on the merits. Indeed, to prevail on a claim of contributory trademark infringement, Juul would have to prove (1) Defendants "continued to

Rutan & Tucker, LLP
attorneys at law

2163/099999-0084
16501777.3 a05/17/21

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION

1  supply its services to one who it knew or had reason to know was engaging in

2  trademark infringement" and (2) Defendants had "[d]irect control and monitoring of

3  the instrumentality used by a third party to infringe" Juul's trademarks.  *Louis*

4  *Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 942 (9th Cir. 2011).

5  Juul has no evidence of either, and in fact, evidence demonstrates that CJ

6  immediately removed the counterfeit products as soon as they learned the products

7  were potentially infringing on Juul's trademarks.  Chou Dec., ¶ 31.  CJ further took

8  steps to ensure that no further Juul listings will ever appear on its platform.

9  Because Juul cannot prove likelihood of success on the merits, this should end

10  the analysis and the Court should deny the request for a preliminary injunction.

11  *Garcia*, 786 F.3d at 740.

12  **2.    Juul Is Not Likely To Suffer Irreparable Harm**

13  To prevail on its request for a preliminary injunction, Juul must also prove

14  that irreparable injury is likely in the absence of an injunction.  *Winter*, 555 U.S. at

15  22.  This further requires Juul to show a "sufficient causal connection" between the

16  irreparable harm and the conduct sought to be enjoined."  *Perfect 10, Inc. v. Google,*

17  *Inc.*, 653 F.3d 976, 982 (9th Cir. 2011).  Juul has not and cannot make these

18  showings.

19  Indeed, Juul's lawsuit is focused on the wrong parties, and its harm (if any) is

20  as a result of a third party (HU QIAN) it chose not to sue.  *See* Sect. III.D.  Even if

21  Juul is successful in obtaining the requested preliminary injunction against

22  Defendants, that injunction would not stop the party responsible for the

23  manufacturing, advertising, and selling of the counterfeit product from doing the

24  same on other platforms.  Instead, there is a disconnect between the harm Juul

25  alleges and its request to enjoin the conduct that is causing that harm.

26  Furthermore, CJ already pulled the infringing products from its online

27  marketplace and removed the URLs associated with them.  Chou Decl. ¶ 31.  As

28  such – and even if any of the Defendants were the source of Juul's alleged harm

Rutan & Tucker, LLP
attorneys at law

2163/099999-0084
16501777.3 a05/17/21

1  (they are not) – CJ has already willingly completed the conduct Juul seeks from its

2  requested injunction.

3  **3.    The Balance Of Equities Does Not Tip In Juul's Favor**

4  Before a preliminary injunction may issue, the Court must determine whether

5  the harm the injunction might cause Defendants is outweighed by Juul's threatened

6  injury. *Earth Island Institute v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010). The

7  Court should find it does not. On the one hand, Juul's threatened injury is non-

8  existent. CJ already pulled the infringing products from its online marketplace and

9  removed the URLs associated with those products. Chou Decl. ¶ 31. On the other

10  hand, the injunction Juul seeks would cause great and immediate harm to

11  Defendants. By continuing to freeze their U.S. assets, Defendants would be

12  effectively precluded from operating their U.S. businesses, not to mention it would

13  extend to Defendants that had no connection whatsoever to the alleged counterfeit

14  Juul sales.

15  **4.    An Injunction Is Not In The Public Interest**

16  Finally, Juul must prove the preliminary injunction it seeks is in the public

17  interest. *Winter*, 555 U.S. at 20. While Defendants do not dispute that enjoining

18  trademark infringement could protect the public and thereby be in the public

19  interest, the injunction Juul seeks does not actually enjoin the infringing party or

20  infringing behavior (as discussed above). As such, Juul's injunctive relief is not in

21  the public interest and this element is not met.

22  **5.    Injunctive Relief Should Not Alternatively Be Granted**

23  **Under The "Sliding Scale"/"Serious Questions" Test**

24  In addition to the traditional requirements for a preliminary injunction

25  discussed above, a plaintiff can also obtain this relief if it proves "the likelihood of

26  success is such that 'serious questions going to the merits were raised and the

27  balance of hardships tips sharply in [plaintiff's] favor.'" *Alliance for the Wild*

28  *Rockies v. Cottrell*, 632 F.3d 1127, 1131 (quoting *Clear Channel Outdoor, Inc. v.*

Rutan & Tucker, LLP
attorneys at law

2163/099999-0084
16501777.3 a05/17/21

-13-

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION

*City of L.A.*, 240 F.3d 810, 813 (9th Cir. 2003).  In other words, the plaintiff would have to make a "strong showing of irreparable harm" to "offset a lesser showing of likelihood of success on the merits."  *Id.*

This alternative test does not help Juul.  For the reasons set forth above, there are no "serious questions going to the merits."  Sect. IV.A.1.  Juul will simply not be able to prove Defendants infringed on its intellectual property.  Further, and even if Juul has raised "serious questions going to the merits" (it has not), it has submitted no evidence demonstrating the "balance of hardships tips *sharply* in" Juul's favor.  Indeed, Juul is the only consumer to have purchased the counterfeit Juul products from CJDROPSHIPPING.COM, and CJ has already taken down all listings for the counterfeit Juul products and disabled the URLs to these products.  Chou Dec., ¶¶ 29, 31.  As such, there is no continuing risk or harm to Juul or its intellectual property.

**B.**     **The Court Should Deny Juul's Request To Continue To Freeze Any Of The Defendants' Assets.**

A party seeking a preliminary injunction freezing assets must (1) prove a "likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted"; and (2) make "a sufficient showing on all four prong of the *Winter* test."  *Consumer Financial Protection Bureau v. Morgan Drexen Inc.*, 2015 WL 12745793, at *2-3 (C.D. Cal. Apr. 30, 2015).  Juul can prove neither.

As an initial matter, and as set forth above, Juul has not and cannot prove the elements of the *Winter* test.  ***On this basis alone, its request to continue to freeze Defendants' assets should be denied***.

Even if Juul could establish the necessary burden to a preliminary injunction, its request for a blanket order over all of the Defendants is unnecessarily overbroad and overreaching.  Some of the Defendants are not even tangentially connected to the alleged transactions, including CJ Trade (the California fulfillment center), the

1    two unknown Chinese entity defendants, and Chou, who was sued in his personal

2    capacity despite that there is not an iota evidence that Chou had any personal

3    involvement in any of the transactions at issue in this case.  Moreover, the impact of

4    the asset freeze order sought by Juul bears no relationship to the amount in

5    controversy.  In essence, Juul seeks an order paralyzing CJ's operations, freezing

6    over $1.4 of operating funds – all over $2,058.40 worth of alleged counterfeit Juul

7    products (solely purchased by Juul's own investigator) for which there is zero risk

8    of any similar future sales on the CJ platform.  Entering an order that effectively

9    shuts down 50% of CJ's overall business (roughly $80 million annually) to address

10   the isolated sales (all of which were to Juul's investigator) is out of balance with the

11   alleged actual harm.  This conflicts with the primary purpose of an asset freeze,

12   which is to facilitate judgment collection in the event the defendant is found liable at

13   trial.  *SEC v. Gonzalez de Castilla*, 170 F.Supp.2d 427, 429 (S.D.N.Y. 2001); *SEC v.*

14   *Lauer*, 445 F. Supp. 2d 1362, 1367 (S.D. Fla. 2006) (amount of assets frozen should

15   reasonably approximate the potential disgorgement); *Hoxworth v. Blinder, Robinson*

16   *& Co.*, 903 F.2d 186, 198 (3rd Cir. 1990) (unfreezing assets because of the overly

17   broad scope of the freeze).

18       The cases relied upon by Juul in support of their claim that a freeze is

19   necessary here present vastly different situations. For example, in both *Reebok Int'l*

20   *Ltd. v. Marnatech Enterprises, Inc.,* 737 F. Supp. 1521, 1527 (S.D. Cal. 1990) and

21   *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 984, 987-88 (11th Cir.

22   1995), the overseas defendants were all actually involved in the manufacture,

23   distribution, and sale of counterfeit goods. *Ibid.* Here, the two overseas defendants,

24   Chou and Yiwu Cute Jewelry, had no involvement in anything relating to the

25   allegedly counterfeit goods.

26       Moreover, in *Yee v. NIVS Intellimedia Tech. Group, Inc.,* No. CV 11-8472

27   JGB (AJWx), 2013 WL 1276024 (C.D. Cal. Mar. 25, 2013), *all* of the defendants

28   were overseas, while here, two of the four Defendants are firmly located in the U.S..

Rutan & Tucker, LLP
attorneys at law

-15-

2163/099999-0084
16501777.3 a05/17/21

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION

1  *Id.* at *14. And finally, in *Redwen v. Sino Clean Energy, Inc.,* No. CV 11-3936 PA

2  (SSx), 2013 WL 12303367 (C.D. Cal. Jul. 9, 2013), in the context of approval of a

3  class action settlement, the Court merely opined that obtaining funds from Chinese

4  defendants was risky in determining that the agreed-upon settlement amount was

5  sufficient. *Id.* at *20.

6        Finally, and even if the Court were to continue to freeze assets, Defendants

7  should at the very least be able to use any frozen assets to pay attorneys' fees.  *See*

8  *CFTC v. Noble Metals Int'l*, 67 F.3d 766, 775 (9th Cir. 1995) (court may allow

9  frozen assets to be used for attorney's fees); *SEC v. Grossman*, No. 87 Civ. 1031

10  2003 U.S. Dist. LEXIS 317, at *16 (S.D.N.Y. 2003) (asset freeze was modified to

11  permit payment of attorneys' fees); *SEC v. Int'l Loan Network, Inc*., 770 F. Supp.

12  678, 680 (D.D.C. 1991) (modifying freeze to permit defendants to retain counsel).

13  Defendants have a valid and complex defense, requiring funds for their counsel and

14  they are entitled to a release of at least some funds in order to pay their attorneys'

15  fees.  Any other result would permit Plaintiff to have full control over the litigation

16  and preclude the possibility that any defense can be mounted by Defendants.

17  **V.**     **JUUL SHOULD BE REQUIRED TO POST A BOND IF A**

18         **PRELIMINARY INJUNCTION IS GRANTED**

19        Except for the United States, no party may be granted a preliminary

20  injunction without first posting security "in an amount that the [C]ourt considers

21  proper to pay the costs and damages sustained by any party found to have been

22  wrongfully enjoined or restrained."  Fed. R. Civ. Pro. 65(c).  There are sound

23  reasons for this rule.  Indeed, requiring a bond for the issuance of a preliminary

24  injunction (1) discourages parties from requesting injunctions made on tenuous legal

25  grounds; and (2) assures courts that defendants will receive compensation for their

26  damages in cases where it is later determined a party was wrongfully enjoined.

27  *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1037 (9th Cir.

28  1994).

Rutan & Tucker, LLP
attorneys at law

2163/099999-0084
16501777.3 a05/17/21

-16-
DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION

1    While the amount of the bond is within the Court's discretion, *Save Our*
2    *Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005), the bond required
3    should still be "designed to protect the enjoined party's interests in the event that
4    future proceedings show the injunction issued wrongfully," *Apple, Inc. v. Samsung*
5    *Electronics Co., Ltd.*, 2012 WL 2401680, at *4 (June 26, 2012) (requiring a $2.6
6    million bond where Apple alleged Samsung infringed on Apple's patents).  Further,
7    and while district courts have discretion to dispense with the bond requirement, or to
8    require a nominal bond, those cases are largely limited to instances where requiring
9    a bond "would effectively deny access to judicial review" (i.e., cases involving
10   environmental protection or indigent parties) or where the party requesting a bond
11   has submitted no evidence that it will suffer damages from the injunction.  *Save Our*
12   *Sonoran*, 408 F.3d at 1126; *Connecticut Gen. Life Ins. Co. v. New Images of Beverly*
13   *Hills*, 321 F.3d 878, 882 (9th Cir. 2003).

14   For the reasons discussed at length herein, Defendants would suffer
15   debilitating damages from the sweeping impact of the requested injunction.  As
16   such, Defendants request that a bond be set in the amount of $500,000, to be
17   adjusted downward depending on the scope of the injunctive relief granted by the
18   Court (if any).  To be clear, this requested amount is not to protect against an
19   injunction precluding sale of the alleged infringing good (which, if correct, is not
20   disputed), but rather to protect against the overly broad portion of the injunction
21   freezing Defendants' assets and preventing any of them from conducting any
22   business whatsoever.

23   / / /
24   / / /
25   / / /
26   / / /
27   / / /
28   / / /

Rutan & Tucker, LLP
attorneys at law

2163/099999-0084
16501777.3 a05/17/21

-17-
DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION

1  **VI.**   <u>**CONCLUSION**</u>

2          For all of the foregoing, Defendants respectfully submit that Plaintiff's

3  request for a total asset freeze should be denied or, in the alternative, structured to

4  actually reflect a likely damages amount and allow Defendants to defend against

5  these claims and continue to run their business.

6

7  Dated:  May 17, 2021        RUTAN & TUCKER, LLP

8

9

10  By:                                          */s/ Bradley A. Chapin*
                                                Bradley A. Chapin
11                                              Attorneys for Defendants and Counter-
                                                Claimants, Andy Chou (aka Lizhi Zhou);
12                                              Yiwu Cute Jewelry Co., Ltd.; Yiwu Xite
                                                Jewelry Co., LTD.; CJ Fulfillment Corp.;
13                                              CJ Trade Corp.; and Yiwu Promotional
                                                Trade Co., LTD (aka Yiwu Promotion
14                                              Trade Co., LTD.)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Rutan & Tucker, LLP
attorneys at law

2163/099999-0084
16501777.3 a05/17/21

-18-

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION