STEPHEN C. STEINBERG (SBN 230656)
  ssteinberg@bzbm.com
GABRIELLA A. WILKINS (SBN 306173)
  gwilkins@bzbm.com
BARTKO ZANKEL BUNZEL & MILLER
A Professional Law Corporation
One Embarcadero Center, Suite 800
San Francisco, California 94111
Telephone:  (415) 956-1900
Facsimile:  (415) 956-1152

Attorneys for Plaintiff JUUL Labs, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JUUL LABS, INC., a Delaware Corporation,<br><br>            Plaintiff,<br><br>        v.<br><br>ANDY CHOU (aka LIZHI ZHOU), an individual; YIWU CUTE JEWELRY CO., LTD., a Chinese limited company; YIWU XITE JEWELRY CO., LTD., a Chinese limited company; CJ FULFILLMENT CORP., a California Corporation; CJ TRADE CORP., an Arizona Corporation; and YIWU PROMOTIONAL TRADE CO., LTD. (aka YIWU PROMOTION TRADE CO., LTD.), a Chinese limited company,<br><br>            Defendant.<br><br>AND RELATED CROSS-ACTION | Case No. 2:21-cv-03056-DSF-PDx<br><br>**PLAINTIFF JUUL LABS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:   Hon. Dale S. Fischer<br>Date:    August 16, 2021<br>Time:    1:30 p.m.<br>Ctrm.:   7D<br><br>Action Filed:      April 8, 2021<br>Trial Date:        October 18, 2022 |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 7

II.     STATEMENT OF THE CASE ........................................................................ 9

        A.      JLI and JUUL Products ................................................................... 9

        B.      JLI's Trademarks ............................................................................. 9

        C.      JLI's Quality Control Measures for Genuine JUUL Products ............ 10

        D.      Defendants and Defendants' E-Commerce Operation ........................ 11

        E.      Defendants' Use of Counterfeit JUUL Marks ..................................... 12

        F.      Defendants Are Responsible for the Conduct of Their Salespeople, Including Celia Yang ......................................................................... 14

        G.      There Is Overwhelming Evidence of Defendants' Willfulness ........... 16

                1.      Defendants' Intent and Knowledge of Infringement ................. 16

                2.      Defendants' Deception of JLI and the Court ............................. 16

III.    SUMMARY JUDGMENT STANDARD ....................................................... 18

IV.     LEGAL ARGUMENT ...................................................................................... 20

        A.      Defendants Are Liable for Infringement ............................................ 20

                1.      It Is Undisputable that JLI Owns the Trademarks at Issue ......... 20

                2.      Defendants Used the JUUL Marks in Commerce ..................... 21

                3.      Defendants' Counterfeiting Caused Confusion ......................... 24

        B.      Defendants Are Liable for Violations of Federal and California Unfair Competition Laws .................................................................. 25

V.      JLI Is entitled to up to $28 million in statutory damages ................................ 26

        A.      Defendants' Misconduct Calls for an Award of Maximum Statutory Damages ......................................................................... 28

VI.     CONCLUSION ................................................................................................. 30

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

**Cases**

5

6

*Adobe Sys. Inc. v. Blue Source Grp., Inc.*,
   125 F. Supp. 3d 945 (N.D. Cal. 2015)................................................................23

7

8

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...........................................................................................19

9

10

*Atari Interactive, Inc. v. Redbubble, Inc.*,
   __ F. Supp. 3d __, 2021 WL 706790 (N.D. Cal. Jan. 28, 2021).................22, 23

11

*BMW of N. Am., LLC v. Rocco*,
   No. CV 19-9285 DSF, 2020 WL 7047318 (C.D. Cal. Nov. 18, 2020)..............20

12

13

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*,
   174 F. 3d 1036 (9th Cir. 1999) ..........................................................................25

14

15

*Celotex, Corp., v. Catrett*,
   477 U.S. 317 (1986) ...........................................................................................19

16

17

*Century 21 Real Estate Corp. v. Sandlin*,
   846 F.2d 1175 (9th Cir. 1988) .....................................................................25, 26

18

19

*Chanel, Inc. v. RealReal, Inc.*,
   449 F. Supp. 3d 422 (S.D.N.Y 2020) ................................................................22

20

21

*Chloe SAS v. Sawabeh Info Servs. Co.*,
   CV 11-4147 GAF (MANx), 2013 WL 12126742
   (C.D. Cal. Oct. 8, 2013)......................................................................................24

22

23

*Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*,
   259 F.3d 1186 (9th Cir. 2001) ............................................................................27

24

25

*Delta Air Lines, Inc. v. Wunder*,
   No. 1:13-CV-3388-MHC, 2015 WL 11242003 (N.D. Ga. Dec. 15, 2015) .......29

26

27

*Devereaux v. Abbey*,
   263 F.3d 1070 (9th Cir. 2001) ............................................................................19

28

*Feiya Cosmetics, LLC v. Beyond Beauty Int'l, LLC*,
   No. C-10-00967 JCS, 2011 WL 4506182 (N.D. Cal. Aug. 29, 2011) .............. 28

*Forsberg v. Pac. Nw. Bell Tel. Co.*,
   840 F.2d 1409 (9th Cir. 1988) ..................................................................... 19

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
   826 F.2d 837 (9th Cir. 1987) ....................................................................... 20

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*,
   176 F. Supp. 3d 137 (E.D.N.Y. 2016) ..................................................... 29, 30

*Jazz Casual Prods. Inc. v. Byron*,
   No. C-11-0352 JCS, 2012 WL 13059823 (N.D. Cal. June 21, 2012) ............... 29

*JL Beverage Co., LLC v. Jim Beam Brands Co.*,
   828 F.3d 1098 (9th Cir. 2016) ..................................................................... 25

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Eastimpex*,
   No. 04-cv-4146 MMC, 2007 WL 328696 (N.D. Cal. Feb. 2, 2007) ................. 30

*Levi Strauss & Co. v. Shilon*,
   121 F.3d 1309 (9th Cir. 1997) ..................................................................... 21

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,
   658 F.3d 936 (9th Cir. 2011) ................................................................. 21, 22

*Mallard Creek Indus., Inc. v. Morgan*,
   56 Cal. App. 4th 426 (1997) ........................................................................ 26

*Microsoft Corp. v. Buy More, Inc.*,
   No. CV-14-9697-R, 2015 WL 12748627 (C.D. Cal. Nov. 6, 2015) ................. 27

*Microsoft Corp. v. Image & Bus. Sols., Inc.*,
   No. CV 05-6807 ABC, 2007 WL 2874430 (C.D. Cal. May 4, 2007) .............. 21

*Moroccanoil, Inc. v. Groupon, Inc.*,
   278 F. Supp. 3d 1157 (C.D. Cal. 2017) ........................................................ 22

*N. Face Apparel Corp. v. Niman*,
   No. CV 05-3628 DSF, 2007 WL 9700729 (C.D. Cal.
   Jan. 29, 2007) ...................................................................................... 27, 29, 30

*New W. Corp. v. NYM Co. of Cal.*,
   595 F.2d 1194 (9th Cir. 1979) ........................................................................ 25

*Nike Inc. v. Variety Wholesalers, Inc.*,
   274 F. Supp. 2d 1352 (S.D. Ga. 2003) *aff'd*, 107 F. App'x. 183
   (11th Cir. 2004) ............................................................................................ 28

*Nike, Inc. v. E. Ports Custom Brokers*, Inc.,
   No. 2:11-CV-4390-CCC-MF, 2018 WL 3472628 (D.N.J. July 19, 2018) ........ 23

*Nike, Inc. v. Top Brand Co.*,
   No. 00 Civ.8179(KMW)(RLE), 2006 WL 2946472 (S.D.N.Y.
   Feb. 27, 2006) ............................................................................................. 27

*In re Oracle Corp., Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) ........................................................................ 19

*Philip Morris U.S.A. Inc. v. Castworld Prods., Inc.*,
   219 F.R.D. 494 (C.D. Cal. 2003) .................................................................. 29

*Philip Morris USA Inc. v. Felizardo*,
   No. 03 Civ 5891(HB), 2004 WL 1375277 (S.D.N.Y. June 18, 2004) ............. 24

*Philip Morris USA, Inc. v. Lee*,
   481 F. Supp. 2d 742 (W.D. Tex. 2006) ......................................................... 24

*Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc.*,
   No. 08-0068(KAM)(JO), 2010 WL 2133937 (E.D.N.Y.
   Mar. 11, 2010) ............................................................................................. 24

*Phillip Morris USA Inc. v. Shalabi*,
   352 F. Supp. 2d 1067 (C.D. Cal. 2004) .......................................... 22, 24, 28

*Playboy Enters., Inc. v. Asiafocus Int'l, Inc.*,
   No. Civ.A. 97-734-A, 1998 WL 724000 (E.D. Va. Apr. 10, 1998) ............ 27, 28

*Polo Fashions, Inc. v. Craftex, Inc.*,
   816 F.2d 145 (4th Cir. 1987) ........................................................................ 24

*Power Balance LLC v. Power Force LLC*,
   No. SACV 10-1726 AG (MLGx), 2010 WL 5174957(C.D. Cal. 2010) ............ 24

*Sara Lee Corp. v. Bags of New York, Inc.*,
   36 F. Supp. 2d 161 (S.D.N.Y. 1999) ............................................................. 27

*Spy Optic, Inc. v. Alibaba.Com, Inc.*,
  163 F. Supp. 3d 755 (C.D. Cal. 2015) ................................................. 20

*SV3, LLC v. GG Distrib., Inc.*,
  No. EDCV 19-0046 JGB (SPx), 2019 WL 1460621 (C.D. Cal.
  Feb. 27, 2019) ..................................................................................... 26

*Tommy Bahama Group, Inc. v. Sexton*,
  No. C 07-06360 EDL, 2009 WL 4673863 (N.D. Cal. Dec. 3, 2009),
  aff'd, 476 F. App'x 122 (9th Cir. 2012) ............................................... 21

*UL LLC v. Space Chariot Inc.*,
  250 F. Supp. 3d 596 (C.D. Cal. 2017) ........................................... 21, 29

*United States v. Kim*,
  307 F. App'x 324 (11th Cir. 2009) ....................................................... 29

*Zobmondo Ent., LLC v. Falls Media, LLC*,
  602 F.3d 1108 (9th Cir. 2010) ............................................................. 20

**Statutes and Rules**

15 U.S.C.
  § 1114 .............................................................................................. 21, 25
  § 1114(1)(a) ................................................................................. 20, 21, 26
  § 1117(a) .............................................................................................. 26
  § 1117(b) .............................................................................................. 26
  § 1117(c) .............................................................................................. 26
  § 1127 .............................................................................................. 21, 22

Cal. Bus. & Prof. Code
  § 17200 *et seq.* .................................................................................... 26

Fed. R. Civ. P.
  Rule 56(c) ............................................................................................ 19

**Other Authorities**

4 McCarthy on Trademarks and Unfair Competition § 25:10 (5th ed.) ................. 21

Rest. (3d) of Agency § 2.03 (2006) ........................................................ 15

# I.   INTRODUCTION

This is a straightforward counterfeiting case that presents no genuine disputed issue of material fact as to Defendants' knowing, intentional, and willful infringement of Plaintiff JUUL Labs, Inc.'s ("JLI") trademarks.

JLI owns various federally registered trademarks that it uses or has used in connection with the following JUUL products: (1) JUUL Device; (2) JUULpods; (3) JUUL USB Charging Dock; and (4) JUUL Starter Kits containing the aforementioned products (together, the "JUUL Products"). Defendants are comprised of Defendant Andy Chou (aka Lizhi Zhou) and various companies that he owns and uses interchangeably for parts of his business. As part of its global anti-counterfeiting efforts, JLI discovered Defendants advertising for sale purported JUUL Products on its website, "cjdropshipping.com." JLI hired a private investigator to purchase these suspect products from Defendants, all of which bore JLI's federally registered trademarks and were found to be counterfeit. Defendants are liable for trademark infringement because they used in commerce JLI's rightfully owned trademarks, and such use caused a likelihood of confusion.

As a threshold matter, it is undisputable that JLI is the exclusive and rightful owner of the trademarks at issue here.

Next, it is undisputable that Defendants advertised for sale, sold, and distributed counterfeit JUUL Products with counterfeit JUUL Marks both on the packaging and the products themselves. Defendants do not dispute that the products are counterfeit. Nor do they dispute that the products were advertised on, and sold and distributed through their website. Instead, Defendants seek to avoid liability by claiming that a third party is actually the one responsible for advertising and selling the counterfeit products, not them. But for the reasons explained below, this contention fails as a matter of law. Thus, no triable issues of fact remain.

Defendants' argument fails for two distinct reasons. First, the undisputable evidence shows, and Defendants admit, that sales of the infringing products

occurred on Defendants' website and that their site facilitated distribution of the offending products. This alone is sufficient to impose liability on them. Second, even if Defendants' contentions were true regarding the purported third-party being the seller, Defendants' are legally responsible because all of the sales activity was conducted by Defendants' actual or apparent agents. Indeed, Defendants have admitted that it is reasonable for someone purchasing a product from their website to believe that Defendants, as opposed to a third-party seller, is the actual seller of the goods. The evidence supports this, as none of the product listings for the counterfeit JUUL Products identified any other party, other than Defendants, as the advertiser, seller, and distributor of the goods.

Because the JUUL Products were counterfeit, likelihood of confusion is presumed. And even if this were not so, a review of the *Sleekcraft* factors shows that confusion is likely, as Defendants are using identical replicas of JLI's strong marks on products that are intended to look like authentic JUUL Products. None of the *Sleekcraft* factors favor Defendants. Thus, likelihood of confusion is established as a matter of law.

The counterfeit JUUL Products purchased by JLI's investigator from Defendants included a total of 14 counterfeit marks on the different types of goods sold. And Defendants' conduct warrants the maximum allowable statutory damages because there is no dispute that: (1) the JUUL Marks are an invaluable asset to JLI; (2) Defendants' conduct was intentional and willful; (3) Defendants violated the Court's Orders; and (4) the counterfeit JUUL Products were for human consumption and were not subject to JLI's quality control measures.

There is no triable issue of fact on whether Defendants' infringement was willful. Defendants, through someone with actual or apparent authority, acknowledged the purported JUUL Products they were selling were counterfeit during the transactions in question. And Defendants knowingly and intentionally source and sell other non-genuine branded products. Additionally, Defendant Chou

has previously been convicted for infringement in China and he and his companies actively educate other Chinese sellers on how to evade U.S. intellectual property laws. All of these facts support the stiffest penalties permitted by law.

Defendants have also repeatedly violated the Court's Orders by failing to sequester and deliver inventory and accurately and completely disclose all of their assets, and by continuing to transfer and withdraw assets after admitted notice of the Court's asset freeze. Defendants have already admitted violating the Court's Orders and lying to the Court about their compliance.

Finally, case law supports the maximum statutory damages in cases that involve counterfeit products for human consumption to act as a deterrent because of the risk to human health. Therefore, the Court should grant JLI's summary judgment motion and award the maximum statutory damages for willful infringement, up to $28 million.

## II.   STATEMENT OF THE CASE

### A.   JLI and JUUL Products

JLI designs, manufactures, and distributes JUUL-branded electronic nicotine delivery systems ("ENDS") and related products. Statement of Uncontroverted Facts And Genuine Issues in Support of Plaintiff's Motion for Summary Judgment (hereinafter, "SUF") No. 1. The JUUL Device is a rechargeable inhalation apparatus designed to be exclusively used with JUULpods. SUF No. 3. JUULpods are individual disposable cartridges filled with JLI's proprietary nicotine e-liquid formulations and contain a heating chamber. SUF No. 4. JUULpods are designed to be inserted directly into the JUUL Device. SUF No. 5. The JUUL USB Charging Dock is an individual charging dock designed specifically for the JUUL Device and related accessories. SUF No. 6.

### B.   JLI's Trademarks

JLI is the exclusive owner of the following trademarks registered with the U.S. Patent and Trademark Office ("USPTO") for use in connection with, and that

appear on genuine JUUL Products:

- "JUUL" (U.S. Trademark Reg. No. 4,818,664);

- JUUL (U.S. Trademark Reg. Nos. 4,898,257);

- JUUL LABS (U.S. Trademark Reg. No. 5,770,541);

- "JUUL LABS" (U.S. Trademark Reg. No. 5,776,153);

- "JUULPODS" (U.S. Trademark Reg. Nos. 5,918,490);

- ⟨ JUUL ⟩ (U.S. Trademark Reg. No. 6,064,902); and

- JUUL (U.S. Trademark Reg. Nos. 6,211,614).

SUF No. 10. All of these marks together are referred to as the "JUUL Marks." JLI has used the JUUL Marks continuously in commerce, including in connection with its sale of the JUUL Device, JUULpods, and JUUL USB Charging Dock. SUF No. 11. JLI prominently displays the JUUL Marks in all of its promotional materials and on all product packaging. SUF No. 12. As a result of JLI's significant investment in marketing efforts featuring the JUUL Marks and JLI's marketplace success of the JUUL brand, the JUUL Marks are widely recognized and have become well known to the public. SUF No. 13. Due to JLI's longtime use of and investment in the JUUL Marks and the quality of JLI's products, the JUUL brand has built up a tremendous amount of consumer goodwill. SUF No. 14. The JUUL Marks symbolize the business goodwill of JLI and are invaluable assets to JLI. SUF No. 14.

## C.   JLI's Quality Control Measures for Genuine JUUL Products

All JUUL Products are designed to meet industry standards for safety, quality, reliability, and performance. SUF No. 7. JLI practices stringent quality controls to guarantee consistent quality, safety, and performance for each of its products. SUF No. 9. JLI conducts quality control tests on JUUL Products in their totality and on component parts. SUF No. 8. JLI also conducts regular visits to and audits of its suppliers' factories to ensure strict product standards are met. SUF No. 9. In the

United States, JLI sells its products on both its online retail store and through its authorized network of distribution partners. SUF No. 15. JLI ensures that its distribution partners meet its high-quality standards and will only pre-approve authorized vendors if they do so. SUF No. 15. Defendants are not one of JLI's authorized distribution partners. SUF No. 16.

### D.    Defendants and Defendants' E-Commerce Operation

Defendant Andy Chou (aka Lizhi Zhou) ("Chou") is the founder, owner, CEO and principal of co-Defendants Yiwu Cute Jewelry Co., Ltd., Yiwu Xite Jewelry Co., Ltd., CJ Fulfillment Corp., CJ Trade Corp., and Yiwu Promotional Trade Co., Ltd. SUF No. 17. Chou maintains control over all corporate accounts and routinely transfers funds from one corporate account to another, and from the corporate accounts to his personal bank accounts and vice versa. SUF No. 18. Defendants operate two fulfillment centers in the U.S. where they house inventory and from which they ship products. SUF Nos. 20-21. One is in Cranbury, New Jersey, and is operated by Defendant CJ Trade Corporation, an Arizona corporation, and the other is in Chino, California, and is operated by CJ Fulfillment Corporation, a California corporation. SUF Nos. 20-21. Outside of the U.S., Defendants operate warehouses all over the world, including in China, Germany, Thailand, Indonesia, Britain, Australia, and France. SUF. No. 22.

Defendants advertise and sell products through an e-commerce platform, www.cjdropshipping.com ("CJ"), and otherwise operate their business under the name "cjdropshipping." SUF Nos. 17, 19. Defendants source products, advertise, offer for sale, and sell products on their website, store products in their various warehouses, process orders made on CJ, and handle distribution of such products and shipping logistics to end customers. SUF No. 23. When a product is purchased on CJ, Defendants fulfill the order from their inventory and/or Defendants' purchase team finds a supplier from whom to obtain the product. SUF Nos. 24-26. Defendants are responsible for the shipping and handling of every product sold on CJ. SUF No.

27. Defendants control all product information on their website. SUF No. 28. None of the listings on CJ for the counterfeit JUUL Products at issue here (and indeed none of the listings on CJ at all), mention any other supplier, nor do they indicate that the goods advertised are being advertised, sold, or shipped by anyone other than CJ. SUF Nos. 63-65. Defendants maintain control over, and have access to, all communications that take place on CJ's platform. SUF No. 30. When customers purchase products on CJ, they pay Defendants directly, not any other third party. SUF No. 31.

### E.  Defendants' Use of Counterfeit JUUL Marks

As part of an ongoing effort to protect its rights to the JUUL Marks, JLI discovered Defendants advertising and offering for sale "JUUL Starter Kits" on CJ, which included the following purported JUUL products: (a) JUUL Device; (b) JUUL USB Charging Dock; and (c) four JUULpods in Cool Mint, Virginia Tobacco, Crème Brulee, and Mango flavors. SUF No. 32. Notably, in the U.S., JLI has not sold JUUL Starter Kits in retail locations that include these four-flavored JUULpods since November 2018. SUF No. 33. JLI changed the names of its JUULpods in Crème Brulee and Cool Mint flavors to "Crème" and "Mint," respectively, and has not sold JUULpods with flavors named "Crème" since October 2019, and "Mint" since November 2019. SUF Nos. 34-36. So Defendants' advertising and offering these products for sale raised a red flag that they were potentially counterfeit.

JLI arranged for an investigator to buy the suspect JUUL Products from Defendants. SUF No. 37. As part of JLI's investigation, JLI's investigator accessed Defendants' website, cjdropshipping.com, and searched for "JUUL" products, which resulted in listings for JUUL Starter Kits and JUUL USB Charging Docks. SUF No. 38. According to their website, Defendants were advertising and offering for sale inventory of over 10,000 JUUL Starter Kits and over 1,800 JUUL USB Charging Docks at that time. SUF Nos. 39.

On October 7, 2019, JLI's investigator purchased three silver and two pink JUUL Starter Kits and five JUUL USB Charging Docks on CJ, which were delivered to the investigator on November 7, 2019 (Order # ZF1910083563215030). SUF No. 40. The exterior and interior packaging of each suspect JUUL product purchased from Defendants, as well as the JUUL Devices themselves, bore one or more of the JUUL Marks. SUF No. 44. On January 6, 2020, JLI's investigator shipped the products from Order # ZF1910083563215030 to JLI's evidence specialist, who is responsible for inspecting and authenticating suspect JUUL products to determine whether they are counterfeit. SUF Nos. 42-43. JLI's evidence specialist determined these products were counterfeit because of the differences between them and genuine JUUL Products. SUF No. 45.

On March 16, 2020, JLI's investigator ordered another one hundred JUUL Starter Kits from CJ to be shipped to Defendants' warehouse in New Jersey (Order # SY2003143563222037). SUF No. 47. JLI arranged for another investigator, along with personnel from the U.S. Department of Homeland Security ("DHS"), to pick up the suspect JUUL Starter Kits from the NJ warehouse, which they did on August 20, 2020. SUF No. 48. DHS kept most of these products, except JLI's investigator kept two samples. SUF No. 49. The exterior and interior packaging of each suspect JUUL product purchased from Defendants, as well as the JUUL Devices themselves, bore one or more of the JUUL Marks. SUF No. 50. On or around August 26, 2020, JLI's investigator sent high resolution photos of one of the samples to JLI's evidence specialist for analysis. SUF No. 49. JLI's evidence specialist determined these products were also counterfeit. SUF Nos. 51-52.

On April 8, 2020, JLI's investigator purchased two silver, six pink, and five slate JUUL Starter Kits from CJ, which were delivered to the investigator on April 23, 2020 (Order # ZF2004083563265205). SUF No. 54. JLI's investigator forwarded the products to JLI's evidence specialist on June 25, 2020, who evaluated the products. SUF No. 56. The exterior and interior packaging of each suspect JUUL

13

product purchased from Defendants, as well as the JUUL Devices themselves, bore one or more of the JUUL Marks. SUF No. 57. JLI's evidence specialist determined these products were also counterfeit. SUF No. 58.

All of the JUUL Products purchased were determined to be inauthentic due to distinct differences between them and authentic JUUL Products, including:

1.  The JUUL Device has either no engraved serial number or multiple JUUL Devices have the same engraved serial number;

2.  The lot code on some of the suspect JUUL Device packaging does not match the serial number on the suspect JUUL Devices contained therein;

3.  Some of the suspect JUUL Devices have an incorrect UPC;

4.  Some of the foil packaging for the suspect JUULpods has a shiny metallic appearance, whereas packaging for authentic JUULpods has a matte appearance; and

5.  The font and spacing on the packaging for the suspect JUUL Starter Kits, JUUL Device, and JUULpods differ from authentic JUUL Products.

SUF Nos. 45, 52, 58.

Throughout JLI's investigation, Defendants continuously advertised single-day inventories of over 10,000 units of the JUUL Starter Kits, and over 1,000 units of the JUUL USB Charging Docks. SUF Nos. 39, 46, 53. Up until JLI filed its Complaint and *ex parte* application for an asset freeze order and other relief, on April 8, 2021, Defendants were continuing to advertise and offer for sale various purported JUUL USB Charging Docks on their website. SUF No. 74.

**F.   Defendants Are Responsible for the Conduct of Their Salespeople, Including Celia Yang**

Throughout the aforementioned investigation and series of purchases of counterfeit JUUL Products from Defendants, JLI's investigator communicated with

several different representatives of Defendants. SUF Nos. 59-62, 67. Whether they were formal employees or not, these sales representatives had actual or apparent authority to act on behalf of Defendants. *See* Rest. (3d) of Agency § 2.03 (2006) ("Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.")

At the June 7, 2021 hearing, Defendants' counsel admitted to the elements of apparent authority: "it's understandable. Your Honor … from the private investigator's standpoint, that it appeared, given the way the platform is set up. I understand why someone buying a product from the website would think that the representative is actually a CJ employee … ." SUF No. 66.

One of Defendants' representatives, Celia Yang ("Celia"), was assigned as the personal agent for JLI's investigator to handle all of his orders, including for the purported JUUL Products at issue. SUF Nos. 61, 66, 68; ECF No. 65, pp. 13-14, 22. Celia actively found a supplier to provide additional JUUL Products to ensure that Defendants could fill JLI's investigator's larger order. SUF Nos. 71-72. On more than one occasion, Celia acknowledged that the JUUL Starter Kits JLI's investigator had purchased could not be legally shipped to the United States. SUF No. 73. Neither Celia, nor any of the other three representatives from Defendants who JLI's investigator corresponded with, ever informed JLI's investigator that they worked for or represented anyone other than Defendants, nor that the counterfeit JUUL Products being purchased were being sourced, advertised, offered, sold, or distributed by anyone other than Defendants. SUF Nos. 64-65; ECF. No. 65, p. 14. JLI's investigator paid Defendants for each purchase through PayPal, which listed the seller as Defendant "Yiwu Promotional Trade Co., Ltd." (one of the entities used by Defendants for transactions on its website). SUF No. 31. In addition, one of Defendants' representatives with whom JLI's investigator corresponded about

ordering counterfeit JUUL products was Leon Li, who then met JLI's other investigator and provided the actual products from Defendants' New Jersey warehouse. SUF Nos. 48, 60, 66.

### G. There Is Overwhelming Evidence of Defendants' Willfulness

#### 1. Defendants' Intent and Knowledge of Infringement

Besides the clear evidence of counterfeiting and that Defendants' conduct was intentional set forth above, Defendant Chou, the owner of all of the Defendant entities and mastermind behind the CJ organization, is no stranger to largescale trafficking of counterfeit goods. In 2010, Chou was convicted of conspiracy for producing and selling hundreds of thousands of counterfeit goods, and was sentenced to four years in prison in China. SUF No. 88. Now, Chou educates other illicit offshore suppliers on best practices to evade liability for intellectual property infringement in the United States. SUF No. 89.

Moreover, there is undisputable evidence that while selling the aforementioned counterfeit JUUL Products, Defendants also knowingly offered to source and sell other counterfeit products from their website to JLI's investigator. SUF Nos. 90. For example, as part of his investigation, JLI's investigator ordered Apple-branded products from CJ. SUF No. 90. Celia, Defendants' agent assigned to JLI's investigator, informed him that the products she found to fulfill his order were non-genuine products, but had Apple branding on them. SUF No. 90.

#### 2. Defendants' Deception of JLI and the Court

On April 13, 2021, the Court granted JLI's application for a temporary restraining order and an asset freeze order, among other relief. ECF No. 31 ("TRO Order"). Defendants were ordered not to secret, transfer, or convey any of their assets and were required to produce a full accounting of all of their assets within three days of receipt of the TRO Order. *Id.*, pp. 28-29; SUF No. 75-76. JLI served Defendants with the TRO Order, and Defendants admit they received it, as early as April 22, 2021. SUF No. 77.

In violation of the Court's TRO Order, Defendants withdrew tens of thousands of dollars from their Wells Fargo and Payoneer accounts on April 23 and 25, 2021. SUF No. 78. Also in violation of the TRO Order, Defendants failed to provide the required accounting of the restrained assets within three business days of receiving the Order, which would have been on April 27, 2021. SUF Nos. 76-77, 79. Rather, ten days late, on May 7, 2021, Defendants produced a declaration of Chou attaching a list of **only ten accounts**, one piece of real estate, and one automobile. SUF Nos. 76-77, 80. Chou swore under penalty of perjury that this was ***"[a] full accounting of the restrained assets***," and that "***Defendants are in full compliance with the*** [TRO] ***Order***." SUF No. 81 (ECF No. 55-8) (emphasis added). But in fact, Chou and his companies were intentionally concealing over sixty more accounts containing millions of dollars in assets at that time, as shown in more detail below.

On May 17, 2021, Mr. Chou filed another declaration with the Court in which he admitted being served with the Court's TRO Order on April 22, 2021, and declared under penalty of perjury that "as soon as I was served with the instant lawsuit and court order, I immediately engaged counsel and ***took action to comply with the expedited discovery requests and the remainder of the Order***." SUF No. 77; ECF No. 51-1 ¶ 37 (emphasis added). Again, this was false, as Defendants had violated the TRO Order as explained above.

On June 7, 2021, the Court held a hearing on whether a preliminary injunction should issue. Defendants' counsel initially claimed that "***there has been no violation of the [TRO] order***" as to the asset freeze, and that "[w]e have provided the other side with declarations consistent with the order on where we bank which ***includes all the accounts including the ones that they say we omitted***." SUF No. 84 (emphasis added). But after JLI's counsel identified several accounts that had been omitted, Defendants' counsel finally admitted that his client had lied and violated the TRO Order as "***there are some accounts that were not listed***," that "***I don't dispute that some accounts weren't specifically identified***," and that there were

"some mistakes." SUF No. 84 (emphasis added). But, Defendants' counsel maintained that they had "*largely complied with the order*." SUF No. 84 (emphasis added). Defendants' deception and concealment at the hearing, however, were far greater than JLI or the Court could have reasonably anticipated at the time of the hearing and at the time the Court issued its order following the hearing.

On June 9, 2021, the Court granted JLI's application for a preliminary injunction and continued to freeze Defendants' assets ("Preliminary Injunction Order")[1] (ECF No. 65), but capped the asset freeze at a level based on the information the Court had before it at the time, including the representations that Defendants' counsel made at the hearing. On June 14, 2021, a week after the hearing, in response to the directive from the Court in its Preliminary Injunction Order, Defendants were forced to produce a "Supplemental Accounting" that identified a total of **<u>seventy</u>** accounts, of which **<u>sixty</u>** accounts containing millions of dollars had been concealed from Chou's original accounting, plus three parcels of real estate and one automobile, confirming that Defendants had been concealing most of their assets from JLI and the Court. SUF Nos. 82-83.

Defendants' Supplemental Accounting also represented that a total of approximately USD $2.63 million was located in accounts at five financial institutions in the U.S.: Bank of America, Wells Fargo, Payoneer, Stripe, and PayPal. SUF. No. 83. Subsequently, Plaintiffs discovered that Defendants had grossly understated the total amount in these accounts, and had failed to disclose additional accounts at Stripe, Payoneer, and other financial institutions, providing further evidence of Defendants' deceitfulness. SUF Nos. 86-87.

## III.   SUMMARY JUDGMENT STANDARD

A motion for summary judgment must be granted when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no

---

[1] The TRO Order and Preliminary Injunction Order are collectively referred to as the "Court Orders."

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "This burden is not a light one." *In re Oracle Corp., Sec. Litig.,* 627 F.3d 376, 387 (9th Cir. 2010). But the moving party need not disprove the opposing party's case. *Celotex, Corp., v. Catrett*, 477 U.S. 317, 323 (1986). Instead, the movant bears the initial burden to demonstrate the absence of a genuine issue of material fact for trial. *Id.* at 325. Once the movant carries its initial burden, the non-moving party "may not rest upon the mere allegations or denials …, but must provide … evidence that set[s] forth specific facts showing that there is a genuine issue for trial." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247-48 (emphasis in original). An issue of fact is a genuine issue if it reasonably can be resolved in favor of either party. *Id.* "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence which the jury … could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict … ." *Id.* at 252. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. at 248. "The district judge is not required to comb the record to find some reason to deny a motion for summary judgment." *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex,* 477 U.S. at 323-24, 327.

## IV.   LEGAL ARGUMENT

### A.   Defendants Are Liable for Infringement

15 U.S.C. § 1114 (1)(a), states:

> (1) Any person who shall, without the consent of the registrant -
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.

To prevail on a trademark infringement claim, the moving party must establish: (1) they have a valid, protectable trademark; and (2) defendant's use of the same or similar mark causes a likelihood of confusion in the minds of the relevant consuming public. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 841 (9th Cir. 1987); *BMW of N. Am., LLC v. Rocco,* No. CV 19-9285 DSF (PLAx), 2020 WL 7047318, at *7 (C.D. Cal. Nov. 18, 2020). The same requirements apply to claims for false designation of origin and unfair competition. *Spy Optic, Inc. v. Alibaba.Com, Inc.*, 163 F. Supp. 3d 755, 768 (C.D. Cal. 2015). For the reasons explained below, all of these elements are satisfied.

### 1.   It Is Undisputable that JLI Owns the Trademarks at Issue

Federal registration of a trademark is *prima facie* evidence of the mark's validity and entitles the plaintiff to a strong presumption that the mark is protectable. *Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010); *BMW of N. Am., LLC*, 2020 WL 7047318, at *7. JLI is the exclusive owner of the federally registered trademarks at issue. SUF No. 10. JLI has used the JUUL Marks continuously in commerce, and has always prominently displayed its marks on all product packaging. SUF Nos. 11-12. Thus, it is undisputable that the JUUL Marks are valid, protectable, and owned exclusively by JLI.

### 2.     Defendants Used the JUUL Marks in Commerce

Section 1114 states, "[a]ny person who shall … use in commerce any … counterfeit … of a registered mark … which such use is likely to cause confusion, or to cause mistake, or to deceive … *shall be liable* in a civil action by the registrant for the remedies hereinafter provided." 15 U.S.C. § 1114 (emphasis added). An offer to sell a counterfeit good, "without the consent of the [trademark] registrant," is sufficient to establish trademark counterfeiting under the Lanham Act. 15 U.S.C. 1114(1)(a); *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1312 (9th Cir. 1997) ("An offer to sell without more will suffice to establish liability [under the Lanham Act]."); *Tommy Bahama Group, Inc. v. Sexton,* No. C 07-06360 EDL, 2009 WL 4673863, at *4 (N.D. Cal. Dec. 3, 2009), aff'd, 476 F. App'x 122 (9th Cir. 2012) ("offer to sell is sufficient."). A counterfeit is "a non-genuine mark identical to the registered, genuine mark of another, where the genuine mark was registered for use on the same goods to which the infringer applied the mark." *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 945-946 (9th Cir. 2011); *see also* 15 U.S.C. § 1127. Counterfeiting is a more specialized case of trademark infringement because "[a] 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127; *see also* 4 McCarthy on Trademarks and Unfair Competition § 25:10 (5th ed.) ("[C]ounterfeiting is 'hard core' or 'first degree' trademark infringement and is the most blatant and egregious form of 'passing off.'). As Judge Scheindlin put it, counterfeiting is an aggravated form of trademark infringement "that seeks to trick the consumer into believing he or she is getting the genuine article." *UL LLC v. Space Chariot Inc.*, 250 F. Supp. 3d 596, 607–08 (C.D. Cal. 2017) (internal quotation marks and citations omitted).

"[T]rademark infringement" is a "strict liability offense[], and the state of mind of the defendant is not relevant." *Microsoft Corp. v. Image & Bus. Sols., Inc.*, No. CV 05-6807 ABC (RCx), 2007 WL 2874430, at *7 (C.D. Cal. May 4, 2007). A defendant is strictly liable for selling infringing goods even if it did not personally

itself affix the offending mark to the goods it sells. *Atari Interactive, Inc. v. Redbubble, Inc.*, __ F. Supp. 3d __, 2021 WL 706790, at *4 (N.D. Cal. Jan. 28, 2021). For this reason, "an online marketplace" cannot avoid liability for "offering to sell an infringing good" by asserting that it is simply selling third parties' goods "if a person shopping on [the website] would have reasonably believed that the [website provider], and not the third-party sellers, was the seller with title or possession of a product who could have entered into a contract to transfer title or possession." *Id.* at *8 (citation omitted) (alterations in original); *accord e.g.*, *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1074 (C.D. Cal. 2004) (sellers of cigarettes with infringing packaging liable regardless of whether they knew the goods were counterfeit); *Chanel, Inc. v. RealReal, Inc.*, 449 F. Supp. 3d 422, 441 (S.D.N.Y 2020) (online consignment store could be liable for direct infringement by counterfeit products even though it was not involved in the "manufacture nor the affixing" of the trademark). "[A]s a legal matter, a 'sale' is not limited to sales by the owner" since "the law recognizes a sale by anyone who has authority to transfer title." *Atari Interactive, Inc.* 2021 WL 706790, at *5.

Here, Defendants advertised for sale on their website identical copies of JUUL Products bearing the JUUL Marks. SUF Nos. 23, 32, 38-39, 46, 53. Defendants also sold and shipped inauthentic JUUL Products bearing counterfeit JUUL Marks to JLI's investigator. SUF Nos. 40, 44-45, 47, 50-52, 54, 57-58. There is no dispute that the JUUL Products Defendants advertised for sale, sold, and distributed were counterfeit. SUF Nos. 38-58; *see* 15 U.S.C. § 1127; *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 945 (9th Cir. 2011). JLI's evidence specialist tested and analyzed all of the JUUL Products purchased from Defendants and determined the products were clearly counterfeit based on numerous material differences between them and authentic JUUL Products. SUF Nos. 45, 51-52, 58; *see Moroccanoil, Inc. v. Groupon, Inc.*, 278 F. Supp. 3d 1157, 1162 (C.D. Cal. 2017) (products sold on Groupon were counterfeit where plaintiff showed that

unique identifiers on authentic products were missing and the contents of the products were distinctly different from authentic products).

Defendants deny using the JUUL Marks in commerce by alleging that a third party, rather than Defendants, was the true offeree and seller of the JUUL Products at issue. But Defendants cannot present any evidence capable of creating a triable issue of fact on this. It is undisputed that the JUUL Products were listed and advertised on Defendants' website and that none of the listings identified any other party, other than cjdropshipping, as the seller or distributor. SUF Nos. 23, 32, 38-39, 46, 53, 65. There is no doubt that persons "shopping on [cjdropshipping.com] would have reasonably believed that [Defendants], and not the third-party sellers, [were] the seller with title [and] possession" of the counterfeit JUUL Products at issue in this case. *See Atari Interactive, Inc.*, 2021 WL 706790, at *8; SUF Nos. 23, 29, 32, 38-39, 46, 53, 63-65. Moreover, it is undisputable that Defendants are the only party that accepts payment and that JLI's investigator paid Defendants, and no other third party, for the JUUL Products he purchased. SUF Nos. 31, 40, 47, 54.

Even if Defendants were able to present evidence to create a genuine issue of fact as to whether a third party used its site to sell the JUUL Products—which they cannot—*Defendants are still liable*, as there is no dispute that Defendants were responsible for sourcing and shipping the JUUL Products, including the storage of at least one-hundred JUUL Starter Kits purchased by JLI's investigator from Defendants' New Jersey warehouse. SUF Nos. 23-28, 40, 47-48, 54, 70-72; *Adobe Sys. Inc. v. Blue Source Grp., Inc.,* 125 F. Supp. 3d 945, 973 (N.D. Cal. 2015) ("any member of the distribution chain of allegedly infringing products can be jointly and severally liable for the alleged misconduct") (internal quotation marks and citations omitted); *see e.g. Nike, Inc. v. E. Ports Custom Brokers*, *Inc.*, No. 2:11-CV-4390-CCC-MF, 2018 WL 3472628, at *5 (D.N.J. July 19, 2018) (defendants still liable for direct infringement since they arranged for the shipment of counterfeit cargo despite their claims of being "innocent service provider[s]" who "neither knew nor

1   had any reason to have known that [their] services were being used by"

2   counterfeiters); *Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc.*, No. 08-

3   0068(KAM)(JO), 2010 WL 2133937, at *5 (E.D.N.Y. Mar. 11, 2010), *report and*

4   *recommendation adopted*, No. 08-0068 (KAM)(JO), 2010 WL 2160058 (E.D.N.Y.

5   May 27, 2010) (arrangement of transportation of counterfeit goods sufficient to

6   qualify as "use in commerce"); *Philip Morris USA, Inc. v. Lee*, 481 F. Supp. 2d 742,

7   746 (W.D. Tex. 2006) (officer of company who arranged for importation of

8   counterfeit cigarettes into the U.S. liable for trademark infringement even though

9   defendants never actually possessed the counterfeit goods).

10      Accordingly, there is no genuine dispute of material fact concerning

11  Defendants' unauthorized use of the JUUL Marks in commerce.

### 3.      Defendants' Counterfeiting Caused Confusion

13      "'Where … one produces counterfeit goods in an apparent attempt to

14  capitalize upon the popularity of, and demand for, another's product, there is a

15  presumption of likelihood of confusion.'" *Power Balance LLC v. Power Force LLC*,

16  No. SACV 10-1726 AG (MLGx), 2010 WL 5174957, at *4 (C.D. Cal. 2010)

17  (quoting *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987)).

18  Thus, where, as here, there is no doubt that that the JUUL Products JLI's

19  investigator purchased from Defendants' website were counterfeit, likelihood of

20  confusion is presumed and "it is unnecessary to perform [*Sleekcraft*'s] step-by-step

21  examination … because counterfeit marks are inherently confusing.'" *Shalabi*, 352

22  F. Supp. 2d at 1073 (quoting *Philip Morris USA Inc. v. Felizardo*, No. 03 Civ.

23  5891(HB), 2004 WL 1375277, at *5 (S.D.N.Y. June 18, 2004)); *accord e.g.*, *Chloe*

24  *SAS v. Sawabeh Info Servs. Co.*, CV 11-4147 GAF (MANx), 2013 WL 12126742, at

25  *5 (C.D. Cal. Oct. 8, 2013); ECF No. 65, p. 13.

26      Nevertheless, JLI meets the *Sleekcraft* factors for likelihood of confusion to

27  be found as a matter of law. The *Sleekcraft* test considers the following: "(1) the

28  strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the

marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016). "The factors are non-exhaustive and applied flexibly; the *Sleekcraft* factors are not intended to be a rote checklist." *Id.* (internal quotation marks and citation omitted).

The *Sleekcraft* test favors JLI. JLI has continuously used the JUUL Marks in connection with the JUUL Products, and the JUUL Marks have become widely recognized, strong, and well-known (factor 1). SUF Nos. 10-14. Defendants advertise for sale, sell, and distribute products that are almost identical to authentic JUUL Products bearing identical counterfeit JUUL Marks (factor 2). SUF Nos 32-58. The marks Defendants use are unauthorized uses of identical replicas of the JUUL Marks (factor 3). SUF Nos. 32-58. Finally, Defendants intend to confuse the public by using the JUUL Marks to sell counterfeit JUUL Products (factor 7). SUF Nos. 32-58. At the same time, <u>none</u> of the *Sleekcraft* factors favor Defendants. ECF No. 65, p. 13. Thus, JLI has satisfied this element as a matter of law.

**B.     Defendants Are Liable for Violations of Federal and California Unfair Competition Laws**

The elements discussed above also govern JLI's claims for false designation of origin and unfair competition. *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F. 3d 1036, 1047 (9th Cir. 1999) (same elements govern liability under § 32 and § 43 of the Lanham Act). Thus, the "'ultimate test'" for all these claims "is exactly the same as for trademark infringement: 'whether the public is likely to be deceived or confused by the similarity of the marks.'" *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988) (quoting *New W. Corp. v. NYM Co. of Cal.,* 595 F.2d 1194, 1201 (9th Cir. 1979)).

These same elements likewise govern Plaintiffs' state law claims. It is well settled that "[t]he elements for establishing unfair competition under California Business and Professions Code § 17200 by trademark infringement and common law trademark infringement are essentially the same as those for the Lanham Act." *SV3, LLC v. GG Distrib., Inc.*, No. EDCV 19-0046 JGB (SPx), 2019 WL 1460621, at *3 (C.D. Cal. Feb. 27, 2019); *accord e.g.*, *Century 21 Real Estate Corp.*, 846 F.2d at 1178); *Mallard Creek Indus., Inc. v. Morgan*, 56 Cal. App. 4th 426, 434 (1997) (analysis for state law trademark infringement is the same as under federal law).

Because for the reasons explained above, no triable issues of fact exist regarding Defendants' liability for federal trademark infringement, their liability for false designation of origin and unfair competition and for violations of California state law, follows as a matter of law.

## V.   JLI IS ENTITLED TO UP TO $28 MILLION IN STATUTORY DAMAGES

Under the Lanham Act, a plaintiff who proves trademark infringement is entitled to recover the defendant's profits, any damages suffered by the plaintiff, and the costs of the action. 15 U.S.C. § 1117(a). In a case involving the knowing and intentional use of an infringing, counterfeit mark, the court shall provide damages of three times the amount of profits or damages to the plaintiff, unless "extenuating circumstances" require a lesser amount. 15 U.S.C. § 1117(b). But in a case involving use of a counterfeit mark, a plaintiff can elect instead to recover statutory damages of "not less than $1,000 or more than $200,000 *per counterfeit mark per type of goods or services sold*, offered for sale, or distributed, as the court considers just," or "if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 *per counterfeit mark per type of goods or services sold*, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c) (emphasis added). To calculate statutory damages, the Court determines the number of infringing "marks" used and multiplies this by "the amount of goods" bearing such

26

PLAINTIFF'S MPA ISO MOTION FOR SUMMARY JUDGMENT

marks. *Nike, Inc. v. Top Brand Co.*, No. 00 Civ.8179(KMW)(RLE), 2006 WL
2946472, at *3 (S.D.N.Y. Feb. 27, 2006) (plaintiff entitled to $12 million for willful
infringement of <u>three</u> counterfeit goods each bearing <u>four</u> Nike marks).

      "[T]he court has wide discretion in determining the amount of statutory
damages to be awarded, constrained only by the specified maxima and minima."
*Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d
1186, 1194 (9th Cir. 2001). "[T]here is no necessary mathematical relationship
between the size of [a statutory damages] award and the extent or profitability of the
defendant's wrongful activities." *Sara Lee Corp. v. Bags of New York, Inc.*, 36 F.
Supp. 2d 161, 165 (S.D.N.Y. 1999) (internal quotations and citations omitted). Since
statutory damages also provide deterrence for future infringement, the statutory
damages awarded need not equal the actual damages suffered by Plaintiff. *Microsoft
Corp. v. Buy More, Inc.,* No. CV-14-9697-R, 2015 WL 12748627, at *4 (C.D. Cal.
Nov. 6, 2015); *see also N. Face Apparel Corp. v. Niman*, No. CV 05-3628 DSF
(PLAx), 2007 WL 9700729, at *7 (C.D. Cal. Jan. 29, 2007). Maximum statutory
damages for use of counterfeit marks will be awarded when a defendant's
counterfeit use "is sufficiently broad, extensive, blatant, and willful." *Playboy
Enters., Inc. v. Asiafocus Int'l, Inc.*, No. Civ.A. 97-734-A, 1998 WL 724000, at *9
(E.D. Va. Apr. 10, 1998).

      Defendants used a total of 14 counterfeit JUUL Marks on the different types
of counterfeit JUUL Products sold to JLI's investigator. SUF No. 91. More
specifically, there were six different instances of counterfeit JUUL Marks on each
counterfeit JUUL Device and its packaging, six different instances of counterfeit
JUUL Marks on each package of counterfeit JUULpods, and two different instances
of counterfeit JUUL Marks on each package of a counterfeit JUUL USB Charging
Docks. SUF No. 91; *see N. Face Apparel Corp. v. Niman,* No. CV 05-3628 DSF
(PLAx), 2007 WL 9700729, at *6 (C.D. Cal. Jan. 29, 2007) (holding calculation of
seven violations "conservative" where one mark used on t-shirts and three marks

used on two types of jackets—down and fleece); *Shalabi*, 352 F. Supp. 2d at 1076
(holding four violations where four marks used per cigarette pack); *Nike Inc. v.
Variety Wholesalers, Inc.*, 274 F. Supp. 2d 1352, 1374 (S.D. Ga. 2003) *aff'd*, 107 F.
App'x. 183 (11th Cir. 2004) (holding that use of Nike's "SWOOSH DESIGN" mark
on sweatpants, sweatshirts, socks, and shirts constituted four separate violations).

Accordingly, JLI is entitled to statutory damages of no less than $14,000 and
upwards of $2,800,000 if Defendants' infringement is deemed non-willful. But if the
Court finds that Defendants' conduct was willful, which the evidence strongly
supports, JLI is entitled to up to $28,000,000 in statutory damages.

### A.   Defendants' Misconduct Calls for an Award of Maximum Statutory Damages

Many courts have considered the following factors in determining the
appropriate statutory damages award:

1. the expenses saved and the profits reaped;
2. the revenues lost by the plaintiffs;
3. the value of the trademark;
4. the deterrent effect on others besides the defendant;
5. whether the defendant's conduct was innocent or willful;
6. whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and
7. the potential for discouraging the defendant.

*Feiya Cosmetics, LLC v. Beyond Beauty Int'l, LLC*, No. C-10-00967 JCS, 2011 WL
4506182 (N.D. Cal. Aug. 29, 2011); *see Asiafocus Int'l, Inc.*, 1998 WL 724000, at
*9 (maximum statutory damages for use of counterfeit marks will be awarded when
a defendant's counterfeit use "is sufficiently broad, extensive, blatant, and willful").

First, the JUUL Marks are an invaluable asset to JLI. SUF No. 14. Second,
there is no genuine dispute as to whether Defendants' conduct was willful.
Willfulness is proven by showing that the defendant was actually aware of the

28

infringing activity or the defendant's actions were the result of reckless disregard or willful blindness. *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 164 (E.D.N.Y. 2016). "Knowledge may be actual or constructive … it need not be proven directly but may be inferred from the defendant's conduct." *Id.* (internal citations omitted). The undisputed evidence shows that Defendants knew that the JUUL Products JLI's investigator purchased were counterfeit, or at the very least Defendants had a reckless disregard for the truth. SUF Nos. 25, 70-73. Further, willfulness can be inferred by Defendants' conduct, such as Defendant Chou's previous conviction for infringement and the fact that he educates others to this day on how to evade liability for infringing intellectual property laws in the United States. SUF Nos. 88-90. This is so because "a prior conviction of trademark counterfeiting charges is relevant to show present infringement was willful." *Delta Air Lines, Inc. v. Wunder*, No. 1:13-CV-3388-MHC, 2015 WL 11242003, at *13 (N.D. Ga. Dec. 15, 2015) (citing *United States v. Kim*, 307 F. App'x 324, 326 (11th Cir. 2009); *accord Jazz Casual Prods. Inc. v. Byron*, No. C-11-0352 JCS, 2012 WL 13059823, at *5 (N.D. Cal. June 21, 2012) (finding "prior judgments entered against [defendant]" provide "evidence that [defendant's] infringement was willful").

Next, Defendants' failure to produce complete accounting records, their lies to the Court, and obstructive discovery practices, all in violation of the Court's Orders, shows a "palpable disregard for the law" and "warrants the maximum statutory damages for each violation." SUF Nos. 75-87. *N. Face Apparel Corp.*, 2007 WL 9700729, at *7; *see Philip Morris U.S.A. Inc. v. Castworld Prods., Inc.,* 219 F.R.D. 494, 500 (C.D. Cal. 2003) (finding that a party's failure to comply with the judicial process indicates willful use of a counterfeit mark); *Space Chariot, Inc.*, 250 F. Supp. 3d 596 ($1,000,000 in statutory damages awarded for one use of three of plaintiff's Certification Marks, where defendants' conduct was held to be willful due to defendants' knowledge of infringement and failure to provide a full accounting of assets in violation of the Court's TRO and Preliminary injunction).

1   *N. Face Apparel Corp.* is particularly instructive. There, a defendant and

2   various companies he owned operating out of China were found to have sold

3   counterfeit North Face products and were liable for trademark infringement. 2007

4   WL 9700729, at *7. The evidence showed that defendants had orchestrated the

5   manufacture of these counterfeit goods, just as Defendants did here. *Id.* at *1; SUF

6   Nos. 71-73. The Court found additional justifications for the maximum allowable

7   damages because defendants had violated the Court's temporary restraining order

8   and preliminary injunction, just as Defendants did here. *Id.* at *7; SUF No. 85. This

9   Court therefore awarded a total of $7,000,000 in statutory damages or $1,000,000

10   per mark per good. *Id.* Here, awarding the maximum statutory damages for each

11   violation is even more justified as the products at issue are for human consumption,

12   as opposed to clothing, but have been manufactured and distributed outside of JLI's

13   quality controls and reviews. Therefore, the maximum amount allowed should be

14   awarded to discourage such activity that is threatening to "public health and safety"

15   *Innovation Ventures, LLC*, 176 F. Supp. 3d at 154, 170 ($10 million awarded in

16   statutory damages for use of five different marks on bottles and caps for sale and

17   transportation of counterfeit energy drinks); *see e.g.*, *Koon Chun Hing Kee Soy &*

18   *Sauce Factory, Ltd. v. Eastimpex,* No. 04-cv-4146 MMC, 2007 WL 328696, at *13

19   (N.D. Cal. Feb. 2, 2007) (awarding $550K for infringement of one mark hoisin

20   sauce as "although there have been no reports of any ill effects resulting from the

21   consumption of such [counterfeit] goods, a statutory award nonetheless should be of

22   sufficient magnitude to deter future sales of counterfeit food products by others").

23   Defendants' conduct was willful and JLI should be awarded the maximum

24   statutory damages amount for willful infringement for a total of up to $28 million.

25   **VI.   CONCLUSION**

26   For the foregoing reasons, JLI's motion for summary judgment should be

27   granted in its entirety and the maximum statutory damages for willfulness should be

28   awarded.

1   DATED:  July 19, 2021                BARTKO ZANKEL BUNZEL & MILLER
                                         A Professional Law Corporation
2

3

4                                        By:  _____/s/ Gabriella A. Wilkins_____
5                                              Gabriella A. Wilkins
                                               Attorneys for JUUL Labs, Inc.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28