# EXHIBIT 4

Alejandro S. Angulo (State Bar No. 217823)
aangulo@rutan.com
Bradley A. Chapin (State Bar No. 232885)
bchapin@rutan.com
Kathryn D.Z. Domin (State Bar No. 274771)
kdomin@rutan.com
RUTAN & TUCKER, LLP
18575 Jamboree Road, 9th Floor
Irvine, CA 92612
Telephone: 714-641-5100
Facsimile: 714-546-9035

Alexander Chen (State Bar No 245798)
William R. Walz (State Bar No 136995)
Katja M. Grosch (State Bar No 266935)
Theodore S. Lee (State Bar No 281475)
INHOUSE CO. LAW FIRM
7700 Irvine Center Drive, Suite 800
Irvine, CA 92618
Telephone: 949-250-1555
Facsimile: 714-882-7770

Attorneys for Defendants and Counter-Claimants,
Andy Chou (aka Lizhi Zhou); Yiwu Cute Jewelry Co., Ltd.; Yiwu Xite Jewelry Co., LTD.; CJ Fulfillment Corp.; CJ Trade Corp.; and Yiwu Promotional Trade Co., LTD (aka Yiwu Promotion Trade Co., LTD.)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JUUL LABS, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>ANDY CHOU (aka LIZHI ZHOU), an individual; YIWU CUTE JEWELRY CO., LTD., a Chinese limited company; YIWU XITE JEWELRY CO., LTD., a Chinese limited company; CJ FULFILLMENT CORP., a California corporation; CJ TRADE CORP., an Arizona corporation; and YIWU PROMOTIONAL TRADE CO., LTD. (aka YIWU PROMOTION TRADE CO., LTD.), a Chinese limited company,<br><br>Defendants. | Case No.: 2:21-cv-03056-DSF-PD<br><br>**DECLARATION OF ANDY CHOU IN SUPPORT OF DEFENDANTS' OPPOSITION TO JUUL LABS, INC.'S MOTION FOR PRELIMINARY INJUNCTION** |

| | |
|---|---|
| 1<br>2<br>3<br>4 | ANDY CHOU (aka LIZHI ZHOU), an individual, YIWU CUTE JEWELRY CO., LTD., a Chinese limited company; CJ FULFILLMENT CORP., a California corporation; and CJ TRADE CORP., an Arizona corporation, |
| 5 | Counter-Claimants,<br>vs. |
| 6 | |
| 7 | HU QIAN, an individual,<br>Counter-Defendant. |
| 8 | _____ |

## DECLARATION OF ANDY CHOU

I, ANDY CHOU, hereby declare as follows:

1. I am a resident of the People's Republic of China. I am over the age of 18. I have personal knowledge of the matters stated herein, and if called upon to testify in a court of law, I could and would competently testify to the veracity of the facts I state in this declaration. I make this declaration support of defendants' Opposition to Juul Labs, Inc.'s ("Juul") Motion for Preliminary Injunction.

<u>Overview Of CJ Drop-Shipping And The Defendant Entities</u>

2. I am the owner and CEO of CJDROPSHIPPING ("CJ"). I founded the company in 2014 and with the help of hundreds of dedicated employees have built it up to an internationally recognized and well-respected operation. As explained below, CJ is comprised of several entities that serve various roles for the business. At its core, CJ is an online marketplace that connects third-party vendors with businesses throughout the world to fill product needs for the ultimate customer. Much like an Amazon or Alibaba, CJ (albeit on a much smaller scale) provides the apparatus for third-party vendors, suppliers, wholesalers, and resellers to connect online with businesses seeking a one-stop shop to secure goods for sale to their customers. Attached hereto as **Exhibit 1** is a true and correct copy of a screenshot of the website platform CJDROPSHIPPING.COM in its most recent form.

3. Collectively, CJ grossed over $160 million (US) in 2020, maintaining an average listing of over 500,000 products for sale at any given time through over 400 vendors (and CJ sourced products) while supporting 400,000 customers worldwide. We currently employ over 800 people in China and internationally, including several employees at two fulfillment centers in the United States. While Juul refers to all of the "defendants" as one collective group of actors, this ignores the specific roles each entity plays in CJ's stream of commerce. Given Juul's accusations in this case, it is worth understanding who the various defendants are and how they fit into CJ's operations.

4. Defendant Yiwu Cute Jewelry Co., Ltd. is a company based in China and functions as the operating entity for all of CJ, employing the vast majority of CJ's employees and is responsible for operation of the CJ website (i.e., the website through which the alleged infringing sale of Juul products occurred). However, as explained in further detail below, the "Juul" products at issue were not sold by any of the Defendants, but instead, were sales made by a third-party vendor (Hu Qian) who is now a named counter-defendant in this action.

5. <u>Since first learning about this case and the sales at issue in this case, I have personally verified that the only Juul products that have ever been sold in the history of CJ's operations are the products that Juul's investigator secured during his pre-litigation investigation.</u> None of those products remain listed on CJ's website and the brand has been flagged so that no Juul branded product (or known knock-off) will ever been listed for sale on the CJ website. In all, the sum total of Juul products ever sold through the CJ platform adds up to $2,058.04. (*See*, **Exhibit 2** hereto, which reflects the purchases made by Juul's investigator, i.e., the only Juul branded sales ever made through CJ.)

6. Defendant CJ Trade Corporation ("CJ Trade") is an established Arizona corporation that has been in business since 2017. CJ Trade operates one of two fulfillment centers in the United States for CJ. Specifically, CJ Trade leases

property in New Jersey where CJ maintains its East Coast fulfillment operations. While not all products sold on the CJ website ship through the fulfillment center, sellers have the option for product shipments to be sent to the warehouse and stored until such time that the purchasing business customer arranges to pick up the goods or shipping arrangements are made to deliver the product to the purchasing customer. CJ Trade has 6 employees, and remains in good standing. Attached as **Exhibit 3** is a true and correct copy of the lease for the Cranbury, New Jersey, warehouse. Attached as **Exhibit 4** is a true a correct copy of pictures showing the operation of the New Jersey warehouse. The Court's Order freezing Defendants' assets resulted in CJ Trade's bank account being frozen, preventing it from continuing to financially support its entire East Coast fulfillment center for all products.

7. Defendant CJ Fulfillment Corporation ("CJ Fulfillment") is an established California corporation that has been in business since 2018. CJ Fulfillment leases property in Chino, California where CJ maintains its West Coast fulfillment operations. As with CJ Trade, not all products sold on the CJ website ship through the fulfillment center, but sellers have the option for product shipments to be sent to the warehouse and stored until such time that the purchasing business customer arranges to pick up the goods or shipping arrangements are made to deliver the product to the purchasing customer. CJ Fulfillment has 2 employees, and remains in good standing. Attached as **Exhibit 5** is a true and correct copy of the lease for the Chino California, warehouse. Attached as **Exhibit 6** are true and correct copies of pictures showing the operation of the Chino, California, warehouse. The Court's Order freezing Defendants' assets resulted in CJ Fulfillment's bank account being frozen, preventing it from continuing to financially support its entire West Coast fulfillment center for all products sold through CJ's website.

8. Of the four purchases of "Juul" products from CJ's website (all made

by Juul's investigator), <u>none</u> of the products traveled through CJ Fulfillment. CJ Fulfillment had no involvement in any manner whatsoever with the alleged infringing sales. Three of the orders were direct shipped to the customer (Juul's investigator). One of the orders was shipped from the seller to CJ Trade in New Jersey, where it was stored until such time as Juul's investigator scheduled to pick up the product.

9. The Complaint identifies two additional defendants, Yiwu Xite Jewelry Co., Ltd. and Yiwu Promotional Trade Co., Ltd. (aka Yiwu Promotion Trade Co., Ltd.) It is not clear to me who Juul is referring to as there are no CJ companies that go by these names. However, other that as described above, no other CJ entities were involved in the listing or storage of the "Juul" products at issue in this case.

The CJ Drop-Shipping Business

10. CJ entered the drop-shipping business in 2014 and launched the web-based CJ platform in 2018. Since then, CJ has grown to become recognized as one of the most professionally operated drop-shipping supply chain companies in China.

11. When CJ first began operations, it sold only jewelry, including the Conor Cross Necklace, which was CJ's first hot-selling product and provided CJ with its first profitable product line.

12. CJ focuses on the drop-shipping piece of the supply chain, e.g., product sourcing, warehousing, order processing, and shipping, thus allowing retailers to focus on sales and marketing. CJ offers to help each drop-shipper from order to successful delivery.

13. Over the past four years, CJ has grown at a rapid pace and now leases and operates warehouses in China, the United States, Germany, Thailand, and Indonesia. CJ also cooperates with warehouses in Britain, Australia, and France. CJ is able to source any legal products its customers seek.

14. Part of the reason for CJ's success is our excellent customer service in a niche market. Indeed, a big reason for CJ's success is due to its hybrid form

between the web-based marketplaces Amazon and Alibaba. While Amazon provides a platform for third-party Chinese sellers to sell to customers with logistic support in the US, Alibaba provides a platform for third-party Chinese sellers to sell to US retailers but without local US logistics. CJ merges the two concepts and provides a platform for third-party Chinese sellers to sell to US retailers with logistics support in the US. As such, a typical US retailer would operate an e-commerce site using a service like Shopify on the front end to process transactions and CJ on the backend to provide inventory and fulfilment.

15. The reason CJ now has two fulfillment centers in the US and 8 employees between the two locations is due to the immense demand for CJ's services in the United States. In fact, roughly 50% of CJ's $160 million (US) revenue in 2020 came from customers in the United States.

16. Currently, CJ employs over 800 people. It is truly a thriving company with a dedicated staff and a focus on productive, legally compliant operations. Attached as **Exhibit 7** is a true and correct copy of a photograph showing the company activities of CJ, including its annual company banquet, company picnic, and Christmas party.

17. Presently, CJ supplies more than 400,000 retailers worldwide, with more than 3,000 packages a day shipped to customers within the US, and over 10,000 daily from China to the US. Attached as **Exhibit 8** is a true and correct copy of pictures showing the operation of the warehouses in China.

18. To provide the broadest selection of available products, CJ now works with over 400 third-party suppliers, wholesalers, or resellers in China that actively sell products on a regular basis to retailers via the CJ platform. In addition to providing its platform, storage, and shipping services at the retailers' request, CJ also offers sourcing programs through which CJ will try to match the demand to a third-party reseller to fulfill a retailer's request.

19. Because CJ collaborates with over 400 third-party sellers and over

400,000 customers, there are hundreds of thousands of different products available on CJ's marketplace. Naturally, given the number of available products, CJ is not able to train and request its own team to adequately provide products support.

<u>CJ's Efforts To Prevent Listing And Sale Of Infringing And Counterfeit Products And The Suspect Juul Transactions.</u>

20. To protect the intellectual properties of others and to combat counterfeiting, CJ has an anti-counterfeiting and intellectual property rights policy which is posted on its website and contained within the terms and conditions of its agreement with its users. Attached as **Exhibit 9** is a true and correct copy of the User Terms and Conditions specifically showing CJ's IP policy.

21. In addition, CJ maintains an IP Enforcement Unit that actively monitors the listing requests on the CJ platform via manual review as well using Artificial Intelligence software for better accuracy and efficiency to combat counterfeiting and trademark infringement. As explained in the concurrently-filed declaration of Wang Huiyun, she is the Director of CJ's IP Enforcement Unit and manages a team of employees whose sole purpose is to ensure compliance with intellectual laws and avoid the listing or sale of unauthorized or counterfeit products. Indeed, on average, CJ's IP Enforcement Unit removes approximately two hundred (200) listing requests per day which Ms. Huiyun's team identifies as potentially counterfeit or infringing of a third-party's IP rights.

22. In fact, Plaintiff's own "consultant," Max Hewlett, who apparently purchased the offending "Juul" products through the CJ website, has experience with CJ's IP enforcement team's efforts. Mr. Hewlett previously posed as a retailer in 2019 in connection was a separate sting operation and was denied sourcing for Samsung-logo products. Attached as **Exhibit 10** is a true and correct copy of the CJ platform rejecting Mr. Hewlett's attempt to purchase infringing Samsung-branded items in 2019.

23. Notably, Samsung is a widely recognized brand in China. But CJ's IP

Enforcement program relies heavily on brand recognition. If a brand is not widely recognized in China and is not recognized by a CJ team member, it is hard to police for potential infringement because a CJ team member would not know whether it is a domestic brand in China or from elsewhere in the world. It is therefore understandable that listings like the "Juul" products would not be flagged. Had Juul reached out to CJ at any time and made us aware of their brand and the suspect listings, we would have immediately investigated it and removed the offending listings. Unfortunately, that did not happen and it was not until this lawsuit was served on me that we first realized the issue. And we took immediate action.

24. First, there is background on the suspect transactions that we have been able to dig up upon learning about this case. Regarding the subject Juul-branded products, in late 2019, Juul's operative, Mr. Hewlett interacted with a person named Celia, who is an agent of and works for third-party seller and counter-defendant, Hu Qian. Celia is not an employee of CJ. In communications with Celia, Mr. Hewlett inquired about procuring the suspected counterfeit Juul products listed on the CJ platform. CJ's platform allows third-party sellers and customers to directly interact because it is these third-party sellers who are most knowledgeable about their own products and thus best able to assist the customers. As such, it was Hu Qian's agent, Celia, who assisted Mr. Hewlett in purchasing the allegedly counterfeit JUUL products from Hu Qian. Because these communications take place over the CJ platform, we maintain access over these communications and have accessed the exchanges between Celia and Mr. Hewlett. Attached hereto as **Exhibit 11** is a true and correct copy of the relevant exchanges between Mr. Hewlett and Celia, which took place over the CJ platform.

25. To be clear, Hu Qian makes its own listings and fulfills the order; CJ's only involvement is to collect the funds and manage logistics. Attached as **Exhibit 12** is a true a correct copy of Hu Qian's ID.

26. While we have not been able to confirm, we believe that Celia's legal

Chinese name is Dang Chao Hein with an address of Fukian Province, Wu Ping County, Chung Tzao Chang, Won Ying Tuan, Diang Tao Ping, No. 5, China, Chinese Citizen ID 440233198807084505.

27. It is also important to note that all third-party sellers who wish to utilize CJ's platform, must first receive training from CJ's team, including CJ's IP Enforcement Team. During this training, these third-party sellers and their agents are informed of CJ's IP Policy and warned against attempting to list or sell counterfeit goods or products that in any way infringe on the intellectual property rights of others. The strict policy of CJ is not to permit the listing or sale of any items that infringe the intellectual property right of others. When items are determined to pose a risk of IP infringement or counterfeiting, they are flagged for closer inspection, and then if deemed as potentially infringing or counterfeit, the third-party retailers are denied access to the CJ Platform. Again, Exhibit 9 hereto is an example of this in practice when Mr. Hewlett attempted to buy Samsung branded products.

28. Notably, in the same interaction surrounding the complained-of JUUL incident, Mr. Hewlett also attempted to purchase products bearing the Apple logo, and Celia repeatedly rejected his requests. The exchange (reflected in Exhibit 10) shows that Celia, and Mr. Hewlett, knew and understood CJ's IP enforcement policy.

29. Unfortunately, as it happens, CJ's IP Enforcement team did not know that JUUL was a US brand for electronic cigarettes. (It must be noted that there are hundreds of thousands of trademarks that are registered in 120-plus countries and at any given time, some marks are abandoned, others are transferred, some are registered, others are never registered, some are only well known in certain countries, others are well known only in a certain part of a country. These enforcement issues are not unique to CJ, as much larger and more robust companies like Amazon and Alibaba continue to address these issues on a daily basis.) As

such, unlike with the well-known Apple or Samsung brand, CJ's IP Enforcement team never identified the Juul-branded products as being suspect, and thus were not alerted to intercede in the transaction whereby Mr. Hewlett was able to consummate his sting purchase on behalf of JUUL from Hu Qian. But it is critical to note that these are the only Juul branded sales that have ever taken place over the CJ platform.

30. Contrary to the allegations made by Juul in this case, CJ at no point intentionally evaded U.S. Customs or participated in brand counterfeiting. To the contrary, CJ has a dedicated staff whose sole focus is to assure that no counterfeit goods are sold over the CJ platform.

31. At no time before filing this lawsuit did CJ ever receive any notice of infringement or complaint from Juul. The first time we were made aware of the alleged infringing activity was on April 22, 2021, when we were first served by email with the documents filed in this action. Had CJ received any notice of infringement or complaint from Juul prior to the filing any lawsuits in US or China, CJ, consistent with its past practice and policy, would have immediately taken the listings down. Indeed that was exactly what we did when we found out about this action and Juul's efforts to protect its intellectual property rights.

32. I am proud to have built CJ to where it is today. CJ's progress is a culmination of our efforts to connect entrepreneurs in China with the retail sellers of the world. I am proud to say that throughout the over four years' time CJ has been in operation, CJ has never been in trouble with the law in any countries, China or US or Europe until the instant case. CJ has received countless positive reviews online on Shopify, Trustpilot, Facebook, and YouTube just to name a few. These reviews are a testament to the quality service we provide to our customers and the many successful products sold through our platform.

33. While not relevant to this case, it is worth noting that I am personally focused on ensuring that CJ complies with all intellectual property laws and respects

the intellectual property rights of others. This is because I learned a very unfortunate lesson about 11 years ago when I was just out of college. The setting was in 2010 Shanghai World Expo, two years after China had hosted the 2008 Olympic Games. I was 20 at the time and I was arrested for selling stuffed animals that were intentionally made to look like the Shanghai Expo Mascot "Hai Bao." (A screen shot of the actual mascot can be seen at **Exhibit 13**.) Unbeknownst to me at the time, the mascot "Hai Bao" was registered in 2D. The look-alike stuffed animal we were selling on the street did not include any official tags that would suggest that it was an officially-licensed product of the 2010 Expo, but I quickly learned that that did not mean I was allowed to sell the stuffed animal. The Chinese government prosecuted me for both counterfeiting and infringing the Hai Bao trademark. While the Judge dismissed the counterfeiting charge, the infringement charge was upheld and I was sentenced to four years in prison (I was released for good behavior after three years).

34. To say the least, I was young and I paid a heavy price for my actions. But it was precisely that experience that made me place such a huge focus on CJ's IP Enforcement efforts.

35. As the CEO of CJ, I can safely represent to the Court and to Juul that CJ respects all rules of law, whether in China, Europe, US, or anywhere in the world. Protecting the IP rights of third-parties has always been and remains a core value of the company.

36. Following the Court's order freezing all of Defendants' assets, my personal assets were frozen along with CJ's assets. The total amounts frozen is over $1,400,000. My personal obligations as well as the ability for any of the CJ operations to run their business has been completely cut off, making it impossible for any of them to pay employees (including the 8 US employees in New Jersey and Chino) ,office or warehouse rental fees, ordinary expenses, insurance, taxes, and more.

37. Despite the inaccurate allegations made by Juul to secure the restraining order, as soon as I was served with the instant lawsuit and court order, I immediately engaged counsel and took action to comply with the expedited discovery requests and the remainder of the Order. But the Court should know that TRO has essentially caused a (literal) overnight implosion of Defendants' business in the U.S. Lifting the Order is critical to allowing CJ to resume business. CJ is not concerned that any further Juul products will ever be listed on its platform, but is nevertheless willing to work with Juul to ensure whatever further protections it believes are necessary to protect against further such listings or sales. And as demonstrated in my declaration, CJ is more than willing to provide information about the actual vendor that listed and sold the Juul-branded products through CJ's platform.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on May 17, 2021, at Hangzhou, People's Republic of China.

Andy Chou
Chief Executive Officer
CJDROPSHIPPING