# EXHIBIT 6

Alejandro S. Angulo (State Bar No. 217823)
aangulo@rutan.com
Bradley A. Chapin (State Bar No. 232885)
bchapin@rutan.com
Kathryn D.Z. Domin (State Bar No. 274771)
kdomin@rutan.com
RUTAN & TUCKER, LLP
18575 Jamboree Road, 9th Floor
Irvine, CA 92612
Telephone: 714-641-5100
Facsimile: 714-546-9035

Alexander Chen (State Bar No 245798)
William R. Walz (State Bar No 136995)
Katja M. Grosch (State Bar No 266935)
Theodore S. Lee (State Bar No 281475)
INHOUSE CO. LAW FIRM
7700 Irvine Center Drive, Suite 800
Irvine, CA 92618
Telephone: 949-250-1555
Facsimile: 714-882-7770

Attorneys for Defendants and Counter-Claimants, Andy Chou (aka Lizhi Zhou); Yiwu Cute Jewelry Co., Ltd.; Yiwu Xite Jewelry Co., Ltd.; CJ Fulfillment Corp.; CJ Trade Corp.; and Yiwu Promotional Trade Co., Ltd. (aka Yiwu Promotion Trade Co., Ltd.)

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JUUL LABS, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>ANDY CHOU (aka LIZHI ZHOU), an individual; YIWU CUTE JEWELRY CO., LTD., a Chinese limited company; YIWU XITE JEWELRY CO., LTD., a Chinese limited company; CJ FULFILLMENT CORP., a California corporation; CJ TRADE CORP., an Arizona corporation; and YIWU PROMOTIONAL TRADE CO., LTD. (aka YIWU PROMOTION TRADE CO., LTD.), a Chinese limited company,<br><br>Defendants. | Case No.: 2:21-cv-03056-DSF-PD<br><br>**DECLARATION OF WANG HUIYUN IN SUPPORT OF DEFENDANTS' OPPOSITION TO JUUL LABS, INC.'S MOTION FOR PRELIMINARY INJUNCTION** |

| | |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8 | ANDY CHOU (aka LIZHI ZHOU), an individual, YIWU CUTE JEWELRY CO., LTD., a Chinese limited company; CJ FULFILLMENT CORP., a California corporation; and CJ TRADE CORP., an Arizona corporation,<br><br>           Counter-Claimants,<br>  vs.<br>HU QIAN, an individual,<br>           Counter-Defendant.<br>_____ |

## DECLARATION OF WANG HUIYUN

I, Wang Huiyun, hereby declare as follows:

1. I am a resident of the People's Republic of China ("PRC"). I am over the age of 18. I have personal knowledge of the matters stated herein, and if called upon to testify in a court of law, I could and would competently testify to the veracity of the facts I state in this declaration. I make this declaration support of defendants' opposition to Plaintiff's motion for preliminary injunction.

2. I am the Director of the IP Enforcement Unit of Defendant Yiwu Cute Jewelry Co., Ltd., which operates CJDROPSHIPPING.COM ("CJ"). I joined CJ in September 2017. Prior to joining CJ, I held a position as assistant manager with China Life Insurance Company YIWU.

3. The purpose of the IP Enforcement Unit is to monitor and prevent any proposed product listing that violates the trademark rights of the rightful third-party owner. The IP Enforcement Unit is within the same department as CJ's sourcing unit. Currently this department has approximately 80 employees.

4. My unit has developed significantly in its capabilities over the past three years. While I take pride in our robust IP enforcement program to-date, we are constantly striving to improve our governance of new product listings to ensure that while we accommodate CJ's rapid inflow of legitimate third-party resellers

(particularly the substantial increase during the COVID-19 pandemic), we continue to successfully weed out the bad apples who want to take advantage of our platform to sell counterfeits or infringing, look-alike products. It is my job to ensure that these bad actors do not find a way to circumvent our safeguards and list products that violate anyone's IP rights.

5. With each new seller that signs up to utilize our marketplace, we begin the process by educating the retailer that CJ does not sell items that infringe any IP rights. Attached as **Exhibit 1** hereto is a true a correct copy of a screen shot of the IP policy contained within CJ's User Agreement. We endeavor to ban any retailer trying to buy counterfeits using our "SOURCING" solution. In other words, when a retailer places a sourcing request, our team reviews it from an IP enforcement perspective and only allows the sourcing team to carry out the request after we approve it.

6. In addition to filtering the buy-side request, we also filtered the sell-side listings, only permitting new listings by third-party resellers after approval by my unit. One of the ways we filter the legitimate listings from illegitimate listings is we train our employees to recognize popular brands that are susceptible to counterfeiting. Attached as **Exhibit 2** hereto is a true and correct copy of the Trademark training card distributed to all team members so they recognize common name brands and can refuse infringing requests. The identification card is updated every month, as the Unit takes into account all feedback regarding IP issues from the team members.

7. We currently have an average of 500,000 active SKUs listed online, with at least several thousand new SKUs requested daily. On average, we refuse at least 200 product requests daily.

8. In addition to the identification card, CJ also maintains a brand database in the Cloud to which each team member has access so that they may conduct brand checks to ensure compliance. Attached as **Exhibit 3** is a screen shot

of the database that our team members use to access and search for brand clearance. The brands listed in the screen shots include Acer, Alexander Wang, Bally, and more.

9. In addition to our unit's in-person review, we have now deployed an AI (artificial intelligence) software system to review and increase the efficiency of approving and refusing new listings.

10. To supplement these active enforcement mechanisms, CJ also encourages brand owners to contact us to request that listings in violation of their IP rights be taken down. CJ regularly deactivates suspecting infringing items, including but not limited to marks such as 580, Adidas, Air Jordan, and Air Max, and listings associated with such marks are identified and delisted.

11. Attached as **Exhibit 4** is a true and correct copy of a sample of communications received by the IP team from brand owners requesting that listings be taken down of the listing, along with screenshots showing that the listings were removed immediately. This is the industry standard when brand owners discover potential listings that infringe on their IP. But here, Juul never contacted us (other than when their private investigator bought the alleged infringing goods from one of our third-party vendors). No one in my IP Enforcement Unit ever received communication from Juul asking us to remove any listing. Had we received such a notice, we would have – as we always do – acted promptly to investigate and take down the offending listings.

12. While we now know that Juul is a brand in the U.S. for e-cigarettes, it was not previously listed in our database or on the ID card as described above. Indeed, given that the brand is not known worldwide and none of us at CJ are e-cigarette users, the Juul listings by Hu Qian were never flagged, and Juul never

/ / /

/ / /

/ / /

informed us that they believed their IP rights to have been violated until serving us with the temporary restraining order.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on May 17, 2021, at Hangzhou Zhejiang; People's Republic of China.

*Wang Huiyun*
Wang Huiyun
Director of IP Enforcement Unit
CJDROPSHIPPING.COM