# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUUL LABS, INC.,<br>            Plaintiff,<br><br>              v.<br><br>ANDY CHOU, et al.,<br>            Defendants. | CV 21-3056 DSF (PDx)<br><br>Order GRANTING in Part and<br>DENYING in Part Plaintiff<br>JUUL Labs, Inc.'s Motion for<br>Summary Judgment (Dkt. 77) |

This case alleges counterfeiting of Plaintiff JUUL Labs, Inc.'s (JLI) electronic cigarettes and related products by Defendants Andy Chou (aka Lizhi Zhou); CJ Fulfillment Corp.; CJ Trade Corp.; Yiwu Cute Jewelry Co., Ltd.; Yiwu Xite Jewelry Co., Ltd.; and Yiwu Promotional Trade Co., Ltd. (aka Yiwu Promotion Trade Co., Ltd.). JLI moves for summary judgment. Dkt. 77 (Mot.). Defendants oppose. Dkt. 90 (Opp'n). The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78; Local Rule 7-15. For the reasons stated below, the motion is GRANTED in part and DENIED in part.

## I. UNDISPUTED FACTS

### A.    Background on JLI

JLI designs, manufactures, and distributes JUUL-branded electronic nicotine delivery systems and related products. PUF ¶ 1.[1]

---

[1] Citations to PUF refer to "Defendants' Statement of Genuine Disputes in Support of its Opposition to Plaintiff's Motion for Summary Judgment," dkt. 90-1, which incorporates JLI's proposed uncontroverted facts and Defendants' responses to those facts. Citations to DUF refer to "Plaintiff JUUL Lab[s],

JLI introduced its JUUL-branded cigarette (JUUL Device) into the U.S. market in 2015.  Id. ¶ 2.  The JUUL Device is a rechargeable inhalation apparatus designed to be exclusively used with JUULpods. Id. ¶ 3.  JUULpods are individual disposable cartridges that are filled with JLI's proprietary nicotine e-liquid formulations and contain a heating chamber.  Id. ¶ 4.  JUULpods are designed to be inserted directly into the JUUL Device.  Id. ¶ 5.  The USB Charging Dock is an individual charging dock designed specifically for the JUUL Device and related accessories.  Id. ¶ 6.

JLI conducts quality control tests on JUUL products in their totality and on component parts.  Id. ¶ 8.  JLI maintains quality control standards for all of its products and conducts regular visits to and audits of its suppliers' factories.  Id. ¶ 9.  In the United States, JLI sells its products both through its online retail store and its pre-approved authorized network of distribution partners, and ensures that its distribution partners meet its quality standards.  Id. ¶ 15.

JLI owns the following trademarks registered with the United States Patent and Trademark Office for use in connection with JUUL products (JUUL Marks):

- (U.S. Trademark Reg. No. 6,064,902);

- (U.S. Trademark Reg. Nos. 4,898,257);

---

Inc.'s Response to Defendants' Statement of Uncontroverted Facts in Support of Plaintiff's Reply in Support of Motion for Summary Judgment," dkt. 94-11, which incorporates Defendants' proposed uncontroverted facts and JLI's responses.  To the extent certain facts are not mentioned in this Order, the Court has not relied on those facts in reaching its decision.  To the extent the Court cites to a disputed fact, the Court has found the dispute was not valid or was irrelevant, unless otherwise indicated.  The Court has independently considered the admissibility of the evidence and has not considered facts that are irrelevant or based on inadmissible evidence.

- **JUUL**<sub></sub> (U.S. Trademark Reg. No. 5,770,541);

- "JUUL LABS" (U.S. Trademark Reg. No. 5,776,153);

- "JUULPODS" (U.S. Trademark Reg. Nos. 5,918,490);

- JUUL (U.S. Trademark Reg. Nos. 6,211,614).

Id. ¶ 10.

JLI has used one or more of the JUUL Marks continuously in commerce, including in connection with its sale of JUUL Devices, JUULpods, and USB Charging Docks.  Id. ¶ 11.  JLI prominently displays one or more of the JUUL Marks in all of its advertising and promotional materials and on all product packaging.  Id. ¶ 12.

## B.   Background on Defendants

Chou is the founder, owner, CEO, and principal of Yiwu Cute Jewelry Co., Yiwu Xite Jewelry Co., CJ Fulfillment Corp., CJ Trade Corp., and Yiwu Promotional Trade Co., which all make up the company CJDropshipping (CJ).  Id. ¶ 17.  Chou maintains control over all corporate accounts.  Id. ¶ 18.  In 2010, Chou was convicted of conspiracy for producing and selling hundreds of thousands of counterfeit goods and was sentenced to four years in custody in China. Id. ¶ 88.

Yiwu Cute Jewelry Co. is a China-based company that functions as the operating entity for all of CJ, employs the vast majority of CJ's employees, and is responsible for the operation of CJ's website, cjdropshipping.com.  Id. ¶ 19; dkt. 77-6 (Chou Decl.) ¶ 4.  CJ Trade Corp. is incorporated under the laws of Arizona and operates one of the U.S.-based fulfillment centers for Defendants in Cranbury, New Jersey. PUF ¶ 20.  CJ Fulfillment Corp. is incorporated under the laws of California and operates one of the U.S.-based fulfillment centers for Defendants in Chino, California.  Id. ¶ 21.  Defendants operate and cooperate with warehouses in China, the U.S., Germany, Thailand, Indonesia, Britain, Australia, and France.  Id. ¶ 22.

Defendants advertise products, offer products for sale and sell products on their website, source products, store products in their warehouses, process orders from their website, and arrange for shipping of products to customers.  Id. ¶ 23.  Defendants' website lists about 500,000 products for sale.  DUF ¶ 92.  When a customer purchases a product on CJ, Defendants provide the inventory for the product and fulfill the order.  PUF ¶ 24.  Defendants' purchase team personnel choose which of their suppliers to source products from.  Id. ¶ 25.  Defendants' internal teams review all sourcing requests before approving them.  Id. ¶ 26.  Defendants offer to help each drop-shipper from sourcing and order through shipping and delivery.  Id. ¶ 27; Chou Decl. ¶ 12.  Defendants maintain control over all product information on and communications taking place over the CJ website.  PUF ¶¶ 28, 30.  When a purchase is made on CJ, payment is made directly to Defendants through various payment options.  Id. ¶ 31.

## C.  The Infringing Goods and JLI's Investigation

In 2019 and 2020, JLI found Defendants advertising and offering for sale "JUUL Starter Kits" on cjdropshipping.com.  Id. ¶ 32.  The Starter Kits included the following purported JUUL products: (a) a JUUL Device; (b) a USB Charging Dock; and (c) four JUULpods in Cool Mint, Virginia Tobacco, Crème Brulee, and Mango flavors.  Id.  JLI has not sold JUUL Starter Kits that included JUULpods in Cool Mint, Virginia Tobacco, Crème Brulee, and Mango flavors in retail locations in the U.S. since November 2018.  Id. ¶ 33.

JLI hired an investigator to buy the suspect JUUL products from CJ.  Id. ¶ 37.  In October 2019, JLI's investigator accessed cjdropshipping.com and searched for "JUUL" products, which resulted in listings for JUUL Starter Kits and JUUL USB Charging Docks.  Id. ¶ 38.  In October 2019, Defendants' website advertised and offered for sale more than 10,000 units of the purported JUUL Starter Kits and more than 1,800 units of the purported JUUL USB Charging Docks.  Id. ¶ 39.  On October 7, 2019, JLI's investigator purchased three silver and two pink JUUL Starter Kits and five USB Charging Docks from CJ, which were delivered to the investigator in the U.S. on November 7,

2019 (order # ZF1910083563215030).  Id. ¶ 40.  JLI's investigator sent photographs of the products from order # ZF1910083563215030 to JLI's evidence specialist and then stored the products in an evidence locker. Id. ¶ 41.

On January 6, 2020, JLI's investigator shipped the products from order # ZF1910083563215030 to JLI's evidence specialist. Id. ¶ 42. JLI's evidence specialist inspected and analyzed all of the products from order # ZF1910083563215030 and found they were counterfeit based on the differences between the products and genuine JUUL products, including:

- None of the suspect JUUL Devices had a serial number engraved on the back;
- The packaging of all of the JUUL Devices had an incorrect universal product code;
- The cardboard box packaging of the suspect JUULpods showed a lot code that corresponded to a package of JUULpods made by an authorized manufacturer and sold through an authorized retailer in 2018;
- The font and spacing on the cardboard box packaging for all of the products differed from authentic JUUL products; and
- The foil packaging of the suspect JUULpods had a shiny metallic appearance, while authentic JUULpods have a matte appearance.

Id. ¶ 45.  The exterior and interior packaging of each suspect JUUL product purchased in order # ZF1910083563215030, as well as the JUUL Devices themselves, bore one or more of the JUUL Marks.  Id. ¶ 44.

In March 2020, Defendants' website advertised and offered for sale more than 10,000 units of the purported JUUL Starter Kits and more than 1,000 units of the purported JUUL USB Charging Docks. Id. ¶ 46.  On March 16, 2020, JLI's investigator ordered 100 JUUL Starter Kits from CJ to be shipped to Defendants' warehouse in New Jersey (order # SY2003143563222037).  Id. ¶ 47.  JLI arranged for

another investigator, along with personnel from the U.S. Department of Homeland Security (DHS), to pick up the Starter Kits from Defendants' warehouse in New Jersey, which they did on August 20, 2020.  Id. ¶ 48. DHS kept most of these products, except JLI's investigator kept two samples, and then sent high resolution photographs of one of the samples to JLI's evidence specialist for analysis.  Id. ¶ 49.

JLI's evidence specialist inspected and analyzed the photographs of the suspect JUUL Device and found the serial number on the sample was the same serial number that has appeared on more than 100 other counterfeit JUUL Devices previously discovered by JLI.  Id. ¶ 51.  JLI's evidence specialist inspected and analyzed the photographs of the suspect JUUL Device and found the products from order # SY2003143563222037 were counterfeit based on the differences between such products and genuine JUUL products, such as the differences listed above.  Id. ¶ 52.  The exterior and interior packaging of each suspect JUUL product purchased in order # SY2003143563222037, as well as the JUUL Devices themselves, bore one or more of the JUUL Marks.  Id. ¶ 50.

On April 8, 2020, JLI's investigator purchased two silver, six pink, and five slate JUUL Starter Kits from CJ, which were delivered to the investigator on April 23, 2020 (order # ZF2004083563265205). Id. ¶ 54.  JLI's investigator forwarded the products from order # ZF2004083563265205 to JLI's evidence specialist on June 25, 2020. Id. ¶ 56.  JLI's evidence specialist inspected and analyzed the suspect JUUL Device and found that all of the products from order # ZF2004083563265205 were counterfeit based on the differences between such products and genuine JUUL products.  Id. ¶ 58.  The exterior and interior packaging of each suspect JUUL product purchased in order # ZF2004083563265205, as well as the JUUL Devices themselves, bore one or more of the JUUL Marks.  Id. ¶ 57.

Throughout the investigation, JLI's investigator communicated with Meera Jin, Leon Li, Celia Yang, and an individual named Gringer. Id. ¶¶ 62, 67.  The parties agree Jin, Li, and Gringer are employees, agents, or representatives of CJ, but Defendants assert Yang is

employed by counter-defendant Hu Qian and is not one of Defendants' employees.  Id. ¶¶ 59-62.

Yang was assigned to JLI's investigator as his personal agent to handle all of his orders.  Id. ¶ 68.  Yang and CJ's purchase team personnel assisted JLI's investigator with fulfilling his orders for the purported JUUL products, including by choosing a supplier and asking a factory to manufacture JUUL Starter Kits.  Id. ¶¶ 71-72.  The parties dispute whether Yang believed the products were illegal to ship because they were counterfeit or whether Yang was referring to a shipping ban due to the pandemic or for JUUL-branded products.  Id. ¶ 73; DUF ¶ 100.  In the conversation between Yang and the investigator, Yang made several comments about shipping the Starter Kits to the United States, including:

- "[F]or your inventory if we can put it in the Chia [sic] warehouse because due to the shipping methods limited we cant ship so many products to the us."  Dkt. 51-12 (Yang Conversation) at 139.
- "[S]orry due to the limited shipping ways it is hard to ship and in our China warehouse has the enough workers to deal with the orders."  Id. at 140.
- Describing why Defendants cannot ship Apple products: "because it may cause the infringement."  Id. at 152.
- Responding to the question of whether Defendants could ship via Aliexpress to the NJ warehouse: "sorry we are the different platform and I have asked the shipping team that we can ship it secretly but it will have big risk of being checked by the custom."  Id.
- "[S]orry we can't ship this product to our us warehouse now.  the product attribution is banned . . . we can ship it secretly and ship it with several times but we can['t] be sure it wont be checked and hold.  it is the only way we can have.  so I suggest you store it in our china warehouse and ship it when your customer needs it."  Id. at 157.

- When the investigator asked to order more Starter Kits: "sorry we wont sell that because it is banned to ship and last time we take big risk to send out.  you can look for another product."  Id. at 185.

On November 13, 2020, Chou published an article on CJ's website titled How to Avoid Being Sued in Dropshipping? (Copyright & Trademark).  PUF ¶ 89.  The article states, "everyone should respect other's intellectual property."  DUF ¶ 103.  As an answer to "[c]an I sell trademarked items," the article responds: "So the answer is definitely NO."  Id. ¶ 104.  The article goes on to advise readers to "avoid selling products [that] have the potential [of] violating  copyright[s]."  Id. ¶ 105.  The article advises readers to buy products "legally from the licensed accredited distributor."  Id. ¶ 106.  The article also states:

> Even if the supplier or manufacturer violates the copyright law of the United States, since the manufacturer is located in China, the law does not apply to them. . . .  And selling knockoffs and fakes like LV, Gucci is for sure illegal.  But indeed you will decide to sell them or not.  For example, you insist on selling it in the USA, and you are not geographically located in the USA and you are not a US citizen.  In this case, you will not be held accountable by USA copyright law.

Id. ¶ 103.

## D.   Procedural History

On April 13, 2021, the Court granted JLI's application for an asset freeze as part of a temporary restraining order and ordered Defendants to provide a full accounting of the restrained assets within three business days of the receipt of the order.  Dkt. 31 at 28-29.  JLI served Defendants with the order on April 22, 2021.  PUF ¶ 77.  On April 23 and April 25, 2021, Defendants withdrew tens of thousands of dollars from their Wells Fargo and Payoneer accounts.  Id. ¶¶ 78.  Defendants did not provide the required accounting within three days of receiving the order, but instead provided an accounting on May 7,

2021, listing ten accounts, one piece of real estate, and one automobile.
Id. ¶¶ 79-80.

On June 9, 2021, the Court granted JLI's motion for a
preliminary injunction.  Dkt. 65.  The order instructed Defendants to
provide JLI with a full accounting of their assets within three business
days of the order.  Id. at 28-29.  On June 14, 2021, two days late,
Defendants produced a "Supplemental Accounting" that identified
seventy accounts (totaling at the time approximately $2.63 million),
three parcels of real estate, and one automobile.  PUF ¶ 83.  The
Supplemental Accounting also did not include at least a dozen accounts
with small amounts of money, or that were inactive or empty, which
JLI later discovered from other sources.  Id. ¶ 86.

## II. LEGAL STANDARD

"A party may move for summary judgment, identifying each
claim or defense – or the part of each claim or defense – on which
summary judgment is sought.  The court shall grant summary
judgment if the movant shows there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(a).  "This burden is not a light one."  In re
Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).  But the
moving party need not disprove the opposing party's case.  Celotex
Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Rather, "the burden on the
moving party may be discharged by 'showing' – that is, pointing out to
the district court – that there is an absence of evidence to support the
nonmoving party's case."  Id. at 325.  If the moving party satisfies this
burden, the party opposing the motion must set forth specific facts,
through affidavits or admissible discovery materials, showing that
there exists a genuine issue for trial.  Id. at 323-24; Fed. R. Civ. P.
56(c)(1).  A non-moving party who bears the burden of proof at trial as
to an element essential to its case must make a showing sufficient to
establish a genuine dispute of fact with respect to the existence of that
element of the case or be subject to summary judgment.  See Celotex
Corp., 477 U.S. at 322.

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue of fact is a genuine issue if it reasonably can be resolved in favor of either party. Id. at 248. "[A] district court is not entitled to weigh the evidence and resolve disputed underlying factual issues." Chevron Corp. v. Pennzoil Co., 974 F.2d 1156, 1161 (9th Cir. 1992). Summary judgment is improper "where divergent ultimate inferences may reasonably be drawn from the undisputed facts." Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006)). Instead, "the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (punctuation omitted).

## III. DISCUSSION

Defendants do not dispute liability but argue there are genuine, material disputes of fact regarding damages. Opp'n at 6. The Court agrees and grants partial summary judgment on the issue of liability, but finds summary judgment on the issue of damages is not appropriate at this time.

### A.    Evidentiary Objections

"A district court's ruling on a motion for summary judgment may only be based on admissible evidence." Oracle, 627 F.3d at 385. A party seeking to admit evidence bears the burden of proof to show its admissibility. Id. "At the summary judgment stage, [the Court does] not focus on the admissibility of the evidence's form. [The Court] instead focus[es] on the admissibility of its contents." Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003).

Defendants object to certain proffered evidence on various grounds. Dkt. 90-2. JLI also objects to evidence on various grounds. Dkt. 94-13. The Court has reviewed all of the evidentiary objections.

The Court has not relied on any inadmissible evidence or facts not mentioned in this Order.

## B.   Liability

Defendants do not contest liability.  The Court nevertheless considers this issue on the merits.  See Cristobal v. Siegel, 26 F.3d 1488, 1494-95 & n.4 (9th Cir. 1994).

### 1.   Trademark Infringement

JLI brings a trademark infringement claim under 15 U.S.C. § 1114(1)(a), which states:

> (1) Any person who shall, without the consent of the registrant –
>
>> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

To prevail, JLI must establish (1) it has a valid, protectable trademark or trade dress and (2) the alleged infringer's use of the same or a similar mark causes a likelihood of confusion in the minds of the relevant consuming public.  See Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 841 (9th Cir. 1987).

### a.   Valid Trademark

JLI must first have a "valid, protectable trademark" to claim trademark infringement.  See Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp., 174 F.3d 1036, 1046 (9th Cir. 1999).  The plaintiff bears the ultimate burden of showing that the trademark is valid and protectable.  Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc., 419 F.3d 925, 927-28 (9th Cir. 2005).  Federal registration of a

trademark provides prima facie evidence of the mark's validity and entitles the plaintiff to a strong presumption that the mark is protectable. Zobmondo Ent., LLC v. Falls Media, LLC, 602 F.3d 1108, 1113 (9th Cir. 2010); see 15 U.S.C. § 1115(a). If the plaintiff shows that a mark has been properly registered, the burden shifts to the defendant to show by a preponderance of the evidence that the mark is not protectable. Tie Tech, Inc. v. Kinedyne Corp., 296 F.3d 778, 783 (9th Cir. 2002).

JLI is the undisputed exclusive owner of the federally registered trademarks at issue. PUF ¶ 10. JLI has used one or more of the JUUL Marks continuously in commerce, including in connection with its sale of JUUL Devices, JUULpods, and USB Charging Docks. Id. ¶ 11. JLI prominently displays one or more of the JUUL Marks in all of its advertising and promotional materials, including all product packaging. Id. ¶ 12. JLI has established that it has valid, protectable trademarks.

        b.   <u>Used in Commerce</u>

To prevail on its claims, JLI must also show Defendants "used" their trademarks "in connection with a sale of goods or services." See Bosley Med. Inst., Inc. v. Kremer, 403 F.3d 672, 677 (9th Cir. 2005); see 15 U.S.C. § 1114(a)(1) (prohibiting any use "in connection with the sale, offering for sale, distribution, or advertising of any goods or services").

The parties dispute whether Defendants actively sold the goods at issue, because they disagree about whether Yang, who coordinated with JLI's investigator to source and sell the goods, is an employee or representative of CJ. PUF ¶ 61. The Court need not decide that issue. "Courts in the Ninth Circuit have held that in patent, trademark, literary property, and copyright infringement cases, any member of the distribution chain of allegedly infringing products can be jointly and severally liable for the alleged misconduct." Adobe Sys. Inc. v. Blue Source Grp., Inc., 125 F. Supp. 3d 945, 973 (N.D. Cal. 2015) (collecting cases) (quoting marks omitted) (quoting Unicolors, Inc. v. Macy's, Inc., No. CV 14-08611-RGK SSX, 2015 WL 1020101, at *4 (C.D. Cal. Mar. 6,

2015)).  Defendants are responsible for shipping and handling of the products sold on CJ.  PUF ¶ 27.  Defendants also stored the goods at issue here at their warehouse in New Jersey and coordinated with the investigator to have the goods picked up.  Id. ¶¶ 47-48.

This is sufficient to establish Defendants were part of the distribution chain and therefore used the goods in commerce.  See Nike, Inc. v. E. Ports Custom Brokers, Inc., No. 2:11-CV-4390-CCC-MF, 2018 WL 3472628, at *9 (D.N.J. July 19, 2018) (defendants liable for direct infringement since they arranged for the shipment of counterfeit cargo despite claims of being "innocent service provider[s]" who "neither knew nor had any reason to have known that [their] services were being used by" counterfeiters); Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc., No. CV 08-0068 (KAM) (JO), 2010 WL 2133937, at *5 (E.D.N.Y. Mar. 11, 2010) (arrangement of transportation of counterfeit goods sufficient to qualify as "use in commerce"), report and recommendation adopted, No. CV 08-0068 (KAM) (JO), 2010 WL 2160058 (E.D.N.Y. May 27, 2010); Philip Morris USA, Inc. v. Lee, 481 F. Supp. 2d 742, 746 (W.D. Tex. 2006) (officer of company who arranged for importation of counterfeit cigarettes into the U.S. liable for trademark infringement even though defendants never possessed the counterfeit goods).

c.    Likelihood of Confusion

JLI must also establish there is a likelihood of confusion, deception, or mistake from Defendants' use of the JUUL Marks.  See Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1178 (9th Cir. 1988); 15 U.S.C. § 1114(a)(1).  "[C]ounterfeit marks are inherently confusing." Microsoft Corp. v. Buy More, Inc., 136 F. Supp. 3d 1148, 1157 (C.D. Cal. 2015), aff'd, 703 F. App'x 476 (9th Cir. 2017) (quoting Philip Morris USA Inc. v. Shalabi, 352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2004)).  A counterfeit is "a non-genuine mark identical to the registered, genuine mark of another, where the genuine mark was registered for use on the same goods to which the infringer applied the mark." Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc., 658 F.3d 936, 945-946 (9th Cir. 2011); see also 15 U.S.C. § 1127.

Although likelihood of confusion is ordinarily a factual determination made using an eight factor test, <u>Accuride Int'l Inc. v. Accuride Corp.</u>, 871 F.2d 1531, 1534 (9th Cir. 1989), "in cases involving counterfeit marks, it is unnecessary to perform the step-by-step examination . . . because counterfeit marks are inherently confusing," <u>Shalabi</u>, 352 F. Supp. 2d at 1073 (citing <u>Philip Morris USA Inc. v. Felizardo</u>, No. 03 CIV. 5891 (HB), 2004 WL 1375277, at *18 (S.D.N.Y. June 18, 2004)); <u>Gucci Am., Inc. v. Duty Free Apparel, Ltd.</u>, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) ("counterfeits, by their very nature, cause confusion").  Where virtually identical marks are used with identical products or services, likelihood of confusion "follow[s] as a matter of course."  <u>Brookfield Commc'ns</u>, 174 F.3d at 1056.

It is undisputed that the goods in question are counterfeit.  PUF ¶¶ 44, 45.  Therefore, JLI has established a likelihood of confusion.  JLI's motion for summary judgment is GRANTED as to liability for trademark infringement.

### 2.    False Designation of Origin/Unfair Competition

JLI asserts it succeeds on its claim for false designation of origin and federal and California claims for unfair competition claims because they are governed by the same test as trademark infringement.  Mot. at 25.  The Lanham Act "prohibits the use of false designations of origin, false descriptions, and false representations in the advertising and sale of goods and services."  <u>Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.</u>, 407 F.3d 1027, 1036 (9th Cir. 2005).  The statute also prohibits unfair competition.  <u>Cleary v. News Corp.</u>, 30 F.3d 1255, 1262 (9th Cir. 1994) (noting because the plaintiff had established false designation of origin and false representation claims, the plaintiff had also shown unfair competition).

In order to succeed on a false designation of origin claim under § 1125(a)(1)(A), Plaintiffs must prove each of the following elements:

(1) the defendant used a designation (any word, term, name, device, or any combination thereof) or false designation of origin;

(2) the use was in interstate commerce;

(3) the use was in connection with goods or services;

(4) the designation or false designation is likely to cause confusion, mistake, or deception as to

> (a) the affiliation, connection, or association of defendant with another person, or

> (b) as to the origin, sponsorship, or approval of defendant's goods, services, or commercial activities by another person; and

(5) plaintiff has been or is likely to be damaged by these acts.

Summit Tech., Inc. v. High-Line Med. Instruments, Co., 933 F. Supp. 918, 928 (C.D. Cal. 1996) (citing J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27.03). "A likelihood of confusion exists when consumers 'are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques.'" Metro Publ'g, Ltd. v. San Jose Mercury News, 987 F.2d 637, 640 (9th Cir. 1993) (quoting Nutri/Sys., Inc. v. Con-Stan Indus., Inc., 809 F.2d 601, 604 (9th Cir. 1987); Shakey's Inc. v. Covalt, 704 F.2d 426, 431 (9th Cir. 1983)).

The "ultimate test" for all these claims "is exactly the same as for trademark infringement: 'whether the public is likely to be deceived or confused by the similarity of the marks.'" Century 21 Real Estate Corp., 846 F.2d at 1178 (quoting New W. Corp. v. NYM Co. of Cal., 595 F.2d 1194, 1201 (9th Cir. 1979)). "The elements for establishing unfair competition under California Business and Professions Code § 17200 by trademark infringement and common law trademark infringement are

essentially the same as those for the Lanham Act." SV3, LLC v. GG Distrib., Inc., No. EDCV 19-0046 JGB (SPx), 2019 WL 1460621, at *3 (C.D. Cal. Feb. 27, 2019); accord, e.g., Century 21 Real Estate Corp., 846 F.2d at 1178; Mallard Creek Indus., Inc. v. Morgan, 56 Cal. App. 4th 426, 434 (1997) (analysis for state law trademark infringement is the same as under federal law).

As discussed above, it is undisputed that Defendants used the JUUL Marks in question in interstate commerce in connection with a counterfeit good.  Defendants' use of JUUL Marks is likely to cause confusion.  Lastly, JLI has been damaged by Defendants' acts.  Therefore, JLI's motion for summary judgment is GRANTED as to the false designation of origin and unfair competition claims.

## C.  Damages

Defendants argue summary judgment as to the amount of damages is inappropriate because, "[w]hile Defendants concede liability for trademark infringement, numerous factual issues remain regarding (1) the number of counterfeit marks at issue, (2) the appropriate amount of damages, which involves a weighing of factors, and (3) whether counterfeiting was willful, an inherently factual assessment."  Opp'n at 6.  The Court agrees there are outstanding issues of material fact, including whether Defendants' sale was willful, that preclude a grant of summary judgment.

15 U.S.C. section 1117(a) provides that a plaintiff that has had a registered trademark infringed shall be entitled "to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  The statute further specifies that in cases "involving the use of a counterfeit mark . . . in connection with the sale, offering for sale, or distribution of goods or services," the plaintiff may elect to recover statutory damages in the amount of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods" or, if the use is found to be willful, "not more than $2,000,000 per counterfeit mark per type of goods." Id. § 1117(c).

### 1.    Number of Infringing Marks

JLI argues that, based on the inventory listed on Defendants' website, its statutory damages could be as high as $28 million, based on fourteen different uses of the JUUL Marks on different types of goods sold by Defendants.  Mot. at 26; PUF ¶ 91.  To support the fourteen different uses, JLI points to JUUL Marks on both the exterior packaging of some of the goods and on the products themselves encased in the packaging.  Dkt. 77-33.

To support that it is reasonable to count Defendants' uses of counterfeit marks on both the JUUL device and JUULpods, and their exterior box and interior foil packaging, separately, JLI points to several cases.  But those cases counted a violation for *each separate mark* on a good, not for the same mark used in multiples places on a good or the same mark on packaging for a product as well as on the product itself.  See, e.g., Shalabi, 352 F. Supp. 2d at 1076 (counting four violations for two different marks used by two separate defendants).

JLI also points to the definition of counterfeit mark articulated in 18 U.S.C. § 2320(f)(1)(A).  Dkt. 94 (Reply) at 16-17.  That statute defines counterfeit mark as "a spurious mark" "that is used in connection with trafficking in any goods, services, labels, patches, stickers, wrappers, badges, emblems, medallions, charms, boxes, containers, cans, cases, hangtags, documentation, or packaging of any type or nature."  18 U.S.C. § 2320(f)(1)(A).  JLI points to the inclusion of words such as "box," "container," and "packaging" to support that the marks are counted by component.

But the statute addressing relief for counterfeit goods specifies relief is calculated "per counterfeit mark *per type of goods or services* sold."  15 U.S.C. § 1117 (c) (emphasis added).  The plain language of the statute requires calculating relief per mark anywhere on a product or packaging, not for each component of the product.  Damages here will be measured by the amount of unique marks used on a product as a whole, both in exterior and interior packaging.  The Court need not

determine the amount of marks at issue, however, because there are outstanding questions of material fact as to willfulness.

### 2. Willfulness

JLI argues it is entitled to maximum statutory damages because there is "overwhelming evidence" of Defendants' intent and knowledge of infringement.  Mot. at 16, 26.  The Court finds there are outstanding issues of material fact as to Defendants' willfulness that render summary judgment inappropriate as to the issue of damages.

"To act 'knowingly' [ ] is not necessarily to act only with a positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question."  United States v. Jewell, 532 F.2d 697, 700 (9th Cir. 1976).  "[I]f the [plaintiff] proves the defendant was 'willfully blind' to the counterfeit nature of the mark, it will have met its burden of showing 'knowledge.'"  See Louis Vuitton S.A. v. Lee, 875 F.2d 584, 590 (7th Cir. 1989) (citing legislative history), see also Philip Morris USA, Inc. v. Liu, 489 F. Supp. 2d 1119, 1123 (C.D. Cal. 2007) ("Willfulness can be established by evidence of knowing conduct or by evidence that the defendant acted with 'an aura of indifference to plaintiff's rights' – in other words, that the defendant willfully blinded himself to facts that would put him on notice that he was infringing another's trademarks, having cause to suspect it").

A defendant's willful intent to infringe on a mark need not be proven directly, but may be inferred from circumstantial evidence of his conduct.  UMG Recordings, Inc. v. Disco Azteca Distribs., Inc., 446 F. Supp. 2d 1164, 1173-74 (E.D. Cal. 2006) (citing N.A.S. Imp., Corp. v. Chenson Enters., Inc., 968 F.2d 250, 252 (2d Cir. 1992)).  "To refute evidence of willful infringement, [a defendant] must not only establish its good faith belief in the innocence of its conduct, it must show that it was reasonable in holding such a belief."  Id. (citing Peer Int'l Corp. v. Pausa Recs., Inc., 909 F.2d 1332, 1336 (9th Cir. 1990)).

"Generally, a determination as to willfulness requires an assessment of a party's state of mind, a factual issue that is not usually susceptible to summary judgment."  Id. at 1174; Frank Music Corp. v.

Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 515 (9th Cir. 1985) (a finding of willfulness is a factual determination), cert. denied 494 U.S. 1017 (1990). "Nonetheless, when the relevant facts are undisputed, willfulness can be resolved on summary judgment." N. Face Apparel Corp. v. Dahan, No. 13-04821 MMM (MANX), 2014 WL 12558010, at *18 (C.D. Cal. Oct. 6, 2014) (citing Sega Enters. Ltd. v. MAPHIA, 948 F. Supp. 923, 936 (N.D. Cal. 1996) (concluding defendants' copyright infringement and trademark infringement was willful as a matter of law where the undisputed facts indicated defendants knew they were infringing SEGA's copyrights and trademarks and continued to do so)).

There are several facts that preclude a grant of summary judgment here. First, Yang made several comments that may demonstrate knowledge that the goods were infringing, such as stating the "product attribution" for the relevant products was banned, PUF ¶ 56, or suggesting she could coordinate secretly shipping the products but the products risked being checked by customs, Yang Conversation at 152, 157. But the parties dispute whether Yang was in fact an employee or agent of Defendants or of a third party. PUF ¶¶ 59-62. Any willfulness on Yang's part would not be imputed to Defendants if she was not Defendants' employee or agent.

Second, Yang also referred to a more general shipping ban and constraints due to the pandemic as a reason she could not ship goods. DUF ¶¶ 100-101; Yang Conversation at 139, 140. Yang also refused to sell Apple-branded products because they were in infringing. DUF ¶ 93; Yang Conversation at 152. Viewing these facts in the light most favorable to Defendants, it is possible Yang's statements could be read as referring to a shipping ban because of the pandemic or on JUUL branded products, without knowledge of infringement or "willful blindness" as to whether the goods were infringing.

There are therefore outstanding material questions as to whether Yang worked for Defendants and whether Yang knew, or Defendants were reckless to the truth of whether, the goods were infringing. Given that JUUL branded products are not sold in China, the Court cannot

say with certainty that Defendants were "willfully blind" to the counterfeit nature of the goods.  See Lee, 875 F.2d at 590.

Certainly there is evidence that strongly suggests Defendants were willfully blind or had actual knowledge about the counterfeit nature of the goods.  Chou's past conviction for counterfeiting may also demonstrate willfulness.[2]  Delta Air Lines, Inc. v. Wunder, No. 1:13-CV-3388-MHC, 2015 WL 11242003, at *13 (N.D. Ga. Dec. 15, 2015) ("[A] prior conviction of trademark counterfeiting charges is relevant to show present infringement was willful.").  But the Court is "not entitled to weigh the evidence and resolve disputed underlying factual issues." Chevron Corp., 974 F.2d at 1161.  Drawing all inferences in favor of Defendants, as the Court must on summary judgment, Matsushita Elec. Indus. Co., 475 U.S. at 587-88, there are remaining material questions as to Defendants' willfulness that cannot be resolved at this stage.  Language Line Servs., Inc. v. Language Servs. Assocs., Inc., 944 F. Supp. 2d 775, 784 (N.D. Cal. 2013) (willfulness is generally a question of fact for the jury); Wall Mountain Co., Inc. v. Edwards, No. C 08-2579 PVT, 2010 WL 4940778 at *2 (N.D. Cal. Nov. 30, 2010) ("A willfulness determination requires an assessment of a party's state of mind, which is a factual issue not readily susceptible to summary judgment"); Sega Enters. Ltd., 948 F. Supp. at 936 (same).

The cases on which JLI relies, Mot. at 29-30, Reply at 7, are distinguishable either because the case was at a different procedural posture or because there was a clear finding of awareness or willful blindness as to the counterfeit nature of goods, contradicted only by the defendant's word.  See Philip Morris USA, Inc. v. Castworld Prod., Inc., 219 F.R.D. 494 (C.D. Cal. 2003) (decided on default judgment); UL LLC v. Space Chariot Inc., 250 F. Supp. 3d 596, 613 (C.D. Cal. 2017) (defendant conceded in deposition it was aware of plaintiff's safety

---

[2] The Court agrees, however, that Defendants' violations of Court orders, while concerning and potentially warranting sanctions, are not relevant to the damages calculation as the statute clearly permits enhanced statutory damages only if "the court finds that the *use of the counterfeit mark was willful*."  15 U.S.C. § 1117(c)(2) (emphasis added); Opp'n at 17.

standards while using the plaintiff's mark and plaintiffs had sent cease and desist letters by mail and email); Liu, 489 F. Supp. 2d at 1123 (defendant disregarded a third-party's statement that there was a problem with the shipment, that he would no longer assist with the transloading, and that he suggested defendant do the same); N. Face Apparel Corp., 2007 WL 9700729, at *5 ("But even if the violation in these sales were unknowing, the record contains no innocent explanation for the counterfeit The North Face Products seized at their warehouses that bore the tell-tale 'Fabrique Au Bangladesh' label, which they specifically requested that their factory remove."); Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Eastimpex, No. C 04-4146 MMC, 2007 WL 328696, at *9 (N.D. Cal. Feb. 2, 2007) (findings after a trial was conducted on a willfulness determination evidenced by circumstantial evidence).

JLI's motion for summary judgment as to damages is DENIED.

## IV. CONCLUSION

The Court GRANTS in part and DENIES in part JLI's motion for summary judgment.  The motion is GRANTED as to liability for trademark infringement, false designation of origin, and unfair competition.  It is DENIED as to a finding of willfulness and the issue of damages.

IT IS SO ORDERED.

Date: August 30, 2021

_____
Dale S. Fischer
United States District Judge