1

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                     WESTERN DIVISION

 4      THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

 5
     JUUL LABS, INC. a Delaware       )
 6   Corporation,                     )
                                      )
 7                      Plaintiff,    )
                                      )
 8            vs.                     ) NO. 2:21-CV-03056-CAS-PDx
                                      )
 9   ANDY CHOU, ET AL.,               )
                                      )
10                      Defendants.   )  REDACTED TRANSCRIPT
     _____)

11

12

13         REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

14                  Los Angeles, California

15

16         Tuesday, January 30, 2023, 1:31 P.M.

17                      Court Trial

18                   Pages 1 to 63-21;

19      Pages 65:11 to 73-10; 75:02 to 95 inclusive.

20

21

22                              WIL S. WILCOX CSR 9178
                                Official Reporter
23                              First Street Courthouse
                                350 West 1st Street
24                              Room 4311
                                Los Angeles, CA  90012
25                              wil.wilcox@gmail.com
```

2

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:

 3                           BARTKO ZANKEL BUNZEL & MILLER
                             BY:   STEPHEN C. STEINBERG
 4                                 PATRICK M. RYAN
                                   ATTORNEYS AT LAW
 5                           One Embacadero Center, Suite 800
                             San Francisco, California  94111
 6                           Email: ssteinberg@bzbm.com
                             Email: pryan@bzbm.com
 7
      FOR THE DEFENDANTS:   NI, WANG & MASSAND, PLLC
 8                          ATTORNEYS AT LAW
                            BY:   STEVENSON MOORE (pro hac vice)
 9                                NEAL MASSAND (pro hac vice)
                                  TONG JIN (pro hac vice)
10                          8140 Walnut Lane, Suite 500
                            Dallas, TX 75231
11                          Email: smoore@nilawfirm.com
                            Email: nmassand@nilawfirm.com
12                          Email: tjin@nilawfirm.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Wil Wilcox, Official Reporter

3

| | |
|---|---|
| 1 | LOS ANGELES, CA; MONDAY, JANUARY 30, 2023; 1:31 PM |
| 2 | -oOo- |
| 3 | THE CLERK:  Case number CV-21-3056-DSF, JUUL Labs, |
| 4 | Inc. versus Andy Chou, et al. |
| 5 | Counsel, please state your appearances. |
| 6 | MR. RYAN:  Good afternoon, Your Honor.  Patrick Ryan |
| 7 | for the Plaintiff, JUUL Labs, Inc. |
| 8 | MR. STEINBERG:  Good afternoon, Your Honor.  Stephen |
| 9 | Steinberg, also for the Plaintiff, JUUL Labs, Inc. |
| 10 | THE COURT:  And who do you have with you? |
| 11 | MR. STEINBERG:  Your Honor, we have with us Ben |
| 12 | Botello, who is our trial technician.  We also have |
| 13 | Hillary Shroeder and Paige Fang, who are in-house Counsel |
| 14 | at JUUL Labs, Inc., the Plaintiff. |
| 15 | THE COURT:  Welcome, thank you. |
| 16 | MR. STEINBERG:  Thank you, Your Honor. |
| 17 | MR. MOORE:  Good afternoon, Your Honor.  Stevenson |
| 18 | Moore, here on behalf of Defendants. |
| 19 | THE COURT:  And who's with you? |
| 20 | MR. MOORE:  With me, I have my partner, Neal |
| 21 | Massand, and our associate, Tong Jin. |
| 22 | THE COURT:  Welcome. |
| 23 | All right.  I see from my screen that JUUL |
| 24 | Labs has an opening presentation. |
| 25 | Would you like to proceed? |

Wil Wilcox, Official Reporter

4

1      MR. RYAN:  Just a few housekeeping matters, so Your
2  Honor's aware of what's happening.
3      THE COURT:  All right.
4      MR. RYAN:  The parties have agreed and stipulated
5  that we could divide oral argument up among different
6  attorneys.
7      THE COURT:  All right.
8      MR. RYAN:  I'm going to do a brief introduction
9  followed by Mr. Steinberg, and then Mr. Steinberg's going
10  to do his presentation.  I'll wrap up.
11          And the other issue is we have some physical
12  evidence that we have for Your Honor, if you'd like to
13  look at it.
14          Anything else we want to?
15          And we have one other person in the
16  courtroom, Brittany Garcia, who is one of JUUL's
17  investigators, is actually in the courtroom.
18      THE COURT:  All right.
19      MR. RYAN:  The other thing, Your Honor, is JUUL
20  offered to exchange its presentation a couple of days ago.
21  The other side said that there was no provision for that
22  in the current stipulation and preferred not to do that,
23  so we have not exchanged presentations, although we
24  offered to do so.
25          The parties have agreed to stand on their

5

```
1   written objections, and that if we don't interrupt each
2   other, which we plan not to do, that we will not be
3   waiving any such objections.
4          THE COURT:  That's fine.  There's no jury.  So you
5   didn't need to be showing each other your presentation.
6              So you may proceed.
7              Did you want to say something, Counsel?
8          MR. MOORE:  Just one other thing, Your Honor.  There
9   is some confidential information in our presentation.  It
10  occurs in two separate occasions.  And before we do that,
11  I don't believe there's anyone who is not involved in this
12  case in the courtroom, but we will notify everyone that we
13  are about to have confidential information so that the
14  record can be sealed.
15         THE COURT:  All right.  Thank you.
16         MR. RYAN:  And if that is the case and there is
17  someone in the courtroom at that time, we'll ask that that
18  person be briefly excused.
19         THE COURT:  All right.  That's fine.
20         MR. RYAN:  Ready when you are, Your Honor.
21         THE COURT:  I'm ready.
22         MR. RYAN:  Your Honor, the most important word in
23  this case is "deterrence."  It is the overriding factor
24  that permeates all of the evidence, and all of the facts,
25  and all of the law in this case.
```

6

```
1              The defendants are repeated counterfeiters
2    who have been found willfully liable on five separate
3    occasions.  Other than this case, they've been sued eight
4    times for willful counterfeiting.
5              They claim that they offer over half a
6    million products on their website.  They're a global
7    counterfeiting organization that has warehouses all around
8    the world.  And they have violated this court's orders and
9    other courts' orders on a serial basis.
10             Moreover, in this case, unlike many of the
11   cases, it involves products intended for human
12   consumption, which heightens the need for deterrence.
13             JUUL is the number-one brand of e-cigarettes
14   in the United States.  At all relevant times, it was the
15   number-one brand of e-cigarettes.
16             Now, what the defendants have said is we had
17   a robust anti-counterfeiting program.  What we know is
18   that was a sham, and it was created after the fact.
19             But what is also important is they've said
20   that when they're getting ready to sell a product, they
21   run what's called a "Baidu search," which is the
22   equivalent of Google in China.  And if they had run the
23   Baidu search as they swore under penalty of perjury that
24   they do every time, they would have seen numerous hits
25   that would have told them that the JUUL name is a
```

1    well-known mark and it is a highly-valuable mark, and it

2    is highly used in the United States, in China, and around

3    the world.

4        THE COURT:  Thank you.

5            Let me interrupt you for just a minute,

6    because I usually ask for a glossary.  I don't think I did

7    in this case.

8            So if you're going to use a term that's not

9    immediately familiar, could you spell that so we make sure

10   our court reporter gets it?

11       MR. RYAN:  I've actually given the court reporter

12   written -- a physical copy of our presentation, which has

13   all of these words in it.

14       THE COURT:  Excellent, thank you.

15       MR. RYAN:  So we have a global counterfeiting

16   ███████████████████████████████████████

17   boasts selling over half a million products.  And so what

18   we're going to do is we're going to take you through, Your

19   Honor, what we think are the four factors of deterrence

20   that cover the facts and the law in this case.

21           The first one is evidence of actual or

22   constructive knowledge.  It's overwhelming in this case.

23           The second is past judgments and convictions

24   for willful counterfeiting.  There are five, and there

25   are -- there are numerous cases that say that is

1    sufficient in and of itself, without any other evidence,

2    to grant maximum statutory damages.

3                And then the other factor, which is arguably

4    the most important and distinguishing in this case, is

5    does the case involve products intended for human

6    consumption.  And was there a reckless disregard for the

7    safety of consumers.

8                Mr. Steinberg is going to talk about perjury

9    and failure to produce evidence after I'm done with the

10   first three, what we'll call them "petals in the flower of

11   willfulness."

12               Mr. Steinberg is going to take over from

13   here.

14        THE COURT:  All right.

15        MR. STEINBERG:  Good afternoon, Your Honor.

16        THE COURT:  Good afternoon.

17        MR. STEINBERG:  I want to just take a few minutes to

18   reintroduce Your Honor to the parties in this case and to

19   the products that are issue in this case.

20               First, we have the plaintiff, JUUL Labs,

21   Inc., my client.  JUUL Labs, Inc.  Designs, manufactures,

22   and distributes JUUL-branded electronic nicotine-delivery

23   systems, which are sometimes commonly known as

24   "e-cigarettes," and related JUUL-branded products.  And

25   the array of products that are an issue in this case are

9

1    shown here on this slide.

2              The JUUL device was launched in 2015 as an

3    alternative for the world's adult smokers, that they could

4    use to transition away from combustible cigarettes.

5              First, on the left of the slide, you see the

6    JUUL device.  This is the device that's used for

7    inhalation of nicotine vapor.  Next to that, the JUULpods.

8    These are specifically designed for use with the JUUL

9    device.  They are what contain the nicotine liquid.

10             Next to that is the JUUL USB charger, which

11   is designed to charge the JUUL device.  And next to that,

12   we have a JUUL portable charging case, which can both

13   charge a device and also store it when a consumer is out

14   and about.  And also, there's a USB cable that can be used

15   for charging that device.  So that's the array of

16   authentic products.

17             And, Your Honor, we have samples here.  This

18   is an authentic JUUL starter kit that contains a device,

19   the pods, and a USB charger.  This is an authentic USB

20   charging dock.  And this is an authentic portable charging

21   case with the USB cable included.

22             And we can leave these with the Court at the

23   conclusion of the hearing or I can bring them up to Your

24   Honor if you'd like.

25        THE COURT:  Well, why don't you bring them up.

```
 1                    And I did have a question about the starter
 2     kit and how you are treating that.
 3                    Are the items with the starter kit sold
 4     separately, or are you considering this -- the kit one
 5     product or separate products, or --
 6          MR. STEINBERG:  So they're sold both together on
 7     certain occasions, but also separately.  So it includes
 8     both a device, and the pods, and the USB charger.  They
 9     can be sold together or separately.
10                    In this case, we are counting them as
11     separate types of products as sold by Defendants.
12          THE COURT:  Thank you.
13          MR. STEINBERG:  And may I approach and bring these
14     up?
15          THE COURT:  Yes.
16          MR. STEINBERG:  And these are Trial Exhibits 282,
17     283, and 284.  Thank you.
18                    Your Honor, there are two employees of the
19     plaintiff, who you've heard from through deposition
20     testimony and declarations.  The first is Mr. Adrian
21     Punderson.  He's the vice president of Global Brand
22     Protection at JLI.  He's been doing anti-counterfeiting
23     work for over 17 years.  Besides JUUL, he previously
24     worked for brands including Apple and Oakley, and the
25     recording industry of America.  Before that, he spent over
```

 1   a dozen years working in law enforcement.

 2           And also Ms. Brittany Garcia, who's here in

 3   the front row with us today.  Ms. Garcia is an

 4   investigation specialist at JLI.  She has over nine years

 5   of experience investigating and combating counterfeiting.

 6           And Ms. Garcia is particularly important,

 7   because she's the one who found CJ offering and selling

 8   counterfeit Oakley and Ray-Ban sunglasses when she worked

 9   at her prior employer.

10           When she joined JLI, she looked to see if

11   they were selling counterfeit JUUL products, which they

12   were, and then endeavored to initiate the investigation of

13   Defendants at that time.

14           Your Honor's also heard from two different

15   investigators who worked for JLI.  First is Mr. Matthew

16   Hewlett.  He's a senior private investigator.  Mr. Hewlett

17   was the one who corresponded with the defendants

18   throughout the investigation and placed the various orders

19   that were delivered to him.

20           And then James Ricaurte, who's another

21   private investigator.  Mr. Ricaurte got involved towards

22   the end to help with the pickup of products from

23   Defendants' New Jersey warehouse.

24           And he was accompanied by an agent from the

25   Department of Homeland Security who was undercover, who

```
 1   took the bulk of that order.  Mr. Ricaurte took two
 2   samples.
 3              And, Your Honor, we also have samples of the
 4   counterfeit products, which I'll show a little bit later
 5   in the presentation.
 6              JUUL has a number of different trademark
 7   registrations that it uses to protect its various marks.
 8   Those are depicted on this slide.  And you can see there's
 9   varieties of the word "JUUL", "JUUL labs," "JUULpods,"
10   also the two-dimensional icons on the right-hand side.
11              I want to talk very briefly about who the
12   defendants are.  The defendants operate a site called
13   "CJDropshipping.com."  Sometimes they refer to themselves
14   as "CJ." Mr. Chou is the owner, the founder, the
15   principal, the CEO of all of these companies.
16              Iwacu Josh, shown in the middle, and e-Wu
17   Cute Jewelry are what Mr. Chou has said the companies that
18   administer the overall website and the overall business.
19   She -- excuse me, CJ Trade on the left is the business in
20   New Jersey, and CJ Fulfillment is the business in
21   California.
22              The defendants are not a small operation
23   according to you their own testimony -- this is
24   Mr. Chou's testimony -- their revenues have been well
25   ████████████████████████████████████████████████
```

1  very sizable operation that they're running.

2          On the next slide, we see the locations of

3  Defendants' various warehouses around the world.  Besides

4  having locations in New Jersey and California, they have

5  several warehouses in China.  They have several more

6  warehouses in other countries in Asia, and they have

7  several more warehouses around various locations in

8  Europe.  So this is a worldwide operation that we're

9  talking about.

10          This is just a summary of the key witnesses

11  for Defendants.  I'm not going to spend a lot of time

12  going through that, because I assume that Defendants will

13  talk about their own folks.  These are the ones in China.

14  These are the witnesses that we heard from here in the

15  United States who worked for CJ Trade.

16          So I want to talk just briefly about where we

17  started and where we are today.

18          Back in June of 2021 we were before Your

19  Honor, and we were asking for a preliminary injunction.

20  And at that time, the Court found that $2.8 million was a

21  conservative estimate of statutory damages and ordered

22  that that amount of assets be frozen.  This is before any

23  discovery had taken place.

24          And two months' later, we asked for summary

25  judgment.  Your Honor granted summary judgment.

|     |                                                                        |
| --- | ---------------------------------------------------------------------- |
| 1   | As to the issue of liability for the products                          |
| 2   | we knew about at the time, which was just the starter kits             |
| 3   | and the USB chargers, but found that there was a disputed              |
| 4   | issue of fact on the issue of willfulness.  And at the                 |
| 5   | time, that was focused on uncertainty around someone named            |
| 6   | Celia, who was the person that Mr. Hewlett corresponded                |
| 7   | with at Defendants, and whether she was in fact an                     |
| 8   | employee or agent of Defendants.                                       |
| 9   | What we've learned since then is that, number                          |
| 10  | one, even if we ignore Celia, there's plenty of evidence               |
| 11  | of willfulness in this case.  So we don't necessarily need             |
| 12  | to rely on that.                                                       |
| 13  | But we also learned that multiple CJ                                   |
| 14  | employees have used the name Celia when corresponding with             |
| 15  | customers and we learned that Defendants controlled                    |
| 16  | Celia's methods of communication with customers, and also              |
| 17  | controlled parts of her job function.                                  |
| 18  | So we think we have enough to show that an                             |
| 19  | agency relationship -- because there is control by CJ.                 |
| 20  | But even if we disregard the evidence of Celia, there's                |
| 21  | plenty of evidence of willfulness to talk about.  And I'll             |
| 22  | just talk about that very briefly and then hand it off to              |
| 23  | Mr. Ryan.                                                              |
| 24  | So what else have we learned through                                   |
| 25  | discovery in this case since August of 2021?  We learned              |

that Defendants lied about their lack of legal problems

prior to this case.  They claim that they'd never been in

any legal trouble other than Mr. Chou's conviction in

2010.

         We learned about at least five different

judgments for willful counterfeiting in this country

alone.  There were three more lawsuits filed just while

this case was pending for willful counterfeiting.  And

that's just what we know about, Your Honor.  There may be

other cases around the world that we never did learn of

through discovery.

         We also learned that Defendants' claims that

they're only infringing sales were to JLI's instigator.

We learned that that claim was also false.  The limited

sales data that they produced shows sales to dozens of

other customers, mostly in the United States, and also

showed that they offered and sold other JUUL-branded

products that were counterfeit as well.

         Crucially, we learned that, contrary to

Defendants' claims at the outset of the case and through

the summer when we first moved for summary judgment, they

claimed that they had no inventory of infringing products

left in their possession, though they could not explain

what had happened to it.

         Defendants' own records, which we think are

1  still incomplete, even those limited records that we have

2  reflect that they possessed units at least as recently as

3  October of 2021.  That's six months after the case was

4  filed.  And yet, those were never produced to us so we

5  don't have samples, and there's never been a satisfactory

6  explanation provided for their missing -- for their being

7  missing.

8          And Mr. Ryan already talked a little bit

9  about the Baidu.com search results.

10          And with that, I'm going to hand it back to

11  Mr. Ryan, Your Honor.

12      THE COURT:  All right.  Thank you.

13      MR. STEINBERG:  Thank you.

14      MR. RYAN:  I just want to briefly go over some of

15  the law.  Even if it's not willful, you can award up to

16  $200,000 per mark.  But if it is willful, Your Honor can

17  award up to $2 million per mark.  And we think Your Honor

18  should award the maximum in this case, and we think the

19  evidence is overwhelming to support that.

20          And it's important -- under the law, there is

21  no necessary mathematical relationship between the size of

22  the statutory damage award and the extent or profitability

23  of the defendants' wrongful activities.

24          Willfulness can be shown through actual

25  awareness, reckless disregard for the infringement, or

```
1    willful blindness.  We have overwhelming evidence to show
2    all three methods here.
3              Willfulness can be established through --
4    through knowing conduct or evidence that the defendant
5    acted with an aura of indifference.  We have far more than
6    an aura of indifference here.  We have active motivation
7    to sell counterfeit products.  Certainly, willful
8    blindness.
9              And to act knowingly is not necessarily to
10   act only with positive knowledge, but also to act with an
11   awareness of the high probability of the existence of the
12   fact in question.  That is established overwhelmingly in
13   this case.
14             And knowledge, as Your Honor knows, may be
15   actual or constructive.  Here we have substantial evidence
16   of actual knowledge and certainly evidence of constructive
17   knowledge.  And reckless disregard for the possibility of
18   infringement may be found when the infringer should have
19   known, for instance, by virtue of his occupation that the
20   particular acts would constitute infringement.
21             Here, Mr. Chou is in the business of selling
22   products over the internet.  He swore under penalty of
23   perjury that every time they sell a product they run the
24   Baidu search, which is equivalent to Google on the
25   product.
```

```
 1              So either he did what he swore that he did
 2    and knew that the JUUL products were a popular well-known
 3    branded product, or he didn't do what he says he always
 4    does.
 5              If he did do it, it's actual knowledge.  If
 6    he did do what he said, that is absolutely, as a matter of
 7    law, willful infringement.  And if he didn't do it, that's
 8    willful blindness.  So either way, the defendant is guilty
 9    of willfulness.
10              And if the plaintiff here, JUUL, proves that
11    the defendant was willfully blind to the counterfeit
12    nature of the mark, it will have met its burden of showing
13    knowledge.  So even if you only find willful blindness,
14    we've satisfied our burden of showing knowledge.
15              And principles of deterrence, Your Honor, as
16    I talked about at the beginning, can lead to a maximum
17    damages award even when actual damages are minimal.
18    That's Your Honor's own North Face case.
19              As I said, we have what we call the "four
20    petals of wilfulness" here.  We have evidence of actual or
21    constructive knowledge, which I'm going to talk about
22    first.
23              This is Mr. Chou's declaration that I've been
24    referring to.  So if we look at, "after CJ receives a
25    sourcing request," the sourcing department then
```

1    independently uses the online search engine Baidu.com,

2    which is the equivalent of Google.com in China, to

3    research whether the supplier is authorized to sell

4    products that carry any trademarks.  That is Mr. Chou's

5    sworn declaration.  Let's take him at his word.

6            If he'd run that search on or about 2018, at

7    the same time they began offering the JUUL products for

8    sale, this is just a snippet, Your Honor, of the results

9    that did come up and would have come up if he did what he

10   swore that he did.  "JUUL" in the tagline, it's not

11   Chinese characters.  It's JUUL, the trade name.  JUUL in

12   the research.  JUUL in the image.  And these are just

13   snippets, Your Honor, JUUL, JUUL, JUUL.  It's clearly a

14   popular brand in China, based on these Baidu results.

15           So if we take him at his word in 2018 when he

16   began selling these products, he knew it was a popular

17   brand.  So how do we reconcile that?  He says, This is

18   part of our brand-protection strategy, is we run these

19   searches and if we see that it's a popular brand, we make

20   sure that there's authorization.  What the evidence shows

21   is that Mr. Chou actually uses Baidu.com to research what

22   are the most popular brands and target them for

23   counterfeiting.

24           This is the only explanation for the

25   numerous, numerous acts of counterfeiting that these

1    defendants have committed against very popular brands.

2                   Let's look at a little bit of the history,

3    because it actually shows actual knowledge.

4                   In October of 2020, Homeland Security visited

5    the warehouse with the JUUL investigator.  And according

6    to Defendant's witness, Leon Li, who spoke with the

7    Department of Homeland Security, they raised copyright

8    issues with such products, intellectual property issues.

9                   And thereafter in October of 2020, Defendant

10   Chou tells CJ employees to delist JUUL starter kits,

11   because it was not allowed and was a copycat or

12   counterfeit.

13                  "Copycat" is in Plaintiff's translation, and

14   Defendants' translated the word as "counterfeit."  Either

15   way, they knew what they were doing was wrong.

16                  Nevertheless, for the next six months after

17   the DHS visit, they continued to sell other JUUL products.

18   And in April 23rd, Defendants received notice of this

19   lawsuit, and only then did they finally stop selling all

20   of the JUUL products.

21                  This slide goes through the same evidence

22   with timestamps, in case Your Honor is curious about

23   seeing the details of these admissions in their own

24   written communications.

25                  The JUUL brand is incredibly well known in

```
 1    the United States.  There's no dispute, and Defendants
 2    don't even dispute that it is and has been the number-one
 3    selling e-cigarette brand in the United States.  And all
 4    the statistics that back that up are on this slide, Your
 5    Honor.
 6              And nearly all of the defendants' sales,
 7    admitted sales of counterfeit JUUL products were in the
 8    United States.  That's important to keep in mind.  This is
 9    a global counterfeiting operation that is targeting the
10    United States of America and its consumers.  That is
11    incredibly important to keep in mind.
12              And the JUUL brand undisputedly is well known
13    in China.  Defendants will say, Oh, we never heard of it.
14    Okay, the evidence presented clearly shows that the JUUL
15    brand is widely used and widely known in China, albeit now
16    almost all of those products are counterfeit.
17              And looking once again at Mr. Chou's sworn
18    declaration, a different part of it, after CJ receives a
19    sourcing request, the sourcing department directly asked
20    the suppliers whether their products are generic or
21    whether there is authorization from the owner of any
22    intellectual property rights that may cover the product.
23              Well, what we know is when Mr. Chou got his
24    Baidu results, he knew these products were not generic.
25    JUUL was not a generic term.  JUUL was a brand name, an
```

1    incredibly well-known brand name.

2              And if that wasn't enough, their internal

3    communications clearly show they knew that JUUL was a

4    brand name.  On this slide, we see the language

5    "hot-selling JUUL cigarette."  They know it's popular.

6    They researched it.  They target it because it was

7    popular, as they do with other brands.

8              Now Celia, as Mr. Steinberg talked about,

9    this was their big argument to avoid summary judgment

10   before, was she an agent under the law.

11             Well, Your Honor is the fact finder, will

12   look at the evidence.  And I think the evidence is

13   overwhelming, that they controlled whoever this person is,

14   or person's, activities.

15             They admit they controlled the electronic

16   accounts, and they directed her activities on behalf of

17   the defendants.  That is sufficient under the law.

18             And the *U.S.* versus *Dish Network* case that we

19   cite in our papers, fully supports that.  If you have the

20   right to control another's performance, that establishes

21   agency.

22             But, Your Honor, the evidence of other things

23   is so overwhelming.  Even if you were to ignore this Celia

24   person, you should find willfulness.

25             And as -- what we know now is that multiple

1    people use the name Celia.  It was -- it was an account

2    that they used to communicate.  And they had multiple

3    people use that account.  They should be responsible for

4    whatever the people use that account said, especially

5    because they control it.

6              And the comments of the persons known as

7    Celia clearly show that they knew what they were doing was

8    illegal.  In June 2020, the person known as Celia advised

9    that, quote, "Sorry, we can't ship this product to our

10   U.S. warehouse now," end quote, explaining that, quote,

11   "the product attribution is banned."

12             But she then offered that, quote, "We can

13   ship it secretly and ship it with several items, but we

14   can't be sure it won't be checked and hold."  This is CJ

15   speaking through someone calling themselves Celia, no

16   doubt about it.

17             Now, if we look at past judgments of

18   convictions, and a prior conviction of trademark

19   counterfeiting charges is relevant to show present

20   infringement was willful, we have that in spades.  And a

21   substantial damage award is necessary to deter a defendant

22   from committing future infringements.

23             And if the defendant continued to engage in

24   such conduct despite its prior litigation history,

25   moreover, the Court believes that such an award also will

1    serve to deter other potential infringers.

2                    That's what we have to think about here.  We

3    have a global serial infringer, and we have others like it

4    who need to be deterred.

5                    And in the *Burberry* case, Your Honor.  There,

6    the Court found that liable for willful infringement based

7    solely on the defendant's exhibiting a repeated pattern of

8    trademark counterfeiting.

9                    In that case, there were no prior judgments.

10   In 2002, the defendant in that case was sued by Versace

11   for the sale of counterfeit merchandise.  And in 2004, the

12   defendant was served with a cease and desist letter for

13   the sale of counterfeit Coach, Louis Vuitton, and Chanel

14   merchandise.  And on that basis alone, the Court in 2013

15   found the defendant liable for willful infringement of

16   *Burberry* trademarks.

17                   And the *Viacom* case that we've cited, Your

18   Honor, is similar, Your Honor.  So where you have past

19   convictions or past cases, here we have five past

20   convictions, that independently is enough to award -- to

21   find willfulness and award maximum statutory damages.

22                   Here, we have a history.  Mr. Chou was

23   convicted of criminal conspiracy to sell counterfeit

24   products in 2010.  Now he says he "got religion," and he

25   didn't do anything bad after that.

```
 1              And in a sworn declaration early on in this
 2   case, he says that he's not aware of any other wrongful
 3   acts.
 4              But what do we know?  We know that the
 5   pattern and the timeline show that he continues over and
 6   over and over again, because nobody has stopped him.
 7              He's convicted in 2010.  Then in 2017 he's
 8   sued by Harley-Davidson.  He doesn't stop selling
 9   counterfeit Harley-Davidson.  Again in 2019, he's sued for
10   willful counterfeiting.  He's sued again in 2017, and
11   again in 2017 by Chrome Hearts.  And he's -- he's found
12   guilty of willful counterfeiting over and over again.
13   This is a pattern.
14              And then in 2019, he's sued by Swarovski, and
15   there's a judgment for willful counterfeiting.  And in
16   2021, JUUL sues him.  He doesn't stop.  He's sued by
17   Converse in August 2021.  And there's a settlement for
18   willful counterfeiting.  Then Luxottica in September,
19   November, and March of 2021.  It goes on and on, and this
20   is all we've been able to find.
21              Now, Defendants purportedly added
22   Harley-Davidson, Converse, and Oakley to their database,
23   this so-called database to protect against them selling
24   counterfeits, which we know is a sham because it was
25   admitted after the fact.
```

```
 1              If that were true and they really had added

 2    these names, how is it that in 2019 Harley-Davidson had to

 3    sue them?  In 2021, Converse had to sue them, and Oakley

 4    had to sue them in 2021 and 2022.

 5              This shows the only logical inference from

 6    the evidence is there was no anti-counterfeiting program.

 7    There was a counterfeiting program designed to target

 8    popular brands and sell them to the United States, its

 9    consumers.

10              The products intended for human consumption

11    and reckless disregard for the safety.  Your Honor, when

12    we're talking about products intended for human

13    consumption, the need for deterrence is heightened.

14              A maximum statutory damage award is justified

15    by Defendants' reckless disregard for public health and

16    safety.  There, he bottled counterfeit liquid using large

17    plastic drums in an unsanitary, unregulated, industrial

18    warehouse.

19              Even though, to date, no adverse effects are

20    known to have been reported from consumption of the

21    counterfeit product, a maximum award is nonetheless

22    warranted to punish and deter such dangerous activity.

23              This case could not be more emblematic of

24    when deterrence is necessary.

25          THE COURT:  And what are the products, the JUUL
```

```
 1   products that you're asserting are for human consumption?
 2        MR. RYAN:  Well, the liquid nicotine, Your Honor,
 3   which goes into the JUUL product, which all of the other
 4   products facilitate its use, are ingested into the lungs
 5   when the person uses the e-cigarette, okay?
 6             And so that, arguably, is way more troubling
 7   than these other products.  And the other thing about it
 8   is, this particular defendant says they're selling
 9   half-a-million products, okay?  We don't know, and this is
10   the important thing of deterrence, what products those are
11   and will be in the future, and that's what deterrence
12   looks at.
13             But when you have a defendant that is selling
14   that many products, what is it, is it a helmet for
15   bicyclists or motorcyclists?  Is it a car seat that isn't
16   going to protect?  We don't know.
17             And that's the importance here.  When you
18   have a global operation that will sell anything and
19   everything without regard to who it is sold -- selling
20   to -- and without regard to the conditions that -- that
21   demonstrate how it's manufactured.
22        THE COURT:  Well, one or two aspects of the JUUL
23   products are for human consumption.
24             But, for example, not cable, right, or are
25   you broadening it to anything that has anything to do with
```

1   it?

2        MR. RYAN:  Well, it's -- all of those products

3   facilitate the -- the charging of those products and

4   the -- and the injection of the liquid.  So it's --

5   they're all used to facilitate inhalation.

6        THE COURT:  Does that matter?  Or just am I looking

7   at this overall?  Or am I -- do I do that analysis for

8   each product?

9        MR. RYAN:  I don't think Your Honor needs to do this

10   analysis for each product, because the whole point is that

11   the overall conduct of these defendants is to sell

12   products intended for human consumption in the United

13   States to, to U.S. consumers.

14        THE COURT:  All right.  Thank you.

15        MR. RYAN:  So there are other cases that deal with

16   human consumption.  There's the Soy Sauce case.  There's

17   the Mayonnaise case.  They all stand for the same

18   proposition.  When you have products that are intended for

19   human consumption, it's very important to deter.

20             And to answer your question, we have a slide

21   that deals exactly with this.  JUUL devices and pods are

22   designed for inhalation of nicotine vapor.  Authentic JUUL

23   products are designed to meet industry standards for

24   safety, quality, reliability, and performance.  JUUL

25   conducts quality tests on authentic JUUL products and

1    e-liquids, as well as audits its suppliers.

2             E-Liquid in authentic JUULpods is blended and

3    filled only -- only in the United States following

4    stringent standards.  Only JUUL could can sell authentic

5    JUUL products online in the U.S. to ensure compliance with

6    all laws.

7             Defendants' products were not subject to any

8    of these measures, Your Honor, and what we know is that

9    the conditions in Chinese factories have no regard for

10   their workers and for the consumers that are going to use

11   those products.

12            The U.S. Customs and Border Protection

13   Statement are a JUUL product seized on the way from China.

14   Counterfeit products are often manufactured in unregulated

15   facilities and with substandard materials.  Counterfeit

16   products that are inhaled or ingested pose even greater

17   danger to consumers, because there is no way to verify the

18   authenticity or the safety of the product's ingredients.

19            One of the chief reasons why Customs and

20   Border Protection takes intellectual property rights'

21   enforcement so serious is because of the potential health

22   and safety threats counterfeit goods, like these

23   electronic nicotine products pose to American consumers.

24            And the increase in counterfeit JUUL products

25   has -- has taken off, okay?  And when legitimate products,

1    the supply chains are reduced, the counterfeiters step in.

2             So for example, during COVID, the pandemic,

3    PPE equipment, the counterfeiters stepped in because

4    legitimate supply chains were interrupted.  And any time

5    that happens, the counterfeiters step in because they want

6    to supply the popular products.  And they have no regard

7    for health and safety.

8             And coming back to the *North Face* case,

9    principles of deterrence can lead to a maximum damages

10   award when actual damages are minimal.  Based on the past

11   judgments, the fact that this product is intended for

12   human consumption, and their actual knowledge, all of

13   those things point to it.

14            And I want to talk about the *North Face* case

15   briefly.  It's exactly -- deterrence of future

16   infringement is an important factor.  Defendants willful

17   sold counterfeit.  Defendants violated a TRO and a

18   preliminary injunction, just like *North Face*, suggesting a

19   palpable disregard for the law, and evidence to fit it

20   sold thousands of units but failed to produce complete

21   records.

22            There are inventories of tens of thousands of

23   units, contemporaneous.  That's the only sort of reliable

24   evidence we have of what they actually had.  But here, we

25   have products intended for human consumption.  We didn't

1    have that in *North Face*.  And we have prior judgments of

2    willful counterfeiting.  So this case is North Face on

3    steroids.

4              Mr. Steinberg, please.

5        MR. STEINBERG:  Your Honor, just to add one brief

6    point to Mr. Ryan's point about products that are

7    potentially hazardous to human safety.  Battery products

8    like the charger that was offered by Defendants can also

9    be hazardous to human health even if they're not ingested

10   themselves.  I'm sure Your Honor's familiar with stories

11   about batteries catching on fire or overheating and other

12   things like that.

13             Now, we don't have samples of some of these

14   products because Defendants didn't produce them to us.

15   But we do know that several of their products involved

16   batteries of various kinds.  So those can be hazardous to

17   human safety as well.

18             Moving now to the final petal in the chart

19   here, which is "perjury and failure to produce evidence."

20   I want to talk a little bit about the specific evidence in

21   this case.

22             The case law is clear that a determination of

23   willfulness can be based on a defendant's failure to

24   cooperate in discovery or violation of court orders, and

25   that's exactly what we have in this case, Your Honor.

1          So let's look at some of the specific

2     evidence.  Your Honor may recall that when JLI moved for a

3     preliminary injunction at the outset of the case, Mr. Chou

4     submitted a declaration under oath in which he swore that,

5     quote, "since first learning about this case and the sales

6     at issue in this case, I have personally verified that the

7     only JUUL products that have ever been sold in the history

8     of CJ's operations are the products that JUUL's

9     investigator secured during his pre-litigation

10    investigation."  That was Defendant's testimony under

11    oath.

12          Now, what we know from subsequent discovery,

13    of course, is that based on the limited records that they

14    produced, they had actually sold products to dozens of

15    other customers.  And what's their excuse in the trial

16    briefing and the declaration that Mr. Chou submitted in

17    support of the trial briefing?

18          His excuse now is that he meant that they

19    hadn't sold any such products in the prior 24 months.  But

20    that's just not what the declaration says.  It says that

21    they've never sold anything else, quote, "In the history

22    of CJ's operations."  It's very clear and unequivocal, so

23    the only conclusion is that he lied.

24          On the next slide, we have a depiction of the

25    actual evidence, and, again, these are records that we

1    think are incomplete because they don't match up with the

2    other numbers that Defendants have disclosed.  And we'll

3    go over that in a little bit more detail in a minute.

4              But on the left, we see a list of sales of

5    the JUUL starter kits and USB chargers that Defendants

6    have admitted.  And on the right, we have sales of the

7    counterfeit JUUL portable travel chargers and JUUL

8    charging boxes that they have admitted.  And what we see

9    is sales to dozens of customers in 2018 and '19.

10             And what you can see when you look at the

11   full exhibits with the full spreadsheet is that almost all

12   of those sales were to customers in the United States.  I

13   think there were a couple to Canada, and that's about it.

14   All of it is targeted here.

15             We have another instance of perjury also on

16   the motion for preliminary injunction.  Mr. Chou swore

17   under oath that he was, quote, "proud to say that

18   throughout the over four years time CJ has been in

19   operation, CJ has never been in trouble with the law in

20   any countries."

21             What did we talk about earlier?  We talked

22   about how many times they've been sued, how many times

23   they've suffered judgments for willful counterfeiting.

24             The excuse that's given in the trial brief

25   and in Mr. Chou's declaration in support of Defendants'

1   trial brief is that, what he really meant was that CJ and

2   the CJ platform had not been sued, even though his other

3   entities had been sued.

4           But that doesn't match the actual evidence.

5   When we look at the actual judgments, Harley-Davidson and

6   Chrome Hearts specifically named e-Wu Cute Jewelry, that's

7   one of the defendants in this case.  And courts entered

8   judgments against those companies.  And Mr. Chou has said

9   that is the company that operates all of CJ, and the CJ

10  website, and the dropshipping platform.  So, again, very

11  clear that what he said simply was not true.

12          And that's just the judgments that we know

13  about.  I mentioned earlier to Your Honor, we know

14  Defendants operate in multiple regions of the world,

15  multiple countries around the world.  We have no idea if

16  there's other judgments that they've suffered in some of

17  these other countries, and we probably never will.

18          Defendants also failed to preserve and

19  produce evidence in this case.  We have here Defendants'

20  contemporaneous website at the time of JLI's investigation

21  advertising an inventory of 10,507 units of the

22  counterfeit JUUL starter kit.

23          And Mr. Chou has confirmed that it's CJ's own

24  IT department that set up this website, kept it updated,

25  including the inventory number.  That inventory has never

shown up in discovery. They've claimed that they simply don't have it. So that's one example of a failure to preserve and produce evidence in this case.

Notably, the records that Defendants have produced in this case as part of discovery that they've asked us to rely on, those not only do not match the website, but they don't match each other. They're not internally inconsistent.

So on the left, Defendants claim that they've only ever sold 138 units of the starter kit, including the ones sold to JLI. But their own warehouse data shows they received 169 units. That does not match. There's another 31 units there that are missing that they've never explained and never produced. And then they have other data that they call "system data," which shows that they received 155 units and only shipped out 44.

So, again, that doesn't match the other two documents and it doesn't explain what happened to the missing 100-plus units that they are at least willing to admit that they had at one time in their warehouse.

Let's look at the next product, the JUUL USB Charger. Defendants' website advertised during the investigation that they had inventory of 1,843 units. Again, Mr. Chou admits that his own IT department created this website, kept it updated including the quantity.

1   Those units have never shown up, and, again, it doesn't

2   match their internal documents that they produced in

3   discovery.

4           So they ask the Court to believe that they

5   only ever sold 32 units total of this product, including

6   the ones received by JLI.  But that doesn't match their

7   purchasing data.  Their purchasing data they produced in

8   this case shows they bought 48 units.  So what happened to

9   the rest?

10          And their warehouse and their system data

11  shows that they received even more than that.  It shows

12  that they received 55 units.  So, again, we have major

13  discrepancies between the records that they produced in

14  this case.  And none of them explain what happened to the

15  inventory that was being advertised during the

16  investigation.

17          Let's look at the next product, the portable

18  travel charger.  This is one that we didn't know about

19  until we got into discovery.  This one -- or we didn't

20  know fully whether they had actually made any sales.

21          This one was advertised as having 3,197 units

22  in Defendants' inventory.  And again, Mr. Chou admits that

23  this web page was created and updated by his own

24  personnel.  Their records show sales of just 62 units.

25  That's what they produced in this case.  But, again, their

purchasing data shows they bought 80.  That's a delta of
18 units.

           And this is really important, Your Honor.
Their warehouse data shows that for this product, they had
18 units left.  That's the difference between the 80 they
bought and the 62 that they admit selling.  They had those
in their warehouse as recently as October of 2021, six
months after this case was filed, and this is shown on the
next slide.  And they never produce those in this case.
They've claimed they just simply didn't have them, and
they haven't come up with any credible explanation for
what happened to them.

           We also have the JUUL USB charging cable.
Defendants before this case advertised having an inventory
of 10,000 units of this product.  This is a web page that
was set up by Defendants and kept up-to-date by them.

           They never produced any units whatsoever of
this product, nor did they admit making any actual sales
of this product.

           Now we go to the JUUL charging box or case.
This is a different product.  So this is one that they do
admit having actual sales of.  So their sales data shows,
on the left, sales of 17 units.  Their purchasing data
shows purchases of 19 units, and their warehouse shows
that they received 18 and shipped out 17.

         1              So, again, this is really important, because

         2    there's at least one unit that their own records reflect

         3    they had.  And if we go to the next slide, Your Honor,

         4    here it is.  So their own records that they produced in

         5    this case, which we contend are unreliable and incomplete,

         6    show that they had at least one unit of this product left

         7    in their warehouse in October of 2021.

         8              Did they produce it to us?  No.  Have they

         9    explained what happened to it?  No.  And so when there's

        10    questions about what does this product actually look like,

        11    what did the packaging look like, how was the packaging

        12    marked, we simply don't know.  But that's not our fault,

        13    it's Defendants who never produced the unit and never

        14    accounted for its disappearance.

        15              To summarize, Your Honor.  Defendants claim

        16    sales, which they claim are so low, simply lack any kind

        17    of credibility.  The contemporaneous records during the

        18    investigation, not the ones that were produced in

        19    discovery months later when they knew they were in trouble

        20    but during the investigation, advertise tens of thousands

        21    of units being in their warehouse.  And in this case, they

        22    claim that they've only sold less than 200 total.  It's

        23    simply not credible, Your Honor, given all the

        24    discrepancies in the records.

        25              As Your Honor knows, the Court's order on

1    preliminary injunction clearly compelled Defendants to

2    preserve and produce any samples of products that they

3    had.  There's other provisions of the order that apply to

4    computer records as well.  And that simply wasn't done in

5    this case, as shown in the prior slides.

6              So did Defendants preserve and produce the

7    evidence that they were ordered to do by the Court?  We've

8    talked about the physical samples, notably the web page

9    listings.  This is one that they admit deleting.  And they

10   claim that they simply didn't know they were supposed to

11   preserve it, because they didn't have U.S. counsel at that

12   time.  But they'd been named in at least five different

13   lawsuits prior to this.

14             So the idea that they were unfamiliar with

15   U.S. litigation and the obligations under it is simply not

16   credible.  And those web page listings are important.

17   Because while we have some of them that we preserved as

18   part of the investigation, we don't have them for some of

19   these products that we only learned about through

20   discovery.

21             And those web pages had additional pictures

22   of each product that would have given us a better window

23   into what they look like.  And, of course, the best

24   evidence would have been the physical samples that their

25   own records admit they had six months into the case and

1    that they never produced.

2              So what do we have at the center of all of

3    this, all these different areas of evidence?  We have

4    CJ Dropshipping.  We have all these different evidence --

5    pieces of evidence, that weigh in favor of a finding of

6    willfulness and maximum statutory damages.

7         THE WITNESS:  I want to talk briefly about the

8    *Tiffany* factors.  The *Tiffany* factors is another way of

9    going through the analysis of willfulness and statutory

10   damages.  It comes from a copyright infringement case.

11   It's cited in some trademark infringement cases but not

12   others.  It was not the framework that was applied to

13   *North Face*.  Some cases only emphasize one or two factors.

14   But the bottom line is that the *Tiffany* factors favor a

15   finding of willfulness in this case as well.

16             Factors 1 and 2 have to do with Defendants'

17   sales and profits or the Plaintiff's losses attributable

18   to the infringement.  Well, in this case we simply don't

19   know the true extent of that, because they haven't

20   produced complete records of it.

21             But if we look at the numbers that were

22   disclosed on their website, the quantities and the tens of

23   thousands and we multiply it by the retail prices, this

24   could create a floor of what the actual damages may have

25   been.  But, of course, this doesn't account for the fact

1   that they may have sold the entire inventory, restocked,

2   and sold it again, possibly multiple times.  We simply

3   don't know.

4            But if we just take their own web page and

5   their own claims about inventory at their word and say,

6   That's the minimum, you still get to a substantial number,

7   over 800,000 in minimum loss sales, and you treble that

8   for willfulness.

9            The other *Tiffany* factors clearly favor a

10  significant damages award, the value of the trademark.  We

11  talked earlier about the fact that the JUUL brand has long

12  been the undisputed top-selling brand.  Defendants don't

13  dispute that.  It has very high value among consumers of

14  e-cigarettes.

15           Defendants want to focus on the reputation

16  among nonconsumers of the product, but that's not what's

17  relevant.  What's relevant here is do consumers of

18  e-cigarettes find it to be a valuable brand, and the

19  undisputed evidence in this case is that the answer is

20  yes.

21           The other *Tiffany* factors also favor a

22  maximum statutory damages award.  Mr. Ryan talked

23  extensively about the importance of deterrence, both to

24  the defendant and to others, other would-be infringers.

25           Notably, Your Honor, in the prior cases in

1  which Defendants suffered judgments for willful

2  counterfeiting, the judgments in those cases total

3  $3.65 million.  That was not enough to deter them from

4  infringing in this case and in the three additional cases

5  that have been filed since this one was filed.  So

6  obviously that's not enough to deter them from their

7  course of conduct that they've engaged in going back to at

8  least 2017 or for Mr. Chou back to 2010, the time of his

9  conviction.

10           So I want to go through, real quick, the

11  counting of the marks.  Now, a counterfeit mark doesn't

12  have to be identical.  It can be substantially

13  indistinguishable.

14           Just as an example, the *North Face* case.

15  Defendants argue that marks that are similar should not be

16  counted separately even if they are separately registered.

17  But the law doesn't support that.  And this was dealt with

18  in the *North Face* case.

19           The *North Face* case involved three different

20  marks, the word mark, and two design marks.  You can see

21  there's obvious similarities there.  Those were counted

22  separately in that case three different times, and that's

23  exactly what we're asking Your Honor and the Court to do

24  in this case.

25           The *Innovation Ventures* case on the 5-Hour

```
1    Energy trademarks.  Similarly, those also involve similar
2    marks, but that were covered by separate trademark
3    registrations.  And each of them is counted separately for
4    the purposes of statutory damages.
5              So let's look at the individual products.
6    And I can turn in these samples to Your Honor once we're
7    concluded with our -- with our argument.
8              This is a summary here showing each of the
9    different marks on each of the different products.  We'll
10   start with the JUUL device.  There's both the word and the
11   design JUUL mark on the exterior packaging and on the
12   interior on the -- on the device itself.  And we're not
13   counting this twice.  We're just counting the design mark
14   and the word mark.  It's used on the outside and the
15   inside.  And if Your Honor looks at the samples, you can
16   see that.
17             I think it's notable the two-dimensional JUUL
18   icon is also used on the packaging.  We're not seeking
19   damage for the -- damages for this given Your Honor's
20   ruling on the -- on the motion in limine, but it shows
21   that they were trying very hard to make this a convincing
22   package.
23             And if you compare them, Your Honor, you'll
24   see the differences are not even observable to someone
25   who's not an expert in how JUUL packaging is supposed to
```

1  look like.

2          We also have the JUUL Labs word mark on the

3  back and the JUUL Pods word mark used inside the packaging

4  for the device.  So that's a total of four marks on the

5  JUUL device.

6          On the pods, similarly, we have the JUUL word

7  mark, the JUUL design mark on the exterior packaging, also

8  on the interior packaging.  And, again, we're not counting

9  this twice, we're just counting the word mark once and the

10  design once.

11          You can also see there's the two-dimensional

12  JUUL Pods icons that are used.  We're not seeking damages

13  for this, but it does show that they were trying very hard

14  to make it look authentic.  And on the back, we have both

15  JUULpods and JUUL Labs word marks appearing.

16          Now I want to talk about the USB chargers.

17  These clearly have the stylized JUUL mark on them.  We

18  also have a sample of that for Your Honor.  This is one

19  that was obtained during the investigation.

20          Now we get to the ones where we don't have

21  samples.  And so I want to spend a little more time on

22  this.  The JUUL portable travel charger as we discussed

23  earlier, this is a product we don't have a sample of from

24  the investigation, notwithstanding Defendants' records

25  showing they had units of it.

```
 1              As recently as October 2021, we never got the
 2    sample.  So we don't have a package, we don't have the
 3    actual product, we don't know exactly what it looked like.
 4              But what we do know is that it was clearly
 5    advertised as a JUUL portable charger.  "JUUL" spelled
 6    exactly as it's used in the design mark.  And we think
 7    that's substantially indistinguishable such that it should
 8    be counted for the purposes of statutory damages.
 9              To the extent that there is any ambiguity in
10    the evidence, it should be inferred against Defendants
11    because of their failure to produce discovery, including
12    the samples and including the web page itself and the
13    other photos that they had of this product because we
14    didn't get that either.
15              Similarly, the JUUL USB charging cable,
16    again, we don't have samples of this that we were able to
17    obtain in discovery, but it was clearly advertised using
18    the name "JUUL," which is substantially indistinguishable
19    from the JUUL design mark.
20              And to the extent that there's any ambiguity
21    in the evidence, we ask the Court to infer that against
22    Defendants because of their failure to produce discovery
23    in the case.
24              Now, the JUUL charging boxes or cases,
25    Defendants admit this product used the trademark.  So I
```

1    don't think it's in dispute that this should be counted as

2    another iteration.  If it is, if I'm wrong about that, we

3    have even less on this.  We don't have the web page

4    because we didn't capture it during the investigation, and

5    Defendants never produced it.  They didn't preserve it.

6            But, again, their records show they had a

7    sample of this in October of 2021 that they never turned

8    over.  So any uncertainty on this should be inferred

9    against Defendants as well.

10           And lastly, we have the JUUL mobile phone

11   case.  And this is one that we have the least amount of

12   evidence on.  But what we do have is that it was clearly

13   called a "JUUL mobile phone case."

14           So, again, that's substantially

15   indistinguishable from the design mark, the design JUUL

16   mark, and we think that's entitled of being counted as

17   well.  To the extent there's any missing evidence, that is

18   the responsibility of Defendants to fill in that hole, and

19   unfortunately they failed to do so.

20           Now, Defendants claim that their use was

21   purely descriptive, right?  They've portrayed their

22   advertisements as advertising products that were

23   compatible with JUUL but that were generic.  But that's

24   simply not the case when you look at the actual product

25   listings and product descriptions.

1    Nowhere does it say "compatible with JUUL,"

2    or "generic product compatible with JUUL," or "universal

3    product that's compatible with JUUL but other products

4    too."  What it says is "JUUL portable phone charger" or

5    "JUUL mobile phone case."

6    And when you look at this JUUL USB charging

7    cable, I just want to call this one out because it does

8    have the word "universal."  But it says "JUUL USB charging

9    cable."  And when you look at a picture, it's clearly for

10   use with the JUUL device to be inserted into it.

11   So in conclusion, to summarize, we have a

12   total of seven infringing products.  We have a total of

13   13 different combinations of registered marks on those

14   different products, and we're asking the Court to award

15   the maximum of $2 million dollars per mark for a total of

16   $26 million in statutory damages.

17   We also think this case merits a finding that

18   it is exceptional, and that could warrant an award of

19   attorneys' fees through a further motion.

20   Case Law says a trademark infringement case

21   is exceptional where the Defendant acted maliciously,

22   fraudulently, deliberately or willfully.  We've talked at

23   length about the evidence of willfulness in this case.

24   I want to finish by talking a little bit

25   about Defendants' IP program, and then I'm going to hand

1    it back to Mr. Ryan.

2              Defendants' trial briefing focus is quite

3    heavily on their IP program.  But what they don't

4    highlight is that most of this evidence was created after

5    the fact.

6              When you look at the dates on the documents,

7    and this isn't highlighted in Defendants' declarations but

8    it is apparent on the face of the documents, all of this

9    purported program was created after the fact; the training

10   slides, the infringing products collection, the trademark

11   training poster.  All of this stuff is dated in 2021 after

12   this litigation was filed.

13             But amazingly it still didn't stop them from

14   being named in three more lawsuits just while this one has

15   been pending, and those are the cases by Converse, by

16   Luxottica, and Oakley, right?

17             So -- and I think also crucial is the fact

18   that CJ Dropshipping is head of IP enforcement, who

19   supposedly administers this program, and that's

20   Xiangcheng Zheng, which is spelled on the slide.  He did

21   not know of any of their counterfeiting lawsuits until his

22   deposition or until preparing for his deposition.  He

23   didn't even know about the JUUL case.  But he also didn't

24   know about any of the prior lawsuits.

25             And this is the person who's supposed to be

```
 1    managing their program that protects against infringement.
 2    So we think the whole thing was created for the purposes
 3    of litigation and it's entirely a sham.
 4              And with that, Your Honor, I am going to hand
 5    it back to Mr. Ryan to finish.
 6         THE COURT:  All right.  Thank you.
 7         MR. RYAN:  Your Honor, what happens if Defendants
 8    are not deferred?  We know it's a global operation,
 9    half-a-million products, no regard for human safety, no
10    regard for the fact that they've been found guilty of
11    willful infringement five times before.
12              What happens is they continue to do what
13    they're doing, they continue to target popular U.S.
14    brands.  They source them.  They sell them into the United
15    States.  They harm the U.S. economy.  And they put U.S.
16    consumers at risk.
17              My only concern is the $26 million may not be
18    enough, given the size of this operation and how lucrative
19    it is for them to sell counterfeit products.
20              Your Honor, each one of these petals is
21    enough for you to award the maximum statutory damages.
22    Overwhelming evidence of actual knowledge, but continuing
23    to do it.  Five convictions in the past.  That's enough
24    under the case to award the max.  And then on top of that,
25    we have products intended for human consumption.
```

```
1              And then you throw in the cherry on top of
2     this evidence, is the perjury and the failure to produce
3     evidence.
4              Your Honor, I ask you, I implore you, to do
5     the most you can do to stop these Defendants from harming
6     the U.S. economy and putting our consumers at risk.
7     Please award the maximum of $26 million dollars, plus an
8     award of fees.
9              And I do want to caution you, because we're
10    going to send these samples back, the client asked me to
11    tell you that fake pods often leak.  So if you intend to
12    open the packaging, please be careful and wear gloves.
13         THE COURT:  Thank you.
14         MR. RYAN:  Counsel, do you want me to switch it over
15    to your monitor?
16         THE COURT:  I think we'll take a 15-minute break
17    before we continue.
18         MR. RYAN:  Thank you, Your Honor.
19              (Break taken.)
20         THE COURT:  All right.  You may proceed.
21         MR. MOORE:  Good afternoon, Your Honor.
22         THE COURT:  Good afternoon.
23         MR. MOORE:  We're really only here today to address
24    the issue of the proper amount of damages in this case,
25    and whether or not Plaintiff is entitled to damages for
```

1    the four newly-accused products.

2              One of the touchstones of statutory damages

3    is that the amount awarded must bear some relationship to

4    the actual damages suffered.  Plaintiff, lest the

5    plaintiff be granted a windfall.  So in this case,

6    Plaintiff is seeking statutory damages of $26 million.

7    And that's in a situation where the defendants' total

8    profits for the sale of the accused products is less than

9    $1,500.  And Plaintiff's lost revenue is less than $8,000.

10   So there are no cases that support a statutory damages

11   award of 3,250 times the actual damages.

12             So the damages sought by Plaintiff are

13   this -- they are just unwarranted.  And they go -- they're

14   contrary to the case law and they're unmoored from any

15   actual damages that it may have suffered.

16             So Defendants have already stipulated to

17   infringement of all of the products that were listed in

18   the complaint, and they only contest the infringement of

19   the new products, which had no sales, or to which

20   Plaintiff isn't entitled to damages, as the goods covered

21   by the marks.

22             So Plaintiff argues that the maximum

23   statutory damages in this case are necessary for

24   deterrence.  It makes a lot of accusations and

25   allegations, which are not supported by the facts of this

1    case.

2              First, there's no evidence of any threat to

3    public safety.

4              Second, Defendants are not serial

5    counterfeiters, and they have fully cooperated in

6    discovery.

7              And, finally, Defendants had no knowledge of

8    the JUUL brand until they received notice of this lawsuit.

9              So Plaintiff's argument overlooks the simple

10   fact that Defendants are a young, online third-party

11   marketplace.  And much like Amazon or eBay, it faces

12   serious challenges in combating infringement.  CJ is a

13   legitimate business that provides a much-needed service to

14   small businesses.  And the CJ Dropshipping platform was

15   launched by Andy Chou in 2018 in recognition of this.

16             So the platform provides dropshipping

17   services to small businesses.  And that allows them to

18   source and ship products directly to their consumers

19   without having to have their own warehouse, shipping

20   departments, or sourcing departments.

21             CJ provides dropshipping services to its

22   customers, which is an order fulfillment method.  So the

23   platform lists more than 500,000 goods and the platform is

24   for dropshippers.  CJ is not a manufacturer.

25             The way that dropshipping works is first, an

1    in-customer will place an order with a vendor.  And that

2    order is sent to CJ, who prepares the customer's order and

3    ships it to the end user.

4                    So CJ offers three different types of

5    services.  So the first is conventional dropshipping.  And

6    that's where vendors will link their stores to CJ's

7    platform, and then CJ will fulfill the orders by sourcing

8    and shipping the products to the ultimate customer.

9                    The second is CJ's affiliate system, and

10   that's where vendors will use their own domain and

11   websites to sell products to their customers, and CJ will

12   provide the sourcing and shipping to those customers.

13                   And, finally, CJ also offers a case-by-case

14   service, and that's where a vendor will ask CJ to provide

15   a specific product, and CJ will reach out to third-party

16   suppliers to find that product.

17                   And the way the vendors ask CJ for these

18   products is they'll provide a listing, an image, and a

19   description of the product to CJ.

20                   So as we'll discuss later, the facts are and

21   the evidence shows that CJ is a legitimate business.  And

22   that it provides a much-needed beneficial service to the

23   marketplace.

24                   CJ is well aware that brand protection is

25   vital to its success.  And despite Plaintiff's argument to

the contrary, CJ takes brand protection seriously.  So the sad reality is that online counterfeiting and intellectual property infringement is a serious problem for the entire online marketplace industry, which affects CJ as well as all the other marketplaces.

And like those other marketplaces, CJ has implemented policies and procedures to help combat the problem.  For example, CJ's sourcing department has stopped approximately 20,000 infringing listings.

The facts show, again, that CJ takes brand protection seriously.  As I said, its created and implemented a brand-protection protocol detailing how to inspect products and prevent infringing listings, which is denied of roughly 20,000 listings in the first four years of its operations.

It maintains a brand database, which its sourcing department uses to cross-check listings before allowing them to be placed.  And all of the personnel and CJ sourcing department receive intellectual property training.

The training specifically covers how to use CJ's brand database, and how to identify and deal with suspected counterfeit goods.  It also conducts regular training and follow-up training on its brand-protection policies and procedures.

1            It also has a reward and punishment system in

2       place for its employees wrongfully listing infringing

3       products.

4            Now, Plaintiff has made a bunch of noise

5       about how CJ's warehouse personnel in New Jersey didn't

6       receive the IP protection training.  But the reality is,

7       they're a warehouse worker.  Their job is logistics.

8       Brand protection is handled by the sourcing department.

9       And those individuals do receive training.

10           So as I said, CJ's put into place several

11      policies and procedures to combat counterfeiting.  For

12      example, their brand department takes several steps to

13      ensure that each listing placed on the platform does not

14      infringe the intellectual property rights of others.  So

15      when a supplier submits a sourcing request, the first

16      thing CJ does is ask them if they're licensed.

17           They'll then search online databases and

18      search engines such as Baidu.com to determine if the

19      supplier is authorized.  They'll also use their personal

20      knowledge and experience to help them make the

21      determination.

22           In addition, they maintain a brand database,

23      which gets searched prior to the listing being placed to

24      see if the listing would infringe anything in the brand

25      database.

```
 1              And finally, after all this, they perform
 2    another round of review before it gets posted.  Only after
 3    the sourcing department has determined that the listing is
 4    either licensed or does not infringe, does CJ allow the
 5    listing to be placed.
 6         THE COURT:  So what happened when they ran JUUL
 7    through Baidu.com?
 8         MR. MOORE:  Well, Your Honor, the sad thing is, is
 9    that JUUL slipped through, obviously.  Otherwise, we
10    wouldn't be here today.
11              As we'll -- as I'll get into a little bit
12    later, the JUUL brand was not well known in China.  I
13    believe Plaintiff's own 30(b)(6) witness testified that it
14    was only available for a few number of days in China.
15              The other thing that I would point out is
16    that Plaintiff's investigation from when it began -- when
17    it became aware of the products on the website and when it
18    filed a suit was more than two years.  And at no point
19    during that time did JUUL ever provide us with notice that
20    the products were infringing.
21              Now, like a lot of other online marketplaces
22    like Amazon or eBay, CJ in-part relies on brand owners to
23    inform it when they find infringing products on the
24    website.
25              And when they do that, CJ will take immediate
```

1   steps to remove the listing and review if it -- review the

2   listing and remove it if it determines that the listing is

3   counterfeit.  In this case, CJ never received such notice

4   from JUUL, and it wasn't aware of the JUUL brand.

5        THE COURT:  Well, I'm not familiar with Baidu.  I

6   have figured out how to Google things.

7             But are you suggesting that Baidu would only

8   pick up a brand name that was familiar in China?

9        MR. MOORE:  Not necessarily, Your Honor.  It's my

10  understanding that at the time the JUUL listing was

11  placed, that they were primarily just using the brand

12  database to compare incoming listings.

13            Since then, they've updated their policies

14  substantially to help combat online counterfeiting, which

15  we'll get into a little bit later.

16            But it's my understanding that at the time,

17  regularly searching Baidu wasn't part of their normal

18  procedures, that they were primarily relying on the brand

19  database that they have.

20       THE COURT:  All right.  Thank you.

21       MR. MOORE:  So CJ has also created an infringing

22  product-inspection protocol.  And so this is a little bit

23  different than what we've talked about, where we're

24  catching listings before they get listed.  This is a

25  protocol that helps CJ detect listings which are already

1   existing, and to remove them if infringing listings have

2   slipped by their sourcing department.

3               So CJ, as I said, also encourages users to

4   report infringing products to the platform so that can be

5   added to the brand database, so they can avoid future

6   infringement.

7               So while the process isn't perfect, CJ has,

8   in its first four years, denied roughly 20,000 infringing

9   listings.  Sadly, like any other online marketplace, the

10  occasional infringing listing does slip through.

11              Again, this is why we rely on brand owners to

12  let us know when they see infringing products on the

13  website.  And as I said, when we receive such notice,

14  we'll remove -- CJ will review the product, make a

15  determination if it's infringing.  If it is, it will

16  remove it immediately.

17              So we're here today, again, because a few

18  JUUL products slipped through.  And obviously, as I said,

19  in October of 2019 JUUL became aware of the infringing

20  listings.  It didn't notify them, CJ.  So you didn't have

21  the opportunity to add it to its brand database.

22              We think part of the reason why JUUL decided

23  not to notify CJ was that it had a plan to drag out its

24  investigation and to make biweekly orders of the

25  infringing products, presumably in an effort to inflate

1    its damages.

2           Now that's a plan that ultimately failed, and

3    it failed because CJ didn't have the products in stock.

4    So Plaintiff was successful, ultimately, in ordering only

5    118 of the infringing starter kits and 25 of the USB

6    chargers, only five of which were actually branded USB

7    chargers.

8           And CJ as I said has already admitted

9    infringement of these products.  So because of that,

10   damages in this case should be the statutory minimum

11   $1,000 -- $7,000 or $1,000 for each of the seven acts of

12   infringement.  Any more than this would amount to an

13   impermissible windfall, given that the actual damages in

14   this case are less than $8,000.

15          So Defendant's profits were rough -- were

16   $1,307.83.  Plaintiff's lost revenue was about $7,869.83.

17   We've presented evidence that the JUUL brand is of

18   questionable value, and the evidence also shows that

19   there's no need for deterrence in this case.  Defendants

20   fully cooperated in discovery, and there's no evidence of

21   any public safety concerns.

22          So statutory damages are controlled by

23   15 U.S.C. Section 1117(c), which provides damages should

24   be anywhere between 1,000 to 200,000 per mark, per type of

25   good.  And in the case of willful infringement, the

1    maximum extends up to $2 million.  Again, per mark,
2    per type of good.
3              So statutory damages are also limited to the
4    types of goods, which are included in the category of
5    goods for which the mark is registered.  Now, 1117(c) does
6    not provide the minimum or the -- 1117(c) just provides
7    the minimum or the maximum statutory damages.  It doesn't
8    provide any framework for telling the Court how to
9    determine where to land on that spectrum.
10             So as such courts in this circuit and other
11   circuits have relied on the same analysis used in
12   determining damages under the copyright statute, something
13   that this Court recognized in the *North Face* case that
14   Plaintiff cited.  So we focused in on one of the cases,
15   *Tiffany Inc*. *v. Luban*, which is a Southern District of
16   New York case, that lays out these factors we think in a
17   fairly clear way.
18             So the *Tiffany* court and many other courts
19   have consistently held that statutory damages must bear a
20   plausible relationship to the actual damages suffered by
21   the plaintiff.
22             So, for example, in *Konad Company v. OMG*
23   *Marketing*, which is a Central District of California case
24   from 2019, the Court held, "courts consider whether the
25   amount of damages requested bear a plausible relationship

 1    to the plaintiff's actual damages."

 2              Similarly in *Ploom Inc. v. Iploom*, LLC, which

 3    is a Northern District of California case from 2014, the

 4    Court said, "In other words, because statutory damages are

 5    meant to serve as a substitute for actual damages, the

 6    Court should discern whether the requested damages bear

 7    some relation to the actual damages suffered."

 8              So the factors set forth in *Tiffany* are the

 9    expenses saved and the profits reaped by the defendant,

10    the revenue lost by the plaintiff, the value of the

11    trademark, the deterrent effect on others beside the

12    defendant, whether the defendant's conduct was innocent or

13    willful, and whether the defendant has cooperated in

14    discovery and the potential for discouraging the

15    defendant.

16              Importantly, no case supports an award of

17    $26 million for less than $10,000 in actual damages.

18              In our brief, we started no less than 12

19    cases on statutory damages, each showing that Plaintiff's

20    request to damages are unmerited.

21              As an example, in *Rolex Watch, U.S.A. v.*

22    LLM -- sorry -- *LSM Watch*, which is a Central District of

23    California case from 2022, the Court awarded $1 million

24    per mark, so half of the statutory maximum.  But it did so

25    where the defendant's estimated profits were between $3 to

1    $4 million.

2              In *Coach Inc*. *v*. *Diva Shoes*, which is a

3    Northern District of California case from 2011, the Court

4    estimated $23,166 in profits.

5              They also found willful infringement, and a

6    failure to participate in discovery.  Even then, the Court

7    only awarded $140,000, which it said was double the

8    liberal estimate of the Court's -- of Coach's actual

9    damages, as described above.

10             All of the cases cited show that statutory

11   damages should bear some relationship to the actual

12   damages suffered.  The overwhelming majority of these

13   cases hold that the damages award should be some

14   multiplier, usually between two to three times the actual

15   damages suffered by the plaintiff.

16             So in this case, all of the *Tiffany* factors

17   support a nominal damages award.

18             Could you go to the next slide, please?

19   Could you go to the next slide, please?  Slide 17.  Okay.

20             So again, Defendant's profits were $1,307.83.

21   The revenue lost by Plaintiff was $7,869.83.  Plaintiff's

22   trademark is of questionable value at best.

23        THE COURT:  Well, stop, stop there.

24             Why do you say that?

25        MR. MOORE:  About the defendants -- sorry, the

```
 1   plaintiff's lost revenue, Your Honor?
 2           THE COURT:  No, the questionable value of the
 3   trademark.
 4           MR. MOORE:  Sure, Your Honor.  If we could turn to
 5   Slide 22.  And this would be -- this will touch on
 6   confidential information, Your Honor.  So if there's --
 7           THE COURT:  The only person who's joined us is my
 8   law clerk.
 9           MR. STEINBERG:  There's one person in the courtroom
10   that's not affiliated with a party.  We would ask that
11   person to leave.
12           THE COURT:  Oh, I thought you said you didn't
13   recognize anybody who wasn't affiliated.
14                   Who are you, sir?
15           COURTHOUSE NEWS SERVICE REPORTER:  I'm a courthouse
16   news service.  I'm a journalist.
17           THE COURT:  Okay.  Why don't you just step out while
18   I hear whatever this is, and we'll call you back in.
19           COURTHOUSE NEWS SERVICE REPORTER:  Thank you.
20           THE COURT:  And this will be under seal, Mr. Wilcox.
21           (The following proceedings were ordered sealed.)
22                         / / /
23                         / / /
24                         / / /
25                         / / /
```

65

```
 1                          / / /

 2                          / / /

 3                          / / /

 4                          / / /

 5                          / / /

 6                          / / /

 7                          / / /

 8                          / / /

 9                          / / /

10                          / / /
```

11          *(The following proceedings were in open court.)*

12          THE COURT:  All right.  Please continue.

13          MR. MOORE:  All right.  So there's also no need for

14    deterrence against Defendants or others in this case.  And

15    Defendants' actions were not willful, and Defendant has

16    fully cooperated in discovery.

17                So the first two factors in the *Tiffany*

18    factors is essentially an actual damages analysis.  So,

19    again, courts have regularly stressed that the damages

20    awarded must bear a relationship to the actual damages,

21    and again, that's usually been a multiplier of two to

22    three times the actual damages.

23          THE COURT:  Is that case law or statutory?

24          MR. MOORE:  That is case law, Your Honor.

25          THE COURT:  District court level, or is there a

```
 1   circuit court that has said that?
 2        MR. MOORE:  I believe that's all district court
 3   level from various district courts in the Ninth Circuit.
 4   And that's just a survey of what those courts have
 5   typically done in cases like this.
 6        THE COURT:  All right.  Well, as I tell everyone
 7   generally, I have a great deal of respect for all of my
 8   colleagues, Ninth Circuit or otherwise.  Outside of the
 9   circuit doesn't make any difference, unless they're
10   relying on circuit law that's Ninth versus somebody
11   else's.
12             And a district court decision is very much
13   like my walking across the hall and saying to my good
14   friend, Judge Walter, Hey, Jack, what do you think.  So
15   just -- I don't consider that binding at all, but --
16        MR. MOORE:  I understand that, Your Honor.
17        THE COURT:  I know it's tempting, especially to cite
18   me to me, but sometimes the Ninth Circuit thinks I'm wrong
19   so I don't even necessarily rely on my own decisions.
20        MR. MOORE:  Well, it is very tempting to cite
21   yourself to yourself, Your Honor.
22             And if you don't mind, I would like to point
23   out that even in the *North Face* case, you also relied on
24   these same copyright factors that other cases have relied
25   on and that we're referring to as "the *Tiffany* factors."
```

```
 1              So, you know, all of the other cases in --
 2    well, all of the cases we've surveyed in the Ninth Circuit
 3    that have dealt with cases like this, have -- many of them
 4    have relied on this actual damages distinction.  And most
 5    of them have come down with an award that is somewhere
 6    between, as I said, two to three times what they
 7    determined the actual damages to be.
 8          THE COURT:  Thank you.
 9          MR. MOORE:  So, as I said, the first two factors are
10    essentially an actual damages analysis.  And the reason
11    why they usually multiply the actual damages by two to
12    three times is to avoid granting the plaintiff a windfall.
13    And part of that is to discourage Plaintiffs from waiting
14    to file suits in an effort to increase their damages.
15              So as I said, in this case, the defendants'
16    total profits from the sale --
17              Could you go to the next slide, please?
18              So Defendants' total profits from the sale of
19    all of the accused products was a mere $1,307.83.  And
20    that's for the sale of the 138 JUUL starter kits, the
21    12 USB chargers, and 17 dual-charging boxes.
22              So furthermore, at least one court has held
23    that only sales which end up in the hands of consumers
24    should be counted.  So sales to the plaintiff wouldn't
25    count.
```

```
 1              So here, Defendants sold 138 starter kits,
 2    12 USB chargers, and 17 of the JUUL charging boxes, but
 3    sales to the plaintiff accounted for 85% of the total
 4    sales of the starter kits.
 5              So if we adjust Plaintiff's lost revenue,
 6    based on that, their lost revenue was only $1,800.  And
 7    even if we don't adjust it, their lost revenue is still
 8    less than $8,000.  So Plaintiff's only argument related to
 9    their actual damage number is based solely on numbers from
10    CJ's website.  And these are numbers which Plaintiff
11    itself has known for years are accurate.
12              So as we discussed in our brief, Plaintiff
13    was told that CJ didn't have the products and was actually
14    told to get a refund on more than one occasion.  For
15    example, Plaintiff's investigator told Plaintiff in an
16    email that "I noted the current starter kit product
17    listing states 10,949 pieces."
18              But he also stated that, in addition, when
19    hovering over the starter kit product, it indicated three
20    pieces in their U.S. warehouse available in the China
21    warehouse.
22              Plaintiff's investigator also informed the
23    plaintiff that the most recent response received regarding
24    the inventory of starter kits indicated that they do not
25    always keep the quantities updated on their website.
```

1          Again, the investigator was also told to get

2    a refund since they were out of stock and the factory

3    wouldn't make any more.

4          So Andy Chou testified in his declaration

5    that the numbers on the website are not accurate.  Those

6    numbers are a combination of CJ's real inventory that they

7    have and an estimated supplier inventory.

8          So when Plaintiff's investigator, Matthew

9    Hewlett, was on the website and he saw a number, 10,949,

10   and he moused over it, he saw that it showed three units.

11   That was the amount of stock that CJ actually had.

12          The other number was, like I said, an

13   estimate that CJ makes about its supplier inventory.  And

14   that estimate is really just puffery.  They have no idea

15   how many units the supplier has, okay?

16          So the facts at-hand are similar to

17   *Plume v. iPlume*, where the Court held that the defendant's

18   inability to deliver the investigator's order indicated

19   that the defendants did not have such large quantities in

20   stock.

21          Because of this, you should reject

22   Plaintiff's argument the damages should be based on the

23   website numbers.  And that's because all of the evidence,

24   the fact that Plaintiff was told on numerous occasions

25   that CJ did not have the starter kits in stock and

1    couldn't get them, that Plaintiff's investigator was told

2    to request a refund, and that Plaintiff's investigator was

3    told, and in fact confirmed on his own, that the website

4    numbers were not inaccurate -- I'm sorry, that the website

5    numbers were inaccurate.

6             Because of this, you should not base the

7    damages award on inaccurate numbers that everyone has

8    known for more than two years are not accurate.

9             If you could go to Slide 23, please, and

10   skip 22.

11            Okay.  Furthermore, as to Plaintiff's brand

12   value, Plaintiff has been plagued with lawsuits by

13   numerous states, school districts -- Sorry, states'

14   attorney generals and school districts, and has paid

15   hundreds of millions of dollars in settlements related to

16   these cases.

17            They specifically have been sued for

18   marketing to minors, and their products were just last

19   year temporarily banned by the FDA for inadequate testing,

20   among other things.

21            For similar reasons, JUUL's argument that

22   maximum damages are necessary to prevent a threat to

23   public safety is meritless.  First, there's no actual

24   evidence of any threat to public safety in this case.

25            Second, Defendants do not sell e-cigarettes

```
 1   or tobacco products any more.  So there's no threat to

 2   stop.

 3              Third, Plaintiff has presented no evidence of

 4   and has never asserted that it performed any testing on

 5   the infringing products, despite having more than two

 6   years to do so.

 7              The only evidence that Plaintiff has

 8   presented related to this is the unsupported allegations

 9   of Mr. Punderson about the conditions of unrelated

10   third-party manufacturers and has no bearing on the facts

11   at hand.

12              And the cases to which Plaintiff cites did

13   not support their position that maximum damages are

14   warranted In this case.  For example, in one of the cases,

15   Volkswagen, the Court awarded $600,000, which is far less

16   than the maximum when there was actual evidence presented

17   of a public safety concern.  And I believe that case had

18   to do with exploding wheels.

19              In Innovation Ventures, which Plaintiff cited

20   today, the Court did award maximum statutory damages.  But

21   that was in a case against Ford defendants, who had sold

22   more than 44 million bottles of counterfeit 5-hour Energy

23   drinks.  And there was actual evidence presented that

24   showed that there were safety concerns.

25              And in addition, Defendants had moved
```

1   products and continued to sell products after they

2   received notice of the lawsuit.  Those facts are easily

3   distinguishable from the case at hand.

4           Now, Defendant's conduct was not willful.  So

5   the facts and evidence show the defendants were not aware

6   of the JUUL brand.  Not a single witness testified to

7   having any knowledge of the JUUL brand prior to this suit.

8           Furthermore, Plaintiff's own 30(b)(6)

9   witness, again, testified that the JUUL products were only

10  available in China for a few days.  And Mr. Chou's prior

11  conviction of -- Mr. Chou's prior conviction is not

12  evidence that he acted willfully in this case.

13          He testified to the circumstances that led to

14  his conviction and explained how he's learned from his

15  past mistakes.

16          And the article to which Plaintiff cited in

17  its brief specifically discourages counterfeiting.  For

18  example, it states "can I sell trademark items?"  So the

19  answer is definitely "no."

20          The article goes on to advise readers to

21  avoid selling products that have the potential of

22  violating copyrights.  The article even advises readers to

23  buy products legally from licensed accredited

24  distributors.

25          Now, as to the JUUL hot-selling listing.  So

73

```
1    that listing was created by a vendor.  At the time CJ was

2    not aware that JUUL was a brand.  It was not in the brand

3    database and because of that, that listing slipped

4    through.

5              So the next slide is our last one.  I believe

6    it also does have some of Defendant's confidential

7    information on it.  So if we could ask that it be under

8    seal.

9        THE COURT:  All right.  Just step out again, please,

10   sir.

11       (The following proceedings were ordered sealed.)

12                         / / /

13                         / / /

14                         / / /

15                         / / /

16                         / / /

17                         / / /

18                         / / /

19                         / / /

20                         / / /

21                         / / /

22                         / / /

23                         / / /

24                         / / /

25                         / / /
```

```
 1              (End of sealed proceedings.)

 2         MR. MOORE:  With respect to the JUUL products, she

 3    raised concerns about a shipping ban.  She was not

 4    referring to infringement.  She specifically refused to

 5    ship other products because of infringements concerns.

 6              Further, Mrs. Yang was not an employee or an

 7    agent.  She was not on Defendant's payroll.  In fact, she

 8    worked for a supplier named Hieu Kwan, and Plaintiff

 9    relies on a single quote from an uninformed warehouse

10    worker, Li'an Lee, to imply that Mrs. Yang was an

11    employee, but this testimony is contradicted by

12    Defendant's CEO.

13              Further, Plaintiff's contentions that

14    Defendants' purported lies and discovery abuses weren't a

15    finding of willfulness are also misguided.  What Plaintiff

16    calls "lies" were, at worst, misunderstandings.

17              Defendants did not spoliate evidence.  The

18    e-cigarette listings were removed for concerns about an

19    e-cigarette ban, and that was before the lawsuit was

20    filed.  The new product listings were delisted from the

21    platform when CJ received notice of the temporary

22    restraining order in this case.  And CJ inadvertently did

23    not preserve those listings.

24              We also know that those listings were not a

25    named product in the complaint at the time, and it's only
```

```
 1    now that we're dealing with these issues.

 2                So there was no destruction of physical

 3    evidence.  The evidence shows that the inventory numbers

 4    on the website are incorrect, and Defendants performed a

 5    physical inspection of the warehouse to look for all of

 6    the accused products.  And they testified that the

 7    defendants' warehouse showed no such products.

 8                And, so there's no need for deterrence in

 9    this -- in this matter.  As shown, Defendants have taken

10    numerous steps and implemented numerous policies to combat

11    counterfeiting on their platform.

12                As such, there's no need for an award any

13    greater than the statutory minimum.  As I said,

14    counterfeit products account for a minuscule portion of

15    the more than 500,000 products on the platform.

16                So, as I said, Defendants fully cooperated in

17    discovery.  Their witnesses were deposed, despite severe

18    international travel restrictions during COVID, which I'm

19    sure Your Honor is aware of.

20                The defendants produced some 65,000 pages of

21    documents, and this court denied Plaintiff's motion to

22    compel and motions for sanctions regarding discovery.

23                So the number of marks at issue is really

24    only three.  So JUUL has asserted basically three distinct

25    or non-unique -- three unique marks.  Those marks being
```

1    JUUL, which is the 664; the 257; the 902; and the 614

2    marks; JUULpods, which is the 490 mark; and JUUL Labs,

3    which is the 541 and 153 mark.

4             Now, we submitted case law showing that the

5    proper way to count substantially similar marks like this

6    is to group them.  So we have one count for JUULpods, one

7    count for JUUL, and one for JUUL labs.

8             And one of the cases that holds this is

9    *Chanel Inc*. v. *Tshimanga*, which is a Northern District of

10   California case from 2008.  And it said, "if there are

11   multiple marks involved, rather than give a windfall,

12   courts tend to award an amount without multiplying the

13   number of marks or to lower the amount given per mark."

14   And in that case, the Court counted a stylized Chanel mark

15   and word mark as one act of infringement.

16            So as to the categories of goods.  So

17   Defendants have admitted infringement for four categories

18   of goods, only three of which can Plaintiff seek damages

19   for.  So they've admitted infringement for the JUUL

20   devices, the JUUL USB chargers, the JUULpods, and the dual

21   USB charging boxes.

22            Now, Plaintiff has also accused the JUUL

23   travel chargers, which we'll address in a moment.  Those

24   would be in the same category of goods.

25            And so, regardless of whether or not those

1    infringe, we're still left with just four categories.  But

2    only three of which can be used for the damages analysis,

3    because the USB chargers are not covered by the 614 mark

4    itself.

5              So that leads us to three counts for the use

6    of JUUL with JUUL labs, JUULpods, and -- I'm sorry, three

7    counts for the use of JUUL -- JUUL labs and JUULpods with

8    the JUUL devices.  Three for the use of JUULpods,

9    JUUL lab, and JUUL, with the JUULpods.  And one for the

10   use of JUUL with the charging boxes.

11             So, as I said, Plaintiff's not entitled to

12   damages for the USB charging cable or for the mobile phone

13   case, as the 614 mark does not cover the listed goods.

14             So the listed goods in the 614 mark are shown

15   below, and that covers carrying cases, holders and

16   protective cases featuring power supply connectors,

17   adapters, and battery charging device adapted for use with

18   handheld electronic devices, namely electronic cigarettes.

19             So here, Plaintiff has shown a claim for

20   infringement of the 614 mark for JUUL with the mobile

21   phone cases and the USB charging cables and the

22   USB chargers.  But as an initial matter, Defendants

23   made no sale of either the mobile phone cases or the

24   USB charging cables.

25             And, as I said, even if they had, they're not

1    entitled to damages under *Idaho Potato*, as those are not

2    covered by the categories of goods listed in the mark.

3    The mark only covers carrying cases, holders, et cetera,

4    featuring power supply connectors, adapters, and

5    battery-charging devices.

6           The phone case does not feature charging or

7    adapters, and the USB charger does not feature a case.  So

8    they're not entitled to damages for the 614 mark under

9    *Idaho Potato*.

10          Furthermore, even if Defendants had made any

11   sale of the dual USB chargers, which is the travel charger

12   that they've accused, or the USB magnetic cables, any such

13   use would have been descriptive at best.  The portable

14   chargers or the travel chargers were labeled with the OVNS

15   brand.  The USB magnetic chargers had no JUUL branding on

16   them or on the product, and they advertise themselves as

17   universal, indicating that the use of the word "JUUL" in

18   the listing would have been descriptive.

19          So given that the JUUL mobile phone cases had

20   no sales and that Plaintiff's own search did not find it

21   on the CJ website, it's highly likely that it was not

22   listed as a JUUL product.

23          So as to Defendants' affirmative defenses, we

24   briefed these issues fairly extensively.  And I don't have

25   a lot to add here.  But I just want to make a couple of

```
 1   important points.
 2              So any damages award to JUUL should be offset
 3   by Defendants' affirmative defenses of failure to mitigate
 4   an unclean hands.
 5              So as to the failure to mitigate, it's
 6   undisputed that Plaintiff intentionally and affirmatively
 7   decided not to notify Defendants of the infringing
 8   products on their website, despite becoming aware of the
 9   products in October of 2019.
10              Plaintiff's own internal emails show that the
11   reason why they decided not to do this was because the
12   case was too good to send a cease and desist letter, in an
13   apparent effort to inflate their damages.
14              Second, as to the defense of unclean hands,
15   Plaintiff pressed the third party, Celia Yang, to send the
16   products, despite being told on numerous occasions after
17   the first order of the starter kits and USB chargers that
18   Defendants did not have any starter kits and to get a
19   refund.
20              But the plaintiff continued to press until
21   they finally got what they wanted.  And Defendants'
22   reluctance to supply the infringing products is one of the
23   most important considerations in an unclean-hands defense.
24   As such, if this court were to award more than the maximum
25   statutory damages, it should discount those statutory
```

```
 1   damages based on defendants' unclean hands -- defenses of
 2   unclean hands and failure to mitigate.
 3            Thank you, Your Honor.
 4        THE COURT:  All right.  Thank you.
 5            Did you want to briefly respond for JUUL?
 6        MR. RYAN:  Could we have a short break, Your Honor?
 7        THE COURT:  All right.  Five minutes.
 8        MR. RYAN:  Sure.
 9        THE COURT:  All right.
10                  (Recess.)
11        THE COURT:  All right, Counsel.
12        MR. RYAN:  So, Your Honor, we were allocated
13   15 minutes for rebuttal.  I'm going to take roughly half,
14   and Mr. Steinberg will take the other half.
15        THE COURT:  Okay.
16        MR. RYAN:  So just to respond to a few of the
17   points.  On the cease and desist letter, in our briefing
18   and in the case law we've shown that it often tips off
19   counterfeiters.  If you serve cease and desist letters,
20   they change names, they move products, they destroy
21   evidence, just as we've found here.  So there's nothing
22   untoward about not sending a cease and desist letter to
23   warn a counterfeiter that you're investigating them.  So
24   that's -- that's an important factor to consider.
25            The other thing is, and this is in ECF316-5,
```

1    Paragraphs 9 and 10, counterfeiters are often wary of

2    buyers that they're not familiar with.  And it is known in

3    the industry that they often refuse to sell or make

4    excuses not to sell to buyers that are not well-known to

5    them, because they have regular sources of sales and those

6    are the people that they sell their large numbers to.

7    That is a common understanding in the industry that that's

8    the case.

9              So the fact that Celia, who they're relying

10   on, got spooked and was thinking about not selling or

11   saying she doesn't have inventory, that's of no

12   evidentiary value.  That's completely consistent with a

13   counterfeiter's conduct in the industry.

14             The other thing, this thing about hovering

15   over a number, that referred to products already in the

16   U.S. warehouse, not products in the Chinese warehouses.

17   So that's really of no evidentiary value.

18             All the records regarding -- all the evidence

19   regarding their anti-counterfeiting program, they show

20   that that was implemented afterwards.  However, when you

21   were asked, When did they start doing these Baidu

22   searches, Counsel, without citation to evidence, told you

23   they started doing that later.  That's not supported by

24   the evidence.

25             Mr. Chou does not limit the fact that he

1    testified that when they receive a sourcing request they

2    do a Baidu search, which is the equivalent of a Google

3    search in China.

4              And also, we put in front of Your Honor the

5    evidence of what he would have seen at that time in 2018

6    if he'd done a Baidu search.  And we believe that the

7    evidence he provided states, he did do the Baidu search.

8    And what he would have seen is JUUL was a very well-known

9    brand in China.

10             Yes, most of the products were counterfeit,

11   because the Chinese government stopped allowing JUUL

12   legitimate products to be sold.  But the market in China

13   is flooded with counterfeit products, and the brand is

14   very well known in China and in the United States.  This

15   idea that JUUL is here seeking a windfall and without

16   citation to case law is utterly unsupported.

17             Also, he said that there's no threat to

18   human safety, which is belied by the evidence.  The

19   evidence is unassailable that manufacturers in China

20   manufacture under dangerous conditions.  And I quoted for

21   you the U.S. Customs and Border Patrol that says that

22   "manufacturing of e-cigarettes is a danger to humans in

23   the United States." And that's why they're so attuned to

24   them, Your Honor.

25             Now, they say, We should have tested, and we

1    should have tested these actual products.  What would that

2    have done?  What do we test for?  You have to know what

3    you're testing for.  And you don't manufacture a product,

4    You don't know what contaminants are there.  Is it

5    arsenic?  What do you test for?  They're supposed to test

6    for everything under the sun?

7          And the law does not require us to do that.

8    All the cases that talk about human consumption, they say

9    even if there's no evidence that that particular product

10    is dangerous, that does not change the fact that you have

11    to deter these kinds of products being sold.

12          And the other thing is, even if you set aside

13    the human-consumption factor, we have five judgments of

14    willful counterfeiting.

15          Now, they make the excuse, Oh, those were

16    just default judgments.

17          Default judgment is even worse.  They didn't

18    even come in to defend it.  And it has the same

19    evidentiary weight that a full trial would have had.  Your

20    Honor might ask, Well, why is there a trial here?  Why are

21    we having to prove this up?

22          It was solely by the happenstance.  We were

23    lucky enough to see some of their money.  That's the only

24    reason they're here, Your Honor, because that's all they

25    care about.  That's all these counterfeiters care about.

85

```
 1              They want to unfreeze that money.  And you
 2   need to send the message to them that, you engage in this
 3   kind of conduct in the United States, you sell dangerous
 4   products to consumers in the United States, we are going
 5   to put the smackdown on you.
 6              Now, they talk about these cases that
 7   supposedly say -- he actually said "all cases say you have
 8   to bear a relationship to actual harm."
 9              Well, Your Honor, we will never know what the
10   actual harm is in this case, and that's very different
11   from any of those cases that even talk about that.  And
12   that's because the sales' numbers that they produced are
13   inconsistent, unreliable, incomplete.  They are internally
14   incomplete.  And the best evidence are the inventory
15   records.
16              The only thing they have to challenge those
17   inventory records is the testimony of the statements of
18   Celia Yang, who they claim doesn't even work for them.
19   That's pretty hypocritical, Your Honor.
20              So what do we have, inventory records.  Those
21   are the contemporaneous records.  And what is likely to
22   have happened is that those inventories turned over many
23   times.  The 10,000 could have been 100,000, and these
24   defendants are the reason we'll never know.
25              So to reduce statutory damages because there
```

```
 1    isn't a showing of sufficient actual damages would be --
 2    to reward spoliation, reward not cooperating in discovery,
 3    reward not producing evidence.
 4            And we know by their own admission they had
 5    products that they never produced.  So we know for a fact
 6    they destroyed web pages.  They destroyed products or sold
 7    them out the back door and never turned over that
 8    evidence.  We should not be blamed because they hid or
 9    destroyed evidence.
10            So the Tiffany factors he relies on, the
11    first two should be totally discounted and in favor of
12    Plaintiffs, because they all are based on records that are
13    incomplete and not having produced.
14            And deterrence, Your Honor, in the North Face
15    case, at the risk of citing yourself to yourself,
16    "principles of deterrence can lead to a maximum damages
17    award, even when actual damages are minimal."
18            And here, where we have destruction of
19    evidence, refusal to produce evidence, inconsistent
20    records, it's the quintessential case where the actual
21    damages shouldn't matter, because we don't know what they
22    are, Your Honor.
23            Okay.  What's really important when you're
24    talking about deterrence, Your Honor, is the future.  And
25    what do we know about these particular defendants and
```

1    others like them?

2           Their sole motivation is money.  They don't

3    care about the people they sell to.  And if their sole

4    motivation is money, the only thing that's going to deter

5    them from doing this again and again and again is the

6    largest possible statutory damage award.

7           Mr. Steinberg.

8       MR. STEINBERG:  Thank you, Your Honor.

9           Your Honor, excuse me, I just have a

10   few points to add.  Addressing briefly the claimed

11   IP protection program that Defendants mostly created after

12   this case was filed, the Baidu.com search, et cetera.

13          One of the reasons why we're debating about

14   this is because of what we don't have in this case, which

15   is any testimony from anyone at Defendants who was

16   actually involved with making the decision to source and

17   list these products.  The people who actually did the

18   searches, supposedly at the time that these products were

19   first sourced and listed and offered for sale, there's no

20   testimony from those folks.

21          The testimony that we have is from Mr. Chou

22   after the fact and from other folks, but not from the

23   people who are actually involved.  And so, unfortunately,

24   we don't know what was in their heads, but what we can

25   look at is the evidence that we do have and what

1   reasonable inferences we can reach.  And we think those

2   inferences show that Defendants willfully infringed.

3                   I want to look at the counting of the marks.

4   Let's see.  Mr. Botello, can you pull up Slide Number 83?

5   Do you have control of the --

6                   Okay.  So there's no dispute about how the

7   mark -- or at least that the JUUL devices and JUULpods

8   should be separately counted.  Apparently, there is some

9   dispute over the JUUL USB chargers.  Now, these products

10  have already been found to infringe at the original

11  summary judgment.  So I'm not sure why we're arguing about

12  them here today.

13                  But I do want to take a look at the -- sorry,

14  the trademark that's at issue, the trademark registration,

15  and look at whether it covers all the products on the

16  bottom row:  The USB charger, the portable charger, the

17  charging cable, the charging box or case.  There is no

18  dispute on that one at least.  And then the JUUL mobile

19  phone case.

20                  And, Mr. Botello, can you pull up TX-202?

21                  Your Honor, this is the trademark

22  registration.

23                  And Mr. Botello, if you can zoom in a little

24  bit so we can read the description.

25                  So you'll see, Your Honor, this talks about

1   carrying cases, holders, and protective cases featuring

2   power supply connectors, adapters, and battery-charging

3   devices adapted for use with handheld electronic devices,

4   namely, electronic cigarettes.

5              I don't think there can be -- really be a

6   credible argument that all of the products that we're

7   looking at fall into this category of battery-charging

8   devices, of adapters that are specially adapted for use

9   with handheld products.

10             And I would cite Your Honor back to one of

11  the cases that was in some of our prior briefing, and that

12  was the In Re *Midwest Gaming and Entertainment* case.

13  That's at 2013 Westlaw 144-2237 at pages 3 to 4, and also

14  the in re Thor Tech case.  That's a 2009 Westlaw 109-8997

15  at page 5.

16             And what these cases explain is that the

17  items listed in the registration should be construed

18  independently, not together, to limit the scope of

19  registration, but the description of products has to be

20  read broadly to cover everything that is alluded to.  And

21  so we think this clearly covers all of the products that

22  are at issue here.

23             I want to address briefly the issue of the

24  affirmative defenses, and this is addressed in the party's

25  briefing.  The question of mitigation.  Mr. Ryan talked a

1   little about the reasons for not sending a cease and

2   desist letter.  And this is recognized in the case law

3   that we cited in our rebuttal brief, Your Honor, that the

4   case law recognizes that there's a risk when you send a

5   cease and desist letter, particularly to an overseas

6   defendant, that they will simply destroy the evidence.

7   And, indeed, in this case, we have evidence that that's

8   exactly what happened.

9           But beyond that, as testified to in Mr.

10  Punderson's declarations, he explained that one of their

11  approaches in their investigations in general, and in this

12  case specifically, is to try to build a relationship of

13  trust with the supplier for two reasons.

14          Number one, to ascertain how big of a

15  supplier this really is, and get a sense of how big and

16  wide-ranging the operation is.  But also to try to

17  ultimately move up the food chain to the manufacturers and

18  other people that they might be doing business with.

19          So there are very good reasons, particularly

20  when you're talking about an infringer in China, for

21  taking your time to build that relationship of trust and

22  try to figure out where the tentacles of the operation go,

23  and find other suppliers of infringing products.

24          On the defense of unclean hands, as we

25  explained in our rebuttal trial briefing, that defense is

1    very limited to a situation where the alleged unclean

2    hands, the alleged acts are directly part of the

3    allegations in the case.  And that's simply not what we

4    have, what we have here.  So we don't think those

5    affirmative defenses should carry any water.

6                    Lastly, talking about what did the actual

7    products look like.  Opposing Counsel raised this issue

8    of, Were the portable chargers actually marked, were the

9    USB cables actually marked with one of the marks?  Well,

10   unfortunately we don't know, Your Honor, because we don't

11   have those samples, and we also don't have the packaging.

12                   And if Your Honor looks at the counterfeit

13   JUUL USB charger, what you'll see that that device is too

14   small to mark itself.  But what you'll see on the bag from

15   the counterfeit product that was purchased from Defendants

16   is it clearly has the JUUL mark on it.

17                   I think it's fair to assume that all the rest

18   of the counterfeit goods that they offered and sold were

19   similarly marked, but, unfortunately, we'll never know

20   because we don't have that.

21                   I'm sorry.  There's one more point I wanted

22   to make, and that was the question of the survey that was

23   referenced earlier.

24                   Your Honor was absolutely right.  The survey

25   evidence that was referenced by Opposing Counsel was a

```
 1    general survey of the general public.  It was not a survey
 2    of e-cigarette consumers, of people who specifically are
 3    buying these products.  And that's really what's relevant
 4    when we're looking at the value of a trademark.
 5                 If you're not somebody who drinks, then your
 6    opinion about alcohol companies is not going to be
 7    relevant to the value of an alcohol company trademark.  Or
 8    if you're not someone who plays basketball, your opinion
 9    on basketball shoes or basketballs is not going to be
10    relevant to the value of the mark among the relevant
11    consuming public.
12                 And the undisputed evidence in this case is
13    that among actual consumers of JUUL products, they have
14    long been the number-one brand.  And that's not disputed.
15    And there's evidence in the record to support that.
16                 Thank you very much, Your Honor.
17         THE COURT:  All right.  Thank you.
18                 I do have findings of fact and conclusions of
19    law proposed from the plaintiff.  I didn't see any from
20    the defense.
21                 Do I have -- did I miss them, or do I not
22    have any?
23         MR. MOORE:  I believe we did, your Honor.  If you
24    can give me just one moment.
25         THE COURT:  Okay.
```

```
 1        MR. MOORE:  Unfortunately, Your Honor, we don't have
 2   Internet, so we can't look and see what the docket number
 3   is.
 4        THE COURT:  I did a search on the docket, and I
 5   didn't -- I did a search for findings.  If you did submit
 6   them, then send a Word version, please, to the Chamber's
 7   email.
 8             If you didn't, do you plan on doing that
 9   then?
10        MR. MOORE:  Yes, Your Honor.
11        MR. RYAN:  And your Honor, in light of that, we'll
12   go back and look at ours because they were done some time
13   ago, and see if they need to be updated.
14        THE COURT:  I was going to suggest that.
15             And if there's anything you are planning on
16   referring to from the argument, you should order the
17   transcript from Mr. Wilcox if you want to supplement in
18   any way.
19        MR. MOORE:  And we would like a copy of the deck
20   that was presented.
21        THE COURT:  Yes.  And I need that sent to the
22   Chamber's email as well.
23             Why don't you get together and decide some
24   kind of timeframe for presenting anything else that's
25   going to be presented.  It doesn't matter to me, I have
```

94

1    plenty of other things to do.

2              Anything else I can do for you today?

3         MR. RYAN:  I believe we are still -- we are supposed

4    to have another 15 minutes.  My apologies, Your Honor.  I

5    believe we still have 15 minutes of rebuttal for our side.

6         THE COURT:  Usually only side has rebuttal.  These

7    are closing arguments only the plaintiff would have.

8         MR. RYAN:  So our stipulation regarding the trial

9    allocated one hour for each side for opening.

10        THE COURT:  All right.  If you want 15 minutes more

11   and you agreed to it, you can have it.  But make it short

12   as possible.

13        MR. RYAN:  I'll make it as short as I possibly

14   can --

15        THE COURT:  And only in response to what they've

16   indicated in their 15 minutes, or it wouldn't be rebuttal.

17        MR. RYAN:  Yes, Your Honor.  So in that case, I

18   really only have a few things to point out.  So I think

19   that it's clear that the statements in the record and

20   Plaintiff's inability to get more products from the

21   defendants is a clear indicator that CJ didn't have the

22   products, despite Plaintiff's claim to the contrary,

23   despite their argument that counterfeiters will typically

24   have some sort of relationship where they'll deny people

25   that they don't know.

95

1            And the other thing I'd point out is that the

2    policies and procedures and the -- the history of the

3    sourcing rejections that CJ has, indicates that there's no

4    need for deterrence, right?  Because CJ is already denying

5    counterfeit products and they've denied roughly 20,000

6    listings on their website.  That's the kind of evidence

7    that clearly shows that there's no need for deterrence in

8    this case.

9            And the last thing that I point out is the

10   fact that CJ offers more than 500,000 products, that they

11   are an online retailer who provides dropshipping services

12   to small businesses, and that the fact that the number of

13   accused products that we're talking about is a minuscule

14   fraction of that 500,000 products is a pretty clear

15   indicator that CJ is not a habitual counterfeiter, as is

16   proposed by Plaintiff.

17           And that's -- that's all I have, your honor.

18   Thank you for the time.

19        THE COURT:  All right.  Thank you.

20           (At 3:58 p.m. proceedings were adjourned.)

21

22

23

24

25

1               --oOo--

2            CERTIFICATE

3

4        I hereby certify that pursuant to Section 753,

5   Title 28, United States Code, the foregoing is a true and

6   correct transcript of the stenographically reported

7   proceedings held in the above-entitled matter and that the

8   transcript page format is in conformance with the

9   regulations of the Judicial Conference of the United

10  States.

11

12  Date:  February 21, 2023

13

14

15                    /S/    WIL S. WILCOX

16                    U.S. COURT REPORTER
                      CSR NO. 9178
17

18

19

20

21

22

23

24

25

Wil Wilcox, Official Reporter

**COURTHOUSE NEWS
SERVICE REPORTER: [2]**
 63/15 63/19
**MR. MOORE: [21]**
**MR. RYAN: [27]**
**MR. STEINBERG: [12]**
**THE CLERK: [1]**   3/3
**THE COURT: [58]**
**THE WITNESS: [1]**
 40/7

---

**$**

**$1 [1]**   61/23
**$1,000 [2]**   59/11
 59/11
**$1,307.83 [3]**   59/16
 62/20 67/19
**$1,500 [1]**   51/9
**$1,800 [1]**   68/6
**$10,000 [1]**   61/17
**$140,000 [1]**   62/7
**$2 [3]**   16/17 47/15
 60/1
**$2.8 [1]**   13/20
**$200,000 [1]**   16/16
**$23,166 [1]**   62/4
**$26 [5]**   47/16 49/17
 50/7 51/6 61/17
**$26 million [1]**   61/17
**$3 [1]**   61/25
**$3.65 [1]**   42/3
**$3.65 million [1]**
 42/3
**$4 [1]**   62/1
**$600,000 [1]**   71/15
**$7,000 [1]**   59/11
**$7,869.83 [2]**   59/16
 62/21
**$8,000 [3]**   51/9 59/14
 68/8

---

**'**

**'19 [1]**   33/9

---

**-**

**--oOo [1]**   95/21
**-oOo [1]**   3/2

---

**/**

**/S [1]**   96/15

---

**1**

**1,000 [1]**   59/24

---

**1, 843 [1]**   25/23
**10 [2]**   50/12 82/1
**10,000 [2]**   37/15
 85/23
**10,507 [1]**   34/21
**10,949 [2]**   68/17 69/9
**100,000 [1]**   85/23
**100-plus [1]**   35/19
**109-8997 [1]**   89/14
**1117 [3]**   59/23 60/5
 60/6
**118 [1]**   59/5
**12 [1]**   61/18
**12 USB [2]**   67/21 68/2
**13 different [1]**
 47/13
**138 [3]**   35/10 67/20
 68/1
**144-2237 [1]**   89/13
**15 [4]**   94/4 94/5
 94/10 94/16
**15 minutes [1]**   81/13
**15 U.S.C [1]**   59/23
**15-minute [1]**   50/16
**153 [1]**   77/3
**155 [1]**   35/16
**169 [1]**   35/12
**17 [6]**   10/23 37/23
 37/25 62/19 67/21
 68/2
**18 [3]**   37/2 37/5
 37/25
**19 [1]**   37/24
**1:31 [2]**   1/16 3/1
**1st [1]**   1/23

---

**2**

**20,000 [4]**   54/9 54/14
 58/8 95/5
**200 [1]**   38/22
**200,000 [1]**   59/24
**2002 [1]**   24/10
**2004 [1]**   24/11
**2008 [1]**   77/10
**2009 [1]**   89/14
**2010 [4]**   15/4 24/24
 25/7 42/8
**2011 [1]**   62/3
**2013 [2]**   24/14 89/13
**2014 [1]**   61/3
**2015 [1]**   9/2
**2017 [4]**   25/7 25/10
 25/11 42/8

---

**2018 [5]**   19/6 19/15
 33/9 52/15 83/5
**2019 [6]**   25/9 25/14
 26/2 58/19 60/24 80/9
**202 [1]**   88/20
**2020 [3]**   20/4 20/9
 23/8
**2021 [13]**
**2022 [2]**   26/4 61/23
**2023 [3]**   1/16 3/1
 96/12
**21 [2]**   1/18 96/12
**22 [2]**   63/5 70/10
**2237 [1]**   89/13
**23 [1]**   70/9
**23rd [1]**   20/18
**24 [1]**   32/19
**25 [1]**   59/5
**257 [1]**   77/1
**28 [1]**   96/5
**282 [1]**   10/16
**283 [1]**   10/17
**284 [1]**   10/17
**2:21-CV-03056-CAS-PDx**
 **[1]**   1/8

---

**3**

**3,197 [1]**   36/21
**3,250 [1]**   51/11
**30 [4]**   1/16 3/1 56/13
 72/8
**31 [1]**   35/13
**32 [1]**   36/5
**350 [1]**   1/23
**3:58 [1]**   95/20

---

**4**

**4311 [1]**   1/24
**44 [2]**   35/16 71/22
**48 [1]**   36/8
**490 [1]**   77/2

---

**5**

**5-Hour [2]**   42/25
 71/22
**500 [1]**   2/10
**500,000 [4]**   52/23
 76/15 95/10 95/14
**541 [1]**   77/3
**55 [1]**   36/12

---

**6**

**614 [6]**   77/1 78/3
 78/13 78/14 78/20

**6**

**614...** **[1]**   79/8
**62** **[2]**   36/24 37/6
**63-21** **[1]**   1/18
**65,000** **[1]**   76/20
**65:11** **[1]**   1/19
**664** **[1]**   77/1

**7**

**73-10** **[1]**   1/19
**75231** **[1]**   2/10
**753** **[1]**   96/4
**75:02** **[1]**   1/19

**8**

**80** **[2]**   37/1 37/5
**800** **[1]**   2/5
**800,000** **[1]**   41/7
**8140** **[1]**   2/10
**83** **[1]**   88/4
**85** **[1]**   68/3
**8997** **[1]**   89/14

**9**

**90012** **[1]**   1/24
**902** **[1]**   77/1
**9178** **[2]**   1/22 96/16
**94111** **[1]**   2/5
**95** **[1]**   1/19

**A**

**above** **[2]**   62/9 96/7
**above-entitled** **[1]**
 96/7
**absolutely** **[2]**   18/6
 91/24
**abuses** **[1]**   75/14
**accompanied** **[1]**   11/24
**according** **[2]**   12/23
 20/5
**account** **[5]**   23/1 23/3
 23/4 40/25 76/14
**accounted** **[2]**   38/14
 68/3
**accounts** **[1]**   22/16
**accredited** **[1]**   72/23
**accusations** **[1]**   51/24
**accused** **[7]**   51/1 51/8
 67/19 76/6 77/22
 79/12 95/13
**across** **[1]**   66/13
**act** **[4]**   17/9 17/10
 17/10 77/15

**acted** **[1]**   17/5 47/22
 72/12
**actions** **[1]**   65/15
**activities** **[3]**   16/23
 22/14 22/16
**activity** **[1]**   26/22
**acts** **[5]**   17/20 19/25
 25/3 59/11 91/2
**adapted** **[3]**   78/17
 89/3 89/8
**adapters** **[5]**   78/17
 79/4 79/7 89/2 89/8
**add** **[4]**   31/5 58/21
 79/25 87/10
**added** **[3]**   25/21 26/1
 58/5
**addition** **[3]**   55/22
 68/18 71/25
**address** **[3]**   50/23
 77/23 89/23
**adjourned** **[1]**   95/20
**adjust** **[2]**   68/5 68/7
**administer** **[1]**   12/18
**administers** **[1]**   48/19
**admission** **[1]**   86/4
**admissions** **[1]**   20/23
**admit** **[8]**   22/15 35/20
 37/6 37/18 37/22 39/7
 39/25 45/25
**admits** **[2]**   35/24
 36/22
**admitted** **[7]**   21/7
 25/25 33/6 33/8 59/8
 77/17 77/19
**Adrian** **[1]**   10/20
**adult** **[1]**   9/3
**adverse** **[1]**   26/19
**advertise** **[2]**   38/20
 79/16
**advertised** **[6]**   35/22
 36/15 36/21 37/14
 45/5 45/17
**advertisements** **[1]**
 46/22
**advertising** **[2]**   34/21
 46/22
**affiliate** **[1]**   53/9
**affiliated** **[2]**   63/10
 63/13
**affirmative** **[4]**   79/23
 80/3 89/24 91/5
**affirmatively** **[1]**
 80/6

**afternoon** **[7]**   3/6 3/8
 3/17 8/15 8/16 50/21
 50/22
**afterwards** **[1]**   82/20
**agency** **[2]**   14/19
 22/21
**agent** **[4]**   11/24 14/8
 22/10 75/7
**al** **[2]**   1/9 3/4
**albeit** **[1]**   21/15
**alcohol** **[2]**   92/6 92/7
**allegations** **[3]**   51/25
 71/8 91/3
**alleged** **[2]**   91/1 91/2
**allocated** **[2]**   81/12
 94/9
**allow** **[1]**   56/4
**allowed** **[1]**   20/11
**allowing** **[2]**   54/18
 83/11
**allows** **[1]**   52/17
**alluded** **[1]**   89/20
**almost** **[2]**   21/16
 33/11
**alone** **[2]**   15/7 24/14
**alternative** **[1]**   9/3
**although** **[1]**   4/23
**amazingly** **[1]**   48/13
**Amazon** **[2]**   52/11
 56/22
**ambiguity** **[2]**   45/9
 45/20
**America** **[2]**   10/25
 21/10
**American** **[1]**   29/23
**amount** **[9]**   13/22
 46/11 50/24 51/3
 59/12 60/25 69/11
 77/12 77/13
**analysis** **[7]**   28/7
 28/10 40/9 60/11
 65/18 67/10 78/2
**ANDY** **[4]**   1/9 3/4
 52/15 69/4
**Angeles** **[3]**   1/14 1/24
 3/1
**another's** **[1]**   22/20
**answer** **[3]**   28/20
 41/19 72/19
**anti** **[4]**   6/17 10/22
 26/6 82/19
**anti-counterfeiting**
 **[4]**   6/17 10/22 26/6

**A**

anti-counterfeiting...
 [1]   82/19
any uncertainty [1]
 46/8
apologies [1]   94/4
apparent [2]   48/8
 80/13
appearances [2]   2/1
 3/5
Apple [1]   10/24
applied [1]   40/12
apply [1]   39/3
approach [1]   10/13
approaches [1]   90/11
April [1]   20/18
areas [1]   40/3
arguably [2]   8/3 27/6
argue [1]   42/15
argues [1]   51/22
arguing [1]   88/11
argument [11]
arguments [1]   94/7
array [2]   8/25 9/15
arsenic [1]   84/5
article [3]   72/16
 72/20 72/22
ascertain [1]   90/14
Asia [1]   13/6
aspects [1]   27/22
asserted [2]   71/4
 76/24
asserting [1]   27/1
assets [1]   13/22
associate [1]   3/21
assume [2]   13/12
 91/17
attorney [1]   70/14
attorneys [3]   2/4 2/8
 4/6
attorneys' [1]   47/19
attributable [1]
 40/17
attribution [1]   23/11
attuned [1]   83/23
audits [1]   29/1
August [2]   14/25
 25/17
aura [2]   17/5 17/6
authentic [9]   9/16
 9/18 9/19 9/20 28/22
 28/25 29/2 29/4 44/14
authenticity [1]

29/18
authorization [2]
 19/20 21/21
authorized [2]   19/3
 55/19
avoid [4]   22/9 58/5
 67/12 72/21
award [33]
awarded [5]   51/3
 61/23 62/7 65/20
 71/15
awareness [2]   16/25
 17/11

**B**

bag [1]   91/14
Baidu [12]
Baidu.com [6]   16/9
 19/1 19/21 55/18 56/7
 87/12
ban [3]   11/8 75/3
 75/19
banned [2]   23/11
 70/19
BARTKO [1]   2/3
base [1]   70/6
basis [2]   6/9 24/14
basketball [2]   92/8
 92/9
basketballs [1]   92/9
batteries [2]   31/11
 31/16
battery [5]   31/7
 78/17 79/5 89/2 89/7
battery-charging [3]
 79/5 89/2 89/7
bear [7]   51/3 60/19
 60/25 61/6 62/11
 65/20 85/8
bearing [1]   71/10
becoming [1]   80/8
belied [1]   83/18
below [1]   78/15
Ben [1]   3/11
beneficial [1]   53/22
Besides [2]   10/23
 13/3
beyond [1]   90/9
bicyclists [1]   27/15
binding [1]   66/15
biweekly [1]   58/24
blamed [1]   86/8
blended [1]   29/2

blind [1]   18/11
blindness [4]   17/1
 17/8 18/8 18/13
boasts [1]   7/17
Border [3]   29/12
 29/20 83/21
Botello [4]   3/12 88/4
 88/20 88/23
bottled [1]   26/16
bottles [1]   71/22
bottom [2]   40/14
 88/16
box [2]   37/20 88/17
boxes [6]   33/8 45/24
 67/21 68/2 77/21
 78/10
brand [48]
brand-protection [3]
 19/18 54/12 54/24
branded [5]   8/22 8/24
 15/17 18/3 59/6
branding [1]   79/15
brands [6]   10/24
 19/22 20/1 22/7 26/8
 49/14
brief [8]   4/8 31/5
 33/24 34/1 61/18
 68/12 72/17 90/3
briefed [1]   79/24
briefing [7]   32/16
 32/17 48/2 81/17
 89/11 89/25 90/25
Brittany [2]   4/16
 11/2
broadening [1]   27/25
broadly [1]   89/20
build [2]   90/12 90/21
bulk [1]   12/1
bunch [1]   55/4
BUNZEL [1]   2/3
Burberry [2]   24/5
 24/16
burden [2]   18/12
 18/14
business [7]   12/18
 12/19 12/20 17/21
 52/13 53/21 90/18
businesses [3]   52/14
 52/17 95/12
buyers [2]   82/2 82/4
bzbm.com [2]   2/6 2/6

**cable [9]**   9/14 9/21
  27/24 37/13 45/15
  47/7 47/9 78/12 88/17
**cables [4]**   78/21
  78/24 79/12 91/9
**CALIFORNIA [10]**
**Canada [1]**   33/13
**capture [1]**   46/4
**car [1]**   27/15
**careful [1]**   50/12
**carry [2]**   19/4 91/5
**carrying [3]**   78/15
  79/3 89/1
**CAS [1]**   1/8
**cases in [1]**   67/1
**catching [2]**   31/11
  57/24
**categories [4]**   77/16
  77/17 78/1 79/2
**category [3]**   60/4
  77/24 89/7
**caution [1]**   50/9
**cease [7]**   24/12 80/12
  81/17 81/19 81/22
  90/1 90/5
**Celia [13]**
**Celia's [1]**   14/16
**center [2]**   2/5 40/2
**CENTRAL [3]**   1/2 60/23
  61/22
**CEO [2]**   12/15 75/12
**CERTIFICATE [1]**   96/2
**certify [1]**   96/4
**cetera [2]**   79/3 87/12
**chain [1]**   90/17
**chains [2]**   30/1 30/4
**challenge [1]**   85/16
**challenges [1]**   52/12
**Chamber's [2]**   93/6
  93/22
**Chanel [3]**   24/13 77/9
  77/14
**characters [1]**   19/11
**charge [2]**   9/11 9/13
**charger [14]**
**chargers [19]**
**charges [1]**   23/19
**chart [1]**   31/18
**cherry [1]**   50/1
**chief [1]**   29/19
**China [20]**
**Chinese [4]**   19/11

**CHOU [23]**
**Chou's [8]**   12/24 15/3
  18/23 19/4 21/17
  33/25 72/10 72/11
**Chrome [2]**   25/11 34/6
**cigarette [6]**   21/3
  22/5 27/5 75/18 75/19
  92/2
**cigarettes [10]**
**circuit [8]**   60/10
  66/1 66/3 66/8 66/9
  66/10 66/18 67/2
**circuits [1]**   60/11
**circumstances [1]**
  72/13
**citation [2]**   82/22
  83/16
**cite [4]**   22/19 66/17
  66/20 89/10
**cited [7]**   24/17 40/11
  60/14 62/10 71/19
  72/16 90/3
**cites [1]**   71/12
**citing [1]**   86/15
**CJ [66]**
**CJ Dropshipping [1]**
  40/4
**CJ's [11]**
**CJDropshipping.com [1]**
  12/13
**claim [12]**
**claimed [4]**   15/22
  35/1 37/10 87/10
**claims [3]**   15/12
  15/20 41/5
**clear [7]**   31/22 32/22
  34/11 60/17 94/19
  94/21 95/14
**clerk [1]**   63/8
**client [2]**   8/21 50/10
**closing [1]**   94/7
**Coach [2]**   24/13 62/2
**Coach's [1]**   62/8
**Code [1]**   96/5
**colleagues [1]**   66/8
**collection [1]**   48/10
**combat [4]**   54/7 55/11
  57/14 76/10
**combating [2]**   11/5
  52/12
**combination [1]**   69/6
**combinations [1]**

**combustible [1]**   9/4
**comments [1]**   23/6
**committed [1]**   20/1
**committing [1]**   23/22
**common [1]**   82/7
**commonly [1]**   8/23
**communicate [1]**   23/2
**communication [1]**
  14/16
**communications [2]**
  20/24 22/3
**companies [4]**   12/15
  12/17 34/8 92/6
**company [3]**   34/9
  60/22 92/7
**compare [2]**   43/23
  57/12
**compatible [4]**   46/23
  47/1 47/2 47/3
**compel [1]**   76/22
**compelled [1]**   39/1
**complaint [2]**   51/18
  75/25
**complete [2]**   30/20
  40/20
**compliance [1]**   29/5
**computer [1]**   39/4
**concern [2]**   49/17
  71/17
**concerns [5]**   59/21
  71/24 75/3 75/5 75/18
**concluded [1]**   43/7
**conclusion [3]**   9/23
  32/23 47/11
**conclusions [1]**   92/18
**conditions [4]**   27/20
  29/9 71/9 83/20
**conduct [8]**   17/4
  23/24 28/11 42/7
  61/12 72/4 82/13 85/3
**conducts [2]**   28/25
  54/23
**Conference [1]**   96/9
**confidential [4]**   5/9
  5/13 63/6 73/6
**confirmed [2]**   34/23
  70/3
**conformance [1]**   96/8
**connectors [3]**   78/16
  79/4 89/2
**conservative [1]**
  13/21

**C**

considerations [1]
 80/23
consistent [1]    82/12
consistently [1]
 60/19
conspiracy [1]    24/23
constitute [1]    17/20
constructive [4]    7/22
 17/15 17/16 18/21
construed [1]    89/17
consumer [1]    9/13
consumers [16]
consuming [1]    92/11
consumption [15]
contain [1]    9/9
contains [1]    9/18
contaminants [1]    84/4
contemporaneous [4]
 30/23 34/20 38/17
 85/21
contend [1]    38/5
contentions [1]    75/13
contest [1]    51/18
continued [4]    20/17
 23/23 72/1 80/20
continuing [1]    49/22
contradicted [1]
 75/11
contrary [4]    15/19
 51/14 54/1 94/22
control [4]    14/19
 22/20 23/5 88/5
controlled [5]    14/15
 14/17 22/13 22/15
 59/22
conventional [1]    53/5
Converse [4]    25/17
 25/22 26/3 48/15
convicted [2]    24/23
 25/7
conviction [6]    15/3
 23/18 42/9 72/11
 72/11 72/14
convictions [5]    7/23
 23/18 24/19 24/20
 49/23
convincing [1]    43/21
cooperate [1]    31/24
cooperated [5]    52/5
 59/20 61/13 65/16
 76/16
cooperating [1]    86/2

**C**

copycat [2]    20/11
 20/13
copyright [4]    20/7
 40/10 60/12 66/24
copyrights [1]    72/22
Corporation [1]    1/6
corresponded [2]
 11/17 14/6
corresponding [1]
 14/14
count [4]    67/25 77/5
 77/6 77/7
counted [9]    42/16
 42/21 43/3 45/8 46/1
 46/16 67/24 77/14
 88/8
counterfeit [35]
counterfeiter [2]
 81/23 95/15
counterfeiter's [1]
 82/13
counterfeiters [9]
 6/1 30/1 30/3 30/5
 52/5 81/19 82/1 84/25
 94/23
counterfeiting [31]
counterfeits [1]
 25/24
countries [4]    13/6
 33/20 34/15 34/17
country [1]    15/6
counts [2]    78/5 78/7
court [37]
court's [3]    6/8 38/25
 62/8
courthouse [2]    1/23
 63/15
courtroom [5]    4/16
 4/17 5/12 5/17 63/9
courts [8]    34/7 60/10
 60/18 60/24 65/19
 66/3 66/4 77/12
courts' [1]    6/9
cover [4]    7/20 21/22
 78/13 89/20
covered [4]    43/2
 51/20 78/3 79/2
covers [5]    54/21
 78/15 79/3 88/15
 89/21
COVID [2]    30/2 76/18
create [1]    40/24
created [10]

**C**

credibility [1]    38/17
credible [4]    37/11
 38/23 39/16 89/6
criminal [1]    24/23
cross [1]    54/17
cross-check [1]    54/17
crucial [1]    48/17
Crucially [1]    15/19
CSR [2]    1/22 96/16
curious [1]    20/22
customer [2]    53/1
 53/8
customer's [1]    53/2
customers [9]    14/15
 14/16 15/16 32/15
 33/9 33/12 52/22
 53/11 53/12
Customs [3]    29/12
 29/19 83/21
Cute [2]    12/17 34/6
CV [2]    1/8 3/3
CV-21-3056-DSF [1]
 3/3

**D**

DALE [1]    1/4
Dallas [1]    2/10
damage [6]    16/22
 23/21 26/14 43/19
 68/9 87/6
damage for [1]    43/19
damages [82]
danger [2]    29/17
 83/22
dangerous [4]    26/22
 83/20 84/10 85/3
data [11]
database [11]
databases [1]    55/17
Davidson [5]    25/8
 25/9 25/22 26/2 34/5
dealt [2]    42/17 67/3
debating [1]    87/13
decide [1]    93/23
decided [3]    58/22
 80/7 80/11
decision [2]    66/12
 87/16
decisions [1]    66/19
deck [1]    93/19
declaration [9]    18/23
 19/5 21/18 25/1 32/4
 32/16 32/20 33/25

**D**

declaration... [1]
 69/4
declarations [3]
 10/20 48/7 90/10
default [2]   84/16
 84/17
defend [1]   84/18
defendant [19]
defendant's [13]
defendants [84]
defendants' [29]
defense [5]   80/14
 80/23 90/24 90/25
 92/20
defenses [5]   79/23
 80/3 81/1 89/24 91/5
deferred [1]   49/8
Delaware [1]   1/5
deleting [1]   39/9
deliberately [1]
 47/22
delist [1]   20/10
delisted [1]   75/20
deliver [1]   69/18
delivered [1]   11/19
delivery [1]   8/22
delta [1]   37/1
demonstrate [1]   27/21
denied [4]   54/14 58/8
 76/21 95/5
deny [1]   94/24
denying [1]   95/4
department [13]
departments [2]   52/20
 52/20
depicted [1]   12/8
depiction [1]   32/24
deposed [1]   76/17
deposition [3]   10/19
 48/22 48/22
description [3]   53/19
 88/24 89/19
descriptions [1]
 46/25
descriptive [3]   46/21
 79/13 79/18
design [9]   42/20
 43/11 43/13 44/7
 44/10 45/6 45/19
 46/15 46/15
Designs [1]   8/21
desist [7]   24/12

80/12 81/17 81/19
81/22 90/5 90/5
despite [8]   23/24
 53/25 71/5 76/17 80/8
 80/16 94/22 94/23
destroy [2]   81/20
 90/6
destroyed [3]   86/6
 86/6 86/9
destruction [2]   76/2
 86/18
detail [1]   33/3
details [1]   20/23
detect [1]   57/25
deter [8]   23/21 24/1
 26/22 28/19 42/3 42/6
 84/11 87/4
determination [3]
 31/22 55/21 58/15
determined [2]   56/3
 67/7
deterred [1]   24/4
deterrence [20]
deterrent [1]   61/11
device [16]
devices [9]   28/21
 77/20 78/8 78/18 79/5
 88/7 89/3 89/3 89/8
DHS [1]   20/17
difference [2]   37/5
 66/9
differences [1]   43/24
dimensional [3]   12/10
 43/17 44/11
directed [1]   22/16
disappearance [1]
 38/14
discern [1]   61/6
disclosed [2]   33/2
 40/22
discount [1]   80/25
discounted [1]   86/11
discourage [1]   67/13
discourages [1]   72/17
discouraging [1]
 61/14
discovery [23]
discrepancies [2]
 36/13 38/24
Dish [1]   22/18
dispute [7]   21/1 21/2
 41/13 46/1 88/6 88/9
 88/18

disputed [2]   14/3
 92/14
disregard [7]   8/6
 14/20 16/25 17/17
 26/11 26/15 30/19
distinct [1]   76/24
distinction [1]   67/4
distinguishable [1]
 72/3
distinguishing [1]
 8/4
distributes [1]   8/22
distributors [1]
 72/24
district [12]
districts [2]   70/13
 70/14
Diva [1]   62/2
divide [1]   4/5
DIVISION [1]   1/3
dock [1]   9/20
docket [2]   93/2 93/4
documents [5]   35/18
 36/2 48/6 48/8 76/21
dollars [3]   47/15
 50/7 70/15
domain [1]   53/10
double [1]   62/7
doubt [1]   23/16
dozen [1]   11/1
dozens [3]   15/15
 32/14 33/9
drag [1]   58/23
drinks [2]   71/23 92/5
dropshippers [1]
 52/24
dropshipping [9]
 34/10 40/4 48/18
 52/14 52/16 52/21
 52/25 53/5 95/11
drums [1]   26/17
DSF [1]   3/3
dual [3]   67/21 77/20
 79/11
dual-charging [1]
 67/21

**E**

e-cigarette [5]   21/3
 27/5 75/18 75/19 92/2
e-cigarettes [7]   6/13
 6/15 8/24 41/14 41/18
 70/25 83/22

**E**

E-Liquid [1]   29/2
e-liquids [1]   29/1
e-Wu [2]   12/16 34/6
early [1]   25/1
easily [1]   72/2
eBay [2]   52/11 56/22
ECF316 [1]   81/25
ECF316-5 [1]   81/25
economy [2]   49/15
 50/6
effect [1]   61/11
effects [1]   26/19
effort [3]   58/25
 67/14 80/13
eight [1]   6/3
electronic [7]   8/22
 22/15 29/23 78/18
 78/18 89/3 89/4
else's [1]   66/11
email [8]   2/6 2/6
 2/11 2/11 2/12 68/16
 93/7 93/22
emails [1]   80/10
Embacadero [1]   2/5
emblematic [1]   26/23
emphasize [1]   40/13
employee [3]   14/8
 75/6 75/11
employees [4]   10/18
 14/14 20/10 55/2
employer [1]   11/9
encourages [1]   58/3
endeavored [1]   11/12
Energy [2]   43/1 71/22
enforcement [3]   11/1
 29/21 48/18
engage [2]   23/23 85/2
engaged [1]   42/7
engine [1]   19/1
engines [1]   55/18
ensure [2]   29/5 55/13
Entertainment [1]
 89/12
entirely [1]   49/3
entities [1]   34/3
entitled [7]   46/16
 50/25 51/20 78/11
 79/1 79/8 96/7
equipment [1]   30/3
equivalent [4]   6/22
 17/24 19/2 83/2
especially [2]   23/4

66/17
essentially [2]   65/18
 67/10
established [2]   17/3
 17/12
establishes [1]   22/20
estimate [4]   13/21
 62/8 69/13 69/14
estimated [3]   61/25
 62/4 69/7
et [4]   1/9 3/4 79/3
 87/12
Europe [1]   13/8
everyone [3]   5/12
 66/6 70/7
evidence [83]
evidentiary [3]   82/12
 82/17 84/19
Excellent [1]   7/14
exceptional [2]   47/18
 47/21
exchange [1]   4/20
exchanged [1]   4/23
excuse [6]   12/19
 32/15 32/18 33/24
 84/15 87/9
excused [1]   5/18
excuses [1]   82/4
existence [1]   17/11
existing [1]   58/1
expenses [1]   61/9
experience [2]   11/5
 55/20
expert [1]   43/25
explanation [3]   16/6
 19/24 37/11
exploding [1]   71/18
extends [1]   60/1
extensively [2]   41/23
 79/24
extent [5]   16/22
 40/19 45/9 45/20
 46/17
exterior [2]   43/11
 44/7

**F**

face [14]
faces [1]   52/11
facilitate [3]   27/4
 28/3 28/5
facilities [1]   29/15
fact [25]

factor [5]   5/23 8/3
 30/16 81/24 84/13
factories [1]   29/9
factors [17]
factory [1]   69/2
facts [9]   5/24 7/20
 51/25 53/20 54/10
 69/16 71/10 72/2 72/5
failed [5]   30/20
 34/18 46/19 59/2 59/3
failure [11]
fake [1]   50/11
fall [1]   89/7
false [1]   15/14
Fang [1]   3/13
fault [1]   38/12
favor [5]   40/5 40/14
 41/9 41/21 86/11
FDA [1]   70/19
feature [2]   79/6 79/7
featuring [3]   78/16
 79/4 89/1
February [1]   96/12
fees [2]   47/19 50/8
few points [1]   87/10
figure [1]   90/22
file [1]   67/14
fill [1]   46/18
filled [1]   29/3
final [1]   31/18
finally [5]   20/19
 52/7 53/13 56/1 80/21
finder [1]   22/11
findings [2]   92/18
 93/5
finish [2]   47/24 49/5
FISCHER [1]   1/4
fit [1]   30/19
flooded [1]   83/13
floor [1]   40/24
flower [1]   8/10
focus [2]   41/15 48/2
focused [2]   14/5
 60/14
folks [3]   13/13 87/20
 87/22
follow-up [1]   54/24
food [1]   90/17
Ford [1]   71/21
foregoing [1]   96/5
format [1]   96/8
founder [1]   12/14
fraction [1]   95/14

**F**

framework [2]   40/12
60/8
Francisco [1]   2/5
fraudulently [1]
47/22
friend [1]   66/14
front [2]   11/3 83/4
frozen [1]   13/22
fulfill [1]   53/7
fulfillment [2]   12/20
52/22
function [1]   14/17

**G**

Gaming [1]   89/12
Garcia [4]   4/16 11/2
11/3 11/6
general [3]   90/11
92/1 92/1
generals [1]   70/14
generic [5]   21/20
21/24 21/25 46/23
47/2
gets [3]   7/10 55/23
56/2
global [7]   6/6 7/15
10/21 21/9 24/3 27/18
49/8
glossary [1]   7/6
gloves [1]   50/12
gmail.com [1]   1/25
goods [13]
Google [4]   6/22 17/24
57/6 83/2
Google.com [1]   19/2
government [1]   83/11
grant [1]   8/2
granted [2]   13/25
51/5
granting [1]   67/12
great [1]   66/7
greater [2]   29/16
76/13
group [1]   77/6
guilty [3]   18/8 25/12
49/10

**H**

habitual [1]   95/15
hac [1]   2/8 2/9 2/9
hall [1]   66/13
handheld [3]   78/18

89/3 89/9
handled [1]   55/8
happenstance [1]
84/22
Harley [5]   25/8 25/9
25/22 26/2 34/5
Harley-Davidson [5]
25/8 25/9 25/22 26/2
34/5
harm [3]   49/15 85/8
85/10
harming [1]   50/5
hazardous [3]   31/7
31/9 31/16
he'd [2]   19/6 83/6
health [4]   26/15
29/21 30/7 31/9
hearing [1]   9/23
Hearts [2]   25/11 34/6
heavily [1]   48/3
heightened [1]   26/13
heightens [1]   6/12
helmet [1]   27/14
hereby [1]   96/4
Hewlett [4]   11/16
11/16 14/6 69/9
hid [1]   86/8
Hieu [1]   75/8
highlight [1]   48/4
highlighted [1]   48/7
highly [3]   7/1 7/2
79/21
highly-valuable [1]
7/1
Hillary [1]   3/13
history [6]   20/2
23/24 24/22 32/7
32/21 95/2
hits [1]   6/24
hold [2]   23/14 62/13
holders [3]   78/15
79/3 89/1
Homeland [3]   11/25
20/4 20/7
honor [97]
Honor's [5]   4/2 11/14
18/18 31/10 43/19
HONORABLE [1]   1/4
hot [2]   22/5 72/25
hot-selling [2]   22/5
72/25
hour [3]   42/25 71/22
94/9

house [1]   3/13
housekeeping [1]   4/1
hovering [2]   68/19
82/14
human [19]
human safety [1]
83/18
human-consumption [1]
84/13
humans [1]   83/22
hundreds [1]   70/15
hypocritical [1]
85/19

**I**

I'd [1]   95/1
I'll [5]   4/10 12/4
14/21 56/11 94/13
I'm [19]
I've [2]   7/11 18/23
icon [1]   43/18
icons [2]   12/10 44/12
Idaho [2]   79/1 79/9
identical [1]   42/12
ignore [2]   14/10
22/23
illegal [1]   23/8
image [2]   19/12 53/18
immediate [1]   56/25
immediately [2]   7/9
58/16
impermissible [1]
59/13
implemented [4]   54/7
54/12 76/10 82/20
implore [1]   50/4
imply [1]   75/10
importance [2]   27/17
41/23
inability [2]   69/18
94/20
inaccurate [3]   70/4
70/5 70/7
inadequate [1]   70/19
inadvertently [1]
75/22
INC [11]
inclusive [1]   1/19
incoming [1]   57/12
incomplete [6]   16/1
33/1 38/5 85/13 85/14
86/13
inconsistent [3]   35/8

**I**

**inconsistent... [2]**
85/13 86/19
**incorrect [1]** 76/4
**increase [2]** 29/24
67/14
**incredibly [3]** 20/25
21/11 22/1
**indeed [1]** 90/7
**independently [3]**
19/1 24/20 89/18
**indicator [2]** 94/21
95/15
**indifference [2]** 17/5
17/6
**indistinguishable [4]**
42/13 45/7 45/18
46/15
**individual [1]** 43/5
**individuals [1]** 55/9
**industrial [1]** 26/17
**industry [6]** 10/25
28/23 54/4 82/3 82/7
82/13
**infer [1]** 45/21
**inference [1]** 26/5
**inferences [2]** 88/1
88/2
**inferred [2]** 45/10
46/8
**inflate [2]** 58/25
80/13
**information [4]** 5/9
5/13 63/6 73/7
**informed [1]** 68/22
**infringe [5]** 55/14
55/24 56/4 78/1 88/10
**infringed [1]** 88/2
**infringement [28]**
**infringements [2]**
23/22 75/5
**infringer [3]** 17/18
24/3 90/20
**infringers [2]** 24/1
41/24
**infringing [24]**
**ingested [3]** 27/4
29/16 31/9
**ingredients [1]** 29/18
**inhalation [3]** 9/7
28/5 28/22
**inhaled [1]** 29/16
**initial [1]** 78/22

**initiate [1]** 11/12
**injection [1]** 28/4
**injunction [5]** 13/19
30/18 32/3 33/16 39/1
**innocent [1]** 61/12
**Innovation [2]** 42/25
71/19
**inserted [1]** 47/10
**inspect [1]** 54/13
**inspection [2]** 57/22
76/5
**instance [2]** 17/19
33/15
**instigator [1]** 15/13
**intellectual [6]** 20/8
21/22 29/20 54/2
54/19 55/14
**intend [1]** 50/11
**intended [9]** 6/11 8/5
26/10 26/12 28/12
28/18 30/11 30/25
49/25
**intentionally [1]**
80/6
**interior [2]** 43/12
44/8
**internal [3]** 22/2
36/2 80/10
**internally [2]** 35/8
85/13
**international [1]**
76/18
**internet [2]** 17/22
93/2
**interrupt [2]** 5/1 7/5
**interrupted [1]** 30/4
**introduction [1]** 4/8
**inventories [2]** 30/22
85/22
**inventory [19]**
**investigating [2]**
11/5 81/23
**investigation [15]**
**investigations [1]**
90/11
**investigator [10]**
**investigator's [1]**
69/18
**investigators [2]**
4/17 11/15
**IP [5]** 47/25 48/3
48/18 55/6 87/11
**IP protection [1]**

**Iploom [1]** 61/2
**iPlume [1]** 69/17
**issue [13]**
**issues [4]** 20/8 20/8
76/1 79/24
**items [4]** 10/3 23/13
72/18 89/17
**iteration [1]** 46/2
**Iwacu [1]** 12/16

**J**

**Jack [1]** 66/14
**James [1]** 11/20
**January [2]** 1/16 3/1
**Jersey [4]** 11/23
12/20 13/4 55/5
**Jewelry [2]** 12/17
34/6
**JIN [2]** 2/9 3/21
**JLI [7]** 10/22 11/4
11/10 11/15 32/2
35/11 36/6
**JLI's [2]** 15/13 34/20
**job [2]** 14/17 55/7
**joined [2]** 11/10 63/7
**Josh [1]** 12/16
**journalist [1]** 63/16
**JUDGE [2]** 1/4 66/14
**judgment [7]** 13/25
13/25 15/21 22/9
25/15 84/17 88/11
**judgments [15]**
**Judicial [1]** 96/9
**June [2]** 13/18 23/8
**jury [1]** 5/4
**justified [1]** 26/14
**JUUL [153]**
**JUUL lab [1]** 78/9
**JUUL's [3]** 4/16 32/8
70/21
**JUUL-branded [3]** 8/22
8/24 15/17
**JUULpods [12]**

**K**

**key [1]** 13/10
**kinds [2]** 31/16 84/11
**kit [8]** 9/18 10/2
10/3 10/4 34/22 35/10
68/16 68/19
**kits [11]**
**knowing [1]** 17/4
**knowingly [1]** 17/9

## K

**knows [2]**   17/14 38/25
**Konad [1]**   60/22
**Kwan [1]**   75/8

## L

**lab [1]**   78/9
**labeled [1]**   79/14
**labs [15]**
**lack [2]**   15/1 38/16
**land [1]**   60/9
**Lane [1]**   2/10
**language [1]**   22/4
**large [3]**   26/16 69/19
  82/6
**largest [1]**   87/6
**lastly [2]**   46/10 91/6
**launched [2]**   9/2
  52/15
**law [27]**
**laws [1]**   29/6
**lawsuit [4]**   20/19
  52/8 72/2 75/19
**lawsuits [6]**   15/7
  39/13 48/14 48/21
  48/24 70/12
**lays [1]**   60/16
**lead [3]**   18/16 30/9
  86/16
**leads [1]**   78/5
**leak [1]**   50/11
**learn [1]**   15/10
**learned [11]**
**learning [1]**   32/5
**led [1]**   72/13
**Lee [1]**   75/10
**legal [2]**   15/1 15/3
**legally [1]**   72/23
**legitimate [5]**   29/25
  30/4 52/13 53/21
  83/12
**length [1]**   47/23
**Leon [1]**   20/6
**lest [1]**   51/4
**letter [6]**   24/12
  80/12 81/17 81/22
  90/2 90/5
**letters [1]**   81/19
**Li [1]**   20/6
**Li'an [1]**   75/10
**liability [1]**   14/1
**liable [3]**   6/2 24/6
  24/15

**liberal [1]**   62/8
**license [2]**   55/16
  56/4 72/23
**lied [2]**   15/1 32/23
**light [1]**   93/11
**limine [1]**   43/20
**limit [2]**   82/25 89/18
**limited [5]**   15/14
  16/1 32/13 60/3 91/1
**link [1]**   53/6
**liquid [5]**   9/9 26/16
  27/2 28/4 29/2
**liquids [1]**   29/1
**list [2]**   33/4 87/17
**listings [18]**
**lists [1]**   52/23
**litigation [5]**   23/24
  32/9 39/15 48/12 49/3
**LLC [1]**   61/2
**LLM [1]**   61/22
**locations [3]**   13/2
  13/4 13/7
**logical [1]**   26/5
**logistics [1]**   55/7
**Los [3]**   1/14 1/24
  2/14
**losses [1]**   40/17
**Louis [1]**   24/13
**lower [1]**   77/13
**LSM [1]**   61/22
**Luban [1]**   60/15
**lucky [1]**   84/23
**lucrative [1]**   49/18
**lungs [1]**   27/4
**Luxottica [2]**   25/18
  48/16

## M

**made no [1]**   78/23
**magnetic [2]**   79/12
  79/15
**maintain [1]**   55/22
**maintains [1]**   54/16
**major [1]**   36/12
**majority [1]**   62/12
**maliciously [1]**   47/21
**managing [1]**   49/1
**manufacture [2]**   83/20
  84/3
**manufactured [2]**
  27/21 29/14
**manufacturer [1]**
  52/24

**manufacturers [3]**
  71/10 83/19 90/17
**manufactures [1]**   8/21
**manufacturing [1]**
  83/22
**March [1]**   25/19
**market [1]**   83/12
**marketing [2]**   60/23
  70/18
**marketplace [4]**   52/11
  53/23 54/4 58/9
**marketplaces [3]**   54/5
  54/6 56/21
**MASSAND [3]**   2/7 2/9
  3/21
**match [8]**   33/1 34/4
  35/6 35/7 35/12 35/17
  36/2 36/6
**materials [1]**   29/15
**mathematical [1]**
  16/21
**matter [7]**   18/6 28/6
  76/9 78/22 86/21
  93/25 96/7
**matters [1]**   4/1
**Matthew [2]**   11/15
  69/8
**max [1]**   49/24
**maximum [22]**
**Mayonnaise [1]**   28/17
**measures [1]**   29/8
**merchandise [2]**   24/11
  24/14
**mere [1]**   67/19
**meritless [1]**   70/23
**merits [1]**   47/17
**message [1]**   85/2
**method [1]**   52/22
**methods [2]**   14/16
  17/2
**middle [1]**   12/16
**Midwest [1]**   89/12
**MILLER [1]**   2/3
**million [17]**
**millions [1]**   70/15
**minimal [3]**   18/17
  30/10 86/17
**minimum [6]**   41/6 41/7
  59/10 60/6 60/7 76/13
**minors [1]**   70/18
**minuscule [2]**   76/14
  95/13
**misguided [1]**   75/15

**M**

miss [1]   92/21
missing [5]   16/6 16/7
 35/13 35/19 46/17
mistakes [1]   72/15
misunderstandings [1]
 75/16
mitigate [3]   80/3
 80/5 81/2
mitigation [1]   89/25
mobile [8]   46/10
 46/13 47/5 78/12
 78/20 78/23 79/19
 88/18
moment [2]   77/23
 92/24
MONDAY [1]   3/1
monitor [1]   50/15
months [6]   16/3 20/16
 32/19 37/8 38/19
 39/25
months' [1]   13/24
MOORE [2]   2/8 3/18
mostly [2]   15/16
 87/11
motion [4]   33/16
 43/20 47/19 76/21
motions [1]   76/22
motivation [3]   17/6
 87/2 87/4
motorcyclists [1]
 27/15
moused [1]   69/10
Mr [52]
Mr. [1]   12/24
Mr. Chou's testimony
 [1]   12/24
Mrs [2]   75/6 75/10
Ms [3]   11/2 11/3 11/6
much-needed [2]   52/13
 53/22
multiple [7]   14/13
 22/25 23/2 34/14
 34/15 41/2 77/11
multiplier [2]   62/14
 65/21
multiply [2]   40/23
 67/11
multiplying [1]   77/12

**N**

namely [2]   78/18 89/4
nature [1]   18/12

**NEAL [2]   2/8 3/20**
nearly [1]   21/6
necessary [5]   16/21
 23/21 26/24 51/23
 70/22
Network [1]   22/18
New York [1]   60/16
newly [1]   51/1
newly-accused [1]
 51/1
news [1]   63/16
NI [1]   2/7
nicotine [6]   8/22 9/7
 9/9 27/2 28/22 29/23
nicotine-delivery [1]
 8/22
nilawfirm.com [3]
 2/11 2/11 2/12
nine [1]   11/4
Ninth [5]   66/3 66/8
 66/10 66/18 67/2
nmassand [1]   2/11
nobody [1]   25/6
noise [1]   55/4
nominal [1]   62/17
non [1]   76/25
non-unique [1]   76/25
nonconsumers [1]
 41/16
none [1]   36/14
North [13]
Northern [3]   61/3
 62/3 77/9
notable [1]   43/17
notably [3]   35/4 39/8
 41/25
notice [7]   20/18 52/8
 56/19 57/3 58/13 72/2
 75/21
notify [4]   5/12 58/20
 58/23 80/7
notwithstanding [1]
 44/24
November [1]   25/19
Nowhere [1]   47/1
number [20]
number-one [4]   6/13
 6/15 21/2 92/14
numbers [13]
numerous [9]   6/24
 7/25 19/25 19/25
 69/24 70/13 76/10
 76/10 80/16

**O**

Oakley [5]   10/24 11/8
 25/22 26/3 48/16
oath [3]   32/4 32/11
 33/17
objections [2]   5/1
 5/3
obligations [1]   39/15
observable [1]   43/24
obtain [1]   45/17
obtained [1]   44/19
obvious [1]   42/21
occasion [1]   68/14
occasional [1]   58/10
occasions [5]   5/10
 6/3 10/7 69/24 80/16
occupation [1]   17/19
October [9]   16/3 20/4
 20/9 37/7 38/7 45/1
 46/7 58/19 80/9
offer [1]   6/5
offering [2]   11/7
 19/7
offers [3]   53/4 53/13
 95/10
Official [1]   1/22
offset [1]   80/2
Oh [3]   21/13 63/12
 84/15
OMG [1]   60/22
online [10]
oOo [2]   3/2 95/21
open [2]   50/12 65/11
opening [2]   3/24 94/9
operate [2]   12/12
 34/14
operates [1]   34/9
operation [10]
operations [3]   32/8
 32/22 54/15
opinion [2]   92/6 92/8
opportunity [1]   58/21
Opposing [2]   91/7
 91/25
oral [1]   4/5
order [11]
orders [6]   6/8 6/9
 11/18 31/24 53/7
 58/24
organization [1]   6/7
original [1]   88/10
ours [1]   93/12
outset [2]   15/20 32/3

**Q**

overall [4]   12/18
12/18 28/7 28/11
overheating [1]   31/11
overlooks [1]   52/9
overriding [1]   5/23
overseas [1]   90/5
overwhelming [7]   7/22
16/19 17/1 22/13
22/23 49/22 62/12
overwhelmingly [1]
17/12
OVNS [1]   79/14
owner [2]   12/14 21/21
owners [2]   56/22
58/11

**P**

p.m [2]   1/16 95/20
package [2]   43/22
45/2
packaging [10]
page [9]   36/23 37/15
39/8 39/16 41/4 45/12
46/3 89/15 96/8
pages [6]   1/18 1/19
39/21 76/20 86/6
89/13
Paige [1]   3/13
palpable [1]   30/19
pandemic [1]   30/2
papers [1]   22/19
Paragraphs [1]   82/1
part [9]   19/18 21/18
35/5 39/18 56/22
57/17 58/22 67/13
91/2
PARTIAL [1]   1/13
participate [1]   62/6
parties [3]   4/4 4/25
8/18
partner [1]   3/20
party [5]   52/10 53/15
63/10 71/10 80/15
party's [1]   89/24
PATRICK [2]   2/4 3/6
Patrol [1]   83/21
pattern [3]   24/7 25/5
25/13
payroll [1]   75/7
PDx [1]   1/8
penalty [2]   6/23
17/22

pending [2]   15/8
48/15
people [10]
per type [1]   60/2
perfect [1]   58/7
performance [2]   22/20
28/24
perjury [6]   6/23 8/8
17/23 31/19 33/15
50/2
permeates [1]   5/24
person [11]
person's [1]   22/14
personal [1]   55/19
personnel [3]   36/24
54/18 55/5
persons [1]   23/6
petal [1]   31/18
petals [3]   8/10 18/20
49/20
phone [10]
photos [1]   45/13
pick [1]   57/8
pickup [1]   11/22
picture [1]   47/9
pictures [1]   39/21
pieces [3]   40/5 68/17
68/20
place [4]   13/23 53/1
55/2 55/10
plagued [1]   70/12
plaintiff [47]
plaintiff's [29]
Plaintiffs [2]   67/13
86/12
plan [4]   5/2 58/23
59/2 93/8
planning [1]   93/15
plastic [1]   26/17
platform [12]
plausible [2]   60/20
60/25
plays [1]   92/8
plenty [3]   14/10
14/21 94/1
PLLC [1]   2/7
Ploom [1]   61/2
Plume [1]   69/17
Plume v. iPlume [1]
69/17
plus [2]   35/19 50/7
PM [1]   3/1
pods [7]   9/19 10/8

28/21 44/3 44/6 44/12
50/11
point [11]
points [3]   80/1 81/17
87/10
policies [6]   54/7
54/25 55/11 57/13
76/10 95/2
popular [11]
portable [10]
portrayed [1]   46/21
pose [2]   29/16 29/23
position [1]   71/13
positive [1]   17/10
possessed [1]   16/2
possession [1]   15/23
possibility [1]   17/17
posted [1]   56/2
poster [1]   48/11
Potato [2]   79/1 79/9
potential [4]   24/1
29/21 61/14 72/21
potentially [1]   31/7
power [3]   78/16 79/4
89/2
PPE [1]   30/3
pre [1]   32/9
pre-litigation [1]
32/9
preferred [1]   4/22
preliminary [5]   13/19
30/18 32/3 33/16 39/1
present [1]   23/19
presentation [7]   3/24
4/10 4/20 5/5 5/9
7/12 12/5
presentations [1]
4/23
preserve [7]   34/18
35/3 39/2 39/6 39/11
46/5 75/23
preserved [1]   39/17
president [1]   10/21
PRESIDING [1]   1/4
press [1]   80/20
pressed [1]   80/15
prevent [2]   54/13
70/22
prices [1]   40/23
primarily [2]   57/11
57/18
principal [1]   12/15
principles [3]   18/15

**P**
**principles...** [2]
   30/9 86/16
**private** [2]   11/16
   11/21
**pro** [3]   2/8 2/9 2/9
**probability** [1]   17/11
**problem** [2]   54/3 54/8
**problems** [1]   15/1
**procedures** [5]   54/7
   54/25 55/11 57/18
   95/2
**proceed** [3]   3/25 5/6
   50/20
**proceedings** [7]   1/13
   63/21 65/11 73/11
   75/1 95/20 96/7
**process** [1]   58/7
**produce** [14]
**producing** [1]   86/3
**product** [48]
**product's** [1]   29/18
**product-inspection** [1]
   57/22
**products** [144]
**profitability** [1]
   16/22
**profits** [9]   40/17
   51/8 59/15 61/9 61/25
   62/4 62/20 67/16
   67/18
**program** [10]
**proper** [2]   50/24 77/5
**property** [6]   20/8
   21/22 29/20 54/3
   54/19 55/14
**proposed** [2]   92/19
   95/16
**proposition** [1]   28/18
**protect** [3]   12/7
   25/23 27/16
**protection** [12]
**protective** [2]   78/16
   89/1
**protects** [1]   49/1
**protocol** [3]   54/12
   57/22 57/25
**proud** [1]   33/17
**prove** [1]   84/21
**proves** [1]   18/10
**provision** [1]   4/21
**provisions** [1]   39/3
**pryan** [1]   2/6

**public** [8]   26/15 52/3
   59/21 70/4 70/24
   71/17 92/1 92/11
**puffery** [1]   69/14
**pull** [2]   88/4 88/20
**Punderson** [2]   10/21
   71/9
**Punderson's** [1]   90/10
**punish** [1]   26/22
**punishment** [1]   55/1
**purchased** [1]   91/15
**purchases** [1]   37/24
**purchasing** [4]   36/7
   36/7 37/1 37/23
**purely** [1]   46/21
**purported** [2]   48/9
   75/14
**purportedly** [1]   25/21
**purposes** [3]   43/4
   45/8 49/2
**pursuant** [1]   96/4

**Q**
**quality** [2]   28/24
   28/25
**quantities** [3]   40/22
   68/25 69/19
**quantity** [1]   35/25
**question** [5]   10/1
   17/12 28/20 89/25
   91/22
**questionable** [3]
   59/18 62/22 63/2
**questions** [1]   38/10
**quick** [1]   42/10
**quintessential** [1]
   86/20
**quote** [8]   23/9 23/10
   23/10 23/12 32/5
   32/21 33/17 75/9
**quoted** [1]   83/20

**R**
**raised** [3]   20/7 75/3
   91/7
**Ray** [1]   11/8
**Ray-Ban** [1]   11/8
**re** [2]   89/12 89/14
**reach** [2]   53/15 88/1
**readers** [2]   72/20
   72/22
**ready** [3]   5/20 5/21
   6/20
**reality** [2]   54/2 55/6

**reaped** [1]   61/9
**rebuttal** [6]   81/13
   90/3 90/25 94/5 94/6
   94/16
**recent** [1]   68/23
**recently** [3]   16/2
   37/7 45/1
**Recess** [1]   81/10
**reckless** [5]   8/6
   16/25 17/17 26/11
   26/15
**recognition** [1]   52/15
**recognize** [1]   63/13
**recognized** [2]   60/13
   90/2
**recognizes** [1]   90/4
**reconcile** [1]   19/17
**record** [3]   5/14 92/15
   94/19
**recording** [1]   10/25
**records** [24]
**REDACTED** [1]   1/10
**reduce** [1]   85/25
**reduced** [1]   30/1
**referenced** [2]   91/23
   91/25
**reflect** [2]   16/2 38/2
**refund** [4]   68/14 69/2
   70/2 80/19
**refusal** [1]   86/19
**refuse** [1]   82/3
**refused** [1]   75/4
**regions** [1]   34/14
**registered** [3]   42/16
   47/13 60/5
**registration** [4]
   88/14 88/22 89/17
   89/19
**registrations** [2]
   12/7 43/3
**regular** [2]   54/23
   82/5
**regularly** [2]   57/17
   65/19
**regulations** [1]   96/9
**reintroduce** [1]   8/18
**reject** [1]   69/21
**rejections** [1]   95/3
**relation** [1]   61/7
**relationship** [11]
**reliability** [1]   28/24
**reliable** [1]   30/23
**relied** [4]   60/11

**R**

**relied... [3]**   66/23
66/24 67/4
**relies [3]**   56/22 75/9
86/10
**religion [1]**   24/24
**reluctance [1]**   80/22
**rely [4]**   14/12 35/6
58/11 66/19
**relying [3]**   57/18
66/10 82/9
**remove [5]**   57/1 57/2
58/1 58/14 58/16
**removed [1]**   75/18
**repeated [2]**   6/1 24/7
**report [1]**   58/4
**reporter [4]**   1/22
7/10 7/11 96/16
**REPORTER'S [1]**   1/13
**reputation [1]**   41/15
**request [6]**   18/25
21/19 55/15 61/20
70/2 83/1
**requested [2]**   60/25
61/6
**research [3]**   19/3
19/12 19/21
**researched [1]**   22/6
**response [2]**   68/23
94/15
**responsibility [1]**
46/18
**rest [2]**   36/9 91/17
**restocked [1]**   41/1
**restraining [1]**   75/22
**restrictions [1]**
76/18
**results [4]**   16/9 19/8
19/14 21/24
**retail [1]**   40/23
**retailer [1]**   95/11
**revenue [8]**   51/9
59/16 61/10 62/21
63/1 68/5 68/6 68/7
**revenues [1]**   12/24
**review [4]**   56/2 57/1
57/1 58/14
**reward [4]**   55/1 86/2
86/2 86/3
**Ricaurte [3]**   11/20
11/21 12/1
**right-hand [1]**   12/10
**rights [2]**   21/22

**rights [2]**   29/20
**risk [4]**   49/16 50/6
86/15 90/4
**robust [1]**   6/17
**Rolex [1]**   61/21
**Room [1]**   1/24
**rough [1]**   59/15
**round [1]**   56/2
**row [2]**   11/3 88/16
**ruling [1]**   43/20
**RYAN [9]**   2/4 3/6
14/23 16/8 16/11
41/22 48/1 49/5 89/25
**Ryan's [1]**   31/6

**S**

**sad [2]**   54/2 56/8
**Sadly [1]**   58/9
**safety [17]**
**sale [10]**
**sales [26]**
**sales' [1]**   85/12
**sample [4]**   44/18
44/23 45/2 46/7
**samples [15]**
**San [1]**   2/5
**sanctions [1]**   76/22
**satisfactory [1]**   16/5
**satisfied [1]**   18/14
**Sauce [1]**   28/16
**saved [1]**   61/9
**school [2]**   70/13
70/14
**scope [1]**   89/18
**screen [1]**   3/23
**seal [2]**   63/20 73/8
**sealed [4]**   5/14 63/21
73/11 75/1
**search [16]**
**searched [1]**   55/23
**searches [3]**   19/19
82/22 87/18
**searching [1]**   57/17
**seat [1]**   27/15
**second [5]**   7/23 52/4
53/9 70/25 80/14
**secretly [1]**   23/13
**Section [2]**   59/23
96/4
**secured [1]**   32/9
**Security [3]**   11/25
20/4 20/7

**seek [1]**   77/18
**seeking [4]**   43/18
44/12 51/6 83/15
**seized [1]**   29/13
**selling [18]**
**senior [1]**   11/16
**sense [1]**   90/15
**September [1]**   25/18
**serial [3]**   6/9 24/3
52/4
**serious [3]**   29/21
52/12 54/3
**seriously [2]**   54/1
54/11
**serve [3]**   24/1 61/5
81/19
**served [1]**   24/12
**service [4]**   52/13
53/14 53/22 63/16
**services [4]**   52/17
52/21 53/5 95/11
**settlement [1]**   25/17
**settlements [1]**   70/15
**seven [2]**   47/12 59/11
**severe [1]**   76/17
**sham [3]**   6/18 25/24
49/3
**ship [5]**   23/9 23/13
23/13 52/18 75/5
**shipped [2]**   35/16
37/25
**shipping [4]**   52/19
53/8 53/12 75/3
**ships [1]**   53/3
**shoes [2]**   62/2 92/9
**short [3]**   81/6 94/11
94/13
**shown [11]**
**Shroeder [1]**   3/13
**side [5]**   4/21 12/10
94/5 94/6 94/9
**similarities [1]**
42/21
**simple [1]**   52/9
**single [2]**   72/6 75/9
**site [1]**   12/12
**situation [2]**   51/7
91/1
**sizable [1]**   13/1
**size [2]**   16/21 49/18
**skip [1]**   70/10
**skip 22 [1]**   70/10
**slide [20]**

**S**

**slides [2]** 39/5 48/10
**slip [1]** 58/10
**slipped [4]** 56/9 58/2
58/18 73/3
**smackdown [1]** 85/5
**small [5]** 12/22 52/14
52/17 91/14 95/12
**smokers [1]** 9/3
**smoore [1]** 2/11
**snippet [1]** 19/8
**snippets [1]** 19/13
**so-called [1]** 25/23
**sole [2]** 87/2 87/13
**solely [3]** 24/7 68/9
84/22
**sought [1]** 51/12
**source [3]** 49/14
52/18 87/16
**sourced [1]** 87/19
**sources [1]** 82/5
**sourcing [16]**
**Southern [1]** 60/15
**Soy [1]** 28/16
**spades [1]** 23/20
**specialist [1]** 11/4
**specially [1]** 89/8
**specific [3]** 31/20
32/1 53/15
**spectrum [1]** 60/9
**spell [1]** 7/9
**spelled [2]** 45/5
48/20
**spend [2]** 13/11 44/21
**spent [1]** 10/25
**spoke [1]** 20/6
**spoliate [1]** 75/17
**spoliation [1]** 86/2
**spooked [1]** 82/10
**spreadsheet [1]** 33/11
**ssteinberg [1]** 2/6
**stand [2]** 4/25 28/17
**standards [2]** 28/23
29/4
**starter [18]**
**state [1]** 3/5
**stated [1]** 68/18
**Statement [1]** 29/13
**statements [2]** 85/17
94/19
**states [24]**
**states' [1]** 70/13
**statistics [1]** 21/4

**statute [1]** 60/12
**statutory [2]**
**STEINBERG [9]** 2/3 3/9
4/9 8/8 8/12 22/8
31/4 81/14 87/7
**Steinberg's [1]** 4/9
**stenographically [1]**
96/6
**step [4]** 30/1 30/5
63/17 73/9
**STEPHEN [2]** 2/3 3/8
**stepped [1]** 30/3
**steps [3]** 55/12 57/1
76/10
**steroids [1]** 31/3
**STEVENSON [2]** 2/8
3/17
**stipulated [2]** 4/4
51/16
**stipulation [2]** 4/22
94/8
**stock [5]** 59/3 69/2
69/11 69/20 69/25
**stopped [3]** 25/6 54/9
83/11
**store [1]** 9/13
**stores [1]** 53/6
**stories [1]** 31/10
**strategy [1]** 19/18
**Street [2]** 1/23 1/23
**stressed [1]** 65/19
**stringent [1]** 29/4
**stylized [2]** 44/17
77/14
**submit [1]** 93/5
**submits [1]** 55/15
**submitted [3]** 32/4
32/16 77/4
**subsequent [1]** 32/12
**substandard [1]** 29/15
**substantial [3]** 17/15
23/21 41/6
**substantially [6]**
42/12 45/7 45/18
46/14 57/14 77/5
**substitute [1]** 61/5
**success [1]** 53/25
**successful [1]** 59/4
**sue [3]** 26/3 26/3
26/4
**sued [11]**
**sues [1]** 25/16
**sufficient [3]** 8/1

**suggest [1]** 93/14
**suggesting [2]** 30/18
57/7
**suit [2]** 56/18 72/7
**Suite [2]** 2/5 2/10
**suits [1]** 67/14
**summarize [2]** 38/15
47/11
**summary [7]** 13/10
13/24 13/25 15/21
22/9 43/8 88/11
**summer [1]** 15/21
**sun [1]** 84/6
**sunglasses [1]** 11/8
**supplement [1]** 93/17
**supplier [9]** 19/3
55/15 55/19 69/7
69/13 69/15 75/8
90/13 90/15
**suppliers [4]** 21/20
29/1 53/16 90/23
**supply [7]** 30/1 30/4
30/6 78/16 79/4 80/22
89/2
**support [8]** 16/19
32/17 33/25 42/17
51/10 62/17 71/13
92/15
**supported [2]** 51/25
82/23
**supports [2]** 22/19
61/16
**survey [5]** 66/4 91/22
91/24 92/1 92/1
**surveyed [1]** 67/2
**suspected [1]** 54/23
**Swarovski [1]** 25/14
**switch [1]** 50/14
**swore [6]** 6/23 17/22
18/1 19/10 32/4 33/16
**sworn [3]** 19/5 21/17
25/1
**system [4]** 35/15
36/10 53/9 55/1
**systems [1]** 8/23

**T**

**tagline [1]** 19/10
**target [4]** 19/22 22/6
26/7 49/13
**targeted [1]** 33/14
**targeting [1]** 21/9

**T**

Tech [1]   89/14
technician [1]   3/12
temporarily [1]   70/19
temporary [1]   75/21
tempting [2]   66/17
 66/20
tend [1]   77/12
tens [3]   30/22 38/20
 40/22
tentacles [1]   90/22
term [2]   7/8 21/25
test [3]   84/2 84/5
 84/5
tested [2]   83/25 84/1
testimony [9]   10/20
 12/23 12/24 32/10
 75/11 85/17 87/15
 87/20 87/21
thank [23]
their missing [1]
 16/6
thereafter [1]   20/9
they'd [2]   15/2 39/12
thinking [1]   82/10
third-party [3]   52/10
 53/15 71/10
Thor [1]   89/14
thought [1]   63/12
thousands [4]   30/20
 30/22 38/20 40/23
threat [5]   52/2 70/22
 70/24 71/1 83/17
threats [1]   29/22
throw [1]   50/1
Tiffany [12]
time [26]
timeframe [1]   93/24
timeline [1]   25/5
times [13]
timestamps [1]   20/22
tips [1]   81/18
Title [1]   96/5
tjin [1]   2/12
tobacco [1]   71/1
TONG [2]   2/9 3/21
top-selling [1]   41/12
total [11]
totally [1]   86/11
touch [1]   63/5
touchstones [1]   51/2
towards [1]   11/21
trademark [18]

trademarks [3]   19/4
24/16 31/4
transcript [5]   1/10
 1/13 93/17 96/6 96/8
transition [1]   9/4
translated [1]   20/14
translation [1]   20/13
travel [7]   33/7 36/18
 44/22 76/18 77/23
 79/11 79/14
treating [1]   10/2
treble [1]   41/7
trial [12]
TRO [1]   30/17
trouble [3]   15/3
 33/19 38/19
troubling [1]   27/6
trust [2]   90/13 90/21
Tshimanga [1]   77/9
Tuesday [1]   1/16
twice [2]   43/13 44/9
two-dimensional [3]
 12/10 43/17 44/11
TX [2]   2/10 88/20
TX-202 [1]   88/20
typically [2]   66/5
 94/23

**U**

U.S [15]
U.S.A [1]   61/21
U.S.C [1]   59/23
ultimate [1]   53/8
ultimately [3]   59/2
 59/4 90/17
unassailable [1]
 83/19
uncertainty [2]   14/5
 46/8
unclean [7]   80/4
 80/14 80/23 81/1 81/2
 90/24 91/1
unclean-hands [1]
 80/23
undercover [1]   11/25
understanding [3]
 57/10 57/16 82/7
undisputed [4]   41/12
 41/19 80/6 92/12
undisputedly [1]
 21/12
unequivocal [1]   32/22
unfamiliar [1]   39/14

unfortunately [5]
 46/19 87/23 91/10
 91/19 93/1
unfreeze [1]   85/1
uninformed [1]   75/9
unique [2]   76/25
 76/25
unit [3]   38/2 38/6
 38/13
UNITED [20]
units [26]
universal [3]   47/2
 47/8 79/17
unless [1]   66/9
unlike [1]   6/10
unmerited [1]   61/20
unmoored [1]   51/14
unregulated [2]   26/17
 29/14
unrelated [1]   71/9
unreliable [2]   38/5
 85/13
unsanitary [1]   26/17
unsupported [2]   71/8
 83/16
untoward [1]   81/22
unwarranted [1]   51/13
updated [6]   34/24
 35/25 36/23 57/13
 68/25 93/13
us [12]
USB [34]
USB chargers [1]
 78/22
USB charging [1]
 78/24
user [1]   53/3
users [1]   58/3
utterly [1]   83/16

**V**

v. [1]   69/17
valuable [2]   7/1
 41/18
value [12]
vapor [2]   9/7 28/22
varieties [1]   12/9
vendor [3]   53/1 53/14
 73/1
vendors [3]   53/6
 53/10 53/17
Ventures [2]   42/25
 71/19

## V

**verified [1]**   32/6
**Versace [1]**   24/10
**version [1]**   93/6
**versus [3]**   3/4 22/18
 66/10
**Viacom [1]**   24/17
**vice [4]**   2/8 2/9 2/9
 10/21
**violated [2]**   6/8
 30/17
**violating [1]**   72/22
**violation [1]**   31/24
**virtue [1]**   17/19
**visit [1]**   20/17
**visited [1]**   20/4
**vital [1]**   53/25
**Volkswagen [1]**   71/15
**vs [1]**   1/8
**Vuitton [1]**   24/13

## W

**waiving [1]**   5/3
**walking [1]**   66/13
**Walnut [1]**   2/10
**Walter [1]**   66/14
**WANG [1]**   2/7
**warehouse [21]**
**warehouses [6]**   6/7
 13/3 13/5 13/6 13/7
 82/16
**warn [1]**   81/23
**warrant [1]**   47/18
**warranted [2]**   26/22
 71/14
**wary [1]**   82/1
**Watch [2]**   61/21 61/22
**wear [1]**   50/12
**web [9]**   36/23 37/15
 39/8 39/16 39/21 41/4
 45/12 46/3 86/6
**website [23]**
**websites [1]**   53/11
**weigh [1]**   40/5
**weight [1]**   84/19
**Welcome [2]**   3/15 3/22
**well-known [5]**   7/1
 18/2 22/1 82/4 83/8
**West [1]**   1/23
**WESTERN [1]**   1/3
**Westlaw [2]**   89/13
 89/14
**whatsoever [1]**   37/17

**wheels [1]**   71/18
**who's [4]**   8/19 11/2
 11/20 43/25 48/25
 63/7
**wide [1]**   90/16
**wide-ranging [1]**
 90/16
**widely [2]**   21/15
 21/15
**WIL [2]**   1/22 96/15
**wil.wilcox [1]**   1/25
**WILCOX [4]**   1/22 63/20
 93/17 96/15
**wilfulness [1]**   18/20
**willful [29]**
**willfully [5]**   6/2
 18/11 47/22 72/12
 88/2
**willfulness [16]**
**willing [1]**   35/19
**windfall [5]**   51/5
 59/13 67/12 77/11
 83/15
**window [1]**   39/22
**witnesses [3]**   13/10
 13/14 76/17
**worker [2]**   55/7 75/10
**workers [1]**   29/10
**world [6]**   6/8 7/3
 13/3 15/10 34/14
 34/15
**world's [1]**   9/3
**worldwide [1]**   13/8
**worse [1]**   84/17
**worst [1]**   75/16
**would-be [1]**   41/24
**wrap [1]**   4/10
**wrongful [2]**   16/23
 25/2
**wrongfully [1]**   55/2
**Wu [2]**   12/16 34/6

## X

**Xiangcheng [1]**   48/20
**Xiangcheng Zheng [1]**
 48/20

## Y

**Yang [4]**   75/6 75/10
 80/15 85/18
**York [1]**   60/16
**you'd [2]**   4/12 9/24
**young [1]**   52/10

## Z

**ZANKEL [1]**   2/3
**Zheng [1]**   48/20
**zoom [1]**   88/23