JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JUUL LABS, INC., a Delaware Corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>ANDY CHOU (aka LIZHI ZHOU), an individual; YIWU CUTE JEWELRY CO., LTD., a Chinese limited company; YIWU XITE JEWELRY CO., LTD., a Chinese limited company; CJ FULFILLMENT CORP., a California Corporation; CJ TRADE CORP., an Arizona Corporation; and YIWU PROMOTIONAL TRADE CO., LTD. (aka YIWU PROMOTION TRADE CO., LTD.), a Chinese limited company,<br><br>        Defendants. | Case No. 2:21-cv-03056-DSF-PDx<br><br>**<u>JUDGMENT</u>** |

The Court having found in favor of Plaintiff JUUL Labs, Inc. ("Plaintiff" or "JLI") and against Defendants Andy Chou (aka Lizhi Zhou), Yiwu Cu Jia Trade Co., Ltd. (aka Yiwu Cujia Trade Co., Ltd.), Yiwu Cute Jewelry Co., CJ Fulfillment Corp., and CJ Trade Corp. ("Defendants") after a trial before the Court, IT IS ORDERED AND ADJUDGED that:

1.    Defendants shall pay Plaintiff the amount of Two Million Dollars ($2,000,000.00), plus reasonable attorneys' fees and costs in the amount of Eight Hundred Thousand Dollars ($800,000.00), for a total Judgment in favor of Plaintiff of Two Million Eight Hundred Thousand Dollars ($2,800,000.00).

2.     For satisfaction of the Judgment, within seventy-two (72) hours of the Parties' lodging the [Proposed] Judgment with the Court and Defendants' counsel receiving Plaintiff's wiring instructions, Defendants' former counsel, Mei & Mark LLP, is hereby ordered to electronically transfer to Plaintiff's counsel the Two Million Eight Hundred Thousand Dollars ($2,800,000.00) of Defendants' funds, which Mei & Mark LLP agreed to hold in trust pending a final ruling in this case pursuant to the Court's prior Orders (ECF Nos. 102, 107, 31, 65).

3.     To ensure full satisfaction of the Judgment, to the extent Defendants' former counsel does not timely transfer the $2,800,000.00 held in trust to Plaintiff's counsel, Plaintiff's counsel is authorized to inform any financial institution or payment service, common carrier, or any other non-party maintaining financial accounts owned or controlled directly or indirectly by any above-listed Defendant, that such institutions shall freeze such accounts until such date as this Judgment is fully satisfied or the freeze is otherwise released by Plaintiff or this Court.

4.     If the amounts identified herein are not timely paid, JLI is entitled to obtain writs of execution and/or attachment in order to fully satisfy this Judgment, up to the full amount of Two Million Eight Hundred Thousand Dollars ($2,800,000.00).

5.     As detailed in this Court's Findings of Facts and Conclusions of Law, attached hereto as Exhibit 1, Defendants are permanently enjoined from their infringing activities.

**IT IS SO ORDERED:**

DATED:  June 15, 2023

Honorable Dale S. Fischer
UNITES STATES DISTRICT JUDGE

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUUL LABS, INC., a Delaware Corporation,<br>　　　Plaintiffs,<br><br>　　　　　　　　v.<br><br>ANDY CHOU (aka LIZHI ZHOU), an individual; YIWU CUTE JEWELRY CO., LTD., a Chinese limited company; YIWU XITE JEWELRY CO., LTD., a Chinese limited company; CJ FULFILLMENT CORP., a California Corporation; CJ TRADE CORP., an Arizona Corporation; and YIWU PROMOTIONAL TRADE CO., LTD. (aka YIWU PROMOTION TRADE CO., LTD.), a Chinese limited company,<br>　　　Defendants. | CV 21-3056 DSF (PDx)<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL |

Plaintiff JUUL Labs, Inc. initiated this action against Defendants Andy Chou (aka Lizhi Zhou); CJ Fulfillment Corp.; CJ Trade Corp; Yiwu Cute Jewelry Co., Ltd.; Yiwu Promotional Trade Co., Ltd. (aka Yiwu Promotion Trade Co., Ltd.); and Yiwu Xite Jewelry Co., Ltd. for trademark infringement and counterfeiting and false designation of origin and false advertising.

This matter was tried to the Court on January 30, 2023. Having heard and reviewed the evidence, observed the credibility of the witnesses, and considered the parties' post-trial submissions, the Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT[1,2]

### A.    Parties

1.  Plaintiff JUUL Labs, Inc. designs, manufactures, and distributes JUUL-branded electronic nicotine delivery systems and related products.  These products include: JUUL Devices, which are rechargeable inhalation apparatuses; JUUL pods, which are individual disposable cartridges with a heating chamber pre-filled with proprietary nicotine in e-liquid formulations; JUUL USB Charging Docks, which are individual charging docks designed specifically for the JUUL Device; JUUL Portable Charging Cases, which are portable cases containing a battery that is operable to recharge a JUUL device without being connected to a power source; and JUUL USB cables that charge the battery portion of the portable charging case.  Dkt. 278 (Punderson Decl.) ¶¶ 23-28, 39.  JUUL's products were first introduced to the market in 2015.  Id. ¶ 24.

2.  Defendant Andy Chou is the founder, owner, CEO, and principal of CJ Fulfillment Corp.; CJ Trade Corp; Yiwu Cute Jewelry Co., Ltd.; Yiwu Promotional Trade Co., Ltd. (aka Yiwu Promotion Trade Co.,

---

[1] Any finding of fact deemed to be a conclusion of law is incorporated into the conclusions of law.  Any conclusion of law deemed to be a finding of fact is incorporated into the findings of fact.

[2] CJ submitted 71 pages of evidentiary objections - a total of 406 evidentiary objections.  See Dkt. 313 (CJ Objections #1); Dkt. 319 (CJ Objections #2). JUUL submitted 50 pages of evidentiary objections separated into 81 buckets.  Dkt. 316-6 (JUUL Objections).  The Court declines to rule on each objection.  To the extent either party objected to evidence the Court relies on in this Order, the objection is overruled.

Additionally, CJ requested judicial notice of an additional 22 documents. Dkt. 312.  The request is granted as unopposed.  JUUL also requested judicial notice of various documents, Dkt. 275, and CJ objected to judicial notice of twenty-four of those documents.  Dkt. 305.  To the extent the evidence is relied on in this order, the Court has found that judicial notice is appropriate.

2

Ltd.); and Yiwu Xite Jewelry Co., Ltd., own the brand CJDropshipping. (Defendants are collectively referred to as CJ.)  TX 115; Dkt. 307-18 (Chou Decl.) ¶ 2.  Chou founded CJ in 2014.  TX 116 ¶ 2.  CJ is an online marketplace that connects third-party vendors, suppliers, and wholesalers to customers.  Id.  CJ has over 800 employees, including some in the U.S., offers over 500,000 products for sale, and has more than 400,000 retailers worldwide.  Id. ¶¶ 3, 17.  CJ leases and operates warehouses in as many as five countries; it also cooperates with warehouses in three more countries.  Id. ¶ 13.  In 2020, CJ made approximately $160 million dollars in revenue, with half of the revenue coming from customers in the U.S.  Id. ¶ 15.  CJ Fulfillment Corporation is incorporated in California with its principal place of business in Chino, California. TX 116 ¶ 7.

## B.  Trademarks

3.  The United States Patent and Trademark Office issued and assigned the following trademarks to JUUL: U.S. Trademark Reg. No. 4,818,664 ("'664 Mark"), U.S. Trademark Reg. No. 4,898,257 ("'257 Mark"), U.S. Trademark Reg. No. 5,770,541 ("'541 Mark"), U.S. Trademark Reg. No. 5,776,153 ("'153 Mark"), U.S. Trademark Reg. No. 5,918,490 ("'490 Mark"), U.S. Trademark Reg. No. 6,064,902 ("'902 Mark"), and U.S. Trademark Reg. No. 6,211,614 ("'614 Mark").  TX 202.

4.  The '664 Mark is a word trademark for the word "JUUL."  TX 202 at 1.  It was first used in commerce on June 1, 2015 and was registered on September 22, 2015.  The '664 mark is registered for use in association with:

> [n]icotine-based liquid, namely, liquid nicotine used to refill electronic cigarettes; cartridges sold filled with liquid nicotine for electronic cigarettes . . . [e]lectronic cigarette refill liquids, namely, chemical flavorings in liquid form used to refill electronic cigarettes; cartridges sold filled with chemical flavorings in liquid form for electronic cigarettes . . . [e]lectronic cigarettes; electronic smoking vaporizers, namely, electronic cigarettes; tobacco

3

substitutes in liquid solution form other than for medical purposes for electronic cigarettes

Id.

5.  The '257 Mark is a design trademark that consists of the word "JUUL" is stylized lettering:



Id. at 2. It was first used in commerce on June 1, 2015 and was registered on February 9, 2016.  The '257 Mark is registered for use in association with:

> nicotine-based liquid, namely, liquid nicotine used to refill electronic cigarettes; cartridges sold filled with liquid nicotine for electronic cigarettes; electronic cigarette refill liquids, namely, chemical flavorings in liquid form used to refill electronic cigarettes; cartridges sold filled with chemical flavorings in liquid form for electronic cigarettes; electronic cigarettes; electronic smoking vaporizers, namely, electronic cigarettes; tobacco substitutes in liquid solution form other than for medical purposes for electronic cigarettes

Id.

6.  The '541 Mark is a design trademark that consists of the terms "JUUL LABS" in stylized font, with the letters "LA" stacked above the letters "BS" forming the term "LABS" and an overline above the letters "LA" and an underline below the letters "BS":



4

Id. at 3.  It was first used in commerce in March 2019 and was registered on June 4, 2019.  The '541 Mark is registered for use in association with:

> nicotine-based liquid, namely, liquid nicotine used to refill electronic cigarettes; cartridges sold filled with liquid nicotine for electronic cigarettes; electronic cigarette refill liquids, namely, chemical flavorings in liquid form used to refill electronic cigarettes; chemical flavorings in liquid for, and tobacco substitutes in liquid solution form other than for medical purposes; cartridges sold filled with chemical flavorings in liquid form for electronic cigarettes; electronic cigarettes; electronic smoking vaporizers, namely, electronic cigarettes; tobacco substitutes in liquid solution form other than for medical purposes for electronic cigarettes; refill cartridges sold empty for electronic cigarettes; electric vaporizers, namely, smokeless vaporizer pipes for the ingestion and inhalation of tobacco and other herbal matter; electric vaporizers for the vaporization of tobacco; processed tobacco pods; pipe tobacco, namely, tobacco for use in electric vaporizers; tobacco, whether manufactured or unmanufactured: smoking tobacco, pipe tobacco, hand rolling tobacco, snus tobacco; tobacco sold in pods

Id.

7.  The '153 Mark is a word trademark for the phrase "JUUL LABS."  It was first used in commerce in March 2019 and was registered on June 11, 2019.  Id. at 4.  The '153 Mark is registered for use in association with:

> nicotine-based liquid, namely, liquid nicotine used to refill electronic cigarettes; cartridges sold filled with liquid nicotine for electronic cigarettes; electronic cigarette refill liquids, namely, chemical flavorings in liquid form used to refill electronic cigarettes; chemical flavorings in liquid for,

5

and tobacco substitutes in liquid solution form other than for medical purposes; cartridges sold filled with chemical flavorings in liquid form for electronic cigarettes; electronic cigarettes; electronic smoking vaporizers, namely, electronic cigarettes; tobacco substitutes in liquid solution form other than for medical purposes for electronic cigarettes; refill cartridges sold empty for electronic cigarettes; electric vaporizers, namely, smokeless vaporizer pipes for the ingestion and inhalation of tobacco and other herbal matter; electric vaporizers for the vaporization of tobacco; processed tobacco pods; pipe tobacco, namely, tobacco for use in electric vaporizers; tobacco, whether manufactured or unmanufactured: smoking tobacco, pipe tobacco, hand rolling tobacco, snus tobacco; tobacco sold in pods

Id.

8.  The '490 Mark is a word trademark for the word "JUULPODS."  It was first used in commerce in June 2015 and was registered on November 26, 2019.  Id. at 5.  The '490 Mark is registered for use in association with:

Nicotine liquid used to refill electronic cigarettes and vaporizer cartridges; electronic cigarettes and oral smoker's vaporizer refill cartridges sold with liquid nicotine solutions: electronic cigarette and vaporizer refill liquids, namely, liquid form chemical flavorings used to refill electronic cigarettes and oral vaporizers for smokers; liquid form tobacco substitutes other than for medical purposes; refill cartridges filled with liquid form chemical flavorings for electronic cigarettes and oral vaporizers for smokers; electronic and electric cigarettes and oral vaporizers for smokers; electronic smoking vaporizers, namely, electronic cigarettes and oral vaporizers for smokers; liquid form tobacco substitutes other than for medical purposes for electronic cigarettes and oral vaporizers for smokers; refill

6

cartridges sold empty for electronic cigarettes and oral vaporizers for smokers: electronic oral vaporizers for smokers for the vaporization of tobacco; smoker's articles for electric and electronic cigarettes and vaporizers, namely, cases for electronic cigarettes and oral vaporizers for smokers and electronic cigarette accessories, namely, refill cartridges for electronic cigarettes sold empty, and boxes for electronic cigarettes and oral vaporizers for smokers and electronic cigarette accessories, namely, refill cartridges for electronic cigarettes sold empty; components for electric and electronic cigarettes and oral vaporizers for smokers, namely, atomisers, cartomisers, and clearomisers sold empty for tobacco substitutes

Id.

9. The '902 Mark is a design trademark that consists of the word "JUUL" in stylized font within a hexagon:



Id. at 6. It was first used in commerce in December 2018 and was registered on May 26, 2020. The '902 Mark is registered for use in association with:

Carrying cases, holders, and protective cases featuring power supply connectors, adaptors and battery charging devices adapted for use with handheld electronic devices, namely, electronic cigarettes

Id.

10. The '614 Mark is a design trademark that consists of the word "JUUL" in stylized font:

7

# JUUL

Id. at 7.  It was first used in commerce on July 1, 2019 and was registered on December 1, 2020.  The '614 Mark is registered for use in association with:

> Carrying cases, holders, and protective cases featuring power supply connectors, adaptors and battery charging devices adapted for use with handheld electronic devices, namely, electronic cigarettes

Id.

11.    JUUL has continuously used one or more of the marks in connection with all of its products in commerce and predominantly displays the JUUL marks in all of its advertising and promotional materials in the U.S.  Punderson Decl. ¶¶ 88-89.

12.    JUUL puts various quality control measures in place to comply with various regulations.  Id. ¶¶ 43-62.  The e-liquid in the pods is blended and filled in accordance with manufacturing standards.  Id. ¶ 54.  JUUL conducts testing on the ingredient of the e-liquids for harmful substances.  Id. ¶ 55.

13.    JUUL sold its products in China for a short period of time in 2019.  Punderson Decl. ¶ 107.

## C.    CJ's Use of the Marks and JUUL's Investigation

14.    CJ is not a registered distributer of JUUL Products.  Punderson Decl. ¶ 84.

15.    Brittany Garcia, a member of JUUL's brand protection team, discovered CJ was advertising and offering JUUL products for sale that she believed were counterfeit.  Dk. 276 (Garcia Decl.) ¶¶ 23-25.  For example, she noticed that CJ was offering JUUL Starter Kits for sale in October 2019, but JUUL had stopped offering JUUL Starter Kits for

8

sale in November 2018.  JUUL had also discontinued many of the flavors of JUULpods that were being included in the JUUL Starter Kits.  Id. ¶ 24.  JUUL began investigating the infringement in October 2019.  Punderson Decl. ¶¶ 166-71; Garcia Decl. ¶¶ 24-27.

16.    JUUL hired Vaudra International, a third-party investigative firm to investigate the counterfeits and purchase suspected counterfeit products.  Punderson Decl. ¶¶ 168-174; Garcia Decl. ¶¶ 25-26.  From October 2019 through August 2020, Hewlett from Vaudra investigated the suspected counterfeit products on CJ's website.  Dkt. 277 (Hewlett Decl.) ¶ 14.

17.    None of the listings on CJ's website for counterfeit JUUL products mentioned any other supplier or indicated that anyone else was responsible for selling the product.  Hewlett Decl. ¶¶ 127-28.

18.    On October 7, 2019, Hewlett ordered five JUUL Starter Kits and five JUUL USB Chargers.  Hewlett Decl. ¶ 24.  Hewlett received this order on November 7, 2019.  Hewlett ¶ 30.  Hewlett determined the items in the order were counterfeit.  For example, they did not contain a serial number on the back below the JUUL logo. He sent them to JUUL's evidence specialist, who confirmed the products were counterfeit.  Hewlett ¶¶ 24, 30, 36-42; TX 71; TX 285-86.

19.    On December 9, 2019, Hewlett placed a second order for seventeen JUUL Starter Kits, twenty JUUL USB Chargers, and other items.  Hewlett Decl. ¶¶ 51-55; TX 182 at 19, 24-26.  While the website listed the USB chargers as "JUUL USB Charger," the packaging lacked any JUUL marks.  Hewlett Decl. ¶ 55.  The JUUL Starter Kits were missing from the order and Hewlett eventually received a refund for them.  Id. ¶¶ 59-60, 68.

20.    In February 2020, Hewlett engaged with an individual identified as "Celia" through CJ's Skype account to attempt to coordinate a larger order of JUUL products.  Hewlett Decl. ¶¶ 65-67.  In the course of the conversations with Hewlett, Celia held herself out as an agent of CJ and operated as an employee of CJ, answering Hewlett's questions, and resolving issues with his CJ orders.  TX 30; TX 35.  On March 13, 2020,

Hewlett ordered 100 JUUL Starter Kits for shipment to CJ's New Jersey Warehouse.  Hewlett Decl. ¶¶ 69-74.  Shortly thereafter, Celia reached out to inform Hewlett that the factory was out of stock, but CJ found another source and she sent him a picture confirming the JUUL Starter Kits would be shipped.  Hewlett ¶¶ 75, 82; TX 30 at 18-19.  But on April 2, 2020, Celia informed Hewlett that the other source had fallen through; she coordinated with Hewlett to send thirteen Starter Kits from CJ's China Warehouse.  Hewlett Decl. ¶¶ 77-81, 84; TX 30 at 19-22; TX 182; TX 291.  Those Starter Kits arrived on April 23, 2020 and were once again missing certain characteristics that are present on genuine JUUL products.  Hewlett Decl. ¶¶ 84-93.

21.    In conversations about the order for 100 JUUL Starter Kits from May 23, 2020 and July 30, 2020, Celia made various comments to Hewlett about difficulties with shipping.  In May, Celia said "I am also not sure if it can ship from the China warehouse because the custom checking is very strict."  Hewlett Decl. ¶ 95; TX 35 at 18-21.  In June, Celia told Hewlett "now the situation is very serious so we cant ship it now," and could not commit to a date to ship the product, advising "it is hard to say now you know the USA situation is very terrible."  Hewlett Decl. ¶ 97; TX 35 at 22.  Later in June, Celia advised Hewlett that "we cant ship this product to our us warehouse now the product attribution is banned," but suggested "we can ship it secretly and ship it with several items but we can['t] be sure it wont be checked and hold. "  Hewlett Decl. ¶ 98; TX 30 at 41-48.  Celia further stated "during the special time Covid sorry we cant refund and it is not what we want to ship the goods but the custom check it very strictly" and "we are always finding the ways to ship them to our [U.S.] warehouse but it is not easy."  TX 30 at 41-48.

22.    On July 30, 2020, the CJ agent confirmed that the 100 JUUL Starter Kits were at CJ's New Jersey warehouse.  Hewlett Decl. ¶ 105; TX 30 at 56.  The shipment was picked up on August 20, 2020 by another investigator for JLI.  Hewlett Decl. ¶¶ 105-12; Garcia Decl. ¶¶ 71, 74.

10

23.    When Hewlett inquired about more orders for JUUL Starter Kits, Celia advised that "sorry we wont sell that because it is banned to ship and last time we take big risk to send out," and suggested he look for another product.  Hewlett Decl. ¶ 114; TX 30 at 69.

24.    In total, Hewlett placed orders for 135 JUUL Starter Kits, and received a total of 118 JUUL Starter Kits.  Hewlett Decl. ¶ 117; Chou Decl. ¶¶ 71-72.  The Starter Kits were $13.69 apiece.  Hewlett Decl. ¶ 19; Chou Decl. ¶ 71.  Hewlett purchased $1615.42 worth of counterfeit JUUL Starter Kits.  Hewlett ordered and received 25 chargers that were advertised as JUUL USB Chargers. Chou Decl. ¶ 73; TX 73.  The USB JUUL Chargers were $1.00 apiece.  Chou Decl. ¶ 73; TX 138.  Hewlett purchased $25 worth of counterfeit JUUL USB Chargers.

25.    At least one other individual, Nour Chaaban purchased twenty JUUL Starter Kits and seven JUUL USB Chargers.  TX 164.  At $13.69 apiece, this would be a total sale of $280.80.

26.    CJ's shipping records show that it shipped out at least 159 JUUL Starter Kits.  Chou Dep., Vol. I, 106:24-108:13.  Including the Hewlett and Chaaban purchases, a total of $2,176.71 of JUUL Starter Kits were purchased from CJ.

27.    CJ purchased and fulfilled orders for the JUUL Starter Kits as early as January 2019.  Chou Dep., Vol I, 90:12-25, 91:6-9, 92:15-19, 93:15-95:4; TX 122.

28.    Through the course of his investigation, Hewlett observed that CJ's website represented that it had 10,000 JUUL Starter Kits and over 1,800 JUUL USB Chargers.  Hewlett Decl. ¶¶ 16-22; TX 134-38.  The inventory numbers on the website, however, are a sum of CJ's supply and the estimated supplier inventory.  The numbers are not necessarily an accurate reflection of the amount of amount of actual inventory.   Chou Decl. ¶¶ 62-63.

29.    Four other counterfeit JUUL products -- JUUL Charging Boxes, JUUL Portable Chargers, JUUL Charging Cables, and JUUL Mobile

11

Phone Cases -- were listed on the website from September 2018 until April 23, 2021. TX 122, 123-127, 129, 133, 138; TX 144 at 7; Chou Dep., Vol. II, 134:5-12, 212:22-213:14, 234:2-19.

30.     CJ concedes use of JUUL's trademark on the Charging Boxes. Dkt. 307 (Answer. Br.) at 14. CJ's suppliers list these products as "cross-border hot sale COCO vapor e-cigarette kits big smoke portable small cigarettes JUULcharging cases." TX 123; Chou Decl. ¶ 82. CJ ordered at least nineteen units of the JUUL Charging Boxes in November, 2018. Chou Dep., Vol. I, 98:18-99:8. There is a record of seventeen sales of the JUUL Charging Boxes to Nour Chaaban and Khalid Almeri. TX 165; Chou Decl. ¶ 84. These were sold for $17 each. Chou Decl. ¶ 84. The total sale amount would be $289.

31.     The website also, at some point, listed for sale "JUUL Portable Charger," for $10. TX 138 at 3; TX 123; but see Chou Decl. ¶ 78 ("portable Charger was sold at around $14 per unit"). The product pictured on the one preserved webpage shows that the charger is brand OVNS. TX 138; Chou Decl. ¶ 80. CJ's supplier's listing describes the product as "New OVNS portable small cigarettes JUUL Charging cases travel chargers from manufacturer directly to customer, cross-border hot sale [Product's Snapshot]." TX 123 at 5-6. The photo on the listing displays an OVNS branding on the device:



Id.  CJ ordered fifteen JUUL Portable Chargers in December 2018 and then another 65 units in January 2019.  Chou Dep. Vol. I, 102:7-19. Sixty-two portable chargers were sold to Nour Chaaban.  TX 165; Chou Decl. ¶¶ 80-81.  Therefore, CJ made a total of $620 or $868 in sales of the product and CJ is unable to account for eighteen units of the portable chargers.

32.   The website also listed for sale at some point: a "Universal Magnetic JUUL Charging Cable." TX 138 at 2; Chou Decl. ¶ 85.  A JUUL trademark is not visible on the product in the available picture:



TX 138 at 2.  The website listed 10,000 available inventory at a price of $2.50.  Id.  At some point there was a sourcing success for this product, meaning CJ found a vendor.  Chou Decl. ¶ 56.  CJ's systems do not have any recorded sales of this product.  Chou Decl. ¶ 87.

33.   CJ's website also listed a "JUUL Mobile Phone Case."  TX 133 at 4.  CJ delisted the product after receiving notice of this lawsuit.  There are no screenshots of the original listing.  CJ did not find any records of sales or purchases of this product.  Chou Decl. ¶ 88.

13

## D.    Prior Lawsuits against CJ

34.    Chou was previously convicted of conspiracy for producing and selling counterfeit toys.  He received a four-year sentence in China. Chou Dep., Vol. I, 81:17-82:13.

35.    From January 2017 to the present, CJ has been sued on eight separate occasions for trademark infringement by the following parties: (1) Harley-Davidson (twice); (2) Chrome Hearts (twice); (3) Swarovski; (4) Converse; and (5) Luxottica/Oakley (twice).  Chou Dep., Vol. III, 281:8-282-22, 286:1-287:1, 287:7-288:17, 288:19-288:25, 292:15-293:12, 293:22-294:21, 296:13-22, 297:1-3, 297:12-24, 298:2-299:10, 300:2-13, 331:10-23; TX 149; TX 226-36.

36.    In the two Harley-Davidson lawsuits, the two Chrome Hearts lawsuits, and the Swarovski lawsuit, CJ was found liable for willful infringement.  TX 227 at 18, TX 229 at 14, TX 231 at 16, 233, TX 235 at 6.

## E.    CJ Internal Systems to Avoid Infringement

37.    In general, to avoid infringement, CJ uses the online search engine baidu.com to research whether a supplier is authorized to sell a particular product.  Chou Decl. ¶ 20; Dkt. 310 (Zeng Decl.) ¶ 9.  CJ also relies on the life experience of its workers to recognize brands.  Chou Decl. ¶ 20.

38.    CJ also keeps an internal database that it checks products against.  Chou Decl. at ¶ 20, 23, 24; Zeng Decl. ¶¶ 11-12; TX 160; TX 161.  There is evidence of CJ failing to adequately add brands to the database and failing to actually utilize the database.  For example, Harley-Davidson brought an infringement lawsuit against CJ in January 2017, but the Harley-Davidson brand was not added to CJ's internal database until July 2018.  Even after it was added to the database, in 2019, Harley-Davidson again sued CJ for infringement and CJ was found liable for willful infringement.  Chou Dep., Vol. III, 286:1-287:1; 306:1-10; 307:4-20; 308:7-17, 316:19-22, 320:10-18.

14

39.   CJ's User Agreement which post-dates this litigation encourages its users to report potentially infringing listings.  TX 97 (May 23, 2021 User Agreement) at 9-10; see also TX 140 (October 15, 2021 User Agreement) at 2.  CJ has responded to requests to remove infringing products.  TX 316.

40.   CJ has provided no evidence as to any infringement checks it did to avoid infringing JUUL specifically nor any checks it did for the specific products at issue in this case.

## F.   Homeland Security Visit

41.   On October 20, 2020, the U.S. Department of Homeland Security (DHS) visited CJ's warehouse in New Jersey and notified employees of issues with e-cigarettes.  Dkt. 274-6 (Ye Dep.) at 34:25-35:16, 35:23-37:10, 37:21-24, 46:8-47:9; Dkt. 274-7 (Li Dep.) at 184:6-9,184:17-185:6; 184:17-185:6; TX 167.  At least one of the employees specifically recalled being told by homeland security that there was "copyright issues" with e-cigarettes.  Li Dep. at 185:1-6.

42.   After DHS visited, Chou told his employees over a chat message: "counterfeit brands, especially the luxury brands; E-cigarettes; etc., products like these, certainly do not sell them."  Chou Decl. ¶ 93.  The JUUL Starter Kits were delisted from CJ on October 21, 2020, the day after the visit from DHS.  Id. ¶ 90.  CJ continued to offer the other JUUL products until April 23, 2021, when CJ was served with notice of this lawsuit.  Id. ¶¶ 90-93.

## G.   CJ Litigation Conduct

43.   In the course of this litigation, Chou falsely declared that the only sales of branded JUUL products CJ made were to JUUL's investigator. TX 116 ¶¶ 5, 8; see also TX 121 ¶ 9, Ex. 2 (May 5, 2021 Chou declaration stating all data had been provided for customers and suppliers in the preceding 24 months, providing only the purchases by Max Hewlett); but see TX 164; TX 165.

44.   In the course of this litigation, Chou falsely declared "CJ has never been in trouble with the law in any countries, China or US or

15

Europe until the instant case." TX 116 ¶ 32; but see Chou Dep., Vol. I, 81:17-82:13; Chou Dep., Vol. III, 281:8-282:22, 286:1-287:1, 287:7-288:17, 288:19-288:25, 292:15-293:12, 293:22-294:21, 296:13-22, 297:1-3, 297:12-24, 298:2-299:10, 300:2-13, 331:10-23; TX 149, TX 157-59; TX 226-36.

45.    On April 13, 2021, the Court issued an order for Defendants to produce any infringing goods in their custody or control. Dkt. 31 at 29-30. In response, CJ confirmed "that Defendants have no custody or control of any products bearing or infringing upon the JUUL Marks nor have any such products been held in the Defendants' inventory since the issuance of the Order." Dkt. 55-8 ¶ 6; see also Chou Decl. ¶ 70. However, CJ's records indicate they had units of products at their warehouses that were never sold. Chou Dep., Vol I, at 143:7-11; TX 121, TX 124, TX 128, TX 164-65. For example, the number of JUUL Starter Kits that CJ's internal documents reflect as incoming is 169, but their records account for only 159 outgoing sales of the JUUL Starter Kits. Chou Dep., Vol. I, at 104:1-105:13, 106:24-108:8. Records also show that CJ received or transferred between warehouses two JUUL Starter Kits on March 6, 2021, little more than a month before the Court's order. Chou Dep., Vol I, at 111:14-112:6; TX 124, TX 125. As a further example, CJ's records also reflect two units of the JUUL USB Chargers leaving the warehouse in June 2021, after the issuance of the Court's order. Chou Dep., Vol I, at 106:24-108:8. CJ blames these discrepancies on issues with warehouse workers. Chou Dep., Vol. I, at 113:17-116:11.

46.    CJ delisted JUUL branded products upon being served in this lawsuit but failed to preserve any documents or screenshots of the actual listings of the JUUL Mobile Phone Case. There is a single screenshot of the webpage for the JUUL Portable Charger, and the Magnetic JUUL USB Charging cables. Chou Decl. ¶¶ 80-86, 91-93, 124; TX 123; TX 126; TX 127; TX 138; Chou Dep., Vol. II, 168:1-169:14.

### H.      Summary Judgment Rulings and Resolved Issues

47.      The Court previously granted partial summary judgment on JUUL's claims for trademark infringement, false designation of origin, and unfair competition.  The Court found that the JUUL Starter Kits -- which contain JUUL Devices and JUUL Pods and USB Charging Dock -- and the JUUL USB Chargers that CJ sold bore counterfeit marks infringing the '902 Mark, '257 Mark, '541 Mark, '153 Mark, '490 Mark, and '614 Mark.  Dkt. 103 (MSJ Order) at 11-16; 21.

48.      CJ has "conceded use of Plaintiff's trademark on JUUL Charging boxes."  Answer. Br. at 14 n.2.

## II. CONCLUSIONS OF LAW

49.      The Court has subject matter jurisdiction.  18 U.S.C. §§ 1331, 1338; 15 U.S.C. § 1121(a), 15 U.S.C.  §§1051 et seq.

50.      The Court has jurisdiction over the parties.  CJ Fulfillment is a California Corporation with its principal place of business in California. Goodyear Dunlop Tires Operations, S.A., 564 U.S. 915, 924 (2011); see also Water Wheel Camp Rec. Area, Inc. v. Larance, 642 F.3d 802, 818 (9th Cir. 2011) ("for jurisdictional purposes . . . corporate form may be ignored in cases where the corporation is the alter ego of the defendant, or where there is an identity of interests between the corporation and the individual.") (quotation marks omitted).

### A.      LIABILITY

#### 1.      Spoliation

51.      A defendant has engaged in spoliation as a matter of law where it had "some notice that the documents were potentially relevant to the litigation before they were destroyed."  United States v. Kitsap Physicians.  Serv., 314 F.3d 995, 1001 (9th Cir. 2002) (quotation marks omitted).

52.      CJ delisted the JUUL Mobile Phone Case, JUUL Charging Cable, and JUUL Portable Charger on the day it received notice of this lawsuit.  Receiving the lawsuit gave CJ notice that the documents

17

about JUUL products were relevant to litigation.  CJ failed to preserve the listing for the JUUL Mobile Phone Case and only preserved a single shot of a webpage for the JUUL Charging Cable and JUUL Portable Charger.

53.     "A federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence."  Med. Lab'y Mgmt. Consultants v. Am. Broad. Cos., 306 F.3d 806, 824 (9th Cir. 2002) (quotation marks omitted).

54.     To the extent there is missing information because of this failure, the Court presumes the missing information was unfavorable to CJ.

### 2.     Trademark Infringement

55.     The summary judgment orders did not resolve trademark liability as to the JUUL Portable Chargers, JUUL Charging Cables, or JUUL mobile phone cases.  JUUL asserts that each of these three products infringes the '614 mark.

56.     The new products are not the type of goods for which the '614 mark is registered.

57.     A trademark owner can still seek remedies for counterfeit goods for which the mark is not registered.  The difference between the counterfeit products and the goods for which the mark is registered is weighed in the likelihood of confusion analysis.  Applied Info. Scis. Corp. v. eBay, Inc., 511 F.3d 966, 971-72 (9th Cir. 2007) ("Although the *validity* of a registered mark extends only to the listed goods or services, an owner's *remedies* against confusion with its valid mark are not so circumscribed. . . . [T]he owner does not additionally have to show that the defendant's allegedly confusing use involves the *same* goods or services listed in the registration.").

58.     To prevail on claims of trademark infringement, JUUL "must show that (1) it has a valid, protectable trademark, and (2) [CJ's] use of the mark is likely to cause confusion.  Applied Info. Scis. Corp. v. eBAY,

18

Inc., 511 F.3d 966, 969 (9th Cir. 2007) (citing Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp., 174 F.3d 1036, 1053 (9th Cir. 1999)).

59. JUUL bears the ultimate burden of showing that the trademark is valid and protectable. Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc., 419 F.3d 925, 927-28 (9th Cir. 2005).

60. Federal registration of a trademark provides prima facie evidence of the mark's validity and entitles the plaintiff to a strong presumption that the mark is protectable. Zobmondo Ent., LLC v. Falls Media, LLC, 602 F.3d 1108, 1113 (9th Cir. 2010); see 15 U.S.C. § 1115(a). If a plaintiff shows that a mark has been properly registered, the burden shifts to the defendant to show by a preponderance of the evidence that the mark is not protectable. Tie Tech, Inc. v. Kinedyne Corp., 296 F.3d 778, 783 (9th Cir. 2002).

61. The '614 is federally registered mark. CJ does not present any evidence that the mark is not protectable. The '614 mark is a valid and protectable trademark.

62. JUUL must next show that the Defendants "used" their trademarks "in connection with a sale of goods or services." See Bosley Med. Inst., Inc. v. Kremer, 403 F.3d 672, 677 (9th Cir. 2005); see 15 U.S.C. § 1114(a)(1) (prohibiting any use "in connection with the sale, offering for sale, distribution, or advertising of any goods or services").

63. CJ used the JUUL mark in advertising the products. Each of the available descriptions advertising the three products for sale contained the word "JUUL."

64. Finally, JUUL must show that the use created a likelihood of confusion. This is the case even for counterfeiting claims. Arcona, Inc. v. Farmacy Beauty, LLC, 976 F.3d 1074, 1079 (9th Cir. 2020) ("We thus hold that a counterfeit claim requires a showing of likelihood of confusion under Section 1114."). Even if "the marks are identical, there may be no presumption of consumer confusion if the products themselves are not identical." Id. at 1080.

65. Courts determine whether there is a likelihood of confusion by weighing eight non-exhaustive factors known as the Sleekcraft factors: (1) the strength of the mark, (2) the proximity of the goods, (3) the similarity of the marks, (4) evidence of actual confusion, (5) the marketing channels used, (6) the type of goods and the degree of care likely to be exercised by the purchaser, (7) defendant's intent in selecting the mark, and (8) the likelihood of expansion of the product lines. AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979). These eight factors "must be applied in a flexible fashion" and are "not a rote checklist." Rearden LLC v. Rearden Commerce, Inc., 683 F.3d 1190, 120 (9th Cir. 2012).

66. As to factor one, a mark's strength is evaluated based on two components: "the mark's recognition in the market (i.e., its commercial strength) and the mark's inherent distinctiveness (i.e., its conceptual strength)." Stone Creek, Inc. v. Omnia Italian Design, Inc., 875 F.3d 426, 432 (9th Cir. 2017), abrogated in part on other grounds by Romag Fasteners, Inc. v. Fossil, Inc., 140 S. Ct. 1492, 206 L. Ed. 2d 672 (2020). There is no evidence about the '614 Mark's recognition in the market. Further, in registering for the '614 Mark, JUUL is essentially claiming its own brand name in plain font.  The strength of the mark is solely the strength of the JUUL brand name.

67. As to factor two, JUUL has not provided any evidence that it sells portable chargers, phone cases, and magnetic charging cords.  The '614 mark is registered for use with "[Carrying cases, holders, and protective cases] featuring [power supply connectors, adaptors and battery charging devices] adapted for use with [handheld electronic devices, namely, electronic cigarettes]."  The description of products it is registered for use with does not include mobile phone cases or charging cords.  This factor weighs slightly against slightly likelihood of confusion.

68. As to factor three, the products do use the '614 Mark.  The similarity is high.

69.    With regard to factors four, five, six, seven, and eight, there is no evidence or argument that pushes the analysis in either direction.

70.    Based on the above and lack of preserved information, there is a likelihood of confusion with regard to the product that CJ offered that was labeled as the "JUUL Mobile Phone Case."  CJ's listing of the JUUL Mobile Phone case infringes the '614 Mark.

71.    There is no likelihood of confusion with regard to magnetic charging cables.  The single screenshot of the listing describes the product as "Universal Magnetic JUUL Charging Cable" and contains a single image of the product in which no JUUL mark is visible on the actual product.  The use of the word universal implies compatibility with JUUL and not that it is a JUUL product.  There is nothing else in the product description or on the picture of it that indicates it is a JUUL product.  The magnetic charging cables do not infringe the '614 Mark.

72.    There is no likelihood of confusion with the JUUL Portable Chargers.  In addition to the Sleekcraft factors, courts consider the fact that the "[u]se of differing names or distinctive logos in connection with similar marks can reduce the likelihood of confusion."  Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 846 n.13 (9th Cir. 1987); see also Walter v. Mattel, Inc., 210 F.3d 1108, 1111 (9th Cir. 2000) (stating that a trademark accompanied by another mark or logo can "negate[] any similarity").

73.    The supplier listing for the charging cables described it as "New OVNS portable small cigarettes JUUL Charging cases travel chargers from manufacturer directly to customer, cross-border hot sale [Product's Snapshot]."  The preserved webpage shows a picture of the Charger branded with OVNS.  Here the label and branding of another logo eliminates any likelihood of confusion.  The JUUL Portable Chargers do not infringe the '614 Mark.

21

### 3.      False Designation of Origin/Unfair Competition

74.      The "ultimate test" for the false designation of origin and unfair competition claims "is exactly the same as for trademark infringement: 'whether the public is likely to be deceived or confused by the similarity of the marks.'"  Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1178 (9th Cir. 1988) (quoting New W. Corp. v. NYM Co. of Cal., 595 F.2d 1194, 1201 (9th Cir. 1979)).  The result is the same as the trademark infringement analysis.

### B.      DAMAGES

75.      15 U.S.C. § 1117(c) allows a plaintiff to elect, at any time before final judgment is rendered, one of two alternative damage remedies for the use of counterfeit marks: (1) the actual damages caused by the infringement or (2) statutory damages.

76.      JUUL has elected statutory damages.

77.      The Lanham Act provides that an award of damages should be no less than $1,000 and no more than $200,000 in statutory damages "per type of goods or services sold, offered for sale, or distributed."  15 U.S.C. § 1117(c)(1) (2012).  Willful infringements increase the statutory-damages ceiling to $2,000,000. 15 U.S.C. § 1117(c)(2) (2012).

### 1.      Willfulness

78.      "Willfulness can be established by evidence of knowing conduct or by evidence that the defendant acted with an aura of indifference to plaintiff's rights — in other words, that the defendant willfully blinded himself to facts that would put him on notice that he was infringing another's trademarks, having cause to suspect it."  Philip Morris USA Inc. v. Liu, 489 F.Supp.2d 1119, 1123 (C.D. Cal. 2007) (citations omitted); see also Wash. Shoe Co. v. A-Z Sporting Goods Inc., 704 F.3d 668, 675 (9th Cir. 2012) ("We have explained that a finding of willfulness in the copyright context can be based on either intentional behavior, or merely reckless behavior, and that to prove willfulness under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's

22

actions were the result of reckless disregard for, or willful blindness to, the copyright holder's rights.") (simplified); Exec. Law Grp., Inc. v. Exec. Law Grp. PL, CV No. 13-1823 MMM (RNBx), 2014 WL 12577090, at *9 (C.D. Cal. Mar. 24, 2014) ("Courts have applied Washington Shoe to willful trademark infringement.").

79.    Prior infringement is relevant to assessing an infringer's intent. Plough, Inc. v. Kreis Lab'ys, 314 F.2d 635, 639 (9th Cir. 1963) ("[A]n infringer, once caught, should have his conduct carefully scrutinized in any future operations so as to determine his intent in going as far as he does. He must be required to keep a safe distance away from the margin line.").

80.    Past lawsuits filed against a defendant can serve as evidence of willfulness.  Burberry Ltd. v. Salim, No. CV 12-2389 GAF (CWx), 2013 WL 12146120, at *4 (C.D. Cal. July 12, 2013) ("Defendant appears to have exhibited a repeated pattern of trademark counterfeiting. . . . This past conduct is relevant to the instant suit. . . . [T]he Court concludes that Defendant's conduct was willful.") (cleaned up).

81.    CJ has been sued a number of times and courts have found CJ to be liable for willfully infringing others' trademarks on five separate occasions.  After these verdicts, CJ should have examined its own behavior and operations to prevent future infringement.

82.    CJ has not provided evidence of any specific anti-infringement efforts it took with regard to the products and marks *in this case.* There is no evidence of any anti-infringement efforts being performed as to the JUUL branded products before CJ began advertising them on its site.

83.    The systems CJ has implemented -- such as the internal database of brands and using the search engine Baidu to search for brands -- reflect half-hearted attempts to prevent infringement.  CJ's failure to add a brand after being found liable for infringement of that brand shows that the brand database is perfunctory or at very least poorly maintained.  And CJ never claims or presents any evidence that it actually looked for JUUL on the online search engine Baidu.

23

84.     In light of the prior verdicts, the failure to institute systems to adequately prevent the infringement here represents a reckless disregard for JUUL's trademarks.

85.     It is more likely than not that CJ had actual or constructive knowledge after the DHS visit.  CJ clearly knew there was an issue; it immediately de-listed the JUUL Starter Kits.  CJ's claim that it thought it was because of an e-cigarette ban is unpersuasive.  The CJ employees remember DHS mentioned intellectual property issues.  And Chou's command to de-list the JUUL Starter Kits comes with a command not to sell counterfeit products.  Even if CJ believed the visit concerned an e-cigarette ban, failing to research the brand at that point exhibited a reckless disregard for JUUL's trademark rights.

86.     The Court's finding that CJ was willful and had actual or constructive knowledge is not predicated on the statements made over Skype by Celia.  The statements, while indicative of perhaps some illicit behavior, do not refer to counterfeits or trademarks and are not sufficient evidence for the Court to find willfulness.  Surrounding statements suggest that some of her comments about customs and sneaking items in may be in reference to COVID related shipping issues and not trademark issues.

### 2.     Number of Products and Marks

87.     Statutory damages are "per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just."  15 U.S.C. § 1117(c).

88.     There were six products that carried infringing marks: JUUL Device, JUULpods, JUUL USB Charging Dock, JUUL USB Charger, JUUL Charging box, and JUUL Mobile Phone case.

89.     The marks asserted in this case are all substantially similar.  For example: the '664 Mark is a word mark for "JUUL"; the '257 Mark is a design mark for "JUUL" in stylized, but relatively plain font; and the '614 Mark is also a design mark for "JUUL" in a stylized front that is seemingly indistinguishable from the '257 mark.  It would amount to a

24

windfall to multiply damages by the number of marks on each of the counterfeit products. Chanel, Inc. v. Tshimanga, No. C-07-3592 EMC, 2008 U.S. Dist. LEXIS 118783, at *41 (N.D. Cal. July 15, 2008) ("[T]he Court has taken into consideration the fact that the CC monogram marks are largely identical or at least substantially similar and that the Chanel word marks are also largely identical. It would amount to a windfall to Chanel to treat the nine marks as entirely distinct and separate. . . . The Court has therefore treated the nine marks, for purposes of calculating statutory damages, as two marks."); 2-5 Gilson on Trademarks § 5.19 ("If there are multiple marks involved, rather than give plaintiff a windfall, courts tend to award an amount without multiplying it by the number of marks or to lower the award given per mark.").

90.     The Court awards damages for each of the six products that bore infringing marks or were marketed with infringing marks.

### 3.     Appropriate Amount of Statutory Damages

91.     District courts have wide discretion in granting statutory damages. See Nintendo of Am., Inc. v. Dragon Pac. Int'l, 40 F.3d 1007, 1010 (9th Cir. 1994) (stating that courts have wide discretion in awarding statutory damages under an analogous provision of the Copyright Act).

92.     Courts have considered the following factors when deciding how much to award in statutory damages: "(1) the expenses saved and the profits reaped by the defendant; (2) the revenues lost by the plaintiff; (3) the value of the [trademark]; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant." UL LLC v. Space Chariot, Inc., 250 F. Supp. 3d 596, 614 (C.D. Cal. 2017) (citations omitted).

93.     Here the expenses saved and the profits reaped by the defendant are low.  While the exact total sales remains unclear -- as there are a

25

few discrepancies in pricing and total number of sales -- at most the total sales amount (not total revenue) was several thousand dollars. The profit was de minimis.

94.    The revenue lost by JUUL is even lower.  Most of the sales were made to JUUL's own investigator.  These are purchases that would not have been made if JUUL were not investigating infringement. Additionally, as JUUL itself noted, some of the products CJ sold were discontinued JUUL products -- such as flavor pods JUUL no longer offered.  And, as discussed above, JUUL has not presented evidence that some of the products sold, such as the mobile phone case, were products JUUL also offered.  It is not clear how many of the few non-investigator sales actually took sales away from JUUL.

95.    Neither party has presented persuasive admissible evidence about the *market* value of the trademark.

96.    Factors four, five, six, and seven weigh in favor of a higher damages award.  The Court has already found that CJ's infringement was willful.  CJ has also exhibited unacceptable litigation conduct such as spoliation, failing to comply with discovery obligations, questionable production of sales data, and lying about prior legal troubles. Volkswagen Grp. of Am., Inc. v. Varona, No. 19-24838 CIV, 2021 WL 1997573, at *13 (S.D. Fla. May 18, 2021) (assessing statutory damages in a trademark infringement case where "Defendants refused to produce any records concerning their sales during the discovery process. . . . Defendants have been uncooperative and disingenuous with Plaintiffs and the Court throughout this case. . . . Defendants' uncooperative actions and documented lack of candor in this case will therefore factor into the Court's statutory damages calculation."); N. Face Apparel Corp. v. Niman, No. CV 05-3628 DSF (PLAx), 2007 WL 9700729, *7 (C.D. Cal. Jan. 29, 2007) ("TAC has introduced evidence that Chu Defendants sold thousands upon thousands of counterfeit products. This evidence likely understates the true extent of Chu Defendants' activities, given that their refusal to respond to requests for production forced TAC to rely only on documents obtained during execution of the seizure order and testimony from the TC Fashions

case.  For these reasons the Court agrees that this case warrants the maximum statutory damages for each violation.").  This warrants a substantially higher award.

97.    Counterfeit products that are regulated and designed for human consumption pose additional risks to the public and warrant a higher award of damages.  Proof of actual harm is not required.  Innovation Ventures, LLC v. Ultimate One Distrib. Corp., 176 F. Supp. 3d 137, 170 (E.D.N.Y. 2016) ("He bottled counterfeit liquid using large plastic drums in an unsanitary, unregulated industrial warehouse. Even though, to date, no adverse effects are known to have been reported from consumption of the counterfeit product, a maximum award is nonetheless warranted to punish and deter such dangerous activity."); Unilever Supply Chain, Inc. v. I & I Wholesale Food Inc., No. 10-1077 (RJD) (RERx), 2011 WL 1113491, at *3-4 (E.D.N.Y. Feb. 17, 2011) (finding a "large" statutory damage award warranted where defendants "use[d] the counterfeit labels to push expired mayonnaise onto an unsuspecting public," thereby "subjecting consumers who eventually [ate] this product to a completely unknown danger"); Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Eastimpex, No. 04-4146 MMC, 2007 WL 328696, at *13 (N.D. Cal. Feb. 2, 2007) (finding that "although there have been no reports of any ill effects resulting from the consumption of such [counterfeit] goods, a statutory award nonetheless should be of sufficient magnitude to deter future sales of counterfeit food products by others").

98.    E-Cigarettes is a regulated industry.  The JUULpods are for human consumption and the JUUL Devices directly aid in the consumption.  The Court finds it is appropriate to double the damages for these two products.

99.    The various charging accessories are not designed for human consumption.  There are no facts in the record that indicate counterfeiting these products poses a risk to human safety.  The Court declines to increase the damages for the various charging accessories on this basis.

100.   Given the low amount of actual damages and the significant need for deterrence, the Court finds a total of $2,000,000 in statutory damages to be appropriate: $250,000 each for the JUUL USB Charging Dock, JUUL USB Charger, JUUL Charging box, and JUUL Mobile Phone Case and $500,000 each for the JUUL Device and JUULpods.

## C.    AFFIRMATIVE DEFENSES

### 1.    Failure to Mitigate

101.   "A plaintiff has a duty to mitigate damages and cannot recover losses [he] could have avoided through reasonable efforts." Binder v. Disability Group, Inc., 772 F. Supp. 2d 1172, 1184 (C.D. Cal. 2011) (quotation marks omitted).  "Defendants bear the burden of establishing that Plaintiffs failed to mitigate." Id.

102.   JUUL started investigating the infringement in October 2019, but did not notify CJ of an issue until April 2021 when the lawsuit was filed.

103.   In other contexts, courts have found no duty to mitigate where the plaintiff seeks statutory damages rather than actual damages. Ahmed v. HSBC Bank USA, Nat'l Ass'n, No. EDCV 15-2057 FMO (SPx), 2017 WL 5720548, at *2 (C.D. Cal. Nov. 6, 2017) ("the weight of available authority indicates that there is no duty to mitigate statutory damages in these [TCPA] cases.") (quotation marks omitted) (collecting cases); Miholich v. Senior Life Ins. Co., No. 21-1123 WQH (AGS), 2022 WL 1505865, at *7 (S.D. Cal. May 12, 2022) (striking the affirmative defense of failure to mitigate where a plaintiff sought only statutory damages for a TCPA claim); Garcia v. Mickey Fine Enterprises, Inc., No. EDCV 21-1056 JGB (SHKx), 2022 WL 2168886, at *3 (C.D. Cal. Jan. 7, 2022) ("the only damages Mr. Garcia seeks are statutory damages under Section 52(a) of the California Civil Code. As such, mitigation is irrelevant."); Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P., 948 F.3d 261, 265 (5th Cir. 2020) ("We hold that failure to mitigate is not a complete defense to copyright or DMCA claims for statutory damages."); Malibu Media, LLC v. Doe, No. 13-cv-30, 2013 WL 4048513, at *2 (N.D. Ind. Aug. 13, 2013) ("Having

28

elected statutory damages, [the plaintiff] has given up the right to seek actual damages, thereby making a failure-to-mitigate defense inapplicable"); <u>Malibu Media, LLC v. Batz</u>, No. 12-01953 RBC, 2013 WL 2120412, at *2 (D. Colo. 2013) ("T]he Court agrees that a copyright plaintiff's exclusive pursuit of statutory damages invalidates a failure-to-mitigate defense"); <u>Malibu Media, LLC v. Doe</u>, No. 13-3648 MFK, 2014 WL 2581168, at *5 (N.D. Ill. June 9, 2014) (striking failure to mitigate defense where defendant conceded that it did not apply since the plaintiff elected only statutory damages).

104.  CJ's affirmative defense of failure to mitigate is not relevant to JUUL's claim for statutory damages.  This is particularly so in a case where the analysis of the appropriate amount of damages was more heavily dependent on the nature of Defendant's conduct rather than the amount of actual damages.

### 2.  Unclean Hands

105.  "To make out an unclean hands defense, a trademark defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims.  To show that a trademark plaintiff's conduct is inequitable, defendant must show that plaintiff used the trademark to deceive consumers." <u>Japan Telecom, Inc. v. Japan Telecom Am., Inc.</u>, 287 F.3d 866, 870 (9th Cir. 2002).

106.  CJ has presented no evidence showing JUUL used its trademark to deceive consumers.

107.  Unclean hands does not bar JUUL's lawsuit.

### D.  INJUNCTIVE RELIEF

108.  To obtain an injunction, a plaintiff must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006).

109.    JUUL has suffered an irreparable injury.  "Congress has recently made it easier for trademark plaintiffs to obtain an injunction, amending the Lanham Act to provide that such plaintiffs 'shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection.'"  Athena Cosmetics, Inc. v. AMN Distribution Inc., Case No. 20-cv-05526, 2022 WL 4596549, *12 (C.D. Cal. Aug. 16, 2022) (quoting 15 U.S.C. § 1116(a)).  JUUL has established a violation and is entitled to a rebuttable presumption of irreparable harm.

110.    There is no adequate remedy at law.  Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1180-1181 (9th Cir. 1988) ("Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement.").

111.    The balance of hardships weighs in favor of an injunction.  By granting injunctive relief, the Court is merely prohibiting CJ from infringing JUUL's trademarks.

112.    Public interest weighs in favor of a permanent injunction because the public will be confused and harmed by counterfeit products in the marketplace.

113.    JUUL is entitled to a permanent injunction.

**E.    Attorneys' Fees**

114.    "The court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).

115.    "A trademark case is exceptional where the district court finds that the defendant acted maliciously, fraudulently, deliberately, or willfully."  Love v. Associated Newspapers, Ltd., 611 F.3d 601, 615 (9th Cir. 2010) (quotation marks omitted).

116.    This is an exceptional case because CJ's conduct was willful. The Court will award JUUL its reasonable attorneys' fees and costs.

117.    The parties are ordered to meet and confer in good faith to

30

resolve the amount of fees and costs to be awarded.  Based on the amount of fees likely to be requested, if the parties are unable to reach agreement, the Court will appoint a special master pursuant to Rule 54(d)(2)(D) of the Federal Rules of Civil Procedure.  Therefore, in the absence of an agreement as to fees and costs, the parties should attempt to reach agreement as to a special master.  If the parties are unable to agree, each party may submit up to three names of proposed special masters with a brief biography for each, including their hourly rates.  No later than 30 days from the date of this order, the parties must submit 1) a stipulation for the amount of fees and costs to be awarded, 2) a stipulation for the appointment of a special master, or 3) names of proposed special masters from which the Court shall choose.

118.   Each party shall pay 50% of the cost of the special master unless the special master decides otherwise.  The special master shall submit a report and recommendation pursuant to Rule 72(b) unless the parties stipulate that the special master's decision shall be binding.

## III. CONCLUSION

For the reasons explained above, the Court finds Defendants Andy Chou (aka Lishi Zhou); CJ Fulfillment Corp.; CJ Trade Corp; Yiwu Cute Jewelry Co., Ltd.; Yiwu Promotional Trade Co., Ltd. (aka Yiwu Promotion Trade Co., Ltd.); and Yiwu Xite Jewelry Co., Ltd. liable to Plaintiff Juul Labs, Inc. for trademark infringement and counterfeiting and false designation of origin and false advertising in connection with the sale of six products.  Defendants' actions were willful.  The Court AWARDS $2,000,000 in damages to JUUL.  Defendants are permanently enjoined from:

a. Purchasing, selling, distributing, marketing, manufacturing, or otherwise using any of the JUUL Marks on any counterfeit or authentic product, or any marks confusingly similar thereto in connection with any JUUL products or other products.

31

b. Using any logo, trade name, or trademark confusingly similar to any of the JUUL Marks that may be calculated to falsely represent or that has the effect of falsely representing that the services or products of any or all of the Defendants or of others are sponsored by, authorized by, or in any way associated with JUUL;

c. Infringing any of the JUUL Marks;

d. Otherwise unfairly competing with JUUL in the manufacture, sale, offering for sale, distribution, advertisement, or any other use of JUUL products;

e. Falsely representing any or all of Defendants as being connected with JUUL or sponsored by or associated with JUUL or engaging in any act which is likely to cause the trade, retailers, and/or members of the purchasing public to believe that any or all of Defendants are associated with JUUL;

f. Using any reproduction, counterfeit, copy, or colorable imitation of any of the JUUL Marks in connection with the publicity, promotion, sale, or advertising of counterfeit JUUL products;

g. Affixing, applying, annexing, or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to falsely describe or represent such goods as being JUUL products and from offering such goods in commerce;

h. Diluting any of the JUUL Marks;

i. Removing from their premises, or discarding, destroying, transferring, or disposing in any manner any information, computer files, electronic files, business records (including but not limited to e-mail communications), or other documents relating to Defendants' assets and operations or relating in any way to the purchase, sale, manufacture, offer for sale, distribution, negotiation, importation, advertisement, promotion, or receipt of any products purporting to be JUUL; and,

j. Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (h) above.

Defendants must also disable, suspend, cancel, or otherwise cease all use of any and all URL listings from the cjdropshipping.com website or any other associated website that advertises or lists for sale and/or distribution any and all products that use the JUUL Marks or are otherwise advertised as JUUL products or "JUUL compatible" products.

Within 30 days of this order, Defendants must file with the Court and serve on JUUL a report in writing under oath setting forth in detail the manner and form in which the defendant has complied with the injunction. 15 U.S. Code § 1116(a).

Plaintiff must file a proposed judgment. Defendants may file objections within ten days of the filing.

IT IS SO ORDERED.

Date: June 8, 2023

Dale S. Fischer
United States District Judge

33